UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PharmacyChecker.com LLC, | Civil Action No. _____ |
| *Plaintiff*, | |
| vs. | **COMPLAINT** |
| National Association of Boards of Pharmacy, Alliance for Safe Online Pharmacies, Center for Safe Internet Pharmacies Ltd., LegitScript LLC, and Partnership for Safe Medicines, Inc., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff PharmacyChecker.com LLC alleges the following upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters:

## NATURE OF THE ACTION

PharmacyChecker.com brings this action under the Sherman Act, 15 U.S.C. § 1, for injunctive relief and damages arising from a conspiracy among the defendants—Alliance for Safe Online Pharmacies (ASOP), Center for Safe Internet Pharmacies (CSIP), LegitScript, National Association of Boards of Pharmacy (NABP), and Partnership for Safe Medicines (PSM)—and their constituent members to suppress competition in the markets for online pharmacy verification services and comparative drug pricing information. The defendants, who are a network of overlapping nonprofit organizations and private firms that are funded or backed by pharmaceutical manufacturers and large pharmacy interests, are using shadow regulation—private agreements with key internet gatekeepers—to manipulate and

suppress the information available to consumers seeking information about lower-cost, safe prescription medicine. PharmacyChecker.com has now effectively been excluded from the market as a result of the defendants' shadow regulation.

The cost of prescription medicine in the United States is higher than anywhere in the world, and the effect on the public health is disastrous: millions of Americans each year do not fill prescriptions due to cost, and many become sicker or die as a result. Others—about four million—instead seek their medications from pharmacies abroad. Although prescription drug importation is restricted under some circumstances, federal law declares a permissive policy on prescription drug importation for personal use and, consistent with that policy, the law is generally applied only to bulk commercial importations, not personal importation by consumers.

The defendants—and the interests behind them—benefit from higher U.S. drug prices, and they do not want competition from international pharmacies. So they reached private agreements with key gatekeepers of online commerce including search engines, social media networks, shipping companies, and payment intermediaries—to manipulate and suppress the information available to consumers seeking information about cheaper prescription medicine from safe international pharmacies. The purpose, and now the effect, is to choke off information about personal importation of affordable prescription medications from regulated, reputable pharmacies in Canada and elsewhere overseas. PharmacyChecker.com is unique among its competitors (which include LegitScript and NABP) in that it

provides this information, and defendants' shadow regulation scheme has now deprived it of its most essential competitive resource—its visibility to consumers seeking this information on the Internet.

## JURISDICTION AND VENUE

1.     This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the antitrust laws of the United States.

2.     Venue is proper in the Southern District of New York, 15 U.S.C. §§ 15, 22 because the defendants can be found in this district. Venue is also proper under 28 U.S.C.  § 1391 because a substantial part of the events or omissions giving rise to this dispute occurred in this district: defendants targeted their conspiracy at PharmacyChecker.com, which resides in this district.

3.     Assignment to the White Plains is appropriate under Local Rule 21 because the claim arose in whole or in major part in the County of Westchester, and PharmacyChecker.com resides in the County of Westchester.

4.     This Court has personal jurisdiction over each of the defendants because they each have minimum contacts with this district; they each conspired to harm and actually did harm PharmacyChecker.com, which resides in this district, as explained in detail throughout this complaint.

## PARTIES

5.     Plaintiff PharmacyChecker.com LLC is organized under the corporate laws of the State of New York and has its principal place of business in the State of New York. PharmacyChecker.com was founded in 2002 to promote and protect consumer health by evaluating the practices of online pharmacies based inside and outside the United States. It operates a rigorous accreditation program designed to inform consumers of legitimate pharmacies that observe safe pharmacy practices and are licensed in their home jurisdictions.

6.     Defendant National Association of Boards of Pharmacy (NABP) is organized under the corporate laws of the State of Kentucky and has its principal place of business in the State of Illinois. NABP is an association of boards of pharmacies, principally in the United States, which typically are quasi-private organizations that comprise and are controlled by private pharmacists and pharmacies, despite their nominal designations as state agencies. Through its Verified Internet Pharmacy Practice Sites (VIPPS) program, as well as its .pharmacy Verified Websites program and Internet Drug Outlet Identification Program, NABP is a direct competitor of PharmacyChecker.com in the market for online pharmacy accreditation and information. Currently NABP has arrangements with companies, including Google and Bing, to provide verification of online pharmacies for advertising eligibility, among other things.

7.     Defendant Alliance for Safe Online Pharmacies d/b/a ASOP Global (ASOP) is organized under the corporate laws of the District of Columbia and has its

principal place of business in the District of Columbia. ASOP's founding members include the American Pharmacists Association, pharmaceutical company Eli Lilly and Company, defendant LegitScript (a competitor of PharmacyChecker.com that provides online pharmacy accreditation), and the National Association of Chain Drug Stores. A newer ASOP member is GoodRx (a competitor of PharmacyChecker.com, and the leading provider of U.S.-only comparative drug price information). Defendant NABP regularly participates in ASOP meetings and initiatives. ASOP funds the ASOP Global Foundation. The chair of the board of directors of the ASOP Global Foundation, Marty Allain, is also the senior manager for the pharmacy Verified Websites Program at the NABP. The Secretary of the Board of Directors, Bruce Longbottom, is trademark counsel at Eli Lilly Company and is also on the executive board of NABP's pharmacy Verified Websites Program. An ASOP founder and its principal executive, Libby Baney, a former lobbyist for drug company Eli Lilly and ASOP in 2010, is currently a lobbyist for ASOP, and is a principal at Faegre Baker Daniels, a law and lobbying firm which shares an address with ASOP. According to the Center for Responsive Politics, ASOP was Faegre Baker Daniels' biggest client for 2017 and 2018. Libby Baney is also registered as a lobbyist for the NABP and GoodRx. In an email obtained through a Freedom of Information Act request, a representative of Eli Lilly said that ASOP represents the Pharmaceutical Researchers and Manufacturers of America (PhRMA): "ASOP is the manner in which Lilly (and PhRMA as an observer) is working with other key stakeholders to compile

data and collaborate to address the problem of online drug sellers/counterfeits, as we cannot do this as one company, or as PhRMA alone."

8.     Defendant Center for Safe Internet Pharmacies Ltd. (CSIP) is organized under the corporate laws of the State of Delaware and has its principal place of business in the District of Columbia. CSIP's members include internet commerce gatekeepers: companies such as Google, Microsoft, Facebook, Visa, Mastercard, and UPS. Defendants ASOP and LegitScript are responsible for organizing and helping to found CSIP, and LegitScript continues as an ex-officio member of CSIP and regularly participates in CSIP meetings and initiatives. Marjorie Clifton, the executive director of CSIP, formerly consulted for Pfizer. A main purpose of CSIP is to provide a platform through which the remaining defendants (on behalf of the industry interests behind them) can obtain consensus from these gatekeepers to create new barriers to Internet commerce that would otherwise mean open competition in the markets relating to prescription drugs (including the relevant markets alleged in this complaint).

9.     Defendant LegitScript LLC, is organized under the corporate laws of the State of Oregon and has its principal place of business in the State of Oregon. LegitScript, founded by John Horton, is a for-profit, privately managed verification and monitoring service for online pharmacies. It is the only private service recognized by NABP. LegitScript is a direct competitor of PharmacyChecker.com in the market for online pharmacy verification and currently has contracts with companies such as Google to provide verification for and monitoring of Google's ad platform.

