UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PharmacyChecker.com LLC, | Civil Action No. 7:19-cv-07577-KMK |
| *Plaintiff*, | |
| vs. | PLAINTIFF'S CORRECTED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| National Association of Boards of Pharmacy, Alliance for Safe Online Pharmacies, Center for Safe Internet Pharmacies Ltd., LegitScript LLC, and Partnership for Safe Medicines, Inc., | |
| *Defendants*. | Judge Kenneth M. Karas Magistrate Judge Paul E. Davison |

TABLE OF CONTENTS

**RELEVANT FACTS** ................................................................................................ 2

**PharmacyChecker.com and the Blacklist** ............................................................ 5

**Relevant Market** ................................................................................................... 6

**Concerted Action by Defendants** ......................................................................... 8

**LEGAL STANDARD** .......................................................................................... 12

**ARGUMENT** ...................................................................................................... 13

**PharmacyChecker.com Will Suffer Irreparable Harm** ..................................... 23

**An Injunction Is in the Public Interest** ............................................................. 24

**The Balance of the Hardships Favors PharmacyChecker.com** ....................... 25

**CONCLUSION** .................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin,*
754 F.2d 1015 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Shabazz,* 482 U.S. 342 (1987) .............................................................. 13

*AD/SAT v. AP,*
181 F.3d 216 (2d Cir. 1999) ........................................................................ 17

*Am. Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010) ...................................................................... 14, 15, 16

*Arizona v. Maricopa Cty. Med. Soc'y,*
457 U.S. 332 (1982) .................................................................................... 17

*Brenntag Int'l Chems., Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ........................................................................ 23

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,*
429 U.S. 477 (1977) ...................................................................... 15, 22, 23

*Cal. Dental Ass'n v. FTC,*
526 U.S. 756 (1999) .............................................................................. 17, 18

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) .......................................................................... 13

*Ericmany Ltd. v. Agu,*
16-cv-2777, 2016 WL 8711361 (E.D.N.Y. June 3, 2016) ........................... 23

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) .............................................................................. 17, 21

*Jacobson & Co. v. Armstrong Cork Co.,*
548 F.2d 438 (2d Cir. 1977) ........................................................................ 23

*Mastrio v. Sebelius,*
768 F.3d 116 (2d Cir. 2014) ........................................................................ 25

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.,*
381 U.S. 311 (1965) .................................................................................... 24

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
    465 U.S. 752 (1984) .......................................................................... 15

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ............................................................... 15

*N.C. State Bd. of Dental Exam'rs v. FTC*,
    717 F.3d 359 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015) ................... 17

*N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) .................................................................... 18, 19

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
    468 U.S. 85 (1984) ........................................................................... 19

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ......................................................................... 21

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993) ............................................................. 23

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F. 2d 904 (2d Cir. 1990) ...................................................... 14, 25

*Roso–Lino Beverage Distribs. v. Coca–Cola Bottling Co.*,
    749 F.2d 124 (2d Cir. 1984) ............................................................. 24

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ................................................................. 23

*trueEX, LLC v. MarkitSERV Ltd.*,
    266 F. Supp. 3d 705 (S.D.N.Y. 2017) ............................................... 24

*United States v. Columbia Pictures Indus.*,
    507 F. Supp. 412 (S.D.N.Y. 1980) .............................................. 14, 24

*United States. v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .................................................................... 18, 19

*US Airways, Inc. v. Sabre Holdings Corp.*,
    No. 11 Civ. 725, 2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ............. 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................... 12, 13

*Zenith Radio Corp. v. Hazeltine Research*,
    395 U.S. 100 (1969) .................................................................... 14, 24

**Statutes and Rules**

15 U.S.C. § 1 ................................................................................................. 14, 21

15 U.S.C. § 26 ............................................................................................. 2, 14, 24

Fed. R. Civ. P. 65 ................................................................................................. 12

**Miscellaneous**

Roger Bate, American Enterprise Institute, *Bing's Disservice to Online
    Drug Safety* (January 2019) ..................................................................... 22

U.S. DOJ & FTC, Horizontal Merger Guidelines (2010) ........................................ 20

Plaintiff PharmacyChecker.com requests that the Court enter a preliminary injunction against defendants National Association of Boards of Pharmacy (NABP) and Center for Safe Internet Pharmacies (CSIP) to prevent them from continuing unlawful, coordinated acts that harm competition, curtail access to prescription medicine on the internet, and pose an irreparable, existential threat to PharmacyChecker.com's business, reputation, and goodwill.