10.     Defendant Partnership for Safe Medicines (PSM) is organized under the corporate laws of Delaware and has its principal place of business in San Francisco, California. PSM is a 501(c)(6) (business league) organization. From 2007 until 2015, the Executive Director of PSM was Scott LaGanga, who was concurrently a deputy vice president at PhRMA. PSM has been characterized by Kaiser Health News as: "A nonprofit organization that has orchestrated a wide-reaching campaign against foreign drug imports" and that "has deep ties to the Pharmaceutical Research and Manufacturers of America, or PhRMA, the powerhouse lobbying group that includes Eli Lilly, Pfizer and Bayer." PSM has repeatedly published and/or presented falsehoods and misinformation about personal drug importation and PharmacyChecker.com. PSM is a listed observer to ASOP and has funded research of at least one member of the ASOP Academic Advisory Panel.

11.     Defendants and their constituent members, employees, and agents participated personally in the unlawful conduct challenged in this complaint and, to the extent they did not personally participate in a particular act, they authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

12.     This is a conspiracy that—by design—is complex and operates on multiple levels, obscuring the underlying connections and its purposes while in some ways hiding in plain sight. The named defendants are the face of the conspiracy, and with one exception, LegitScript, these defendants are nonprofit associations that were formed to serve the interests of their constituent members, which are the firms

that compete in the underlying product markets related to the relevant markets alleged in this complaint. Two of these defendants are also direct competitors of PharmacyChecker.com.

13.    The defendants' constituent members are, in many cases, horizontal competitors who have consciously committed to this common scheme to further their own interests. As explained above, ASOP's constituent members primarily include pharmaceutical manufacturers who directly compete with one another and who would otherwise be the independent centers of decisionmaking in the market for the manufacture of prescription medication; NABP's constituent members are entities that are controlled by wholesale distributors, pharmacy stores and pharmacists who (respectively) directly compete with one another and would otherwise be the independent centers of decisionmaking in the market for the dispensing of prescription medication, and CSIP's constituent members are technology companies and other gatekeepers that control the flow of information and commerce on the Internet, some of which are direct competitors and some of which are not (Google and Microsoft, for example, would otherwise be independent centers of decisionmaking in the market for internet searches). A conspiracy among these entities necessarily includes sub-conspiracies among the constituent members, who are in many cases the independent centers of decisionmaking in the underlying markets.

14.    It would be impractical and prohibitively costly for a plaintiff like PharmacyChecker.com—a small firm dwarfed by many of the individual members of the defendants—to name all of these parties, and the relief sought can be obtained by

8

a judgment against the named defendants, who are, in any event, the organizations that are most directly responsible for PharmacyChecker.com's harm.

## SUBSTANTIVE ALLEGATIONS

### Background and Summary

15.   Prescription drug costs in the United States are out of control: Americans pay—by far—the highest drug prices in the world. And it has had a disastrous effect on public health, including death, resulting from unaffordable, necessary medications.

16.   In 2016, for example, data from the Commonwealth Fund showed that about 45 million Americans did not fill a prescription due to cost. A Harvard School of Public Health survey found that over half of those who did not take prescription medication due to cost reported becoming sicker.

17.   For decades, some Americans have trekked to Canada to avoid high drug prices at home. The rise of the Internet and increased demand for more affordable prescription drugs spurred the growth of the online international pharmacy industry, vastly increasing the number of U.S. patients seeking and obtaining lower-cost drugs from outside the United States.

18.   According to the United States Centers for Disease Control and Prevention, at least four million Americans annually purchase medications from pharmacies outside the United States. And the savings are significant: the cost of brand-name medicine is often 80% lower outside the United States.

19.   Through the Internet, online pharmacies have challenged entrenched pharmacy business models and reduced barriers to competition. They provide

significant benefits to consumers in terms of cost and convenience, making it easier for consumers to find pharmacies in different states and countries to fill prescriptions at the lowest possible price for the same medication with the convenience of home delivery.

20.    In short, international online pharmacies make lower-price prescription drugs more accessible to patients—particularly U.S. patients who suffer inexplicably higher prices than patients in any other developed nation in the world.

21.    Unsurprisingly, entrenched businesses accustomed to the ease of competing in a captive market do not like market changes that increase competition, and pharmaceutical and pharmacy interests are no exception. Reduced barriers to competition mean a less captive market and lower prices for consumers, which in turn mean lower profit margins for pharmaceutical companies (who otherwise charge higher wholesale drug prices in places like the United States), and domestic pharmacies (who face lower priced competitors and reduced market share).

22.    Pharmaceutical and pharmacy interests have sought to influence U.S. law and enforcement policy through Congress, the White House, the United States Food and Drug Administration, United States Customs and Border Protection, other government agencies and international organizations, to maintain the United States as their captive market in the Internet age and stop Americans who order their medications from online international pharmacies.

23.    They have been successful in some of these lobbying efforts—as personal importation remains under some circumstances in a legal gray area—but not in their

10

efforts to make the law and enforcement policies more restrictive such that it would actually stop consumers from purchasing from abroad. Public sentiment, federal policies, and bipartisan legislative proposals are increasingly hostile to the anticompetitive, captive-market policies sought by pharmaceutical and pharmacy interests and the exorbitant drug prices that have resulted from them.[1]

24.    Pharmaceutical and pharmacy interests have increasingly focused on a behind-the-scenes strategy, one that has been in the works for more than a decade: they created a network of mostly nonprofit organizations with euphemistic names, common ties, and a unified purpose: to use misinformation campaigns and vigilante "shadow regulation" to cut off consumer access to safe online pharmacies and comparative information about drug prices. Those organizations are the public face of this cartel and the defendants in this lawsuit. Their goal is to create and enforce new territorial market restraints through private agreements to replace the natural barriers to competition toppled by technology, keeping patients in the United States in a captive market, free from price-lowering international competition. Over the past couple of years, and particularly over the last few months, this strategy has begun to pay off.

25.    The defendants claim that all safe international pharmacies that sell to consumers in the United States are "rogue," "unapproved," or "not recommended,"

---

1. For example, *see* the Affordable and Safe Prescription Drug Importation Act (introduced Jan. 2019),      https://www.sanders.senate.gov/download/final_-affordable-and-safe-prescription-drug-importation-act-of-2019?id=3AC157ED-B4F5-4B7E-8B64-F980132A856C&download=1&inline=file; the Safe and Affordable Drugs from Canada Act of 2019 (introduced January 2019), *available at* https://www.grassley.senate.gov/sites/default/files/Safe%20and%20Affordable%20Drugs%20from%20Canada%20Act%20of%202019.pdf.

using misinformation campaigns to fool consumers and key private internet gatekeepers by saying or implying that they are illegal and unsafe—spinning a tale of an exploitative online international marketplace, equating all non-domestic pharmacies with counterfeiters, adulterators, and pill mills. And they have successfully persuaded or coerced some of those gatekeepers—social media networks, search engines, payment processors, and shipping companies—to join them.

26.    PharmacyChecker.com is one of the cartel's targets because it provides patients with (1) a way to reliably identify international online pharmacies that operate safely, and (2) direct access to comparative drug price information not limited to U.S. pharmacies. In defendants' view, PharmacyChecker.com is an adversary whose existence is antagonistic to their desired outcome of maintaining a captive U.S. drug market. With PharmacyChecker.com out of the way, defendants and the interests that support them dominate the market for information about accredited-only pharmacies and drug prices.