PharmacyChecker.com's complaint concerns a broad conspiracy—years in the making—that, through one recent action, finally succeeded in obliterating PharmacyChecker.com's presence and critical role in the marketplace. The conspiracy alleged in the complaint involves a number of named defendants and their constituent members, but this motion seeks narrow and discrete injunctive relief against a subset of the defendants for a discrete subset of their ongoing anticompetitive conduct: recently implemented shadow regulation that has effectively excluded PharmacyChecker.com and others from the market. The shadow regulation centers around a blacklist proactively used by NABP, CSIP, and CSIP's members—internet gatekeepers—to restrain competition in the relevant markets and thereby reduce consumer access to information about lower-cost, safe, alternative sources for prescription drugs and comparative drug pricing information that allows them to make informed purchasing decisions. This reduces output in the relevant markets, raises prices that consumers pay in the related prescription drug market, and directly endangers the health of those consumers who are now more likely to obtain their medications from untrustworthy sources.

Accordingly, this Court should enter a preliminary injunction and:

1

1.     Order NABP to immediately remove PharmacyChecker.com and PharmacyCheckerBlog.com from its "Not Recommended Sites" blacklist and any similar list;

2.     Order NABP to immediately inform all parties to which it has distributed the list that PharmacyChecker.com and PharmacyCheckerBlog.com have been removed from the "Not Recommended Sites" blacklist and any similar list;

3.     Order CSIP to immediately accept the revised blacklist, inform its members of the revision and removal of PharmacyChecker.com and PharmacyCheckerBlog.com from the "Not Recommended Sites" blacklist and any similar list, and require them to immediately reflect the changes in all applications of the blacklist.

This narrow relief is authorized by the Clayton Act, 15 U.S.C. § 26, and seeks an appropriate remedy for irreparable harm to PharmacyChecker.com because it will preserve the status quo as it existed before these recent acts and serve the high purpose of enforcing the nation's antitrust laws so that consumers can continue to obtain information about safe, lower cost prescription medicine that they otherwise might be unable to afford.

## RELEVANT FACTS

As further described in the complaint, this case is about a broad, decade-long scheme carried out by a network of organizations backed and funded by pharmaceutical manufacturers and chain pharmacy corporations to restrain

international price competition in the market for prescription medicine. ¶¶24–28.[1] Their means of accomplishing this scheme is to restrain competition and suppress information in two related markets (the relevant markets in this case): the market for online pharmacy verification services and the market for comparative drug price information. ¶¶29–36. PharmacyChecker.com is a direct target and victim of the scheme because it provides consumers with information about safe, international online pharmacies and comparative drug prices of pharmacies within and outside the United States. Paragraphs 3–13 to the Affidavit of Tod Cooperman in Support of Plaintiff's Motion for Preliminary Injunction ("Cooperman Aff."), filed concurrently with this memorandum. It has now effectively been excluded from the market— largely wiped from search results and declared a threat by the defendants—as a direct result of this scheme, which relies in large part on private shadow regulation by and among the defendants and their constituent members. Cooperman Aff., ¶¶14–24.

Prescription drug costs in the United States are—by far—higher than anywhere else in the world. ¶15. And the cost is often prohibitive, leading to more sickness, death, and bankruptcy, as well as decisions to forgo food or basic household goods, affecting many tens of millions of Americans, According to a survey by the Kaiser Family Foundation in 2019, 29% of American adults (about 74 million) did not fill a prescription within the past 12 months as directed because of cost; about 30% (about 22 million) of those people reported getting sicker. According to the National Consumers League and the Food and Drug Administration (FDA), 125,000 deaths

---

1. Unless otherwise noted, paragraph references are to the complaint filed August 13, 2019.

are caused by prescription non-adherence (failure to take prescribed medication as directed). Exhibit 1.[2] Not all of the aforementioned deaths are the result of cost factors but in a survey 62% of 2,400 CVS retail pharmacists reported cost as the number one reason patients aren't taking their medications. Exs. 2–4. Cancer patients are twice as likely to go bankrupt due to drug prices. Ex. 5. According to another Kaiser Family Foundation survey, over half of uninsured Americans and 20% with insurance have struggled in the past year to pay for medical bills, including prescription drugs. Ex. 6. Young adults with diabetes are dying because they can't afford insulin. Ex. 7.

But some Americans—at least 4 million a year—have instead resorted to filling their prescriptions through pharmacies outside of the United States, such as Canada. ¶18. These lower cost prescriptions have become much more accessible to all Americans through online pharmacies. ¶17. The Internet has disrupted entrenched business models and reduced many barriers to competition across the board, but particularly in the market for prescription drugs because the United States has long been a captive market. ¶¶19–21.

That is a boon for consumers, but not for pharmaceutical manufacturers and incumbent pharmacies. Pharmaceutical manufacturers enjoy higher profit margins in the United States than in most other countries through price discrimination. Pharmacies used to face primarily local competition; with the Internet, they now face global competition. They have lobbied, largely unsuccessfully, for new restrictions

---

2. All exhibits are attached to the Declaration of Aaron Gott in Support of Plaintiff's Motion for Preliminary Injunction, filed with this memorandum.

and government intervention in the United States to recreate the barriers that had been broken down. ¶¶22–23. So instead they have turned to other strategies, including by creating and funding a network of nonprofit "consumer advocacy"-type organizations to use scare tactics and misinformation campaigns to set the stage for more control. ¶¶24–27.