27.    The defendants have engaged in targeted misinformation and scare campaigns, group boycotts, and other exclusionary conduct with a goal of destroying PharmacyChecker.com's reputation, suppressing its presence in consumer-accessible channels of the Internet, and interfering with its business relationships. Two members of the cartel—LegitScript and NABP—have also positioned themselves as direct competitors of PharmacyChecker.com, as private accrediting bodies, with the goal of closing off accreditation for safe international pharmacies that sell to markets

that the defendants want to remain captive—most importantly (but not exclusively), the U.S. market.

28.     The agreements reached by the defendants and their constituent members are indefensible violations of Sherman Act, Section 1: their primary purpose is to restrain competition by directly creating geographic barriers to competition, persuading and coercing others not to do business with their targets or to cut them off from essential resources necessary to compete, reducing consumer choice, all ultimately in service of their goal of reducing competition and thus artificially inflating U.S. prescription drug prices.

### The Relevant Market

29.     Two service markets are relevant in this action: the market for online pharmacy accreditation, and the market for comparative prescription drug pricing information. PharmacyChecker.com competes in both markets.

30.     Online pharmacy verification (also referred to as accreditation) is a service by which online pharmacies can obtain public recognition by an independent, third-party verification service. Obtaining such verification allows online pharmacies to signal to consumers that they are properly credentialed and thus subject to qualifications and regulatory oversight, that they practice ethically and lawfully, and that they sell genuine prescription drugs dispensed from licensed pharmacies to patients with valid prescriptions from qualified medical providers. PharmacyChecker.com's primary competitors in this market, which is highly

concentrated, are NABP, LegitScript, and Canadian International Pharmacy Association (CIPA).

31.     An important aspect of this service market is readily available information about online pharmacy verification. PharmacyChecker.com, for example, hosts a directory of its accredited online pharmacies, which is useful to consumers when trying to identify and evaluate online pharmacies. LegitScript and NABP also have similar directories of their accredited pharmacies. Until March 2019, consumers searching Google for "online pharmacies" would immediately see PharmacyChecker's directory of verified online pharmacies among the top three listings on the first page of search results.

32.     PharmacyChecker.com's online pharmacy verification services are unique compared to its competitors because they reduce information asymmetries for consumers who are contemplating purchasing their prescription medications from an online pharmacy website, regardless of the pharmacy's location. LegitScript and NABP do not provide any information to American consumers about safe international pharmacies that sell to consumers in the United States, and instead only provide information about U.S.-based online pharmacy websites. PharmacyChecker.com is a "maverick" firm in this regard, a term the United States Department of Justice Merger Guidelines (2010) describes as "a firm that plays a disruptive role in the market to the benefit of consumers" by, for example, threatening to disrupt market conditions with a new technology or business model or by challenging prevailing industry norms on the terms of competition. Under the

guidelines, the exclusion of a maverick firm from an already concentrated market is likely to have anticompetitive effects.

33.     A comparative drug pricing information directory provides consumers with current pricing information for specific drugs at licensed pharmacies. The information is either ascertained independently by the service provider or submitted for publication by participating pharmacies. PharmacyChecker.com's primary competitors in this market are ASOP member GoodRx, as well as Drugs.com, WellRx, and eDrugsearch (eDrugsearch has also been blacklisted by defendants).

34.     The relevant geographic market for both service markets is the world. These services can be supplied from anywhere in the world notwithstanding any potentially more limited geographic scopes of the services themselves. In the Internet's globalized market, any consumer has the ability to consume information and purchase online goods from anywhere in the world. The relevant markets are no different, because the Internet makes it easier for consumers to find pharmacies in different towns, states and countries and information about their prices, which they then use to ultimately fill prescriptions at the lowest possible price for the same medication with the convenience of home delivery.

35.     The underlying pharmaceutical products to which these markets relate sometimes vary from nation to nation, but they are typically substitutable. As explained in paragraphs 49-50, many prescription drugs that are FDA-approved are sold in other nations, though sometimes under a different name or with a slightly different label, and more than 4 million Americans annually purchase these

medications. Moreover, PharmacyChecker.com provides its services worldwide, and has felt harm throughout the world because the effects of defendants' conduct are not limited by geography or jurisdiction.

36.    Alternatively, the relevant geographic market is the United States. Although not exclusively so, most of the primary competitors in the relevant market target information to U.S. residents. Some of PharmacyChecker.com's competitors provide either verification only for U.S.-based pharmacies or information on U.S.-only drug prices nationally. PharmacyChecker.com provides information about U.S.-based and international pharmacies for consumers worldwide, though the information caters to U.S. residents because they stand to benefit most from this information, given the high price of prescription drugs in the United States.

## Online Pharmacies and Verification

37.    The internet's proliferation of online pharmacies drastically improved consumer access to alternative, lower-priced sources of prescription drugs. But it also facilitated bad actors who engage in nefarious or unsafe practices: selling counterfeit, adulterated, or otherwise unsafe drugs, trafficking in controlled substances and engaging in identity theft. Truly "rogue" online pharmacies often do not provide medicine from licensed pharmacies, dispense medication without requiring a valid prescription, avoid regulatory oversight, practice unsafe pharmacy practices, and, in some cases, intentionally sell counterfeit drugs.

38.    Before April 2003, when PharmacyChecker.com launched, rogue pharmacies could more easily prey on consumers because there were few mechanisms

by which a consumer could reliably distinguish between a legitimate and a rogue online pharmacy, particularly those selling medication internationally.

39.     NABP launched a verification program, VIPPS in 1999, but the program was of little utility for many consumers—those seeking to find the lowest possible prescription drug prices—because NABP would not, and will not, accredit licensed Canadian or other non-U.S. pharmacies that sell medicine into the United States. Indeed, a purpose of VIPPS was to give an impression that only specific U.S. pharmacies, and no international pharmacies, are safe for U.S. patients.

40.     PharmacyChecker.com provides accreditation to safe online pharmacies—both foreign and domestic—that voluntarily submit to extensive and ongoing review in PharmacyChecker.com's Verification Program, which includes rigorous inspection and validation requirements overseen by a full-time, licensed U.S. pharmacist. PharmacyChecker.com approves only those pharmacies that follow good pharmacy practices, require prescriptions, and do not dispense counterfeit or adulterated products, or sell controlled substances internationally into the United States.

41.     PharmacyChecker.com is a recognized authority and trusted source of information about online pharmacies, particularly those that sell medicines internationally, and drug price savings generally. Until defendants' recent actions, a search on Google for "online pharmacies" or related phrases showed PharmacyChecker as a top result indicating that the PharmacyChecker.com website had earned a high "Expertise, Authoritativeness, and Trustworthiness" (EAT)

score—a qualitative metric by which Google's human evaluators rank pages through review of external sources.

42.    Based on its accreditations, PharmacyChecker.com publishes on the Internet a list of currently accredited online pharmacies.

43.    PharmacyChecker.com also maintains price comparisons that include the prices of medications of PharmacyChecker.com-accredited pharmacies to empower consumers to find the lowest possible price for their medications. Furthermore, PharmacyChecker.com also publishes discounted prices at pharmacies within the United States and information about patient assistance programs for lower income individuals, so that consumers have the broadest opportunity to lower their cost of medication.