### PharmacyChecker.com and the Blacklist

Among other conduct, the defendants created blacklists of "rogue" pharmacies that they claim are unregulated, unlawful, and unsafe rather than legitimate pharmacies. Many such listed sites are in fact dangerous, but the defendants' scheme goes much further by listing safe international online pharmacies—and even sites like PharmacyChecker.com, which is not a pharmacy at all but a direct competitor of two defendants—right alongside the rogue sites. And, gradually, they persuaded Internet gatekeepers—who are already aware of the increasing threat of liability for all sorts of potential misuses of their platforms—to use these lists to cut off safe online international pharmacies from the resources essential to modern competition— resources including search engine visibility, advertising, domain registration, payment processing, and shipping.

At the end of last year, the defendants placed PharmacyChecker.com on one of the blacklists used to facilitate their shadow regulation—NABP's "Not Recommended Sites" list—even though it is not a pharmacy. Cooperman Aff., ¶17. In mid-March 2019, Google updated its page rank algorithms incorporating the most recent blacklist, and PharmacyChecker.com was wiped from the face of the internet virtually overnight: before, in February 2019, PharmacyChecker.com commanded a

top-three position in Google searches for 7,612 different search phrases relating to online pharmacies. It has of date lost 87% of those top rankings. Those ranking drops were significant. For "online pharmacy," for example, it was at #1 in early March (before the Google update) but is now at #90—a result that is wholly out of consumers' sight. As a result, PharmacyChecker.com web traffic from organic Google search results has plunged more than 78%, and its monthly click-through revenue has fallen by 72%. ¶¶98–99; Cooperman Aff., ¶¶19–21. NABP and its .pharmacy website, on the other hand, now each rank in top 3 search results on Google for "online pharmacy," and its traffic has increased more than 800% after the update. Ex. 8.

Since July 2019, Microsoft's Bing began including a conspicuous pop-up warning box for PharmacyChecker.com search results that states "[NABP] includes this site on its Not Recommended Sites list" and links to the NABP page, which further states that sites on the list are "out of compliance with state and federal laws or NABP patient safety and pharmacy practice standards" and that using these websites "puts you and your family at risk." The warning also includes a link to a page sponsored by CSIP featuring a pharmacy search box "Powered by LegitScript." ¶84; Cooperman Aff., ¶24.[3]

### Relevant Market

The relevant service markets are (i) the market for online pharmacy accreditation and (ii) the market for comparative prescription drug pricing information. PharmacyChecker.com competes in both markets. ¶¶29–36.

---

3. https://drive.google.com/file/d/1bRQlvCDKq_O9gvBpv0VJ7CFdbAJJUdPL/view

Online pharmacy verification is a service by which online pharmacies can obtain public recognition by an independent, third-party verification service. Accreditation allows online pharmacies to signal to consumers that they are properly credentialed, practice ethically and lawfully, and that they sell genuine prescription drugs dispensed from licensed pharmacies to patients with valid prescriptions from qualified medical providers. Plaintiff PharmacyChecker.com and defendants NABP and LegitScript compete in this market. PharmacyChecker.com is unique in that it verifies pharmacies that dispense to Americans from licensed pharmacies within and outside the United States, whereas NABP and LegitScript provide verification to online pharmacies that dispense to Americans only from pharmacies within the United States. ¶¶30–32; Cooperman Aff., ¶¶4–5.

Comparative prescription drug pricing information directories provide consumers with current pricing information for specific drugs at licensed pharmacies. PharmacyChecker.com's primary competitors in this market include GoodRx (a member of defendant ASOP), Drugs.com, and WellRx. Cooperman Aff., ¶6. PharmacyChecker.com is unique in that it provides price comparisons between U.S. and non-U.S. pharmacies, which is critical here because drug prices outside the United States are often as much as 80% lower.

The relevant geographic market is the world because these services can be supplied or consumed from anywhere in the world notwithstanding any potentially more limited geographic scope of the services of themselves. Cooperman Aff., ¶7. In the Internet's globalized market, any consumer can consume information and purchase online goods from anywhere in the world. *Id.*

7

**Concerted Action by Defendants**

The principal agreements and communications relevant to this motion are as follows:

- In 2007, while employed in the White House Office of National Drug Control Policy, John Horton registered the website Legitscript.com. His purpose was to work with funding or support from pharmaceutical and pharmacy industry partners to provide the same service as PharmacyChecker.com, except with the intent to label all international online pharmacies that sell to the United States as "rogue" or "unapproved." Exs. 9–11.

- In 2009, LegitScript, drug company Eli Lilly, and the National Association of Chain Drug Stores, organized ASOP. Today, LegitScript remains a member of ASOP. Defendants NABP and PSM are also observers of ASOP and regularly participate in its meetings and initiatives.[4] ¶60(a).