44.    As a result of PharmacyChecker.com's work, consumers can obtain lower-priced prescription medicine without taking a gamble on their safety. Peer-reviewed research and independent testing over the past decade have shown that medicine purchased from PharmacyChecker-accredited online pharmacies is at least as safe as the medicine sold by online pharmacies accredited by NABP and LegitScript. Indeed, while dispensing errors in the United States kill thousands of Americans each year, the FDA has not publicly reported a *single* incident of an American dying or experiencing a severe adverse reaction from taking a medication that was ordered online and dispensed by a non-U.S. pharmacy that requires a valid prescription from a licensed healthcare provider.

45.     In 2006, Google, Bing, and Yahoo, three of the leading internet search engines at the time, each chose PharmacyChecker.com as a third-party verification company for advertising eligibility. Each search engine had developed advertising policies, ones to which they did not always adhere, to prevent rogue pharmacy sites from advertising, To advertise, pharmacies were supposed to participate in and be accredited by PharmacyChecker.com's verification program. According to a non-prosecution agreement between Google and the United States Department of Justice in Rhode Island, Google allowed online pharmacy advertisers that did not qualify for certification by PharmacyChecker.com. Participants included many U.S. pharmacies, including major chains such as CVS, Walgreens, Walmart, and Kroger, and many Canadian online pharmacies. To be eligible, the pharmacy had to be licensed in its home jurisdiction, follow good pharmacy practices, only sell medications with a valid prescription from a licensed medical professional, and sell only non-controlled medicines into the United States or be licensed by the United States Drug Enforcement Agency if selling controlled medicines.

46.     But the safety of online pharmacies is not necessarily the main concern of the defendants and the interests they represent: they are concerned with destroying competition in the relevant markets and preserving the national price discrimination in the related prescription drug markets that keeps U.S. drug costs higher than nearly every other developed nation in the world.

47.     The key to their approach is to attempt to eliminate a distinction between rogue pharmacies and safe international pharmacies—and to ensure that

consumers have access to neither. Their tactic is to claim that international pharmacies are risky, unsafe, and not to be trusted, if only because they assert that U.S. law prohibits the sale of prescription drugs into the United States by pharmacies outside of the United States.

48.     That assertion—that prescription medicine importation is illegal—is not true, and has no bearing on the work of PharmacyChecker.com, which neither imports nor facilitates the import of any products. First, it is important to understand that between 40% and 70% of the finished prescription drugs, and 80% of the active pharmaceutical ingredients used to make FDA-approved prescription drugs, sold through pharmacies in the United States are in fact manufactured abroad and imported by pharmaceutical companies and distributors who thus take advantage of lower manufacturing costs outside the United States. But the defendants would have everyone believe that while medicine manufactured in other countries and sold in the United States is safe, medicine manufactured in other countries and even domestically, and sold in other countries is dangerous to U.S. consumers.

49.     Second, drug importation is not, by itself, illegal: FDA-approved drugs can be and are imported. And many drugs sold in foreign countries are FDA-approved drugs, sometimes with different labels, such as labels in both French and English for products sold in Canada. Such drugs, even though actually FDA-approved, are considered "misbranded" by the FDA simply because the labels do not exactly match the label approved by the FDA. One example is Januvia: a single 50 mg pill made by Merck and manufactured in the United Kingdom (UK) sells for approximately $15 in

the United States, while the same pill labeled for sale in Canada sells for approximately $4.

50.     Other drugs sold outside the United States, including from well-known drug companies, are also lawfully-manufactured, safe and effective, but come in a formulation different from that sold in the United States or are made in establishments not necessarily registered with the FDA, so are considered "foreign unapproved drugs" if imported. For example, AstraZeneca sells Nexium in the UK as a 40 mg tablet, which can be purchased from a pharmacy in the UK for approximately $2 per tablet, while AstraZeneca sells Nexium as a capsule in the United States for about $9 per capsule. In the United States, the Nexium tablet would be considered a "foreign unapproved drug" by the FDA. The Secretary of Health and Human Services, Alex Azar, has stated that such lower-cost drugs can be imported safely.

51.     Third, even medicines considered misbranded or unapproved when imported are not necessarily subject to restriction for purposes of personal importation. Under 21 U.S.C. § 384, the Secretary of Health and Human Services is directed to "exercise discretion to permit individuals to make such importations in circumstances in which—(i) the importation is clearly for personal use; and (ii) the prescription drug or device imported does not appear to present an unreasonable risk to the individual." Thus, the FDA does not prosecute personal importation.

52.     Fourth, the FDA guidelines also specifically exempt personal importation of up to 90-day supplies for some prescription medications by U.S. patients.

53.     Nevertheless, because the defendants and the interests they represent have been unsuccessful in their efforts to use the government to do their bidding, they have instead launched misinformation campaigns to scare consumers and developed private agreements with internet gatekeepers to unlawfully deprive consumers access to, and information about, safe international pharmacies. In some instances, these actions deceive consumers to the detriment of their health. Since these pharmacies are selling safe, effective, and lawful drugs that, if imported into the United States under certain circumstances could be considered "unapproved" or "misbranded" despite contrary federal policy, the defendants characterize these pharmacies as "rogue," "unapproved," or "illegal," pharmacies that put "you and your family at risk" and must be stopped.

54.     PharmacyChecker.com is not a pharmacy, is not engaged in the sale, dispensing, or distribution of any prescription drugs and is based in the United States. It is nevertheless a target because it provides consumers information about comparative drug prices, offers accreditation to safe international pharmacies, publicly lists these verified pharmacies, and because its founders have advocated in favor of safe personal drug importation to the public, in the media, and before Congress (not to mention advocating for policies to lower drug prices in the United States). As a result, the defendants have directly targeted PharmacyChecker.com in myriad ways, with the goal of permanently silencing it.

**Agreements and Communications of Defendants and Co-Conspirators**

55.     Pharmaceutical and pharmacy interests have been working to restrain online pharmacies and wholly exclude international online pharmacy competition since the early days of the internet. NABP, for example, established its VIPPS in 1999 with the purpose of accrediting only U.S.-based pharmacies to stave off international pharmacies. The beginning of a well-organized campaign among a core group of pharmaceutical and pharmacy interests began several years later with an alliance with John Horton, the eventual founder of LegitScript. The following allegations contain both direct and circumstantial evidence of the defendants' conspiracy.

56.     In 2006, John Horton was working as a political appointee in the United States Office of National Drug Control Policy (ONDCP). He was tasked with designing a proposed internet drug strategy to prevent the sale of controlled substances on the internet. He worked closely with pharmaceutical and pharmacy interests in drafting the proposal, and those interests sought to influence the strategy by changing its focus to restricting access to international pharmacies that do not sell controlled substances.

57.     Before resigning from ONDCP in April 2007, Mr. Horton formed a new company, LegitScript, registering its website a month before his resignation, raising concerns about his abuse of public office for personal gain.

58.     Horton recognized an opportunity: working with funding and/or support from his pharmaceutical and pharmacy industry partners, he could provide the same sort of services as PharmacyChecker.com, except with the intent of verifying only

U.S.-based pharmacies and labeling all international online pharmacies that sell to the United States as "rogue" or "unapproved." Horton also considered offering drug price comparison on his new website, but decided not to.