- In May 2010, a member of Eli Lilly's government affairs office stated to a White House official that "ASOP is the manner in which Eli Lilly (and PhRMA as an observer) is working with other key stakeholders to compile data and collaborate to address the problem of online drug sellers/counterfeits, as we cannot do this as one company, or as PhRMA alone." PhRMA is the lobbying group for the world's largest drug companies. ¶62; Exs. 12–13.

- In August 2010, ASOP released a strategy of "requiring Internet search engines, domain name registrars, and other 'gatekeepers' to stop enabling rogue Internet drug outlets" (defined as all non-U.S. pharmacies selling medicine to U.S.

---

4. https://web.archive.org/web/20130530073604/http:/safeonlinerx.com/about-us/who-we-are/

residents) with "the support of NABP and other stakeholders." ASOP boasted that the defendants convinced "three major search engines [to amend] their policies to restrict advertising to those Internet pharmacies that are VIPPS accredited" (referring to NABP's VIPPS program). ¶63; Exs. 13–18.

- In 2011, LegitScript and ASOP organized CSIP, whose members include key gatekeepers of internet commerce such as VISA, Mastercard, Facebook, Google, Microsoft, PayPal and UPS. Ex. 19. ASOP previously was listed as an ex-officio member of CSIP, and LegitScript is still listed as an ex-officio member. ¶¶60(b), 61.

- In April 2011, NABP held a meeting with CSIP and its members at its Mount Prospect, Illinois headquarters to discuss strategies for (i) cutting off websites that promote online international pharmacy sales from key Internet resources through the gatekeepers composing CSIP and (ii) suppressing information about online pharmacies and competition in the relevant markets and in the related prescription medication market. ¶64; Ex. 20.

- In March 2012, NABP and ASOP met and discussed plans to further limit competition from online pharmacies, by persuading/coercing internet gatekeepers to deny all international pharmacies and others (such as PharmacyChecker.com) access to essential resources necessary to compete, with the purpose of cutting them off from prospective customers. They also agreed to "continue interfacing with CSIP and encourage CSIP to support" their scheme to deprive pharmacy websites not approved by LegitScript or NABP of those resources. ¶66; Ex. 21.

The defendants undertook overt actions in furtherance of these agreements, plans, and understandings:

- In 2008, NABP approached search engines to persuade them to terminate their contracts with PharmacyChecker.com in favor of NABP or LegitScript. ¶69; Ex. 21a.

- In February 2010 Google reached an agreement with NABP under which Internet pharmacy and prescription drug advertisements targeting the US on its platform must now be accredited by NABP as part of the NABP's (VIPPS) program. Ex. 14. LegitScript also reached an agreement with Google to conduct "sweeps" to monitor Google's ad platform. Ex. 15.

- In 2010, NABP added PharmacyChecker.com to its "Not Recommended Sites" list, asserting "serious and blatant violations posing a significant danger to patient health." In February 2011, NABP admitted it was improper and removed it. ¶70. Cooperman Aff., ¶14; Ex. 21b.

- From 2013 to 2014, NABP, ASOP, CSIP, LegitScript, and various pharmaceutical companies (including Eli Lilly, Merck, Pfizer) and trade groups developed a proposal to create a new gatekeeping function through the global domain name system—and culminated in June 2014 with ICANN creating the ".pharmacy" domain extension. Ex. 21b. NABP is the registry administrator, and thus decides which websites qualify for a .pharmacy domain. The group also worked with CSIP members to implement new restrictions to deprive all non-".pharmacy" sites of vital aspects of Internet commerce. ¶71.

- NABP also proposed in 2015 that ICANN change its rules to require private, third-party domain registrars to shut down any online pharmacy not deemed approved by either LegitScript or NABP, even without a court order. ICANN did not agree to do so. ¶72; Ex. 21b.

- ASOP and LegitScript issued a false and misleading paid news release August 18, 2015 claiming a PharmacyChecker employee was indicted after he approved illegal internet pharmacies that sold $78 million of mislabeled and counterfeit drugs. The wire service through which the release was published later unilaterally retracted the release, agreeing that it was false. On August 19, 2015, NABP also published a misleading blog post on the same topic. CSIP published a similar post on September 15, 2015, and another on October 23, 2015. ¶¶76-77. Exs. 22–27.

- In January 2017, NABP coerced HealthWarehouse.com, a U.S. online pharmacy that was accredited by PharmacyChecker.com and VIPPS, not to do business with PharmacyChecker.com or it would risk losing its VIPPS accreditation. ¶73; Cooperman Aff., ¶15; Ex. 28.

- In 2018, PSM published an article claiming that PharmacyChecker.com's verifications cannot be trusted and repeating false claims made by CSIP and ASOP. Carmen Catizone (NABP) and Libby Baney (ASOP) jointly promote their misinformation campaigns including, for example, blog posts on external websites and appearances on talk radio programs. Ex. 28a.

- In March 2018, NABP again coerced HealthWarehouse.com not to do business with PharmacyChecker.com. ¶74; Cooperman Aff., ¶16; Ex. 29.