59.    LegitScript sought out contracts from internet gatekeepers and others—including by wresting away contracts that PharmacyChecker.com had with search engines—to perform verifications for those companies, except with the intention of excluding international pharmacies from the marketplace. That, in turn, would help accomplish the pharmaceutical and pharmacy interests' goal of restraining competition from international online pharmacies, which would not be able to advertise and would lose search engine rankings and visibility.

60.    Horton also worked with his pharmaceutical and pharmacy industry allies to organize and form two nonprofits comprising two different industries:

     a.    In 2009, the ASOP, whose members include LegitScript, the National Association of Chain Drug Stores, and Eli Lilly. Defendants NABP and PSM are also observers of ASOP and regularly participate in ASOP meetings and initiatives.

     b.    In 2011, the CSIP, whose members include key gatekeepers of internet commerce such as Visa, Mastercard, Facebook, Google, Microsoft, Paypal, and UPS.

61.    LegitScript remains a member of ASOP and is also the "ex-officio" member of CSIP. According to CSIP's website, LegitScript "has had a foundational role in establishing our organization's key efforts . . . ." An earlier version of CSIP's

website also listed ASOP as an ex-officio member, but removed that relationship from the website. On every page of the CSIP website is a prominent link to the website www.verifybeforeyoubuy.org, a CSIP site that is "Powered by LegitScript" and features, at its top, a LegitScript search box to find pharmacies verified by LegitScript.

62.     In a May 2010 email introduction from Jeannie Salo, a member of Eli Lilly's government affairs office, to an Obama administration official, obtained from a Freedom of Information Act request, Salo stated that "ASOP is the manner in which Lilly (and PhRMA as an observer) is working with other key stakeholders to compile data and collaborate to address the problem of online drug sellers/counterfeits, as we cannot do this as one company, or as PhRMA alone."

63.     In August 2010, ASOP issued a press release in which it promoted its anticompetitive strategy with the central goal of "requiring Internet search engines, domain name registrars, and other 'gatekeepers' to stop enabling rogue Internet drug outlets" (by which it meant any non-U.S.-based pharmacy that sells to customers in the United States) and mentions "the support of NABP and other stakeholders," including PSM. The release also mentions their success in persuading some of these gatekeepers, noting that "three major search engines recently amended their policies to restrict advertising to those Internet pharmacies that are VIPPS accredited."

64.     In early 2011, NABP announced that it had hosted a "recent meeting" with CSIP and its members at its Mount Prospect, Illinois headquarters at which they discussed cutting off websites that promote online international pharmacy sales

from key internet resources through the gatekeepers that compose CSIP, among other strategies for suppressing information about online pharmacies and competition in the relevant markets and the related market for prescription medication.

65.    In 2012, NABP and ASOP hosted a meeting they called a "Task Force on Internet Pharmacy Practice," during which ASOP and NABP discussed numerous plans for actions they intended to undertake in conjunction with their co-conspirators to further limit competition from online pharmacies.

66.    At that 2012 meeting, NABP and ASOP affirmed their agreement to continue to work together to restrain competition by online pharmacies, and discussed:

        a.    a concrete plan to persuade and coerce various internet gatekeepers such as domain name registrars, web hosting services, search engine companies, payment service providers, and shipping companies to deny international pharmacies and other targets such as PharmacyChecker.com access to essential services, resources, and markets with the purpose of cutting them off completely from consumers;

        b.    an intent to "continue interfacing with CSIP and encourage CSIP to support Internet environments" that deprive all but LegitScript- and NABP- approved pharmacies of both paid search engine advertising and organic search results, payment processing accounts, website domains, and shipping companies;

c.      other "efforts" both domestically and internationally designed to keep U.S. drug markets as captive as possible; and

d.      NABP's agreement to provide "data" to CSIP that could be used by CSIP and its Internet-gatekeeper members in implementing the plan described above.

67.    PSM is funded and controlled by PhRMA (a lobbying group for the pharmaceutical industry) but calls itself a "consumer protection group." More than one third of PSM members have received PhRMA funding or are local chapters of groups that have received PhRMA funding, and until February 2017, PSM's principal officer was Scott LaGanga, who concurrently served as deputy vice president of advocacy for PhRMA. He stepped down from PSM to "avoid the appearance of a conflict of interest," according to investigative reporting that revealed PSM was a secret arm of PhRMA.

68.    PSM regularly coordinates with and promotes the activities of its co-conspirators through press releases and other publications that use a tactic of falsely conflating legitimate concerns over drug counterfeiting and other safety issues with unjustified warnings about the safety of pharmacies in Canada and other countries. For example, on February 9, 2018, PSM touted the NABP's Internet Drug Outlet Identification Progress Report and its "finding that fake online pharmacies are rushing to get on the fentanyl bandwagon." Similarly, on October 18, 2017, it announced ASOP's new "Global Patient Safety Champion Award to recognize individuals and organizations that are working to protect patient safety and preserve

the gold standard of FDA approval for all American patients." On August 25, 2017, it served as a mouthpiece for NABP by announcing its "findings" that "only 4.2% of online pharmacies are safe." PSM releases misinformation in conjunction with the other defendants to give the appearance of independent authenticity and authority, as exemplified below.

## Actions in Furtherance of the Conspiracy

69.   Caused search engines to terminate PharmacyChecker.com contracts. In 2008, the NABP approached search engines—Google, Bing, and Yahoo!—and sought to persuade them to terminate their contracts with PharmacyChecker.com in favor of either NABP or LegitScript.

70.   Blacklisted PharmacyChecker.com and called it a significant danger to patient health. In 2010 or before, the NABP added PharmacyChecker.com to its "Not Recommended Sites" list of "Internet drug outlets" that, according to the NABP in a press release from 2008, puts "those who purchase from these sites in danger of purchasing drugs that could cause patients serious harm or even death." According to the NABP's website in 2010, when PharmacyChecker.com appeared on the list, "the sites on our Not Recommended list are those with serious and blatant violations posing a significant danger to patient health." NABP publishes its "Not Recommended Sites" list for consumers and internet gatekeepers. PharmacyChecker.com was added even though it does not sell or process orders for the sale of drugs in any manner. The vast majority of websites on this list are rogue online pharmacy sites or websites that sell prescription drugs but cannot be

accredited by NABP's VIPPS program. In January 2011, PharmacyChecker.com contested the addition of its site to this list as it presents no risk to patients and neither sells nor facilitates the sale of medication. Admitting this to be the case when confronted, NABP removed PharmacyChecker.com from the list in February 2011.

71.     Sought and obtained new gatekeeping domain extension. From 2013 to 2014, NABP, ASOP, CSIP, LegitScript, Pfizer, Eli Lilly, Gilead Sciences, Janssen Pharmaceuticals, Merck, the International Pharmaceutical Federation, and other unnamed "stakeholders" jointly developed a proposal that would create a new gatekeeping function through the global domain name system administered directly by NABP. Pharmaceutical companies including Pfizer, Merck, and Ely Lilly funded the initiative. In June of 2014, the proposal culminated with a new generic top-level domain, ".pharmacy," with its registry administered by NABP. The group of "stakeholders" created the eligibility requirements and worked with CSIP members to implement new restrictions to prevent non- ".pharmacy" websites from advertising, receiving merchant payments, and other vital aspects of Internet commerce.