- In December 2018, NABP again added PharmacyChecker.com to its Not Recommended Sites list. It asserts sites on the list are "acting illegally or do not follow best practices." NABP refused to remove PharmacyChecker.com from the list. ¶¶78–82; Cooperman Aff., ¶17; Ex. 27.

- In mid-March 2019, Google updated its search engine, incorporating the blacklist. Before the update, PharmacyChecker.com appeared in the top three positions in Google searches for 7,612 different search phrases relating to online pharmacies. By May 2019, (after the update) PharmacyChecker.com had lost 85% of these top rankings. Cooperman Aff., ¶18; Ex. 30.[5]

- In June and July of 2019, CSIP ran targeted advertisements using "pharmacychecker" as a Google AdWord, with copy stating, "Choose a Safe Pharmacy" and "It's not worth the risk." ¶85. Exs. 30a–b; Cooperman Aff., ¶23.

- On July 21, 2019, Microsoft Bing implemented a red caution shield and "WARNING" box over search results for PharmacyChecker.com and PharmacyCheckerBlog.com stating: "Warning. The National Association of Boards of Pharmacy (NABP) includes this site on its Not Recommended list. We recommend that you learn more and verify your pharmacy before making online health purchases." The NABP blacklist webpage (which states that "Ordering drugs from these websites puts you and your family at risk") and a page sponsored by CSIP with a pharmacy search box "Powered by LegitScript" are linked. ¶84; Cooperman Aff., ¶24; Ex. 31.[6]

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction under Rule 65, Federal Rules of Civil Procedure, must establish that:

1. It is likely to succeed on the merits;
2. It is likely to suffer irreparable harm in the absence of preliminary relief;

---

5 https://docs.google.com/presentation/d/1agaCj72A1QEvYeLVatbfATAB5KM3xA7Dcj2ZgwD92LQ/present?ueb=true&slide=id.g57757e7cce_1_130

6. https://drive.google.com/file/d/1IIn-KfHhGJ6yIpDpmIJCDnhq1WBxGPHo/view

3. The balance of the equities tips in its favor; and
4. That an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A plaintiff will be granted preliminary injunctive relief if, in addition to showing irreparable harm, it can show ***either*** (i) a likelihood of success on the merits *or* (ii) sufficiently serious questions going to the merits, plus a balance of hardships tipping in its favor. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The "likelihood of success" standard merely requires a showing that plaintiff is "more likely than not" to succeed on the merits of its underlying claims. *Id.* at 34–35. A movant need only show "the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Shabazz*, 482 U.S. 342 (1987).

## ARGUMENT

PharmacyChecker.com meets all the requirements for a preliminary injunction. ***First***, PharmacyChecker.com is likely to succeed on the merits or, alternatively, has established "serious questions" going to the merits and that the balance of hardships is in its favor. By effectively excluding PharmacyChecker.com from the relevant markets, defendants have made it more difficult and costly for consumers to obtain critical information about safe online pharmacies and comparative prescription drug prices. A reduction in output of this truthful information through the exclusion of a maverick firm—and direct competitor of two defendants—is manifestly anticompetitive and lacks any redeeming virtue.

13

*Second*, PharmacyChecker.com faces severe irreparable injury in the absence of immediate injunctive relief. PharmacyChecker.com has lost its ability to reach consumers as a result of defendants' conduct. It is also losing good will and customers because of the drop and traffic and suffering reputational harm.

*Third*, the public interest favors preliminary injunctive relief. Once a plaintiff has shown a likelihood of success on the merits for a violation of the Sherman Act, the public interest requirement is necessarily satisfied. 15 U.S.C. § 26 was enacted "not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 130–31 (1969); *United States v. Columbia Pictures Indus.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important . . . is the public's interest in enforcement of the antitrust laws . . . . Any doubt . . . should be resolved by the granting of a preliminary injunction.").

*Finally*, the balance of hardships tips in favor of PharmacyChecker.com. PharmacyChecker.com's existence is in jeopardy. Preserving the status quo—that is, the world as it was before PharmacyChecker.com was added to the blacklist and subsequently implemented by CSIP members—will not cause any harm to NABP or CSIP. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F. 2d 904, 909 (2d Cir. 1990) (balance of hardships tips in movant's favor where movant's irreparable harm is weighed against respondent's mere desire to continue its course of conduct).

### PharmacyChecker.com Is Likely to Succeed on the Merits

Sherman Act Section 1 requires (1) "concerted action" (2) by "separate economic actors pursuing separate economic interests" (3) that unreasonably restrains trade in

the relevant market. *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195–96 (2010). A plaintiff must also show antitrust injury—injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).

PharmacyChecker.com is likely to succeed at establishing these elements. It has already amassed substantial direct and circumstantial evidence to prove an antitrust violation even without the benefit of discovery—and it is reasonable to presume that discovery will uncover additional evidence of the defendants' communications and agreements.