72.     Sought ICANN rule to shut down pharmacy website domains not approved by defendants. In a 2015 letter to the International Corporation for Assigned Named and Numbers (ICANN), NABP requested that ICANN revise its rules to require private domain registrars to take down any pharmacy domain that is not approved by NABP or its direct competitor, LegitScript (but not PharmacyChecker.com).

73. <u>Coerced pharmacies not to do business with PharmacyChecker.com.</u> On January 25, 2017, PharmacyChecker.com received an email from HealthWarehouse.com, a U.S. online pharmacy that was accredited by PharmacyChecker.com and VIPPS, informing PharmacyChecker.com that it would have to leave the PharmacyChecker Verification Program or risk losing its NABP VIPPS accreditation. The email stated in relevant part that "I wanted to send a courtesy e-mail to let you know we will no longer be using the services of PharmacyChecker. We recently found out that having the badge on our website is considered a violation by VIPPS and being an affiliate of yours could cost us our accreditation."

74. <u>And coerced them again not to post prices to PharmacyChecker.com.</u> In March 2018, PharmacyChecker.com and Healthwarehouse.com were in discussions about the latter listing its drug prices on PharmacyChecker.com's website to help Americans find the lowest U.S. pharmacy prices without having to receive PharmacyChecker.com accreditation. PharmacyChecker was willing to accept VIPPS certification for Healthwarehouse.com. Still, NABP's VIPPS program, according to Healthwarehouse.com, told Healthwarehouse.com that "PharmacyChecker.com is out of compliance with VIPPS and dot pharmacy standards. . . . They violate US law. Their site promotes importation." As a result, Healthwarehouse.com decided against participating in PharmacyChecker.com's listing program. In this instance, the NABP prevented an online pharmacy that it views as operating in compliance with law and NABP's own standards from listing its prices on PharmacyChecker.com.

75. <u>Persuaded security vendors to filter PharmacyChecker.com as an unsafe website.</u> The conspirators have also persuaded vendors that maintain and categorize databases of websites and/or otherwise enable network filtering to categorize PharmacyChecker.com and its accredited pharmacy websites as "not safe," "malicious," or "promoting illegal activity." Such classifications are used to deny access to the classified content by users subject to parental controls, firewalls, and enterprise network filters. Upon learning that it was so classified by one such vendor, PharmacyChecker.com contacted the vendor, which stated that it had been classified by a contracted verification service who it would not name, citing confidentiality concerns. On information and belief, that contractor was NABP or Legitscript. After the vendor reviewed the PharmacyChecker.com website using its normal protocols, it immediately re-categorized PharmacyChecker.com as safe.

76. <u>Engaged in a sustained and coordinated misinformation campaign.</u> The defendants have also engaged in coordinated misinformation campaigns designed to spread false information about PharmacyChecker.com. For example:

a. ASOP and LegitScript jointly issued a false and misleading paid news release on August 18, 2015, wrongly linking PharmacyChecker and PharmacyChecker-accredited online pharmacies to an indictment related to illegal wholesale drug importation. The release claimed that a PharmacyChecker employee was indicted after he approved illegal internet pharmacies that sold $78 million of mislabeled and counterfeit drugs. The wire service through which the release was published later

unilaterally retracted the release, agreeing with PharmacyChecker.com and its lawyer, that it was false. Other websites contacted by PharmacyChecker.com subsequently removed that same press release or information it contained.

b.     On August 19th, 2015, the NABP published a misleading blog post on the same topic mentioned above.

c.     On September 15, 2015, CSIP published a blog post similar to the press release by ASOP claiming that a PharmacyChecker.com "executive" was indicted after he approved illegal internet pharmacies that sold $78 million of mislabeled and counterfeit drugs. The statements were patently false: the person was not a PharmacyChecker.com executive or even an employee, and the charges against the person had been dismissed before publication.

d.     On October 23, 2015, CSIP again published false statements regarding the indictment it previously mentioned on September 15. PharmacyChecker.com contacted CSIP demanding that they remove the two aforementioned posts because they were libelous. They were removed.

e.     In 2017, PSM launched an ambitious advertising campaign—including television commercials, promoted search results on Google and a full-page print ad in The Washington Post and The Hill[2]. The

---

2.   https://khn.org/wp-content/uploads/sites/2/2017/04/partnership-for-safe-medicines.pdf

newspaper advertisement asks consumers to "Keep the nation's prescription drug supply safe" by opposing drug importation, which it calls "efforts that would allow dangerous, counterfeit medicines to flow freely across U.S. borders."

f.     In 2018, PSM published an article about the horrors of personal drug importation, again claiming that PharmacyChecker.com's verifications cannot be trusted and repeating false claims made by CSIP and ASOP.

g.     ASOP published (undated) on its buysaferx.pharmacy website a consumer-facing "FAQ" repeating various scare tactics and false claims about the safety of online pharmacies, including that "there are no legitimate Canadian online pharmacies" because they claim shipping any drug into the United States is illegal and because "we have never seen a case where the website is shipping all or even most drugs from the Canadian pharmacy." The FAQ has an entire section dedicated to disparaging PharmacyChecker, which conflates indictments of people and companies for actions related to wholesale distribution, but not related to personal drug importation or PharmacyChecker.com-approved retail online pharmacies. It repeats the false claim about a PharmacyChecker.com executive being indicted. The FAQ also links to a LegitScript article that also falsely claims PharmacyChecker.com certifies "illicit online pharmacies," recommends that consumers only

purchase medicines from pharmacies accredited by LegitScript, and provides links to further information from ASOP and NABP.

h.     Dr. Catizone (NABP) and Ms. Baney (ASOP) regularly appear together to promote content published as part of these misinformation campaigns, including, for example, blog posts on external websites and appearances on talk radio programs.

77.     These misinformation campaigns have been sustained by defendants for extensive periods of time—many of the above examples still come up in search results—and include clearly false statements that are material to consumers considering which firms to trust, that are clearly likely to induce reasonable reliance on the part of consumers who are likely to lack appreciable knowledge of the subject matter. Moreover, these statements are not readily susceptible to neutralization or offset by PharmacyChecker.com because of their wide dissemination.

78.     Blacklisted PharmacyChecker.com again. In December 2018, NABP once again added PharmacyChecker.com to its Not Recommended Sites list, despite its previous, aforementioned admission in 2011 that PharmacyChecker.com did not belong on the list. PharmacyChecker.com was added even though NABP claims at the top of this list that "[o]rdering drugs from these websites puts you and your family at risk." On another page of its website, NABP refers to websites on its Not Recommended Sites list as those that are "acting illegally or do not follow best practices."

79.    Oddly, just a few months before, NABP's director, Catizone, said of PharmacyChecker.com, "clearly they serve a purpose, and they help consumers, and we serve a different purpose, or maybe just slightly different" in an article published at Tarbell.org, an investigative journalism website.[3]

80.    PharmacyChecker, once again disputed NABP's action based on the main fact that it does not sell or process orders for the sale of medicine. Since the Not Recommended Sites list contains thousands of rogue online pharmacies, including those that don't require a prescription and/or intentionally sell counterfeit drugs, NABP's actions threaten public health by confusing consumers and Internet gatekeepers about which online pharmacies or pharmacy information sites actually threaten public health versus those that safely help people find affordable medicine.