***Concerted Action by Separate Economic Actors.*** A plaintiff must offer "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). That evidence is sufficient where it "tends to exclude the possibility that the [defendants were] acting independently." *Id.* at 764. "Rarely do co-conspirators plainly state their purpose," *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018), which often means that plaintiffs must rely on parallel conduct and circumstantial evidence that provides "plus factors" warranting an inference of conspiracy. *Id.* But here, the defendants did state their purpose and the documentary evidence supporting this motion supplies sufficient direct evidence of conspiracy to carry PharmacyChecker.com's burden.

The documents reflecting meetings among the defendants show that since at

15

least 2008 they have been planning and carrying out their scheme to (i) enact private shadow regulation designed to deprive disfavored firms they call "rogue" drug outlets of the essential elements necessary to compete, (ii) and to reduce and eliminate consumer online access to information about safe, alternative sources for prescription drugs and comparative drug pricing information from international pharmacies that allows them to make informed purchasing decisions.

PharmacyChecker.com also presents circumstantial evidence: (i) LegitScript's connection to pharmaceutical companies and its instrumental role in creating ASOP and CSIP; (ii) targeted misinformation campaigns against PharmacyChecker.com that appear to be coordinated among the defendants; (iii) many references and links to each other's websites, services, and publications relating directly to the topic of their objective; (iv) actions against economic interest such as NABP's endorsement of its direct competitor, LegitScript; (v) and that after NABP added PharmacyChecker.com to its blacklist, two of CSIP's members—Google and Microsoft—took actions that harmed PharmacyChecker.com's ability to compete by suppressing its visibility in the marketplace and warning consumers to stay away (the latter of which even links to NABP's website). Ex. 32.

Moreover, the defendants' constituent members are, in many cases, horizontal competitors who have consciously committed to this common scheme to further their own interests. ASOP's members primarily include direct competitors in the pharmaceutical manufacture and pharmacy industries who would otherwise be the independent centers of decisionmaking (*see Am. Needle*, 560 U.S. at 196) in the related prescription drug markets; NABP's members are entities that are controlled

by wholesale distributors, pharmacy stores, and pharmacists, many of whom are also direct competitors; and CSIP's members are gatekeepers that control the flow of information and commerce on the Internet, some of which are direct competitors of one another and some of which are not (Google and Microsoft, for example, compete in the market for internet search engines). A conspiracy among these entities necessarily includes sub-conspiracies among the constituent members, who are in many cases the independent centers of decisionmaking in the underlying markets.

PharmacyChecker.com presents evidence showing that at least some of the constituent members of the defendants were directly involved in the scheme, and that is sufficient to meet its burden. *AD/SAT v. AP*, 181 F.3d 216, 233 (2d Cir. 1999) (antitrust plaintiff must present evidence showing that association members were individually involved in the scheme). The agreements among these parties satisfy the concerted action requirement.

***Harm to Competition.*** An unreasonable restraint is one that injures competition, and courts use a sliding scale to assess whether an injury to competition has occurred. *See N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015). At one end of the scale are practices considered *per se* illegal. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). At the other end of the scale, restraints are analyzed under the "rule of reason" which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *NC Dental*, 717 F.3d at 375 (quoting *Arizona v. Maricopa Cty. Med. Soc*'y, 457 U.S. 332, 347–51 (1982)). Courts apply a middle ground called "quick look" analysis "when the great

17

likelihood of anticompetitive effects can easily be ascertained," and "after assessing and rejecting [the] logic of proffered procompetitive justifications." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770–71 (1999).

*The Restrains Are a* Per Se *Illegal Group Boycott.* The *per se* label applies to conduct that through judicial experience usually lacks redeeming value. Group boycotts, or concerted refusals to deal, are "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle,'" and fall within this category under some circumstances. *N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Factors in applying the *per se* label include (1) whether the defendants possess a "dominant position in the relevant market" (i.e. market power), (2) whether the conduct "cut off [plaintiff from] access to a supply, facility, or market necessary to enable the boycotted firm to compete," *id.*, and (3) whether the expulsion "impl[ies] anticompetitive animus" or instead is likely to be "justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive," *Id.* at 294, 296. "[A] concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Id.* at 295.

The defendants include, among others, two of PharmacyChecker.com's direct competitors and a trade group comprising the two largest Internet search engines. The direct competitors have agreements with the search engines that give them a gatekeeping function that allows them to deprive competitors (and others) of one of the most essential resources of Internet commerce: search engine visibility. The

defendants thus have market power, or "the power to control prices or exclude competition." *United States. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Through their shadow regulation, they cut off PharmacyChecker.com's access to a market necessary to enable it to compete. *N.W. Wholesale Stationers*, 472 U.S. at 294. And their competitive animus is obvious from the evidence showing their decade-long campaign against PharmacyChecker.com.