81.    The    NABP    also    added    PharmacyChecker.com's    blog, (www.pharmacycheckerblog.com), a separate website, to its Not Recommended Sites list. The blog solely provides news, commentary, and analysis on issues relating to drug prices, online pharmacies, safety and drug importation, and does not link to online pharmacies.

82.    Unlike in 2011, NABP did not remove PharmacyChecker.com from the list. The NABP had since revised its criteria for the list, specifically for the purpose of including PharmacyChecker.com. An earlier list of criteria simply did not implicate PharmacyChecker.com. The NABP later added that sites could be included on the list

---

3.   https://tarbell.org/2018/05/keeping-international-pharmacies-under-a-cloud/

if they: "Refer/link patients to sites that facilitate the dispensing of prescription medications in violation of state or federal law *or NABP standards*" (emphasis added).

83.    <u>The blacklist was used by CSIP members to censor PharmacyChecker.com.</u>    NABP    added    PharmacyChecker.com    and    the PharmacyChecker blog to its Not Recommended Sites list in furtherance of the conspiracy. NABP, ASOP, LegitScript, and PSM accomplished their plan (see paragraphs 63–66): they successfully persuaded and reached private agreements with key gatekeepers belonging to CSIP, including Internet search companies such Google and Bing to incorporate NABP's Not Recommended Sites list into aspects of their search engines, causing the listed sites to be down-ranked in searches and/or flagged on search results pages with a public warning. Regardless of the level of "Expertise, Authoritativeness, and Trustworthiness" a site has on Google, an indication that it can cause harm is a basis for a low search ranking. Including PharmacyChecker.com and PharmacyCheckerBlog.com on the Not Recommended Sites list effectively silences both by penalizing them in the search results, thus suppressing truthful information on pharmacy safety and pricing that consumers would otherwise use to make better purchasing decisions.

84.    In fact, on July 21, 2019, users of the Bing search engine began seeing a red caution shield and "WARNING" box when trying to click on search results for pages from PharmacyChecker.com and PharmacyCheckerBlog.com.[4] Text in the box reads: "Warning. The National Association of Boards of Pharmacy (NABP) includes

---

4. A brief video demonstration of the warning is available at https://drive.google.com/file/d/1IIn-KfHhGJ6yIpDpmIJCDnhq1WBxGPHo/view.

this site on its Not Recommended list. We recommend that you learn more and verify your pharmacy before making online health purchases." The warning includes links to both the NABP's Not Recommended Sites list webpage (which states that "Ordering drugs from these websites puts you and your family at risk") and a page sponsored by CSIP with a pharmacy search box "Powered by LegitScript." Due to the pop-up warning, which threatens and discourages potential visitors to PharmacyChecker.com, and diverts them instead to NABP- and Legitscript-approved sites, PharmacyChecker.com has lost 71% of its traffic from Bing to date.

85.    In June and July of 2019, CSIP was found to be running targeted advertisements using "pharmacychecker" as an adword, with copy stating "Choose a Safe Pharmacy" and "It's not worth the risk."

86.    Using funds provided by Eli Lilly, Merck, and Pfizer and with the support of many other drug companies, LegitScript, CSIP, ASOP, the NABP applied to the Internet Corporation for Assigned Names and Numbers (ICANN) to operate a generic top-level domain (gTLD) called ".pharmacy." The NABP uses the ".pharmacy" designation as a gatekeeping function, claiming that all other pharmacy domains are unsafe because they are not .pharmacy verified, and does not allow any international pharmacy that sells into the United States a ".pharmacy" domain.

87.    Pharmacies such as Walgreens, CVS, and Rite Aid have a ".pharmacy" web address, whereas the safest international online pharmacy that sells to the United States is prohibited from doing so. CSIP members, which include Google, MasterCard, and UPS, have jointly agreed to only allow online pharmacies with a

.pharmacy address to advertise, take payments, and ship products. In other words, the defendants now hold the keys to control online prescription drug markets.

88.     As part of the conspiracy, NABP also launched "public education" campaigns urging consumers to avoid any drug-selling website that does not have ".pharmacy" at the end of it, which could scare more Americans away from safe and affordable medication.

89.     The domain extension is also used to lend a sense of legitimacy and officiality to the members of the cartel by giving them ".pharmacy domains": NABP gave ASOP two such domains, asopfoundation.pharmacy and buysaferx.pharmacy, LegitScript its own domain, legitscript.pharmacy, and NABP also holds eight .pharmacy domains of its own. PharmacyChecker.com is excluded from such a domain based on the established criteria, which includes VIPPS certification.

90.     Each of PSM, ASOP and CSIP have endorsed LegitScript and NABP's VIPPS program as an online pharmacy verification service, while they have falsely vilified PharmacyChecker.com as an unsafe, rogue pharmacy website.

## FIRST CLAIM
### Conspiracy to Restrain Trade – 15 U.S.C. § 1

91.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as if fully set forth at length herein.

92.     Section 1 of the Sherman Act, 15 U.S.C. § 1 prohibits every "contract, combination . . . , or conspiracy, in restraint of trade or commerce," whether foreign or domestic.

93.     NaBP, ASOP, CSIP, LegitScript, and PSM combined and conspired to restrain trade in violation of Sherman Act Section 1 by engaging in a scheme to suppress competition in the markets for online pharmacy verification services and comparative drug price and pharmacy information. As part of the conspiracy, the defendants undertook a coordinated campaign designed to exclude PharmacyChecker.com and other similarly situated competitors from the market and otherwise competitively disadvantage it in the relevant markets. The cartel undertook these actions in furtherance of a broader goal to restrain international competition in the market for prescription medications, effectively seeking to allocate for themselves certain geographic markets, such as the United States, Canada, and Australia, with the purpose of artificially raising, maintaining, or stabilizing prices for prescription medications and otherwise reducing competition for domestic pharmacies.

94.     LegitScript and NABP are direct competitors of PharmacyChecker.com in that they each provide online pharmacy verification services, and therefore the conspiracy is a horizontal group boycott, which is *per se* illegal under Sherman Act Section 1.

95.     Alternatively, the defendants' conduct is unlawful under an inherently suspect, quick-look, or rule-of-reason analysis because the anticompetitive effects substantially outweigh any legitimate procompetitive benefits of their agreement. The true purpose and effect of their agreement was to implement naked restraints of trade, and the procompetitive justifications offered by the defendants are pretextual.

96. The defendants' agreement and actions in furtherance of the conspiracy foreclosed competition in the relevant markets.