*The Restraints Are Unreasonable.* Even if the *per se* label did not apply to PharmacyChecker.com's claim, it also meets its burden under the rule of reason, quick-look, or inherently suspect analyses. At summary judgment or trial, a plaintiff meets its *prima facie* burden under the rule of reason by demonstrating either that the concerted conduct at issue had (i) an "*actual* adverse effect on competition as a whole in the relevant market"; *or* (ii) that the defendant and its co-conspirators had "sufficient market power to cause an adverse effect on competition," "plus some other ground for believing that the challenged behavior could harm competition in the market." *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 725, 2017 WL 1064709, at *3 (S.D.N.Y. Mar. 21, 2017) (emphasis added). Then, "the burden shifts to the defendant 'to offer evidence of any procompetitive effects of the restraint at issue.'" *Id.* Finally, "the burden shifts back to the plaintiff to prove that any legitimate competitive benefits offered by defendant could have been achieved through less restrictive means." *Id.*

The first test is met here: the challenged restraints have had an actual adverse effect on competition by reducing output in the relevant markets. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 107 (1984) (reduction of price or output

is "not consistent with [the] fundamental goal of antitrust law"). By effectively excluding PharmacyChecker.com from the relevant markets, they have made it more difficult and costly for consumers to obtain critical information about safe online pharmacies and comparative prescription drug prices.

> As [the FTC] has explained time and time again, robust, accurate, and intelligible price competition among those who compete for consumers' dollars is one of the cornerstones of our vibrant market economy. When information is withheld from consumers, it frustrates their ability to compare the prices and offerings of competitors.

*In re 1-800-Contacts*, Dkt. No. 9372 at 2 (F.T.C. Nov. 7, 2018).[7]

The cost of obtaining information increases with difficulty, and "reduced information flow" means "some customers will pay higher prices for the particular good or service while others stop their search before they find a price that induces them to buy, which reduces the quantity sold." *Id.* at 20. In turn, information restrictions reduce sellers' incentives to lower prices. *Id.* That is exactly why the defendants hatched their scheme in the first place.

Moreover, the market is already highly concentrated, and excluding PharmacyChecker.com makes it even more concentrated: the primary competitors in the market for online pharmacy verification are two of the defendants (LegitScript and NABP), and PharmacyChecker.com. The reduction from three main competitors to two is itself harmful to competition, particularly where the eliminated competitor is a "maverick" that plays a disruptive role in the market to the benefit of consumers. U.S. DOJ & FTC, Horizontal Merger Guidelines (2010) at 3–4.

---

7. https://www.ftc.gov/system/files/documents/cases/docket_no_9372_opinion_of_the_commission_redacted_public_version.pdf.

PharmacyChecker.com is a maverick because it offers unique services—verification of international pharmacy websites—and provides consumers with information that they cannot easily obtain elsewhere—comparative drug prices for both U.S.-based pharmacies and international pharmacies.

The second test is also met here: as explained above, the defendants collectively hold market power in the markets for online pharmacy verification and the market for internet search engines, *See supra* p. 24, and the restraints are clearly anticompetitive: they deprive the marketplace of truthful information that would otherwise promote price competition and allow consumers to make more informed purchasing decisions.

The defendants' public claims that their restraints are designed to keep patients safe are not legitimate procompetitive justifications. In fact, the safety justification for acting anticompetitively has been consistently and emphatically rejected by the U.S. Supreme Court. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (rejecting justification "on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal assault on the basic policy of the Sherman Act."); *Ind. Dentists*, 476 U.S. at 463 (rejecting argument "that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices" as justification for anticompetitive policy).

That argument is also factually meritless: the defendants' use of shadow regulation to exclude PharmacyChecker.com from the relevant markets have actually

21

made consumers **less safe** than they were before PharmacyChecker.com's exclusion. Without PharmacyChecker.com's services in the marketplace, consumers seeking lower-cost prescription medications from international pharmacies cannot verify whether the pharmacy is a legitimate pharmacy that has been subjected to a rigorous verification process they can trust or a rogue pharmacy that might sell them dangerous or ineffective counterfeit medicine.

In fact, one health policy expert and economist undertook a study to determine the effects on consumers of Bing's pop-up warnings against PharmacyChecker.com-accredited online pharmacies and unaccredited sites without the warnings. Roger Bate, American Enterprise Institute, *Bing's Disservice to Online Drug Safety* (January 2019).[8] The study determined all samples from PharmacyChecker.com-accredited sites were authentic, where some from non-accredited sites were not. (e.g., counterfeit, unsafe, and ineffective products). It also found that the uncredentialed (no-warning) sites had higher prices than the credentialed (warning) sites, and thus concluded: "When a respected search engine such as Bing warns [consumers] against a site, only a fool would buy from it. Yet Bing's policy is driving people away from sites selling authentic and cheaper Viagra and onto ones that sell potentially fake, more expensive products." *Id.* at 5.