The market has been harmed by the defendants' conduct in several ways:

a. The effect of defendants' agreements is, first and foremost, to make information enabling consumer comparisons of pharmacies more difficult and thus more costly to obtain. Consumers seeking information about lower-cost, safe online pharmacies and comparative prescription drug pricing are unlikely to find information about such pharmacies and the lowest prices available online via PharmacyChecker.com because of defendants' coordinated campaign to censor PharmacyChecker.com and to reduce or eliminate its search engine rankings and visibility, as well as denigrate its appearance in search results by suggesting to consumers that it operates an unsafe or untrustworthy website.

b. The restraints have reduced output in the markets for online pharmacy verification services and comparative information about prescription drug prices. Absent the restraints alleged in this complaint, consumers would have access to more robust information, including more balanced information about online international pharmacy websites and a greater range of comparative drug prices.

c. As the Federal Trade Commission recently explained, search engines are now a vital part of U.S. commerce and the suppression of competition in online markets directly affects the prices that consumers

40

pay: "As the FTC has explained time and time again, robust, accurate, and intelligible price competition among those who compete for consumers' dollars is one of the cornerstones of our vibrant market economy. When information is withheld from consumers, it frustrates their ability to compare the prices and offerings of competitors."[5] Since obtaining information has a cost that increases with difficulty, a "reduced information flow" means "some customers will pay higher prices for the particular good or service while others stop their search before they find a price that induces them to buy, which reduces the quantity sold." [6] In turn, information restrictions reduce sellers' incentives to lower prices.

d.      That is equally true in this case, and on multiple levels. Consumers pay far higher prescription drug prices for drugs in the related market for prescription drugs—even if they are shopping only from U.S.-based pharmacies—because (1) PharmacyChecker.com provides price comparisons that also include U.S. pharmacies' drug pricing information, and that information has been suppressed by defendants' conduct; (2) defendants' conduct was designed to have and had the actual effect of protecting U.S.-based pharmacies' market share and suppressed price competition from international pharmacies; (3)

---

5.      *In re 1-800-Contacts*, Dkt. No. 9372 at 2 (F.T.C. Nov. 7, 2018), https://www.ftc.gov/system/files/documents/cases/docket_no_9372_opinion_of_the_commission_redacted_public_version.pdf.
6.      *Id.* at 20.

defendants' conduct allows pharmaceutical companies to continue captive-market price discrimination in the U.S. market, which ultimately harms U.S. pharmacies, third-party payers, and end-patients.

e.     Defendants' conduct has similar effects in other, non-U.S. markets. PharmacyChecker.com's traffic has dropped significantly worldwide.

f.     Given the highly concentrated market for online pharmacy verifications and verification information, the effective exclusion of PharmacyChecker.com as a primary competitor in the market has an appreciable effect on competition, leaving only NABP and LegitScript as reasonable choices for pharmacies, consumers, and vendors to choose from. A reduction of meaningful competitors from three to two invariably lessens competition, and that is especially true when the eliminated competitor is a "maverick" that plays a disruptive role in the market to the benefit of consumers, like PharmacyChecker.com does.

g.     Through the exclusion of PharmacyChecker.com, consumers did not simply lose the choice of another competitor in the market; they have been deprived of unique information and services: verification of safe international pharmacies and comparative drug price information for pharmacies both in the United States and abroad.

h.     Consumers are also **less** safe as a direct result of defendants'
conduct because PharmacyChecker.com provides a service designed to
help consumers avoid unsafe international pharmacies. For one
example, international health policy expert and economist Roger Bate
undertook a study of foreign online pharmacy sites credentialed by
either PharmacyChecker.com or CIPA—which have the Bing/NABP
pop-up safety warning—on the one hand, and uncredentialed foreign
online pharmacy sites that do **not** have the Bing/NABP pop-up safety
warning.[7] Bate obtained and tested samples of one of the most popular
medications to buy online—Viagra—from a number of each category of
site. None of the 28 samples from the credentialed sites labeled "unsafe"
by Bing and NABP were counterfeit, all were genuine Pfizer Viagra,
while four of the 39 samples from uncredentialed sites that are **not**
labeled "unsafe" by Bing and NABP were counterfeit. The study
concludes that Bing searchers will avoid PharmacyChecker-accredited
online pharmacies, instead choosing rogue online pharmacies that have
yet to be added to the NABP's Not Recommended List—and increase
their chance of obtaining a counterfeit drug.

97.    PharmacyChecker.com has suffered injury as a direct result of the
defendants' conduct, and the harm to competition flows from that injury:

---

7.  Roger Bate, American Enterprise Institute, *Bing's Disservice to Online Drug Safety* (January
2019), http://www.aei.org/wp-content/uploads/2019/01/B%E2%80%8Cings-Disservice-to-Online-Drug-Safety.pdf.

PharmacyChecker.com's exclusion from the market means reduced consumer choice, reduced truthful and non-misleading advertising and information available to consumers, and fewer and more restricted options for alternative sources of lower-priced prescription drugs both U.S.-based and abroad.

98.    As a direct result of the defendants' conduct, PharmacyChecker.com's site traffic from organic search results has dropped more than 78%. Its monthly click-through revenue has dropped by more than 72% since March 2019.

99.    Most of PharmacyChecker.com's revenue is directly related to its performance and visibility in search engine results. In February 2019, PharmacyChecker.com pages were appearing in the top 3 positions in Google searches for 7,612 different search phrases relating to online pharmacies. Since the the Google update incorporating defendants' blacklisting, PharmacyChecker.com has lost 87% of these top rankings. Defendants' conduct caused this drop in rankings.

100.    For example, before the Google update, PharmacyChecker.com was the first result for the search phrase "online pharmacies"; now it is number 90—which is effectively out of consumers' sight. At the same time, defendants have artificially inflated the visibility of their own websites. NABP and its .pharmacy website now each rank in top 3 search results on Google for "online pharmacy." NABP's Not Recommended Sites list, which previously had scarce traffic, saw its traffic increase more than 800% from February 2019 (pre-update) to April 2019.

101.    PharmacyChecker.com's Bing traffic has vastly diminished because searches that include PharmacyChecker.com (or PharmacyCheckerBlog.com) as a

result now have a mouse-over pop-up "WARNING" that the website may be unsafe because it is on NABP's Not Recommended Sites list. Traffic from Bing is down 71% since July 21, 2019.

102.    PharmacyChecker.com has also lost business from online pharmacies, at least one of whom was threatened by the defendants that participation in PharmacyChecker.com's accreditation or price comparison programs will result in automatic disqualifications from the defendants' verification programs, while others have left PharmacyChecker.com's programs because of the damages to PharmacyChecker.com's reputation caused by the defendants or because PharmacyChecker.com's web traffic has declined precipitously. Moreover, the defendants have used PharmacyChecker.com's accreditation list itself to target pharmacies that do business with PharmacyChecker.com: they farm the list of PharmacyChecker.com-accredited pharmacies and add those pharmacies to their "unapproved" and Not Recommended Sites lists based on their affiliation with PharmacyChecker.com alone.

103.    PharmacyChecker.com's reputation has also been damaged by the defendants' actions as described throughout this complaint.

## REQUEST FOR RELIEF

WHEREFORE, PharmacyChecker.com requests that this Court:

    A.    Enter judgment against defendants;

    B.    Declare that defendants' conduct violates 15 U.S.C. § 1;

    C.    Enjoin defendants from continuing their unlawful acts;

     D.      Award PharmacyChecker.com three times its actual damages under 15 U.S.C. § 15 in an amount to be determined at trial;

     E.      Award PharmacyChecker.com its costs and expenses of this action, including its reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15, 26;

     F.      Award PharmacyChecker.com pre- and post- judgment interest at the applicable rates on all amounts awarded; and

     G.      Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims.

DATED: August 13, 2019

By:

*S/Alexandra Shear*
Alexandra Shear

Alexandra Shear
BONA LAW PC
The Seagram Building
375 Park Ave. #2607
New York, NY 10152
(212) 634-6861
alex.shear@bonalawpc.com

Aaron Gott (CA Bar #314264)
Jarod Bona (CA Bar #234327)
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
aaron.gott@bonalawpc.com
jarod.bona@bonalawpc.com

*Counsel for Plaintiff*
*PharmacyChecker.com*