**Antitrust Injury.** A plaintiff must satisfy two elements for antitrust injury: (1) the injury is of the type the antitrust laws were intended to prevent, and (2) the injury flows from that which makes the defendant's conduct unlawful. *Brunswick*,

---

8   .   http://www.aei.org/wp-content/uploads/2019/01/B%E2%80%8Cings-Disservice-to-Online-Drug-Safety.pdf.

22

429 U.S. at 489. Put another way, the "injury should reflect the anticompetitive effect . . . of the violation." *Id.* That inquiry is simple here, because both the harm to competition and the injuries to PharmacyChecker.com flow directly from the exclusion of PharmacyChecker.com from the market. ¶96.

### PharmacyChecker.com Will Suffer Irreparable Harm

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.' " *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). Harm is irreparable where "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). "Major disruption of a business can be as harmful as termination, and a '*threat* to the continued existence of a business can constitute irreparable injury.' " *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993). So too can a "threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages." *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir. 1977); *see also Ericmany Ltd. v. Agu*, 16-cv-2777, 2016 WL 8711361, at *3 (E.D.N.Y. June 3, 2016) (reputational loss is irreparable harm).

PharmacyChecker.com has lost 78% of its organic search traffic—and 72% of its revenue—as a result of defendants' conduct in just the last few months, and it is likely that its traffic and revenue will continue to drop as this litigation proceeds absent relief. This is prototypical irreparable harm. *See Tom Doherty*, 60 F.3d at 37–38; *Roso–Lino Beverage Distribs. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d

Cir. 1984) (loss of "ongoing business representing many years of effort" is irreparable harm). PharmacyChecker.com has already lost customers—pharmacies who participate in its verification and comparative price information programs—because that traffic has disappeared. ¶¶97–103; Cooperman Aff., ¶¶19–22.[9]

### An Injunction Is in the Public Interest

The public interest requirement is satisfied here. 15 U.S.C. § 26 was enacted "not merely to provide private relief . . . but to serve as well the *high purpose* of enforcing the antitrust laws." *Zenith Radio,* 395 U.S. at 130–31 (emphasis added). Congress' policy is that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965); *see also trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 (S.D.N.Y. 2017) ("The public has an interest 'in enforcement of the antitrust laws and in the preservation of competition.' Granting a preliminary injunction in this case would serve those interests because it would preserve competition . . . ."); *Columbia Pictures*, 507 F. Supp. at 434 ("Far more important than the interests of either the defendants or the existing industry [] is the public's interest in enforcement of the antitrust laws and in the preservation of competition. . . . Any doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction.").

The defendants are also harming the public health. Tens of millions of Americans are not filling their prescriptions because they cannot afford them, and

---

9.https://docs.google.com/presentation/d/1agaCj72A1QEvYeLVatbfATAB5KM3xA7Dcj2ZgwD92LQ/present?ueb=true&slide=id.g57757e7cce_1_10 and
https://docs.google.com/presentation/d/1agaCj72A1QEvYeLVatbfATAB5KM3xA7Dcj2ZgwD92LQ/present?ueb=true&slide=id.g57757e7cce_1_261

many are getting sicker or dying. By depriving consumers of access to information that has proven to help people afford necessary medications they could not otherwise afford, even fewer people will get the medication they need. And some of those consumers will resort to a rogue online pharmacy that sells counterfeit, unsafe, or ineffective medication because they cannot obtain the services of PharmacyChecker.com.

### The Balance of the Hardships Favors PharmacyChecker.com

The balance of hardships tips in favor of PharmacyChecker.com because the defendants' conduct has created an existential threat to its business model and will continue to harm PharmacyChecker.com's reputation and goodwill. Continuing the status quo—that is, the world as it was before PharmacyChecker.com was added to the blacklist and subsequently implemented by CSIP members—will not cause any harm to NABP or CSIP. *See Reuters*, 903 F. 2d at 909 (balance of hardships tips in movant's favor where movant's irreparable harm is weighed against respondent's mere desire to continue its previous course of conduct); *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (defining status quo as "the last actual, peaceable uncontested status which preceded the pending controversy"); *see also id* at 120–21 ("Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]").

### CONCLUSION

For the foregoing reasons, the Court should grant PharmacyChecker.com's motion and enter a preliminary injunction against NABP and CSIP.

Respectfully submitted,

DATED: August 29, 2019                By:

*S/Alexandra Shear*

Alexandra Shear

Aaron Gott (CA Bar #314264)          Alexandra Shear (4373023)
Jarod Bona (CA Bar #234327)          BONA LAW PC
BONA LAW PC                          The Seagram Building
4275 Executive Square, Suite 200     375 Park Ave. #2607
La Jolla, CA 92037                   New York, NY 10152
(858) 964-4589                       (212) 634-6861
aaron.gott@bonalawpc.com             alex.shear@bonalawpc.com
jarod.bona@bonalawpc.com

*Counsel for Plaintiff*              *Counsel for Plaintiff*
*PharmacyChecker.com*                *PharmacyChecker.com*