```
190912pharm1OA              Conference
```

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PHARMACYCHECKER.com, LLC,

4                    Plaintiff,

5            v.                        19 CV 7577 KMK

6   NATIONAL ASSOCIATION OF BOARDS
    OF PHARMACY,
7
                     Defendant.
8
    ------------------------------x
9                                      United States Courthouse
                                       White Plains, N.Y.
10                                     September 11, 2019
                                       3:07 p.m.
11
    Before:
12
                    THE HONORABLE KENNETH KARAS,
13
                                              District Judge
14
                          APPEARANCES
15
    BONA LAW FIRM
16       Attorney for Plaintiff PharmacyChecker.com, LLP
    ALEXANDRA SHEAR
17
    BARNES & THORNBURG
18       Attorneys for Defendant Nat'l. Assoc. of Boards of Pharmacy
    BRIAN E. CASEY
19  PAUL T. OLSZOWKA

20  BAKER BOTTS, LLP
         Attorney for Defendant Nat'l. Assoc. of Boards of Pharmacy
21  ERIK T. KOONS

22  HERRICK FEINSTEIN, LLP
         Attorney for Defendant Ctr. for Safe Internet Practices
23  BARRY WERBIN

24

25

190912pharm1OA            Conference

1  BALLARD SPAHR, LLP
        Attorneys for Defendant Partnership for Safe Medicines
2  LESLIE E. JOHN
   JAY N. FASTOW
3
   AXINN VELTROP & HARKRIDER, LLP
4      Attorney for Defendant Alliance for Safe Online Pharmacies
   CRISTINA M. FERNANDEZ
5
   GORDON & REES, LLP
6      Attorney for Defendant LegitScript, LLC
   RYAN J. SESTACK
7  ALSO PRESENT:  LISA MITTWOL, Bona Law, Paralegal

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

190912pharm1OA              Conference

1              (In open court)

2              THE DEPUTY CLERK:  In the matter of PharmacyChecker

3    v. the National Association of Boards of Pharmacy.

4              Counsel, please state your appearances for the

5    record.

6              MS. SHEAR:  Good afternoon, your Honor.  Alexandra

7    Shear from Bona Law for the plaintiff, PharmacyChecker.com,

8    LLC.

9              THE COURT:  Good afternoon, Ms. Shear.

10             MS. SHEAR:  Good afternoon, your Honor.  Also, Lisa

11   Mittwol, my paralegal.

12             MS. MITTWOL:  Lisa Mittwol.  Good afternoon, your

13   Honor.

14             THE COURT:  Good afternoon, your Honor.  Brian Casey,

15   Barnes & Thornburg, here on behalf of defendant NABP.  With me

16   is my colleague Paul Olszowka.

17             MR. OLSZOWKA:  Good afternoon.  Paul Olszowka for

18   NABP.

19             MR. WERBIN:  Barry Werbin for the Center for Safe

20   Internet Pharmacies.

21             THE COURT:  All right.

22             MR. FASTOW:  Jay Fastow, Ballard Spahr, LLP, for

23   defendant Partnership for Safe Medicines, Inc.

24             MS. JOHN:  Good afternoon, your Honor.  Leslie John,

25   also from Ballard Spahr, also for Partnership for Safe

190912pharm1OA              Conference

1   Medicines.  And we have entered a limited appearance because we

2   will be contesting venue and jurisdiction.

3               THE COURT:  Okay.

4               MS. JOHN:  Thank you.

5               MS. FERNANDEZ:  Cristina Fernandez, Axinn, Veltrop &

6   Harkrider, for defendant Alliance for Safe Online Pharmacies.

7               THE COURT:  Anybody else?

8               Please be seated.  Good afternoon to you all.

9               So, we're here on plaintiff's application for a

10  preliminary injunction.  I have read the papers.  I certainly

11  don't want to silence anybody.

12              Ms. Shear, it's your application.  The floor is

13  yours.

14              MS. SHEAR:  Thank you, your Honor.  Someone taller

15  was speak before me.  Good afternoon.

16              THE COURT:  Good afternoon.

17              MS. SHEAR:  I'm Alex Shear from Bona Law for

18  PharmacyChecker.com.

19              PharmacyChecker is seeking an injunction against

20  National Association of Boards of Pharmacy, which I'll call

21  NABP, and the Center for Safe Internet Practices, which I'll

22  call CSIP.  I believe counsel for both will speak, and if it

23  pleases your Honor, I'll reserve some time for rebuttal.

24              THE COURT:  We don't have a yellow lights and green

25  lights and orange, so --

190912pharm1OA             Conference

1          MS. SHEAR:  Thank you, your Honor.

2          THE COURT:  All yours.

3          MS. SHEAR:  So, first, I plan to address NABP and

4  circle back to CSIP.

5          THE COURT:  Okay.

6          MS. SHEAR:  PharmacyChecker was formed 17 years ago

7  to provide an albeit partial solution to the public health

8  crisis of exorbitant U.S. drug prices.  That solution entails

9  providing information to consumers.  This case, this motion is

10  not, is not about whether personal importation is legal or

11  whether it's good policy.

12          This is about an antitrust question.  It's about a

13  boycott aimed at excluding PharmacyChecker from competing in

14  two markets: that's the market for pharmacy accreditation or

15  verification, and I'll use those terms interchangeably, and the

16  market for comparicy, pharmacy pricing publication.

17          PharmacyChecker has shown that it set aside all

18  required elements of a preliminary injunction.  In response,

19  NABP has cited some irrelevant arguments and case law and

20  failed to even acknowledge or respond to certain of our

21  arguments and our evidence.

22          The preliminary injunction that PharmacyChecker seeks

23  is narrow.  It seeks removal of all blacklists and functional

24  equivalents of blacklists, and it seeks a requirement that

25  applications of all blacklists and functional equivalents, and

190912pharm1OA            Conference

1    when I say application, I mean by CSIP members who are party to

2    this motion, the application of all CSIP members of blacklist

3    and functional equivalents be updated so that they reflect the

4    removal of PharmacyChecker from those blacklists if your Honor

5    so orders.

6          So, as your Honor is well aware, the first required

7    showing for preliminary injunction is likelihood of success on

8    the merits.  The standard for likelihood of success is more

9    likely than not; that's greater than 50 percent.

10         NABP argued this is a mandatory injunction that we

11   seek and that requires a greater showing, but the injunction

12   that we seek is a prohibitory injunction because it seeks to

13   maintain the status quo.  The status quo is the last actual

14   peaceable uncontested status preceding this controversy, so

15   here, that's before PharmacyChecker was added to the NABP

16   blacklist in December 2018.  It doesn't matter that an

17   affirmative act is required to unwind that placement.  We're

18   seeking a return to the status quo *ex ante*.

19         So, the merits --

20         THE COURT:  The status quo at the time you filed the

21   lawsuit was what?

22         MS. SHEAR:  At the time we filed the lawsuit, the two

23   parties at issue had worked together to apply NABP's blacklist

24   to --

25         THE COURT:  Right.  At the time the lawsuit was

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1   filed, the blacklist had then applied, right?  So you're trying

2   to undo something that was in place when you filed the lawsuit.

3           MS. SHEAR:  Yes.  We're trying to return to --

4           THE COURT:  You're trying to undo something that

5   existed at the time you filed the lawsuit.

6           MS. SHEAR:  Yes, your Honor.

7           THE COURT:  Okay.  I don't understand how that's not

8   mandatory.

9           MS. SHEAR:  Because a mandatory injunction is seeking

10  an order requiring a plaintiff to do something affirmatively

11  that it otherwise would not have done.

12          THE COURT:  A plaintiff or a defendant?

13          MS. SHEAR:  I'm sorry.  A defendant, your Honor.

14          THE COURT:  So, the defendant -- a non-mandatory

15  injunction would be, We want to keep the status quo as-is,

16  right, so that would be the prohibitory.  We don't want them to

17  do X.  Here, you're saying, We need them to do X.

18          MS. SHEAR:  Well, we need them to return to having

19  done nothing.

20          THE COURT:  Otherwise, every PI would be prohibitory,

21  because you would be saying we want the Court to undo something

22  bad that the defendant did.

23          MS. SHEAR:  In any event, your Honor, PharmacyChecker

24  maintains that we've made the required showing, even to satisfy

25  the higher threshold.

190912pharm1OA          Conference

1          THE COURT:  Okay.

2          MS. SHEAR:  If you'd like to discuss that more, I'm

3    happy to, but otherwise, I'll move on.

4          THE COURT:  That's okay.  Go ahead.

5          MS. SHEAR:  Okay.  The merits of the claim:  A claim

6    under Section 1 of the Sherman Act requires four things –

7    concerted action by separate economic actors that unreasonably

8    restrains trade and antitrust injury.

9          Here, the concerted action is indisputable.  We, at

10   PharmacyChecker, have submitted direct evidence, not just

11   allegations but evidence, including multiple documents from the

12   defendants that described their meetings where they discussed

13   plans and intentions, where they agreed to suppress competition

14   from PharmacyChecker, preempt competition from a similar entity

15   into markets, the pharmacy verification market and the pharmacy

16   price publication market in which some of the defendants

17   participate.

18         The defendants have not tried to dispute the

19   reasonableness, or lack thereof, of their conduct.  They

20   haven't offered a pro-competitive justification for their

21   conduct, nor could they.

22         Antitrust injury:  Antitrust injury is that which

23   flows from the injury to competition.  Antitrust injury here

24   flows from the exclusion of PharmacyChecker in those two

25   markets, and that results in a reduction of output and

190912pharm1OA          Conference

1   information.  PharmacyChecker competes in the market by sharing

2   information, and when it's silenced, that information is not

3   accessed.

4           THE COURT:  So, what information is your client

5   sharing that you think defendants are trying to silence?

6           MS. SHEAR:  There are two sorts of information the

7   defendants have tried to silence, your Honor.  The first is

8   information about safe international pharmacies.

9           So, what distinguishes PharmacyChecker from other

10  participants in the pharmacy verification market is that it

11  will accredit or verify the safety of legitimate pharmacies

12  that have passed rigorous testing and adhered to its standards,

13  but -- pharmacies that meet these standards regardless of

14  whether they're located in the United States or not.

15          THE COURT:  So, a patient or somebody is looking for

16  prescription, they can come to your website and you can say,

17  Yeah, there's this pharmacy in Toronto that meets the status of

18  requirements, so that is a pharmacy you can get prescription

19  medication from?

20          MS. SHEAR:  Yes.

21          THE COURT:  Okay.  So, if I do that, if I then try to

22  get prescription medication from the pharmacy in Toronto, am I

23  allowed to do that?

24          MS. SHEAR:  Well, the answer to that is complicated.

25  It's a legal gray area.  If you, as an individual, Judge Karas,

190912pharm1OA              Conference

1   were to do so, you would not be prosecuted for it.  So,

2   although NABP paints the issue of personal importation as black

3   and white, there are exceptions to the law, there's permissible

4   policy --

5           THE COURT:  Assuming -- are there lots of exceptions

6   or just a couple of exceptions?

7           MS. SHEAR:  I would say there are many.

8           THE COURT:  Okay.  What exception could I invoke if I

9   want to get medication from this pharmacy in Toronto?

10          MS. SHEAR:  Specifically the law says, and this is a

11  summary, I don't have the statute in front of me, but I can

12  cite it at a later date, it says personal importation or

13  personal use that satisfies certain conditions for I think a

14  quantity of up to 30 days would not be prosecuted.

15          THE COURT:  Okay.  So, if I am taking a medication,

16  the doctor says, You have to take this medication indefinitely,

17  then I can't use that exception to get the medication from the

18  Toronto pharmacy?

19          MS. SHEAR:  I believe that's correct, your Honor.

20          THE COURT:  Okay.  Whatever, there's any number of

21  examples.  So, the doctor says, You have to take this once a

22  day for the rest of your life, then I'm not going to fit within

23  that exception?

24          MS. SHEAR:  Is your question, to make sure I

25  understand, could you, at the end of 30 days, seek your

190912pharm1OA                Conference

1   medication from this pharmacy again indefinitely?

2           THE COURT:  Yes.  It sounds like if it's a one-off

3   thing where, if you take it for less than 30 days, then that

4   exception would apply.  And the inference from that is that if

5   it's more than 30 days, the exception would not apply and I

6   would not be allowed to import that medication from the Toronto

7   pharmacy.

8           MS. SHEAR:  My understanding, your Honor, is that is

9   a correct interpretation of the letter of the law, but the way

10  it's enforced is that personal importation --

11          THE COURT:  Yeah, but it would be not cool for me to

12  say okay, Judge, you broke the law.  Well, it's just the letter

13  of the law.  It's not really enforced.  Right, it's illegal.

14  Right?  And that's true -- by the way I think all of us, as

15  lawyers, we would be, like, not a good idea to sort of say,

16  Well, nobody else is getting prosecuted for it.

17          MS. SHEAR:  Yes, but your Honor, let me remind you

18  what PharmacyChecker does.  PharmacyChecker does not sell

19  drugs.  It does not import them.  It's not a pharmacy.

20          THE COURT:  I understand that, but to the extent that

21  you're providing information about the *bona fides* of a pharmacy

22  in Toronto from which it would be illegal according to the

23  letter of the law in most instances, unless certain exceptions

24  apply, to buy the prescription from that pharmacy, then you're

25  providing information that people can't lawfully use.

190912pharm1OA            Conference

1          MS. SHEAR:  There's another exception here, and this

2    exception is significant.

3          THE COURT:  Okay.

4          MS. SHEAR:  FDA-approved drugs may be legally

5    imported.  So, this is really only -- the discussion we had

6    really only applies to drugs that are not approved by the FDA,

7    which, in many cases, are the same chemical compounds, but

8    either labeled or dispensed differently.

9          THE COURT:  Yes.

10          MS. SHEAR:  But any FDA-approved drug could be

11    imported.

12          THE COURT:  I was watching TV last night.  Was it

13    Humira?  Do I have that right?

14          MS. SHEAR:  I think it's Humira.

15          THE COURT:  Is that an FDA-approved drug?

16          MS. SHEAR:  I believe it is.

17          THE COURT:  I assume so if it's being advertised.

18    So, I can go to this pharmacy in Toronto.  Turns out it's

19    cheaper.  And I can say, Hey, do you have Humira, and they say

20    yes, and I can just buy it?

21          MS. SHEAR:  The Canadian pharmacy may be selling a

22    different formulation, but if they're selling a formulation

23    that is approved in the United States, then you can buy it

24    legally.

25          THE COURT:  No exceptions?

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1          MS. SHEAR:  Consistent with the spirit and letter of

2     the law.

3          THE COURT:  Okay.

4          MS. SHEAR:  Thanks, your Honor.

5          So, PharmacyChecker, as I was saying, provides

6     information about accreditation of pharmacies, regardless of

7     their location, and also about the prices of their

8     pharmaceuticals.

9          THE COURT:  It certainly is foreseeable, is it not,

10    that people might take the information -- might be seeking the

11    information that your client provides precisely to get the

12    cheaper medication and sort of bank on the fact that the

13    anti-importation laws are not really enforced.  It's not

14    unforeseeable; is that a fair statement?

15         MS. SHEAR:  That is a fair statement, your Honor.

16         THE COURT:  Go ahead.

17         MS. SHEAR:  The PharmacyChecker has also made a

18    showing that it's suffered irreparable harm absent --

19         THE COURT:  What is that irreparable harm?

20         MS. SHEAR:  Well, there are three sorts of

21    irreparable harm.

22         THE COURT:  Yes?

23         MS. SHEAR:  The first one is loss of revenues, which

24    in this case could be catastrophic to the business.

25         THE COURT:  Failing their catastrophic levels, loss

190912pharm1OA          Conference

1   of revenues is normally compensable, right?

2          MS. SHEAR:  Yes, ordinarily, except for when the

3   entire business is at risk, the business can't be resurrected.

4   If it goes entirely out of business, that can't be compensated

5   with money damages.

6          THE COURT:  But we don't know at this stage whether

7   or not that's going to happen.

8          MS. SHEAR:  It appears likely, your Honor.  We have

9   lost I think approximately 80 percent of revenues in recent

10  months, and that is trending further.

11         THE COURT:  Right.  So, the conduct that you find

12  objectionable happened in December of last year, right?

13         MS. SHEAR:  That's not exactly correct, your Honor.

14         The conduct on NABP's part with which we take issue

15  happened in December, and that was the placement on the

16  blacklist.  But the two events that triggered the immediate

17  urgency that sent us to court immediately happened in March and

18  July of this year.  And those events are in March, Google,

19  which is a CSIP member, updated its search algorithm to

20  incorporate the NABP blacklist.  So, the placement on the

21  blacklist was one thing; but then once Google, at the direction

22  of CSIP, we maintain, --

23         THE COURT:  What's the status of that?

24         MS. SHEAR:  That --

25         THE COURT:  The Google --

190912pharm1OA              Conference

1           MS. SHEAR:  That continues.

2           THE COURT:  Okay.  And but Google ain't here.

3           MS. SHEAR:  Right, but Google is a member of CSIP.

4           THE COURT:  NABP doesn't -- I mean, that's something

5    Google did, right?

6           MS. SHEAR:  Well, it's something that we believe CSIP

7    directed Google to do as part of its conspiracy with NABP --

8           THE COURT:  Okay.

9           MS. SHEAR:  Excuse me, your Honor.  I don't want to

10   interrupt.

11          THE COURT:  I don't want to interrupt.  Go ahead.

12   I'm sorry.

13          MS. SHEAR:  Our argument is that CSIP and NABP, as

14   well as the other defendants, but for purposes of this motion,

15   those two are working in tandem to harness the membership of

16   CSIP, the Internet gatekeepers, to put effect to the list that

17   NABP created.

18          THE COURT:  So, you see NABP says in its brief, well,

19   actually their revenue numbers went up after it did what it did

20   in December, right?  And so, I think January was the number

21   they cite in particular and there are other numbers.  And they

22   say if you look at -- if it's a snapshot, you can get maybe to

23   draw one conclusion, but that there's been a substantial delay

24   between what you say it did that violated the antitrust laws

25   and when you brought the injunction request or application.

190912pharm1OA          Conference

1          MS. SHEAR:  I would say that it was a

2   multi-month-long process that began with NABP in December but

3   culminated in these two acts in March 2019.

4          THE COURT:  So, if Google didn't do what it did, then

5   what's one to make of the irreparable harm claim as to NABP's

6   conduct, not CSIP, but just NABP?

7          MS. SHEAR:  Well, there are additional consequences

8   of placement on the NABP blacklist.  It's made public, so --

9          THE COURT:  Sure.  But I guess in terms of

10  irreparable harm, I'm trying to understand, because before

11  Google entered the fray, the numbers weren't existentially bad.

12  In fact, they arguably were kind of good at least in some

13  months.

14          MS. SHEAR:  Uh-huh.

15          THE COURT:  So, the combination of the delay, and I

16  think maybe there's a causation question, I guess is what I'm

17  getting to, I'm trying to understand the irreparable harm of

18  that.

19          MS. SHEAR:  Thank you, your Honor.  So, that's an

20  interesting argument that I'd planned to address later.  It's

21  important that PharmacyChecker gets all the relief it's

22  seeking, because without the two components of the conspiracy,

23  we're not helped.

24          THE COURT:  Right.  I know that it's important for

25  your client, but I'm trying to understand the irreparable harm

190912pharm1OA            Conference

1   piece of this from what NABP is alleged to have done given what

2   the data shows and given the delay, because you didn't come to

3   court in January, you didn't come in December, you didn't come

4   in January, in February.  So before these other things happened

5   in March and July, there's no application, right?

6           MS. SHEAR:  Uh-huh, well, I wouldn't say --

7           THE COURT:  So, I'm trying to understand the

8   irreparable harm from what NABP is alleged to have done in

9   December.

10          MS. SHEAR:  There's no application by Google or by a

11  CSIP member, but as I said, NABP list is public, and NABP has

12  been engaged in a campaign, along with the other defendants,

13  to --

14          THE COURT:  Right.  And your brief goes back to Adam

15  and Eve on this, but that kind of makes my point, is that if

16  there's concerted conduct going back even further, there's no

17  PI application, there's no claim of irreparable harm until the

18  one that's made in this application here.

19          MS. SHEAR:  Yes.

20          THE COURT:  So, I guess I'm trying to understand the

21  irreparable harm from what NABP is alleged to have done, and if

22  there is irreparable harm, doesn't the delay kind of undercut

23  that point?

24          MS. SHEAR:  Okay.  So, our argument is that the harm

25  became irreparable, as opposed to the ongoing preexisting harm,

190912pharm1OA            Conference

1   once CSIP sealed the deal in concert with NABP, so once the two

2   entities took NABP's list and applied it via the CSIP members.

3           THE COURT:  So, at best, doesn't that argue for an

4   injunction giving you that relief in terms of undoing what you

5   said CSIPs did, at best?

6           MS. SHEAR:  Yes, but your Honor, what CSIP has done

7   is they've applied or they've instructed their members --

8           THE COURT:  No, but until CSIP did what it did, I

9   don't see how you would have -- the reason you didn't come to

10  court, I suspect, is because you didn't have a claim of

11  irreparable harm.  There was no data to support that.

12          MS. SHEAR:  Well, we agree that we came to court as

13  soon as we believed we had a claim for irreparable harm.

14          THE COURT:  Right.

15          MS. SHEAR:  And I think the idea is that CSIP alone

16  didn't cause us irreparable harm, neither did NABP, but it's

17  the combination of CSIP's application of NABP's list.

18          THE COURT:  But arguably, it's the second piece of it

19  that triggered the irreparable harm.

20          I understand that the second piece couldn't happen

21  without the first piece, but it doesn't mean the first piece is

22  what's causing the irreparable harm.

23          So, if you have an injunction saying to CSIP, Undo

24  what you did with your membership, including Google, why would

25  that not be your best argument, because your argument is that

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA              Conference

1  it's really the last few months that the financial loss is

2  becoming an existential risk to your client, right?

3          MS. SHEAR:  Yes, that's true, but perhaps, your

4  Honor, if I move on past the financial loss, I can talk to you

5  about other irreparable harm that we've demonstrated.

6          THE COURT:  Yes.

7          MS. SHEAR:  The other sorts of irreparable harm are

8  loss of goodwill and customers which can't be compensated with

9  money damages, but once a customer turns to an alternative

10  provider, they decide that they're not going to go to

11  PharmacyChecker, they're not going to return to

12  PharmacyChecker, even if, at the end of the day, we

13  successfully litigate our antitrust claims.  And there's

14  reputational harm.  And our credibility, PharmacyChecker's

15  credibility is vital to its business.  When it provides

16  information as its sole purpose, without visibility, without

17  credibility, PharmacyChecker can't exist and can consumers

18  can't access the services it provides, and that is the harm

19  that cannot be repaired with money damages, that, again, have

20  been felt most acutely in the recent months and has prompted

21  our application for this preliminary injunction.

22          THE COURT:  How is one to, in the context of this

23  case, discern the difference between the loss of business and

24  the loss of goodwill?  That's what I'm trying to figure out.

25          MS. SHEAR:  Well -- so, there are customers that have

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA                Conference

1    withdrawn from the verification program, so that's an example

2    of the loss of customer.

3              THE COURT:  Yes, which is also a loss of revenue.

4              MS. SHEAR:  Yes.

5              THE COURT:  You know that you've lost that customer's

6    goodwill because you've lost their business.

7              MS. SHEAR:  Right, but then there's also search

8    traffic: whether people are coming to our site, whether people

9    are reading what we have to say, whether they believe what we

10   have to say, and that's gone down.

11             We talked about the Google algorithm update in March,

12   but also, in July, being placed warnings on PharmacyChecker

13   sites, the main site and PharmacyChecker blog, and those black

14   box warnings are a big deterrent to people either visiting our

15   site or believing what's said on our site.

16             THE COURT:  Okay.

17             MS. SHEAR:  Incidentally, I know we had informed the

18   Court in our brief that those warnings had been removed on

19   September 5.  They've since been restored.

20             THE COURT:  And who's responsible for their

21   restoration?

22             MS. SHEAR:  I don't know the answer to that, your

23   Honor, but our understanding of the way things operate is that,

24   as a CSIP member, Bing is operating at the direction of CSIP.

25             THE COURT:  It being --

190912pharm1OA            Conference

1          MS. SHEAR:  I meant to say Bing.  Bing is operating

2     at the direction --

3          THE COURT:  Right.  Let's explore that for a second.

4          Is the theory that Bing is somehow being compelled or

5     persuaded to do this?

6          MS. SHEAR:  We would argue it's been compelled, your

7     Honor.

8          THE COURT:  And what's the basis -- it's one thing to

9     allege it and survive a Rule 12(b)(6) motion, but here you have

10    to back it up.

11         What's the basis to allege that Bing is being

12    compelled?  Bing is pretty big, so why is it somehow beholden

13    to CSIPs to do this blacklist thing?

14         MS. SHEAR:  So, if you see at CSIP's Principles of

15    Participation, it lists the conditions of membership which make

16    clear that this is not a voluntary organization necessarily,

17    but were entities like Bing and these other Internet

18    gatekeepers to be a member of CSIP, they need to do what CSIP

19    tells it.  And CSIP's stated purpose is to --

20         THE COURT:  CSIP has the leverage to control Bing and

21    Google?

22         MS. SHEAR:  I wouldn't say with respect to all of its

23    operations.

24         THE COURT:  But any of its operations?

25         MS. SHEAR:  Yes, your Honor.

190912pharm1OA          Conference

1              THE COURT:  And what's the basis to allege that?

2              MS. SHEAR:  Their membership in CSIP is for this

3    express purpose.

4              THE COURT:  What do you mean?  Bing's membership in

5    CSIP is for what expressed purpose?

6              MS. SHEAR:  So, CSIP's mission is purportedly, we

7    disagree that it does this --

8              THE COURT:  Whatever it says --

9              MS. SHEAR:  -- but purportedly extensively to promote

10   safety of Internet pharmacy -- use of Internet pharmacies, and

11   that Bing's membership in CSIP is -- is a member of CSIP to the

12   extent that it plays a role in Internet pharmacy use, and it's

13   committed --

14             THE COURT:  Presumably Bing -- on the surface, I

15   realize you're a little sceptical about what the actual goal of

16   CSIP is, but to the extent CSIP has this stated goal and Bing

17   says, Yeah, we agree with that, then Bing decides to become a

18   member of CSIP, right, there's nothing to compel Bing to become

19   a member of CSIP?

20             MS. SHEAR:  Yes.  That's correct, your Honor.

21             THE COURT:  So, for the same reason, presumably, Bing

22   can say, We don't like CSIP, we're no longer going to be a

23   member of CSIP.

24             MS. SHEAR:  Yes, but I think --

25             THE COURT:  Okay.

190912pharm1OA          Conference

1          MS. SHEAR:  -- the idea that Bing might agree with

2    what CSIP instructs it to do or requires it to do doesn't make

3    that more voluntary.

4          THE COURT:  Why not?  Because if you we'd like you to

5    blacklist this one site, and here's why, then Bing takes a look

6    at it and says, Yeah, all right, we'll do that, but that's Bing

7    making a choice.

8          MS. SHEAR:  Your Honor, we would propose a slightly

9    different formulation, which is that CSIP says "We require

10   you."

11         THE COURT:  And where's the proof of that?  Do you

12   have an e-mail, a text?  Do you have anything that says that

13   CSIP instructed Bing to blacklist your client?

14         MS. SHEAR:  No, your Honor, we do not.

15         THE COURT:  I guess I don't really understand.  If

16   Bing has made its own volitional choice to do this, then why is

17   it not here defending itself?

18         MS. SHEAR:  Well, there are practical reasons that we

19   did not sue Bing, and so that's --

20         THE COURT:  Why?  If Bing is so bad, then why isn't

21   Bing here to answer for its badness?

22         MS. SHEAR:  Well, our position is that Bing is acting

23   at the direction of CSIP.

24         THE COURT:  But you have no evidence that proves

25   that.

190912pharm1OA            Conference

1          MS. SHEAR:  Well, we have evidence of the

2    association --

3          THE COURT:  So what?

4          MS. SHEAR:  -- between them.

5          And we have evidence that Bing has been used by some

6    of the other defendants in other ways.

7          THE COURT:  When you say "used," if Bing listens to

8    what CSIP says, there's no evidence that says that Bing can

9    say, No, we don't agree with you; after all, the blacklist was

10   lifted at one point, and then it was reapplied.

11         I guess I'm trying to understand, in the absence of

12   any evidence that CSIP somehow has control over Bing, then I

13   don't understand why, if Bing has done something wrong, it's

14   not here; and if Bing does act on its own, then I don't

15   understand why the injunctive relief is going to do you any

16   good if Bing decides, on its own, to say we're going to

17   continue with the blacklist.

18         MS. SHEAR:  Well, we believe that Bing's restoration

19   of the warnings suggest that when it defies CSIP, it's forced

20   to correct that.

21         THE COURT:  A lot of people believe Lee Harvey Oswald

22   didn't act alone.

23         It's not a question of what we believe.  You need

24   evidence to substantiate your claims here, right, because one

25   of your burdens is likelihood of success on the merits, which

190912pharm1OA              Conference

1    means you have to have proof.

2              So, what substantiates the belief?

3              MS. SHEAR:  Our belief is primarily based in our

4    understanding of the relationship between CSIP and its members;

5    the overall concept that organizations are able to and, in

6    fact, in practice, do control their members, and their actions

7    regardless of whether the members --

8              THE COURT:  You have to be able to prove that they

9    controlled Bing, because presumably not all members have the

10   same economic power or independence that Bing might have.

11             So, I just -- I don't understand how, if Bing decides

12   to go along with this on its own, then --

13             MS. SHEAR:  As I said, your Honor, we view this as a

14   condition of Bing's participation in CSIP, and I guess --

15             THE COURT:  So what?  That assumes that they don't

16   have some choice about whether or not they want to participate

17   in CSIP.  It just begs the question.

18             MS. SHEAR:  Right, your Honor.  I guess Bing, then,

19   is forced to choose between its participation in CSIP who is a

20   sensible mission it might otherwise --

21             THE COURT:  But you don't prove that.  How do you

22   prove that?

23             MS. SHEAR:  Well, the Principles of Participation,

24   which are I think Exhibit 1 to our reply brief, those do state

25   that there are conditions of membership.

190912pharm1OA                Conference

1          THE COURT:  But do those conditions mandate that Bing

2    or Google or Facebook do what CSIP says?

3          MS. SHEAR:  The exact wording is not -- that's not

4    the exact wording, but the idea is that the members need to

5    comply and execute the mission, including with public media --

6    social media.

7          THE COURT:  Right, but they can say we don't think

8    this is part of your mission; you haven't satisfied us that

9    this particular website should be blacklisted.

10          MS. SHEAR:  Well, the Principles of Participation do

11    go into detail about the public media -- public social media

12    and other publication of what CSIP deems to be dangerous sites.

13          THE COURT:  And this applies presumably to Google and

14    to Facebook, too, right?

15          MS. SHEAR:  Yes, to all CSIP members.

16          THE COURT:  Facebook -- I read the stories.  Facebook

17    is so big, the government is trying to break it apart.  This

18    big, huge, giant behemoth is somehow on its knees begging for

19    mercy from CSIP?  Please don't kick us out of your association;

20    we just don't want to blacklist this one website?

21          MS. SHEAR:  I don't see that, your Honor, but I do

22    think these organizations, including CSIP, including Facebook

23    or Bing might have a belief in the stated purpose of CSIP and

24    really think that it's essential.

25          THE COURT:  Right, but they make a choice.  They make

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA              Conference

1    the choice, right?

2           Google and Ebay, they have to make choices about all

3    kinds of things that they do and what kind of content they're

4    going to tolerate.  Ebay has to decide if they're going to let

5    counterfeiters on to sell stuff, right, so they make a choice.

6           So if Ebay -- excuse me -- Google and Bing and others

7    have made a choice that, in this case, we're going to do this

8    because we think it's appropriate, then they have made the

9    choice.  And I guess we can move on, but I just don't see any

10   evidence that shows that they've been compelled by CSIP so that

11   even if you get the injunction you want, you're going to get

12   somehow Bing to not do what it thinks it should be doing.

13          MS. SHEAR:  The *Doctors Associates* case, which we

14   cite in our reply brief, and which CSIP also cites in its

15   opposition, that case says that an injunction on the principal

16   can bind the member, so that can and would --

17          THE COURT:  Assuming there's proof of a binding

18   relationship between the two.

19          MS. SHEAR:  There's proof of a relationship.

20          THE COURT:  But you haven't proved any binding nature

21   of that relationship.

22          MS. SHEAR:  Nonetheless, we believe these members are

23   agents of CSIP and would otherwise be bound --

24          THE COURT:  Okay.

25          MS. SHEAR:  Your Honor, the injunction is in the

190912pharm1OA              Conference

1   public interest and PharmacyChecker has proven that.  In an

2   antitrust case, the public interest at issue is a vindication

3   of competition.  So, when there is an antitrust violation that

4   causes harm to competition and an injunction issues to stop the

5   conduct and remedy the harm to competition, that in itself is

6   in the public --

7              THE COURT:  Right, but their argument is, they're the

8   ones defending the public interest because people may not like

9   these laws, but the laws prohibit, with some exceptions, the

10  importation of medicine from outside the United States.  And to

11  the extent that your client's activity is in effect providing

12  information about how to do that, and arguably either turning a

13  blind eye to its existence or, in fact, condoning it, they're

14  saying that they're acting in the public interest.

15             MS. SHEAR:  Right, your Honor, but the problem with

16  their argument is that the Supreme Court rejected that exact

17  argument in *National Society of Professional Engineers.*

18             THE COURT:  Really?

19             MS. SHEAR:  Yes.  In that case, there was a

20  professional society of engineers, as the case suggests, and

21  they had adopted bylaws restricting competitive bidding because

22  they thought that it posed -- it created an incentive for

23  engineers to do cheaper work which might be of less quality.

24             THE COURT:  Okay, but it is illegal, unless certain

25  exceptions apply, to buy pharmaceutical products from

190912pharm1OA              Conference

1    pharmacies outside the United States; in fact, it's a crime.

2             MS. SHEAR:  But PharmacyChecker is not engaged in

3    that activity.

4             THE COURT:  No, it's not, but my point is that to the

5    extent it's providing information that facilitates people doing

6    that, knowing full well that there are people who are going to

7    say, Oh, this law really isn't enforced, their argument is

8    they're acting in the public interest because Congress has

9    decided that it is important that people not get their medicine

10   from outside the United States which is not part of the

11   FDA-approved process, so on and so forth, right?

12            MS. SHEAR:  Right.  And the Supreme Court took a very

13   similar argument saying the public safety is at issue.

14            THE COURT:  But the Supreme Court decision didn't

15   deal with conduct that was criminal.

16            MS. SHEAR:  Right, but PharmacyChecker's conduct is

17   also not criminal.

18            THE COURT:  But the argument is that it's providing

19   information to condone or facilitate others to commit criminal

20   acts, which are criminal because Congress is concerned about

21   people's safety, that's the connection to safety, but it's

22   through the criminal laws.

23            MS. SHEAR:  Well, your Honor, we would characterize

24   it differently, of course, but, yes, you're right that the

25   activity at issue in *National Society of Professional Engineers*

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA            Conference

1   was not criminal.

2         THE COURT:  Right.

3         MS. SHEAR:  But the Court specifically said that to

4   make exception to the Sherman Act for potentially dangerous

5   goods and services would be tantamount to repeal of the

6   statute.  And the Court also said that it was up to Congress to

7   specifically delineate or identify exceptions to --

8         THE COURT:  Let's say a website is selling a drug

9   that the FDA has banned, and the FDA banned it because it's

10  dangerous because it has side effects, you don't think NABP and

11  CSIP could, say, blacklist that website that could be used to

12  sell the drugs?  Of course they could, right?

13        MS. SHEAR:  Yes.

14        THE COURT:  It's dangerous conduct that they're

15  saying don't buy from them because it's bad.

16        MS. SHEAR:  Right, but that conduct is illegal; what

17  PharmacyChecker is doing is not.

18        THE COURT:  I get the point.

19        MS. SHEAR:  So, in *Professional Engineers* also the

20  Court specifically said that Congress should carve-out

21  exceptions to the antitrust laws to the extent that there

22  should be any.  And there is no exception that covers conduct

23  like that which PharmacyCheckers engages in.

24        THE COURT:  One can make the argument that by

25  prohibiting importation of pharmaceuticals, Congress has

190912pharm1OA                Conference

1    created a monopoly.  You can make that argument.

2            MS. SHEAR:  Right.

3            THE COURT:  And that's why, in fact, some people

4    think that and that's why they say these prices are

5    artificially high, because the American pharmaceutical industry

6    has been protected from competition from abroad.  Okay.  So,

7    then, go write your member of Congress and say fix the law.

8            MS. SHEAR:  Right, but PharmacyChecker provides

9    information, and providing information is always -- is legal.

10   It's protected by the First Amendment, and it's adding --

11           THE COURT:  But there's no state action here, so

12   there's no First Amendment issue.

13           MS. SHEAR:  Right.  So, there's -- there's an element

14   of -- it adds a dimension to the conversation around the cost

15   of prescription drugs.

16           THE COURT:  Why can't people be concerned that

17   providing information about how to get pharmaceutical products

18   from abroad when it's illegal to get pharmaceutical products

19   from abroad, unless exceptions apply, could give people the

20   misimpression that it's okay to get pharmaceutical products

21   from abroad?

22           Why can't that be a legitimate concern?

23           MS. SHEAR:  It's a legitimate concern, but it's not a

24   defense to an antitrust violation.

25           THE COURT:  Okay.

190912pharm1OA           Conference

1          MS. SHEAR:  *National Society of Professional*

2   *Engineers* made clear that public safety or public policy of any

3   sort is not a defense to an antitrust violation.

4          And when the separate economic actors combined to

5   restrain trade, they violated the Sherman Act.  There's no

6   pro-competitive business justification because the *Society of*

7   *Engineers* said public safety or public policy is not a

8   pro-competitive business justification.  They specifically

9   rejected it.

10          So, if it's a *per se* violation, then the business

11  mode of justification doesn't count, but under the rule of

12  reason, defendants cannot carry their burden by arguing public

13  safety.

14          THE COURT:  Okay.

15          MS. SHEAR:  There's also, PharmacyChecker would

16  argue, that the factual argument of the public safety is

17  incorrect, but I'll move on.

18          THE COURT:  Okay.

19          MS. SHEAR:  In terms of the equities, there's no harm

20  to NABP if it is enjoined while this litigation plays out, and

21  they haven't identified any equitable consideration that weighs

22  on their behalf.

23          THE COURT:  Well, there's some vague reference to

24  reputational harm, I think, right?  Your argument is your

25  reputation has been harmed, too, so has your business and,

190912pharm1OA          Conference

1    indeed, the business is on the brink.

2              MS. SHEAR:  Yes, your Honor.

3              THE COURT:  Okay.

4              MS. SHEAR:  Also, that our reputation is more

5    important to our survival than theirs is to theirs.

6              NABP's opposition boils down to two points: one, that

7    importation is illegal, which we've discussed at length.

8              THE COURT:  Yes.

9              MS. SHEAR:  And their reliance on *In re: Canadian*

10   *Antitrust Imports*, and that case is inapposite here, because *In*

11   *re: Canadian Imports*, in that case, the harm alleged, which was

12   higher prices for prescription drugs due to the exclusion of

13   lower-priced Canadian drugs, that alleged harm to competition

14   flowed from government policy, not from the defendant's

15   actions.  So, the Court there found missing the causal

16   connection between the antitrust violation and the harm

17   alleged, but here, the harm flows from the defendant's actions.

18   They entered into conspiracy to boycott the competitor.  So,

19   the harm to competition, the silencing of PharmacyChecker,

20   resulting in reduced output and reduced innovation, is directly

21   foreseeable; indeed, it was the intended result of the

22   antitrust violation.

23             And then, finally, NABP makes an argument about

24   venue.  We contest that venue is proper in the Southern

25   District because NABP transacts business in this district by

190912pharm1OA                Conference

1  verifying pharmacy here through its VIPPS program, but

2  regardless, the appropriate vehicle to make such a challenge is

3  a motion under Rule 12(b)(3).

4              THE COURT:  Yes, or 1404, I guess --

5              MS. SHEAR:  Right.

6              THE COURT:  -- even if venue is proper.

7              By the way, I was struck by the fact that your client

8  has an address up the road, but a phone number that connects it

9  to the city.  The area code is 718.  Folks up here use 914.

10             MS. SHEAR:  I can assure you, one of my clients lives

11 locally.

12             THE COURT:  I was just struck.  I'm not saying

13 there's anything sneaky about it.  I just was struck by that.

14             MS. SHEAR:  Todd lives in Scarsdale, and Gabe

15 lives --

16             THE COURT:  Where they live, though, and where their

17 business is --

18             MS. SHEAR:  The business --

19             THE COURT:  It's where the business is harmed, so the

20 location of the business matters, and your point is that the

21 business is in --

22             MS. SHEAR:  The business is Westchester; yes.

23             THE COURT:  -- even if they use a New York City area

24 code.

25             MS. SHEAR:  And then the last point, just closing the

190912pharm1OA            Conference

1  loop on CSIP, I know we talked about its ability to control its

2  members, and as you recall, CSIP has already agreed to request

3  that its members do something.  The only factual further issue

4  is a factual dispute.

5          CSIP says that they don't maintain a blacklist of

6  their own, but they have a data-sharing tool or a data-sharing

7  portal, they sometimes refer to it, which we say is really just

8  a list by another name.  It functions in the same way.  So, we

9  request that your Honor issue an injunction that encompasses

10  that tool or portal, as well as the list maintained by NABP.

11          THE COURT:  Okay.

12          MS. SHEAR:  To sum up, this case is not about the

13  politics of importation or the right to speak in favor or in

14  opposition to it.  It's really about PharmacyChecker preserving

15  its ability to exist while it litigates its valid antitrust

16  claims.

17          And personal importation, it's happening.  Wherever

18  it falls in the legal or policy spectrum, it's happening, and

19  while it does, PharmacyChecker provides legitimate and valuable

20  services by verifying and accrediting the most reputable

21  international pharmacies, safe pharmacies, and providing

22  information about their prices.  But defendants, in their

23  concerted action, have precluded PharmacyChecker from providing

24  this information from competing in two distinct relevant

25  markets.

190912pharm1OA            Conference

1        So, we think that PharmacyChecker has made a showing

2   that it's likely to succeed on the merits of the claims, and

3   that includes the argument that *National Society of*

4   *Professional Engineers* removes public safety as a possible

5   business justification for the conduct.  We have shown

6   irreparable harm, particularly in the forms of reputational and

7   goodwill damage, but also catastrophic revenue damage.  We've

8   shown that the balance of the equities favors our party.  And

9   PharmacyChecker has shown that injunction would be in the

10  public interest.  So, we request respectfully that the Court

11  grant the injunction.

12          THE COURT:  Thank you.

13          MS. SHEAR:  Thank you for your time.

14          THE COURT:  Good afternoon, Mr. Casey.

15          MR. CASEY:  Yes, your Honor.  Brian Casey on behalf

16  of defendant NABP.

17          I wanted to touch on a couple of issues that were

18  raised in your discussion with plaintiff's counsel, so this

19  might be a little bit out of order.

20          THE COURT:  There is no order.  There just is.

21          MR. CASEY:  I had an order, and now I'm going to

22  throw it all out the window.

23          With respect to whether or not this is a mandatory or

24  prohibitory injunction, your Honor pointed out that the state

25  of play right before the complaint was filed was that they were

190912pharm1OA          Conference

1  on the list.  As a matter of fact, they were on the list for

2  eight and-a-half months before the complaint was filed.  And

3  their request is two-prong: not only to be taken off the list,

4  but to go out and affirmatively tell the world whoever we think

5  might have used the list, that they're not on the list.  That

6  would be the definition of a mandatory injunction.

7          There has been no state -- there was no time in the

8  history of the world where we were -- we were broadcasting to

9  the world who was not on our list.  So, I think it's pretty

10  clearly a mandatory injunction, not a prohibitory injunction,

11  but the reality is, even if we assumed *arguendo* as a

12  prohibitory injunction, they still haven't met their burden.

13          I'd like to shift to, there was some discussion about

14  what is and isn't the law.  I would like to clarify that.

15          THE COURT:  Yes, regarding drug importation.

16          MR. CASEY:  Yes, 21 U.S.C. 381(b) is the statute that

17  deals with importation, and it's limited exclusively to the

18  manufacturer that manufactured the drug.

19          In your example about Humira, there is a version of

20  it that is FDA approved in the United States.  Does that mean

21  that the version that might be approved in Canada could be

22  imported?  Not by you, it can't.

23          THE COURT:  Unless it's manufactured in the United

24  States.

25          MR. CASEY:  Right.  If it's manufactured in the

190912pharm1OA            Conference

1   United States and then gets imported to Canada, the

2   manufacturer, and the manufacturer only, can bring it back.

3   And the idea there is that the FDA has concluded that if it's

4   not the manufacturer, who knows what's going on with it?

5           THE COURT:  What Ms. Shear said, if it's

6   FDA-approved, it can be imported.

7           MR. CASEY:  That's not right.

8           THE COURT:  So, it has to be FDA-approved, and it has

9   to be purchased from the United States manufacturer?

10          MR. CASEY:  Unfortunately, the FDCA is a complicated

11  statute, and I don't profess --

12          THE COURT:  Is there one that isn't complicated?

13          MR. CASEY:  This seems to be still on the more

14  complicated side.

15          THE COURT:  I don't know.  You should have been here

16  a couple of years ago when we had the Clean Water Act.  The one

17  thing that wasn't clean was the Clean Water Act.

18          MR. CASEY:  What I'll tell you is that according to

19  the FDA, and let me switch to the guidance that was being

20  quoted, Ms. Shear wasn't quoting statute.  Ms. Shear was

21  quoting the FDA guidance that we have attached to our response.

22  And the important thing in that is the FDA states abundantly

23  clearly, it's not legal.

24          In that guidance, they say we, in the exercise of our

25  executive discretion, because we have scarce prosecutorial

190912pharm1OA          Conference

1  resources, might not prosecute you if you satisfy X, Y and Z,

2  but it doesn't create any rights in any individual that gives

3  them the right to do this.  And it says very clearly that it's

4  illegal.

5          THE COURT:  I know.

6          Getting back to the Humira example, the point here is

7  that even if I want to buy Humira from this awesome pharmacy in

8  Toronto, it may be that the supposed chemical make-up of what

9  I'm buying is the same as the FDA-approved Humira that's made

10  by an approved manufacturer, but I can't import it --

11          MR. CASEY:  Correct.

12          THE COURT:  -- even if it, on the surface, appears to

13  be the same drug?

14          MR. CASEY:  Correct.  There are, in fact, medications

15  that the FDA goes to Canada and says, Let me go review your

16  manufacturing facility in Canada.  Yep, we're okay with that.

17          THE COURT:  So, unless it's FDA approved, it cannot

18  be imported?

19          MR. CASEY:  Correct, your Honor.  And the FDA has a

20  very arduous process for what it takes to approve a drug, and

21  until a drug is approved, it's not approved.  It's misbranded.

22  And bringing it into the country --

23          THE COURT:  Do we have a sense of what -- maybe

24  there's no way to know this, but what percentage of, say,

25  Canadian drugs are approved by the FDA?

190912pharm1OA          Conference

1          Do they actively try to approve as many as they can

2    or are they asked to say there's this one drug that's really

3    important for the treatment of a certain pernicious disease, so

4    can you take a look at that one and let us know?

5          MR. CASEY:  I couldn't say with any kind of --

6          THE COURT:  So, if it turns out that the FDA has

7    approved 90 percent of the drugs imported from Canada, then

8    what's so awful about what plaintiff does, right?

9          MR. CASEY:  Well, as you pointed out, it's illegal.

10         THE COURT:  It's illegal to the extent the FDA hasn't

11   approved it.

12         MR. CASEY:  Right.

13         THE COURT:  But if they're providing information

14   about accredited pharmacies and pricing from these pharmacies

15   for, it turns out, medicine that is approved by the FDA, even

16   though it's manufactured in Canada or produced in Canada, then

17   what's the big deal?

18         MR. CASEY:  Well, number one, that's a false premise.

19   That isn't really all that's going on.  That isn't what's going

20   on.  At least that's not all that's going on.

21         If you actually spent time looking at the -- they

22   have a list of, at this point I think it's 23, 25 pharmacies

23   that they link to.  So, it isn't just providing information.

24   It is affirmatively referring to pharmacies that have "Canada"

25   in their name.  If you actually drill down into them, they may

190912pharm1OA            Conference

1    not be from Canada; they may not be pharmacies.

2            So, it doesn't take much scratching of the surface to

3    see that it's not like these are Canadian pharmacies that are

4    regulated by Canada.  Canada has a different rule for Canadian

5    pharmacies that dispense pharmaceuticals to Canadian residents

6    than it does for people outside the world, outside of Canada.

7    And you'll notice there's a number of those pharmacies that in

8    fact say "We'll ship to anywhere in the world, except Canada."

9    So there's a reason for that.

10            THE COURT:  Yes.

11            MR. CASEY:  So, to talk a little bit more about the

12   illegality, and I think your Honor is on board with it, but all

13   three branches of the federal government say that what they are

14   advocating is illegal.

15            Congress has, through the FDCA and through a number

16   of criminal statutes -- the executive branch has -- they have

17   engaged in some very significant criminal and civil enforcement

18   actions to stop precisely this kind of conduct.

19            And Google was on the short end of a $500 million

20   settlement agreement with the DOJ for facilitating the illegal

21   importation of pharmaceuticals from Canadian online pharmacies,

22   and among the people that were verifying those pharmacies at

23   that time, PharmacyChecker.

24            So, it might be very understandable why Google at

25   this point is gun-shy about who it chooses to verify as

190912pharm1OA                Conference

pharmacies or not, but $500 million.  The DOJ says that's

illegal.  In 2014, the DOJ indicted Canada Drugs, one of the

biggest Canadian online pharmacies for not only wholesale

importation, but there are allegations of personal importation,

as well.  And so the DOJ says that.  The FDA says it in all

sorts of instances, from the guidance to the letters that we

cited and we have -- the FDA basically says in virtually all

circumstances, importation, even of personal pharmaceuticals,

is illegal, and federal case law says that.

        We cited the *Canadian Antitrust Import* case, as well

as a number of others, so all three branches - it's illegal.

What NABP is doing is putting on its "not recommended" list

people that, among other things, refer or link to websites that

engage in or facilitate the illegal importation of

pharmaceuticals.  That's what they do.  And PharmacyChecker

very clearly falls under that rubric.  I want to make sure that

the Court is oriented as to what is legal and what isn't.

        To talk about the -- you've gone over with counsel

the elements of an injunction, whether it's mandatory or

prohibitory, but the first example -- the first criteria that

you have to meet and if you don't meet it, you stop, is

irreparable harm.  And as their very own documents demonstrate,

that there isn't any irreparable harm here, okay?

        And I point you to Exhibit 8 to Mr. Gott's

declaration.  It has a lot of analytics.  And it also has their

190912pharm1OA              Conference

1    revenues from 2017 through April.  And then in Todd Cooperman's

2    affidavit, it has it going through July.  Interestingly, they

3    haven't included what the revenue is for August, despite the

4    fact that as we sit here, it's 11 days into September.  So they

5    haven't disclosed what the revenue is this past month.

6           What you'll see there is that pretty much, I hate to

7    use the word status quo, but the way it was for a number of

8    months, going back to 2017 until about October of 2018, was

9    that they were making about what they were making well after --

10   even after Google changed its algorithm, okay?

11          Two things happened.  Something happened in the back

12   half of 2018 where the revenues went up.  And then, as your

13   Honor accurately points out, after we put them on the list in

14   the end of December, they had their best revenue month ever.

15   February, they had their second-best revenue month ever, okay?

16   March, they still had a very darned good month, even though

17   that was the month that Google put them in -- something

18   happened with the Google algorithm, or that's at least the

19   allegation.  We don't have -- as we sit here, we don't have any

20   idea, and there's certainly stuff in the popular press about

21   that happening.

22          April and May, their revenues were about the same as

23   they were pre-September/October 2018, okay?  Up until, like,

24   the very last two months or the two preceding months, that they

25   were, at best, what they were before, and what that tells us is

190912pharm1OA            Conference

1   a couple of things.  Number one, this is very easily

2   compensable with money damages.  You can take whatever you

3   think the delta is, if you think it's what was the change in

4   revenue from after we put them on the list or after Google did

5   whatever it did or after Bing did whatever it did, compare it

6   to what their average is, they have given us the data for that,

7   okay, as we sit here.  They have explained the number of

8   customers that they've lost.  As your Honor pointed out, that

9   is a very quantifiable number.  What they said in their most

10  recent affidavit was they went down from 31 to about 23.

11          So, all of this is quantifiable.  And from our

12  perspective, it's also pretty darned small, okay, because up

13  until you get to June and July, their trend line is what it was

14  for the last couple of years outside of the aberration.  In all

15  honesty, the aberrant period is not what's happening now; it's

16  what happened in that kind of October 2018 through, you know,

17  March/April of 2019.  And they're picking basically the high

18  watermark and saying, Hey, we lost stuff since then because now

19  we're down from the high watermark.

20          An interesting point of what they didn't say, though,

21  they're not saying that they're actually losing money.  To make

22  less money than you made before is not the same as saying

23  you're actually losing money.  They don't say that their

24  expenses are exceeding the revenues.  They don't say

25  anything -- we don't have any net income statements showing

190912pharm1OA          Conference

1   that prior to anything we did, or prior to anything else, they

2   had a profit of, you know, $1,000 and now they have a loss of

3   negative $100,000.  They don't say anything like that.  They

4   just say their revenue has diminished.  Okay.  As any

5   accountant will tell you, what's the expense side of the

6   ledger, okay?  It doesn't say anything about whether they're

7   actually losing money.

8          There are a couple other things that are kind of

9   useful for the irreparable harm argument, I've lost my place.

10  I told you there was an order here, and now that I go out of

11  it --

12          THE COURT:  The order is gone.

13          MR. CASEY:  We're throwing it all out of the window,

14  your Honor.

15          THE COURT:  I feel like I did the same thing with

16  Ms. Shear.  She had obviously it very carefully organized, but

17  she pivoted well.

18          MR. CASEY:  Right.

19          Another thing that they don't show you, they don't

20  show you what the traffic was before we put them on the list,

21  okay?  We now actually have -- there are data analytics that

22  you can find out in the real world.  And, again, their trend

23  line was pretty much status -- what it was for several years

24  until something happened in the back half of 2018 to move them

25  up the mountain, and then they kind of began to go down the

190912pharm1OA              Conference

1  mountain in March or April of 2019.

2          They don't say what their clicks or what their

3  traffic was before we put them on the list.  As a matter of

4  fact, in their brief, as we point out, they cite the period

5  after we put them on the list as before they were harmed, okay?

6  That's the "before" that shows that after something else

7  happened is -- that's the difference.

8          And so, as your Honor was accurate to point out, us

9  putting them on the list didn't damage them in any way, let

10 alone damage them in an irreparable way, okay?

11         THE COURT:  Do you want to address the goodwill

12 point?

13         MR. CASEY:  The goodwill point, there's case law that

14 says that that's kind of inherently both speculative and

15 conclusory, what we have here.

16         THE COURT:  If you look at maybe future, but --

17         MR. CASEY:  Your Honor, if they had their customers

18 come in and say, We don't believe them anymore, that might be

19 one thing.

20         The self-serving affidavit of the plaintiff to say I

21 think other people don't believe me anymore, that gets a lot

22 less credence, okay, and they don't have people from the

23 outside world saying, you know, We don't believe you anymore.

24 In all honesty, who knows why their customers, to the extent

25 they have left, have left?  Did they go to eight customers and

190912pharm1OA            Conference

1   say why did you leave?  Well, because you were on the list.  We

2   don't like you.  We don't have that.

3          We point to data with archival web pages.  Their

4   customer lists have fluctuated for a number of years, and I

5   would speculate that it will continue to fluctuate for a number

6   of years in the future for a whole variety of things; to

7   attribute that exclusively to NABP's conduct, there just isn't

8   a link there, there just isn't a causal connection.

9          So, I don't think the lack of goodwill -- the

10  purported lack of goodwill is meaningful.  And I think, from

11  our perspective, that is in the overarching bucket of balancing

12  the equities.  And what we are saying in general is, we're not

13  talking about simply harm to NABP.  We're talking about harm to

14  the public health.

15         As we sit here today, Congress has made a considered

16  judgment as to what is safe for the American consumer and what

17  isn't.  We are trying to facilitate that and make sure that

18  everyone is aware of who is engaging in behavior that is

19  consistent with that and who is it that's engaging in behavior

20  that's inconsistent with that.  So to prevent us from

21  identifying them as people that are acting inconsistently with

22  that, it is a potential harm to the public health.

23         And then with respect to whether or not this is in

24  the public interest, they point exclusively to competition.

25  Competition is not the be-all and end-all.  Certainly, the

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA                Conference

1    antitrust laws were not meant to protect illegal activity.

2    There's nothing in *National Society of Professional Engineers*

3    that says that.  I'm sure --

4            THE COURT:  What plaintiff is doing isn't illegal by

5    itself; there's no basis to say that.

6            MR. CASEY:  Well, that isn't where we need to be

7    having that discussion right now.

8            THE COURT:  Okay, but to be clear, it's not as if --

9    if they provide information and people take that information

10   and do illegal things, that's one thing, and that may be what

11   your argument is, but the provision of that information, no one

12   has said that.

13           MR. CASEY:  Provision -- there's two different --

14   provision of information.  These are people out in the world,

15   that is one thing.  If they, instead, and this is what they are

16   really expressing concern about, is the -- their list of

17   pharmacies, when they have a reduction in their click-through

18   revenue, because not only do they just provide this information

19   out in the world.  They specifically link people, link

20   consumers to those pharmacies that are engaging in illegal

21   activity, okay, or potentially engaging in illegal activity.

22   And why, yes, it would be a violation of 18 U.S.C. 2, 18 U.S.C.

23   371 to aid and abet --

24           THE COURT:  Well, 371 is the conspiracy statute, and

25   you have to show a meeting of the minds that they're conspiring

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1    with the illegal purchases of pharmaceutical products from

2    abroad.  I don't think you have that.

3            Aiding and abetting -- there's a difference between

4    maybe some notion of foreseeability and actually aiding and

5    abetting with the intent to, right, have the person --

6            MR. CASEY:  It is not our place to make a judgment as

7    to whether or not they are, in fact, engaging in criminal

8    activity.  What we are saying is, they are pointing to websites

9    that have the potential to be violating federal, and we believe

10   are violating federal, and as a result, those are among --

11   those are one of the three criteria that we have to be put on

12   the "not recommended" list.  That's all we're saying.

13           THE COURT:  Okay.  And on that point, are there other

14   websites that your client has put on the "not recommended"

15   list?

16           MR. CASEY:  We have -- once you actually start

17   digging, there's about 15,000 on this list.  And they are --

18   and honestly, that's part of -- this is a very dynamic area

19   sadly I knew very little about until about two and-a-half weeks

20   ago.  But part of the reason actually that there is that

21   criteria for not simply are you dispensing pharmaceuticals or

22   dispensing unbranded or unapproved drugs, but the third thing

23   is, do you link or refer to pharmacies that do that?

24           There's a whole host of websites out there that

25   aren't pharmacies in and of themselves, but basically they're

190912pharm1OA          Conference

1    aggregators or they are kind of middleman marketers that

2    ultimately get you to a real live pharmacy, but these websites

3    can -- they pop up like top seed.  And there's thousands of

4    them.  And they all kind of like point to a smaller universe of

5    people that are actually doing the dispensing and the credit

6    card processing and the shipping and things like that, but

7    they're all over the place, okay?  So that's exactly why there

8    is that third criteria, because there's -- whether it's

9    1-800-Viagra, 1-800 whatever it is, there's a 1-800 for as many

10   drugs as there are out there in the world.  And they aren't

11   necessarily their own discrete things.  They lead to a smaller

12   universe of places that do that.  That's exactly why we have

13   that third criteria.

14           I have bounced around all over the place, but to give

15   you a 30 seconds as to what NABP does, NABP is a non-profit

16   accreditation --

17           THE COURT:  It's been around since 1904.  I've read

18   the shtick.

19           MR. CASEY:  Okay.  Good.  It accredits a lot of

20   stuff.  We're not out here to pick on anybody.  We're saying we

21   accredit pharmacists, pharmacies, wholesale distributors,

22   everybody in the pharmacy space.  And that's what we do.

23           THE COURT:  Your point is, you're not some economic

24   competitor trying to squeeze plaintiff to gain some market

25   share or anything like that.

190912pharm1OA            Conference

1          MR. CASEY:  No.  We don't do the price comparator

2    stuff.  We don't get -- that's not a revenue generator for us.

3    So, we would say we aren't even their competitor in the price

4    comparator space.

5          And then we would also say that we aren't their

6    competitor in terms of the verification space because as they

7    point out themselves, NABP only verifies pharmacies that are in

8    the United States, and PharmacyChecker verifies pharmacies that

9    are international.

10          THE COURT:  Right.  So, but if one were to -- the

11    counter to that would be that still makes you a competitor to

12    the extent that there is -- the pharmacies are competing for

13    the business of the person who wants to buy pharmaceutical

14    products.  So you're trying to squeeze out non-U.S. pharmacies

15    from that competitive environment.

16          MR. CASEY:  Well, we would say that's different than

17    what we're doing.  We are announcing to the world --

18          THE COURT:  Don't buy from our competitors.

19          MR. CASEY:  Well, we are announcing to the world

20    these are the people that we have accredited.

21          THE COURT:  Yes.

22          MR. CASEY:  That's the VIPPS list.

23          THE COURT:  Yes.

24          MR. CASEY:  And then, this is the "do not recommend"

25    list; these are the people that we think are engaged in

190912pharm1OA          Conference

1   practices that violate one of these criteria.  That's what

2   we're announcing to the world.

3              THE COURT:  Right.  The cynic would say the criteria

4   are used to create competitive barriers.

5              MR. CASEY:  Well, we would say that's the FDCA that

6   creates those competitive barriers.  And that's what they said

7   in the *Canadian Antitrust Import* case.  It's the regulatory

8   scheme, and Congress has the ability -- and you said, go talk

9   to your member of Congress.  Also, go talk to the Secretary of

10  HHS.

11             Congress had a vehicle that said, Hey, Secretary of

12  HHS, when you can certify that this is just as safe, you know,

13  come tell us.  It's been 18, 19 years, and no Secretary of HHS

14  has ever done that.

15             THE COURT:  I'm sure it's on their to-do list.

16             MR. CASEY:  I guess we talked a little bit about

17  delay.  We told them on December 28, 2018, that we were putting

18  them on the list.  They responded that day that, Hey, that

19  would be a bad idea.

20             We explained on January 2, this is why we're doing

21  it.  They sent back something on January 9 saying we still

22  think that's a bad idea.  The whole colloquy is in our stuff.

23             THE COURT:  Yes.

24             MR. CASEY:  And then they sat on their hands.  And

25  they sent us another letter in June.  We responded again in

190912pharm1OA            Conference

1   June.  Still sat on their hands for months.  An eight-month

2   delay from the last thing that we did is, in and of itself, a

3   reason to deny the motion for preliminary injunction.

4           And given that, I don't think we need to get too far

5   into the weeds about the likelihood of success on the merits of

6   the antitrust claim, but if you have questions about that, I'd

7   be happy to answer them, but I'd also be happy to yield my time

8   to counsel for CSIP.

9           THE COURT:  Okay.  Thank you.

10          MR. WERBIN:  Good afternoon.  Harry Werbin for the

11  Center for Safe Internet Pharmacy.  We use CSIP as a shorthand

12  acronym.  There's a lot of acronyms here but --

13          THE COURT:  I was wondering why NABP doesn't use

14  Nab- --

15          MR. CASEY:  It doesn't sound good.

16          THE COURT:  Might want to rethink that.  And I used

17  to work in the U.S. Attorney's Office, and there was an entity

18  in DOJ called CCIPS.  So, I'll try not to confuse them.  They

19  dealt with cyber-crimes.

20          MR. CASEY:  I'll try to keep my New York accent

21  clear, so I don't add the plural at the end.

22          THE COURT:  *Fuhgeddaboudit*.  It's all good.

23          MR. CASEY:  I'll dispense with formal notes because

24  they're useless in my experience.

25          I want to address CSIP's role at this stage in this

190912pharm1OA              Conference

1   proceeding is very limited.  As your Honor notes from our

2   papers, CSIP is willing to so-called accept and share with its

3   members any revised NABP list, which, in any event, is almost a

4   moot concept because it's publicly available to anybody.  If

5   they revise it, anyone who accesses it, is going to see

6   whatever the current iteration is if the Court so orders them

7   to change it.

8           I want to address a couple of things.  One, this

9   concept, which your Honor did speak about extensively with

10  plaintiff's counsel, is this concept that they just throw out

11  as a conclusion that CSIP somehow can have legal control in

12  terms of mandatorily being able to direct its members to do

13  anything on their own.

14          Let's look at who the members are of CSIP:  AMEX;

15  Discovercard.health; Facebook; Google; MasterCard; Microsoft,

16  which owns and controls Bing; as of today, it's Verizon Media;

17  PayPal; and UPS.  Almost all of these are some of the largest

18  public independent companies in the United States.  The concept

19  that CSIP, a small, independent not-for-profit entity, which

20  was formed solely and continues today solely for the purpose of

21  permitting these companies to share information among

22  themselves to the extent they so desire, or not desire, could

23  have any legal control over these entities is simply

24  preposterous.

25          In fact, I want to address a couple of things they

190912pharm1OA          Conference

1  raised in their reply for the first time, happy to submit a

2  supplemental declaration, offer of proof, whatever, but I'll

3  say this:  In their reply brief, they attach the CSIP policies.

4  Those policies were drafted, and in fact, they're dated March

5  2014.  They've never been updated.  They will be updated now,

6  but couple of things in that.

7          First, I point your Honor to page 8 of those

8  policies, the section at the bottom, Roman numeral V, CSIP

9  Membership, which they themselves refer to, but only in part,

10 because they ignore the part that kills this whole argument of

11 theirs.

12          Point 3 of that section, the third bullet point,

13 states as follows, quote, "All actions taken on illegitimate

14 sites is voluntary and subject to individual company

15 guidelines," closed quote.  And then there's a footnote, quote,

16 "participation in the data-sharing tool," which I'll discuss in

17 a moment, your Honor, "participation in the data-sharing tool

18 as permitted, subject to participants' respective policies and

19 consistent with relevant law."So, right there it says

20 everything is voluntary, and it's up to whatever your company's

21 internal guidelines and policies state, as well as applicable

22 law, number one.

23          Number two, they refer to this as their sole

24 evidence, so to speak, of some nefarious, hidden database or

25 other list that CSIP keeps or kept other than the NABP

190912pharm1OA              Conference

1    so-called blacklist.  That's completely false, and I'll tell

2    you what happened.

3           In 2013 or 2014, CSIP came up with an idea with its

4    members that it thought would be a good idea to create a

5    private portal that its members, its corporate members could

6    individually log into and share information.

7           For example, if Federal Express suspected some

8    foreign pharmaceutical site or company, because they're in the

9    shipping business, to be illegal, they could share that

10   information and then theoretically check it against some other

11   third-party site list, whether it's NABP or LegitScript, and

12   that was the purpose for this portal.  However, the portal was

13   never used by the members and it was closed in 2015 because of

14   non-use.  It wasn't used because there were complex technical

15   issues, incompatibilities between different companies.  There

16   were confidentiality concerns and business issues with respect

17   to their own business models.  It was never used.  It never

18   came to fruition.  There was never any database created.  There

19   was no list created.  There is no other list.  There is no

20   other database.  And this is attested to, under oath, by

21   Marjorie Clifton, the Executive Director of CSIP, so so much

22   for that issue.

23          I don't have a lot more to add.  I wanted to clarify

24   those few things.  I also want to note they mention that, in

25   their reply papers, that Eli Lilly was involved in founding

190912pharm1OA              Conference

1    CSIP.  That's completely false.  Eli Lilly was never involved

2    in founding CSIP, and, again, we can submit a supplemental

3    declaration to attest to that.

4            The only cooperation they can cite to again made out

5    of whole cloth here is, again, from the 2014 Principles where

6    there's a singular reference to a marketing program that CSIP

7    did with defendant Alliance for Safe Online Pharmacies, or

8    ASOP, back in 2013, 2014.

9            And as it says in the Principles, your Honor can read

10   it, on page 8, this was a reference to a specific pre-2015

11   marketing program that supported the FDA's safe prescription

12   drug program.  It had nothing whatsoever to do with the

13   plaintiff.  In fact, as we got into 2015, ASOP's business model

14   started to steer much more towards lobbying in the political

15   sphere, which was never – and never has been – CSIP's model,

16   which, to the contrary, has been consumer education.  As a

17   result, CSIP and ASOP, as of around 2015, essentially parted

18   ways in terms of doing these kinds of partnerships for public

19   education.

20           I just want to emphasize this, your Honor, because

21   once again, what we see here is all these allegations thrown

22   out without a scintilla of evidence to support an injunction as

23   to CSIP, other than to the extent CSIP was willing to accept,

24   of course, whatever your Honor might order as to NABP, and then

25   only to the extent of requesting that its members make whatever

190912pharm1OA                  Conference

1  changes they deem appropriate, but they certainly can't require

2  their members to do that.

3           Thank you, your Honor.  Any questions?

4           THE COURT:  I don't.  Thank you.

5           MR. WERBIN:  Thank you.

6           THE COURT:  Ms. Shear.

7           MS. SHEAR:  Thank you, your Honor.  I appreciate the

8  Court's time, and I'll be brief.  I just wanted to make two

9  points.

10          This is a conspiracy case.  It necessarily entails

11  concerted action by two different entities, and those actions,

12  the actions at issue here that caused the anticompetitive harm

13  that PharmacyChecker complains about, happened months apart.

14          Your Honor asked about how an injunction can apply to

15  NABP, but the idea is that NABP and CSIP, they acted in

16  concert.  So, their combination, their concerted action began

17  in December and culminated with the actions that CSIP directed

18  in July.

19          THE COURT:  Let's pause on that for a second.

20          To the extent that they have different roles in this

21  field, so one makes a decision about who is going to be on a

22  "not approved" and the other is "information sharing," and that

23  is what they do in the normal course, why does that mean what

24  happened here is somehow concerted action that contravenes the

25  antitrust laws?

190912pharm1OA            Conference

1          MS. SHEAR:  Because it caused harm to competition by

2    excluding a competitor from these two marketplaces.

3          THE COURT:  Well, then, isn't it the case that the

4    whole model itself would violate?  Because presumably every

5    time they find that some entity should be on a "not

6    recommended" list and that information is shared, then, if

7    you're right, that's going to harm somebody, right?  Whoever

8    gets that designation presumably would be harmed, so that

9    should, in every instance, be an antitrust violation.

10         MS. SHEAR:  Your Honor, I think the distinguishing

11   issue here is that the effect in this case was to reduce

12   competition in a way --

13         THE COURT:  Why would that not be true in every case

14   where they not recommend something?

15         MS. SHEAR:  Anyway, that's unique because most of the

16   sites that appear on the NABP list are pharmacies, so it would

17   reduce competition in the market for pharmacy drugs, for

18   pharmacy sales.

19         THE COURT:  Right, but that's still -- and what if

20   that pharmacy, some mom-and-pop pharmacy in Markham, Ontario,

21   and then they get this "not recommend" thing, and then their

22   lawyer comes and says, Our business went from, you know, $1,000

23   a day to $5 a day, and Eli Lilly is behind this whole thing,

24   and look what they did.

25         Why is that not exactly the same thing?

190912pharm1OA            Conference

1          They're not going to make a "not recommend" list on

2     whether or not you should buy a lawn mower.  This is a

3     pharmaceutical thing.  This is what they do, right?

4          So, it's always going to be the case that when they

5     do a "not recommend" and that information is shared with

6     members of CSIP, that's going to have a detriment effect on

7     somebody.

8          MS. SHEAR:  Understood.  There's two answers to that.

9     One, to the extent pharmacies on the list are actually engaged

10    in illegal activity, there's no harm.  The other is the --

11         THE COURT:  Wait.  I thought you said that the

12    Supreme Court said that safety doesn't matter?  You can't

13    engage in concerted action.

14         MS. SHEAR:  That's correct with respect to safety,

15    but not with respect to illegality, as your Honor said.

16         THE COURT:  But here, the illegality is motivated out

17    of safety.

18         MS. SHEAR:  So, perhaps I was unclear.

19         In the example that you provided, if the pharmacy was

20    doing something illegal, there can be no harm to competition.

21         THE COURT:  Sure -- well, no, that pharmacy would

22    suffer economic consequences from the "not recommend" that CSIP

23    would somehow coerce Google to publicize.

24         MS. SHEAR:  *In re: Canadian Antitrust Imports* says

25    that when government policy prohibits the conduct, then there

190912pharm1OA          Conference

1   is no private antitrust violation.

2          THE COURT:  All right.

3          MS. SHEAR:  With respect to the example of the

4   mom-and-pop, it would be harm to a competitor, so that

5   individual pharmacy might have experienced harm, but harm to a

6   competitor is not what the antitrust laws protect.  The

7   antitrust laws protect harm to competition.

8          THE COURT:  Right, but you say that you are a

9   competitor, right?

10          MS. SHEAR:  Yes.

11          THE COURT:  So, you still have to win the argument

12   that what's harmed here is not your client, but that is part of

13   what you're saying, right?

14          The mom-and-pop pharmacy could say, Look at our

15   revenues since the "not recommend" came out.  They have taken a

16   nosedive.  They still don't win because you seem to concede

17   that what they're doing is illegal, so that's not harm to

18   competition, or it may be harm to competition, but maybe it's

19   justified harm to competition.  But second, it's not harm to

20   competition, it's harm to a competitor, but I guess I'm trying

21   to understand what's different here because what you're doing

22   isn't *per se* illegal.

23          MS. SHEAR:  Well, so what we're doing is not illegal.

24   And what we're doing -- what we're -- the reason removing

25   PharmacyChecker from the environment is harm to competition, is

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1  because it changes the dynamic of the marketplace.  It changes

2  the competitive landscape.

3          THE COURT:  Sure --

4          MS. SHEAR:  It changes the competitive landscape.

5          THE COURT:  -- because to the extent that your client

6  is providing information that facilitates the illegal

7  importation of pharmaceutical products, including providing the

8  link, it's just one step removed from the -- if you do the link

9  to the mop-and-pop pharmacy in Markham, then why is it that's

10  not motivated out of preventing criminal conduct?

11          MS. SHEAR:  So, the harm to the mom-and-pop pharmacy,

12  they might have some sort of tort claim hypothetically, but

13  they don't have an antitrust claim because their removal from

14  the marketplace doesn't change anything from the perspective of

15  consumers, right?  The antitrust laws are to benefit consumers.

16          THE COURT:  But the mom-and-pops are providing

17  cheaper pharmaceutical products; that's good for consumers.

18          MS. SHEAR:  But there's no reason that an alternative

19  supplier couldn't take its place.

20          THE COURT:  No, there is, actually, because they're

21  not allowed.  So, the mom-and-pop in Scarborough can't do that

22  because they're still in Canada, so I'm not sure I understand.

23          MS. SHEAR:  I'm sorry.

24          THE COURT:  No other Canadian pharmacy can take the

25  place of the mom-and-pop shop.

190912pharm1OA              Conference

1          MS. SHEAR:  Right.

2          THE COURT:  Right, so I don't understand that

3    argument.

4          MS. SHEAR:  Let me start again because we seem to

5    have lost each other.

6          THE COURT:  Maybe I'm misunderstanding, and I

7    apologize.  Go ahead.

8          MS. SHEAR:  I understood your hypothetical to concern

9    a mom-and-pop shop in the United States.

10         THE COURT:  No, no, no.  Markham, Ontario, lovely

11   town, but it's illegal for any of us to buy pharmaceutical

12   products from that poor mom-and-pop pharmacy in Ontario.

13   That's my point.  If it's okay for them to do a "not recommend"

14   on that pharmacy -- so that pharmacy might advertise to sell

15   pharmaceutical products in the United States, and NABP comes

16   along and says "not recommend" because they are in Canada and

17   they're not FDA approved, right, that's harmful to that

18   mom-and-pop shop.

19         MS. SHEAR:  Uh-huh.

20         THE COURT:  That's not illegal for NABP to do that or

21   CSIP to share that information.

22         MS. SHEAR:  Agreed, your Honor, that would not be

23   illegal.

24         THE COURT:  So, if it turns out your client provides

25   information to facilitate people to buy pharmaceutical products

190912pharm1OA            Conference

1   from that mom-and-pop shop in Ontario, why, somehow, is that a

2   violation of the antitrust laws?

3                MS. SHEAR:  Well, I think the degree of removal --

4                THE COURT:  It's one step removed:  Here's how you

5   get to the mom-and-pop shop.

6                MS. SHEAR:  Right.  And I think that the degree is

7   critical because that removal, that the distinction between the

8   pharmacy and PharmacyChecker, which provides information about

9   that pharmacy --

10               THE COURT:  What possible reason would there be to

11  provide information about the mom-and-pop pharmacy in Ontario,

12  except to say, You can buy pharmaceutical products from that

13  pharmacy, which is illegal?

14               MS. SHEAR:  PharmacyChecker provides information.

15  And your Honor makes a good point that that is a foreseeable

16  result of the information it provides.

17               THE COURT:  Let me rephrase it.  What possible reason

18  would there be to provide information about a pharmacy in

19  Canada to potential pharmaceutical purchasers?

20               MS. SHEAR:  To raise awareness about the costs of

21  pharmaceuticals elsewhere.

22               THE COURT:  Why would anybody care about that, unless

23  they're interested in buying pharmaceutical products?

24               MS. SHEAR:  We maintain there are other reasons to

25  care about that, as well, including, your Honor, let me just

190912pharm1OA            Conference

1  remind the Court that PharmacyChecker blog, which is a policy

2  advocacy website, is also on the blacklist, which is really

3  just an opinion --

4      THE COURT:  Let's stick with my question.  What

5  possible reason would there be to provide information about the

6  pharmaceutical prices of a mom-and-pop pharmacy in Ontario to a

7  consumer in the United States?

8      MS. SHEAR:  One possible reason would be to

9  illustrate the point that there is a problem with U.S.

10 pharmaceutical prices.

11     THE COURT:  Well, why do you need to provide the

12 link?  Why can't you just say, If you're interested in Humira,

13 in the United States it will cost you $100 for a prescription,

14 but at this mom-and-pop shop in Ontario, it would cost you $50?

15     But if the point is to show the price disparity, why

16 wouldn't you just say, In Canada, you can buy it for X, in

17 United States you can buy it for X-plus-50, as opposed to

18 saying, By the way, here's a particular pharmacy in Ontario

19 that we say is kosher that you can buy from?

20     MS. SHEAR:  Understood.  My point is simply this,

21 that what -- some international pharmacies selling into the

22 United States, that may be illegal, but providing information

23 is not.  It may be bad policy.

24     THE COURT:  I don't understand what the reason is to

25 provide information, including the link, except to facilitate

190912pharm1OA              Conference

1  that purchase.

2          MS. SHEAR:  That is likely the primary reason, your

3  Honor, but in any event, that, in providing that information,

4  is not illegal.  It's important that illegality versus

5  inadvisability or bad policy, or how ever you want to

6  characterize it, the distinction between that is critical,

7  because that's where we fall under the protections of *National*

8  *Society of Professional Engineers*.  It says that even if the

9  conduct poses a risk to public safety, even if it is unsafe or

10  unadvisable, it's still protected.  It's only when it crosses

11  the line into illegality that there can be a legitimate reason

12  to suppress that competition.

13          THE COURT:  Okay.

14          MS. SHEAR:  Thank you.

15          THE COURT:  Anything else?

16          MR. CASEY:  Not from NABP.

17          THE COURT:  Can you just give me a few minutes to

18  look over my notes which are also a mess and let me see if I

19  have anything else.

20          Why don't we just take a ten-minute break?

21          (Recess)

22          (In open court)

23          THE COURT:  Does anybody have anything that occurred

24  to them that they want to mention?

25          MR. CASEY:  Now that you raised that, the cabal got

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA                Conference

1   together and you had a question that I thought was directed at

2   how much of the importation is illegal.  I may be misrecalling

3   the question.

4        The Eighth Circuit in the *Canadian Antitrust Import*

5   case said the FDA repeatedly expressed the view that virtually

6   all importation of drugs into the United States by individual

7   consumers violates the FDCA.

8        I thought that was the answer to your question, but

9   we thought we'd pass along.

10       THE COURT:  Okay.  Well, given the nature of the

11  application, which is that there is a need for immediate action

12  to avoid irreparable harm, I'm going to give you my ruling now.

13       Just a quick background.  Plaintiff,

14  PharmacyChecker.com, LLC, has brought this action against NABP,

15  ASOP, CSIP, LegitScript, and Partnership for Safe Medicines,

16  LSPSM.  I've just gone with the acronyms, because you all know

17  who the parties are.

18       The underlying claim is a violation of Section 1 of

19  the Sherman Act.  In particular, plaintiff alleges that "The

20  defendants have been engaging in a scheme to suppress

21  competition in the markets for online pharmacy verification

22  services and comparative drug price and pharmacy information,"

23  closed quote.  And that's from paragraph 93 of the complaint.

24       Plaintiff filed its preliminary injunction

25  application on August 19; filed a corrected version the next

190912pharm1OA              Conference

1   day.  The requested injunction is directed only towards NABP

2   and CSIP.  Defendants, the PI Defendants as I'll call them,

3   responded in opposition to the application on August 30, and

4   plaintiff filed replies on September 6.

5            Now in terms of the relevant factual background,

6   plaintiff is a website and blog that aims to provide consumers

7   with, quote, "information about safe international online

8   pharmacies and comparative drug prices of pharmacies within and

9   outside the United States."  And that's straight from

10  plaintiff's memorandum on page 3 in support of its P.I.

11  application.

12           Plaintiff purports to want to help consumers, quote,

13  "seeking affordable prescription medication from abroad,"

14  closed quote, determine whether they are obtaining these

15  medications, quote, "from a safe and trustworthy online

16  pharmacy," closed quote.  That's from paragraph 4 of the

17  Cooperman declaration.

18           Plaintiff was founded back in 2002.  In 2003,

19  plaintiff launched its verification program which accredits,

20  quote, "safe online pharmacies," closed quote.  That's from

21  Cooperman, paragraph 8.  And plaintiff claims that

22  participating pharmacy sites have to submit a thorough review,

23  in quotes, of its safety and marketing practices.  That's also

24  from paragraph 8 of the Cooperman declaration.

25           And to assist with the reviews, plaintiff says that

190912pharm1OA            Conference

1  it employs a U.S.-licensed pharmacist to make decisions

2  regarding applications from pharmacies in foreign countries.

3          The way plaintiff makes money is through application

4  fees from applicants who wish to participate in the

5  verification program, monthly listing fees from applicants who

6  want to be published in plaintiff's online directory,

7  subscription to U.S. pharmacy discount card programs for

8  lower-cost medicine at U.S. pharmacies and banner advertising.

9  That's paragraph 10.

10          Plaintiff does cite a number of statistics to

11  demonstrate how prohibitively high drug prices prevent American

12  consumers from consistently being able to take necessary

13  medication.  And indeed, plaintiff cites a bunch of data that

14  talks about how people are actually harmed and die from not

15  being able to afford prescriptions that they would otherwise

16  have to purchase here in the United States, and as a result

17  plaintiff sites statistics that show that at least 4 million

18  people, Americans a year, buy prescriptions from pharmacies

19  outside the United States such as Canada.  And that's all on

20  pages 3 and 4 of the opposition.

21          Plaintiff says the flip side of this is that it is

22  harmful for these individuals to buy their prescriptions abroad

23  because pharmaceutical manufacturers enjoy higher profit

24  margins in the U.S. than in most other countries through price

25  discrimination than other countries alleged on page 4 of the

190912pharm1OA          Conference

1   memorandum.

2        So, motivated by their interest in maintaining this

3   price discrimination, plaintiff alleges that large

4   pharmaceutical companies have formed a, quote, "nonprofit

5   consumer advocacy type organization, or organizations, to use

6   scare tactics and misinformation campaigns to set the stage for

7   more control."  That's from page 5 of the memorandum.  And

8   according to plaintiff, the two PI defendants are two such

9   organizations.

10        And then, plaintiff goes through a great deal of

11   history, the connections between all the defendants in the

12   case.  So LegitScript is a member of ASOP.  According to

13   plaintiff, NABP and PSM are friendly with ASOP, and they

14   regularly participate in meetings together.  Back in 2011,

15   LegitScript and ASOP organized CSIP, the members of which

16   include Facebook, Google and Microsoft, among other major

17   players.  Back in April of 2011, it's alleged that NABP

18   officials met with CSIP and its members to discuss strategies

19   for cutting off access to websites like plaintiff's.

20        As a result of the meeting, there were a bunch of

21   steps taken over time to limit plaintiff's ability to conduct

22   business.  Just some examples that are alleged include a 2008

23   NABP allegedly approached search engines asking a determinative

24   contact with plaintiff.

25        In 2010, Google is alleged to have reached an

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1   agreement with NABP that ads must be from pharmacies and drug

2   manufacturers accredited through NABP through its VIPPS, which

3   is the acronym for Verified Internet Pharmacy Practice Site

4   Program.  And in 2017, NABP allegedly coerced a U.S. online

5   pharmacy, healthwarehouse.com, to stop doing business with

6   plaintiff, or else it would lose its VIPPS certification.

7           And I skipped one.

8           Back in 2010, NABP added plaintiff to its, quote,

9   "Not Recommended Sites," but removed it in February of 2011

10  because, according to what plaintiff says, quote, "NABP is

11  reviewing the standards and criteria used in brackets

12  determinations for our "Not Recommended Sites," closed quote.

13  But in December '18, NABP again added plaintiff to its "Not

14  Recommended Site" list.  And then in March of this year, Google

15  allegedly updated its search engine protocol to include the

16  updated NABP blacklist.

17          So, as a result of this conduct, plaintiff alleges a

18  couple of things.  It alleges that Microsoft's Bing implemented

19  a, quote, "red caution shield," closed quote, warning sign

20  indicating that NABP includes plaintiff site in its blacklist.

21  This appears on Bing's search results when plaintiff appears.

22  And initially, it appeared as though it had been removed, but

23  now it's back up, so there's been some change during the

24  briefing.

25          Plaintiff alleges that it has lost 78 percent of its

SABRINA A. D'EMIDIO – OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA          Conference

1   organic search traffic; it's lost 72 percent of its

2   click-through revenue; its lost eight pharmacy customers out of

3   31 since December of '18; and that no new pharmacies have

4   joined plaintiff's program in 2019, whereas, eight joined in

5   2018.

6          Now NABP's theme is that, based on statutory and case

7   law, as well as agency reports, that importing drugs from

8   foreign countries is mostly illegal, and that the FDA regulated

9   online pharmacies that, quote, "offer potentially dangerous

10  prescription drugs to U.S. consumers," closed quote.  That's

11  page 2 of its memorandum.  NABP also cites FDA guidance that

12  provides that personal importation of drugs from Canada and

13  other countries remains illegal even for, quote, "foreign-made

14  chemical versions for drugs available in the U.S.," closed

15  quote.

16         Now, to be clear, plaintiff in its complaint alleges

17  that it doesn't sell any foreign pharmaceutical products.  That

18  doesn't seem to be in dispute, but it rather provides a

19  verification program, which includes foreign online pharmacies.

20  And also, plaintiff asserts that many FDA-approved drugs that

21  are manufactured abroad are manufactured abroad and many drugs,

22  quote, "sold in foreign countries are FDA approved, but

23  sometimes with different labels," closed quote.  That's from

24  paragraph 49 of the complaint.

25         NABP is a private nonprofit organization founded in

190912pharm1OA          Conference

1   1904, quote, "to establish interstate licensure, transfer for

2   pharmacist based upon uniform educational standards," closed

3   quote.  It provides, quote, "educational and accreditation

4   services to support its members, state board, pharmacy and

5   protect the public health," closed quote.  This is all from

6   page 4.  And it says that its members -- it has 65 domestic and

7   international Boards of Pharmacy.  It receives funding solely

8   from accreditation and testing services, but not from

9   pharmaceutical companies.

10          It claims that in '99 it established VIPPS to, quote,

11   "protect the nation's drug and device supply chain and

12   distribution system from counterfeit and diverted products by

13   verifying and accrediting internet websites offering pharmacy

14   services," closed quote.

15          So, according to NABP, VIPPS only accredits U.S.

16   pharmacies that, based on NABP's review, complies with federal

17   and state law and, quote, "best industry practices," closed

18   quote.

19          It started its "Not Recommended Sites" in 2008 to

20   identify websites that, quote, "dispense prescription

21   medication without a prescription," that's one; two, "dispense

22   foreign or unapproved medicine," closed quote, that's two;

23   three, refers/link patients to site and facilitate the

24   dispensing of prescription medications, in violations of

25   standard federal or NABP standards," closed quote.

190912pharm1OA            Conference

1        And it has been discussed during our oral argument

2   this third category was supposedly added specifically to

3   address websites that were quote seeking to circumstance vent

4   the blacklist by not directing dispensing medicines, but quote,

5   "instead, linked or referred patients to online drug sellers,"

6   closed quote, that would not be accredited by NABP.

7        NABP also cites the fact that DOJ and FDA have

8   entered into an agreement with Google, did so in 2011 after an

9   eight-year investigation that required Google to forfeit

10  $500 million generated from online ads for Canadian pharmacies.

11  In fact, Google was sanctioned for using plaintiff as a

12  verification service because it verified foreign online

13  pharmacies.

14       So, according to NABP as a result of this, Google

15  switched to the VIPPS verification standard of its own accord

16  and as a result of the DOJ prosecution, but not based on any

17  collusive conduct between NABP and Google.

18       NABP defends its not recommended determination in

19  December of last year, saying that plaintiff's website met the

20  criteria because it referred consumers to sites and facilitated

21  dispensing of prescription drugs in violation of federal and

22  state law.

23       CSIP mostly just argues that it doesn't have control

24  over its members such as Google, Facebook or Microsoft, and

25  therefore can't be enjoined to require its members to do

190912pharm1OA          Conference

1   anything.  It says it doesn't have any of its own blacklists
2   like NABP and says that it can and is willing to request its
3   members reflect changes in all applications of the NABP
4   blacklist if the Court ordered it to do so.

5         In terms of the conclusions of law.  The applicable
6   law is as we all know, preliminary injunction is an
7   extraordinary remedy; never awarded as a matter of right said
8   the Supreme Court in *Winter v. Natural Resources Defense*
9   *Council, Inc.*, 555 U.S. 7, 24.

10        It is designed preliminary injunction to preserve the
11  status quo and prevent irreparable harm until the Court has an
12  opportunity to rule on the lawsuit's merits.  That's from this
13  district in *Williams v. Rosenblatt Security Inc.,* 136 F. Supp.
14  3d 593, 616, footnote 11.

15        The standard for TRO is the same as a preliminary
16  injunction.  A party seeking a PI must ordinarily establish,
17  (1) irreparable harm; (2) either (a) a likelihood of success on
18  the merits or (b) sufficiently serious questions going to the
19  merit of its claim to make them fair ground for litigation,
20  plus a balance of hardships tipping decidedly in favor of the
21  moving party; (3) that the balance of hardships tips in its
22  favor, and (4) that a PI is in the public interest.  That's
23  from *Schneiderman v. Actavis, PLC*, 787 F.3d 638, 650.

24        A heightened standard is appropriate where an
25  injunction is mandatory or the injunction otherwise will

190912pharm1OA              Conference

1    provide the movant with substantially all the relief sought and

2    that relief cannot be up done even if the defendant prevails at

3    a trial on the merits.  Same case.

4            So, we had a little skirmishing over whether the

5    heightened standard applies.  On balance, I think it does apply

6    because the injunction seeks to undo something.  It doesn't

7    seek to maintain the status quo.

8            The argument is made, well, it seeks to maintain the

9    status quo before the illegal conduct, but the illegal conduct

10   has been in place, illegal conduct according to plaintiff, for

11   eight months by the time it brought its lawsuit.

12           It also does ask the Court to mandate that NABP

13   broadcast the change of the not recommended list.  So it does

14   actually mandate that NABP, in my view, do two things, but

15   certainly at least the second thing.  So, if I had to decide, I

16   would say that the heightened standard applies.  I'm not sure

17   it matters, and so, even for purpose of this conversation, I

18   think the result would be the same if the heightened standard

19   did not apply.

20           Irreparable harm is considered the most important

21   prerequisite for issuance of a PI.  That's what the Circuit has

22   said many times; one case is *Kamerling v. Massanari*, 295 F.3d

23   206, 214.  The Second Circuit has defined irreparable harm as,

24   quote, "certain and imminent harm for which a monetary award

25   does not adequately compensate; thus, only harm shown to be

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA                 Conference

1    noncompensable in terms of money damages provides a basis for

2    awarding injunctive relief," said the Second Circuit in *Wisdom*

3    *Import Sales Company v. Labatt Brewing Co.*, 339 F.3d 101.  Of

4    course we all know where Labatt is made.

5            Now, to establish irreparable harm, plaintiff has to

6    establish that it will suffer an injury that is neither remote

7    or speculative, but actual and imminent, and one that cannot be

8    remedied if the Court waits until the end of trial to resolve

9    the harm.  That's from the Second Circuit in *Freedom Holdings,*

10   *Inc. v. Spitzer*, 408 F.3d 112, 114.

11           So, plaintiff alleges a couple of different types of

12   irreparable harm.  One is the loss of the click-through

13   revenue, but the courts have been pretty consistent in ruling

14   that to the extent that a plaintiff claims loss of revenue

15   streams, is typically the kind of thing that weighs against

16   irreparable harm.  So, as the Supreme Court said in *Conkright*

17   *v. Frommert*, "The possibility that adequate compensatory or

18   other corrective relief will be available at a later date in

19   the ordinary course of litigation weighs heavily against the

20   claim of irreparable harm."  And so it is here.

21           Indeed, plaintiff provides very specific data, almost

22   on a month-by-month basis.  And I think the defense is right

23   about the starting point, and it does sort of hinder I think

24   plaintiff's claim because it's hard to make a before-and-after

25   judgment, but it's clear from the exhibits and the other

190912pharm1OA          Conference

information that's been provided as part of the litigation of

this issue, that plaintiff has a very good idea of the revenue

that it says it has lost.  Defendant contests that there's lost

revenue, but in any event, it certainly is the type of harm

that can be compensated.  So, I don't think the plaintiff has

established irreparable harm from the click-through revenue.

With respect to the loss of customer relationship

goodwill, reputational harm, the Second Circuit has said,

quote, "It would will be very difficult to calculate monetary

damages that would successfully redress the loss of a

relationship with a client," closed quote, and this weighs in

favor of irreparable harm.  And that is from *Ticor Title*

*Insurance v. Cohen*, 173 F.3d 63, 68-69.

But the Second Circuit has also said that

particularly when a PI movant has been operating a business for

some period of time a, quote, "history of operation," closed

quote, will enable the movant to, quote, "calculate money

damages for any loss of goodwill that it may have suffered."  I

added the "it" instead of "they."  That's from *Dexter 345, Inc.*

*v. Cuomo*, 663 F.3d 59, 63.  Moreover, it's proper to give

little weight to conclusory statements regarding the loss of

future business relationships, unless they're substantiated by

some specific evidence.

With respect to prospective goodwill, quote, "there

must be a clear showing that a product that a plaintiff has not

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA            Conference

1    yet marketed is truly a unique opportunity for a company,"

2    closed quote.  That's from *Tom Doherty Associates, Inc. v.*

3    *Saban Entertainment, Inc.,* 60 F.3d, 27, 38.

4         So, as a general rule, where the Second Circuit has

5    found no irreparable harm, the alleged loss of goodwill was

6    doubtful and lost profits stemming from the inability to sell

7    the terminated product could be compensated with money damages,

8    determined on the basis of past sales of that product and of

9    current and expected future market conditions," closed quote.

10   Also from *Tom Doherty.*

11        In the Court's view, there are a number of problems

12   given this legal landscape with plaintiff's application.

13   First, I don't think the plaintiff has shown that all of its

14   purported loss of goodwill isn't calculable.  The plaintiff has

15   been in existence for some time.  Plaintiff obviously has

16   tracked the very sources of its revenue on a month-by-month

17   basis.  And to the extent that there is business loss going

18   forward, that is something that can be compensated.

19        Second, I don't think the data supports the claim

20   that there is an existential threat.  The data in fact shows

21   that there has been substantial revenue, even after the

22   December 2018 adoption of the "No Recommend" list.  There's

23   really not a point of comparison pre-December '18, and I think

24   that even today, as counsel for NABP points out, there's

25   nothing in the record that says that plaintiff is on the verge

190912pharm1OA            Conference

1  of bankruptcy or liquidation, or not being able to survive.

2  So, the damages, taking them in the light most favorable to

3  plaintiff, are the types of things that involve loss of revenue

4  and can be compensated should plaintiff prevail at trial.

5          With respect to likelihood of success on the merits,

6  I'm going to address that in the alternative.  A plaintiff

7  doesn't need to show that a court success is certain, but only

8  has to show the possibility as better than 50 percent.

9          To the extent that the higher standard applies, then

10 the plaintiff would have to show a clear or substantial

11 likelihood of success, and that's from *Hoblock v. Albany County*

12 *Board of Elections*, 422 F.3d 77, 97.

13         Looking at the likelihood of success on the merits,

14 Section 1 of the Antitrust Act provides that "Every contract,

15 combination in the form of trust or otherwise, or conspiracy,

16 in restraint of trade or commerce among the several States, or

17 with foreign nations, is declared to be illegal."

18         To establish a Section 1 conspiracy, proof of

19 concerted or joint action is required whether you're talking

20 about horizontal or vertical or both.  To prove the existence

21 of an unlawful conspiracy, quote, "the antitrust plaintiff" --

22 oh, by the way, that's from *Anderson News, LLC v. American*

23 *Media, Inc.*, 680 F.3d 162, 183.  From the same case at page

24 184, quote, "The antitrust plaintiff should present direct or

25 circumstantial evidence that reasonably tends to prove that the

190912pharm1OA          Conference

1   defendant and others had a conscience commitment to a common

2   scheme designed to achieve an unlawful objective."  And of

3   course, both NABP and CSIP contest that their behavior was in

4   concert among themselves or with any of the others.

5          Now an antitrust plaintiff also has to demonstrate

6   that itself has sustained an antitrust injury in order to have

7   standing to sue.  That's from *Daniel v. American Board of*

8   *Emergency Medicine*.  That's a Second Circuit decision from

9   2005, reported at 428 F.3d 408, 438.  In other words, the

10  injury has to be the type that antitrust laws were intended to

11  prevent, and it flows from that, which makes the defendant's

12  conduct illegal.

13         So, I think of some relevance here is the Eighth

14  Circuit's decision in the *In re: Canadian Import Antitrust*

15  *Litigation* case, 470 F.3d 785.  In that case, the Eighth

16  Circuit held that, quote, "allegedly anticompetitive behavior

17  [that] discourage[s] only unlawful importation of drugs and not

18  lawful activity that the Sherman Act was designed to protect,"

19  closed quote, was not, quote, "an injury of the type that the

20  antitrust laws were designed to remedy," closed quote.

21         Now, in that case, the plaintiffs were a class of

22  consumers bringing an antitrust action against pharmaceutical

23  manufacturers, alleging that they suppressed international

24  pharmacy competition and therefore, raised prices in the United

25  States.  The Eighth Circuit found that the higher prices were

190912pharm1OA          Conference

1    the result of government regulation and laws, and not an

2    antitrust conspiracy.

3           The Court recognizes plaintiff thinks this case can

4    be distinguished because its injury here was not higher drug

5    prices, and also that the NABP's actions are the direct causal

6    link of its injuries, which I will get to in a minute.

7           Now, certain practices are so obviously

8    anticompetitive that courts can consider these to be *per se*

9    violations of the Sherman Act.  Examples of *per se* illegal

10   conduct include group boycotts, division of markets and tie-in

11   arrangements.  *Bogan v. Hodgkins*, 166 F.3d 509, 514.  That's a

12   Second Circuit decision from '99.  But, quote, "Only manifestly

13   anticompetitive conduct is appropriately designated *per se*

14   illegal.  The majority of allegedly anticompetitive conduct

15   continues to be examined under the rule of reason."

16          Plaintiff argues that what's going on here basically

17   is a boycott.  Boycotts are, quote, "joint efforts by a firm or

18   firms to disadvantage competitors by either directly denying or

19   persuading or coercing suppliers or customers to deny

20   relationships that competitors need in the competitive

21   struggle," closed quote, from *Northwest Wholesale Stationers,*

22   *Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 294.

23          Organizations that prevent the competitor from

24   gaining market access by refusing to provide, for example,

25   purported safety certification or approval, may be

190912pharm1OA            Conference

1    participating in a group boycott.  That was found and discussed

2    in cases such as *Radiant Burners, Inc. v. People's Gas Light &*

3    *Coke, Co.*, 364 U.S. 656, 659.

4            So, to the extent plaintiff can establish that it

5    suffered an injury, the type of which antitrust laws were meant

6    to remedy and that the cause of its injuries is NABP's actions,

7    then it might have an argument, but I think there are a couple

8    of problems, which I'll get to in a minute.

9            In the absence of practices being *per se* illegal,

10   there is the rule of reason.  And under this test, the

11   plaintiff bears the initial burden of showing that "The

12   challenged action has had an actual adverse effect on

13   competition as a whole in the relevant market; to prove it has

14   been harmed as an individual competitor will not suffice.

15   Insisting on proof of harm to the whole market fulfills the

16   broad purpose of the antitrust law that was enacted to ensure

17   competition in general, not narrowly focused to protect

18   individual competitors."  That explanation was given by the

19   Second Circuit in *Capital Imaging Associates, P.C. v. Mohawk*

20   *Valley Medical Associates, Inc.*, 996 F.2d 537, 543.

21           "Once the plaintiff establishes the threshold burden

22   under the rule of reason, the burden then shifts to the

23   defendant to offer evidence of the pro-competitive, quote,

24   'redeeming virtues,' closed quote, of their combination.

25   Assuming that that burden of production is met, then the burden

190912pharm1OA            Conference

1   shifts back to the plaintiff to demonstrate that any legitimate

2   collaborative objectives could have been achieved by less

3   restrictive alternatives that would be less prejudicial to

4   competition as a whole."  Same case, same page.

5            So, the question is whether or not the NABP not

6   recommend and I guess the CSIP sharing of this information with

7   some of its members violates Section 1 under either the *per se*

8   illegal test or otherwise the rule of reason.  And I just don't

9   think plaintiff has at this stage established a likelihood of

10  success on the merits on that for a couple of reasons – one is

11  delay.

12           I think that the fact that there was an eight

13  and-a-half-month delay between the publication of the list and

14  when plaintiff sought this relief is I think really problematic

15  for plaintiff.  And as defendant points out, based on the data

16  that's been made available, the revenue streams and the other

17  data that plaintiff has provided is really uneven at best in

18  showing any sort of causal link between the NABP action and any

19  financial consequences for plaintiff.  So that's broken down in

20  two ways.  One is, there's plenty of data that suggests there

21  were no consequences, certainly in the months immediately

22  following the NABP list.  And second, because of the delay,

23  it's hard to say that there's a causal link.

24           So, even if it turns out that the August numbers are

25  terrible, plaintiff hasn't really established a causal link

190912pharm1OA            Conference

1  between the NABP conduct and any numbers that would be bad,

2  which the record, by the way, doesn't have.

3          To the extent that there is a claim that the sharing

4  of this through CSIP and, in particular, what some of the

5  larger media sites have done, there's a complete absence of

6  evidence in terms of causation.  There's no evidence that CSIP

7  somehow is able to direct the likes of Bing and Google and

8  Facebook to do these things.  And counsel, who I thought did a

9  great job and also, to her credit, was candid about the lack of

10  such evidence, I think is really telling.  So, it makes it hard

11  for plaintiff at this point, even though it's not likely to

12  establish that there has been *per se* illegal conduct or conduct

13  that otherwise has an actual adverse effect that's caused by an

14  antitrust injury.

15          All CSIP does is share the information.  And what

16  Google does or doesn't do, or what Facebook does or doesn't do,

17  is up to Google and Facebook, and they are not even parties to

18  this application.

19          To the extent that plaintiff were to establish sort

20  of its initial burden under the rule of reason, the defendants

21  have, especially NABP in particular because it's the one that

22  did the "no recommend," has explained why.  In NABP's view,

23  that what plaintiff does is provide information, and when I say

24  "provide information," it includes links to pharmaceutical

25  entities, pharmacies, from which American consumers can buy

190912pharm1OA              Conference

1   pharmaceutical products from abroad, including Canada.  So,

2   this isn't just general information where what plaintiff does

3   is say, Hey, you know what?  American pharmaceutical consumers

4   are really being harmed by the pharmaceutical monopoly and the

5   pharmaceutical lobby and there's price discrimination, and we

6   all need to go write our members of Congress to do something

7   about it.  That's not what this is.

8            This is information saying, Here's the price you can

9   get this drug at and here's the pharmacy you can get it from

10  outside the United States, and here's a link.  And it is

11  entirely foreseeable that that information is going to be used

12  by individuals to break the law, whether they're going to be

13  prosecuted for it or not, because FDA can't prosecute, in all

14  likelihood, 4 million people.

15           And indeed, when I asked counsel, Ms. Shear, what

16  would be the purpose of providing the information other than to

17  allow people to do something that's illegal, the answer is,

18  there isn't.

19           So, from NABP's perspective, the conduct that it

20  engaged in here, which is conduct it has done with others,

21  wasn't meant to harm competition; in other words, it had the

22  redeeming virtue of trying to identify websites that facilitate

23  the violation of law, criminal law.

24           And whether or not people agree with the laws that

25  prohibit the importation of pharmaceutical products, we can

190912pharm1OA          Conference

1  all -- we'll go out to dinner and have a conversation about it,

2  but this is not suppression of speech by the government, and

3  this is not even trying to stop people from advocating for a

4  change of our pharmaceutical laws.  This is about NABP saying

5  that this website is being used to facilitate the illegal

6  importation.  No, they are not selling drugs from Canada.

7  That's not what plaintiff is doing.  But plaintiff is certainly

8  making it a lot easier for people to do that.  And so under the

9  rule of reason test, I don't think plaintiff is likely to

10  succeed on the merits.

11         So, given the Court's view that plaintiff hasn't

12  established irreparable harm or likelihood of success on the

13  merits, I don't really even need to go through the rest of the

14  criteria in terms of the balance of hardships or the public

15  interest.

16         I will just say with respect to *National Society of*

17  *Professional Engineers*, that case, 435 U.S. 679, we've had a

18  lot of talk about that case.  And plaintiff argues that, to the

19  extent that public health or safety is a justification for

20  otherwise anticompetitive conduct, there certainly is language.

21  I understand why plaintiff is relying on this.  And what the

22  Supreme Court talked about was, quote, "exceptions to the

23  Sherman Act for potentially dangerous goods and services, but

24  to allow anticompetitive conduct in that case would, in the

25  Supreme Court's view, be, quote, "tantamount to repeal of the

190912pharm1OA                Conference

1    statute" and that, quote, "the judiciary cannot indirectly

2    protect the public against this harm by conferring monopoly

3    privileges on the manufacturers," closed quote.

4            And what happened there in that case was the

5    antitrust scheme was the Engineering Association's, quote,

6    "Canon of Ethics prohibiting competitive bidding by its

7    members," closed quote, didn't involve anything what we're

8    talking about here, which is services to encourage that

9    individuals would break federal criminal law, so it's just

10    different.  Indeed, NABP makes the point that federal law warns

11    against importation of drugs from online pharmacies.  That's

12    what the FDA does, consistent with the statutes that Congress

13    has passed.  So, it may very well be that affordability of

14    drugs is a problem.  It may well be that the law should be

15    completely overhauled.  That's not for me to say.  I just paint

16    here.  I don't mix the colors.  But based on this record, I

17    just don't think plaintiff has established irreparable harm or

18    likelihood of success on the merits.

19            Let me just say with respect to CSIP, as I said, I

20    think plaintiff has a hard time making the case that CSIP has

21    done anything to lead to Google's conduct.  So to the extent

22    that Google's conduct is what's causing plaintiff harm, Google

23    is not here, Bing is not here, Facebook is not here.  And

24    there's just no evidence that CSIP somehow directs these

25    entities to engage in the conduct that, even if it did harm

190912pharm1OA              Conference

1    plaintiff, would be something that would justify plaintiff's

2    application here.  And to the extent that the Googles of the

3    world have done something to harm plaintiff and they have

4    violated some law, then plaintiff can seek appropriate relief

5    as to those entities.

6          Obviously, all of this is without prejudice to see

7    what the record develops which is based on the record as it

8    exists now, so for all of those reasons, the application is

9    denied.

10         Anything else that we can do?  We have kept you here

11   all afternoon.

12         So, you haven't answered yet or anything, right?  And

13   I know some of you all have issues with jurisdiction.  I'm sure

14   we'll be hearing from you.

15         I'll say this for the record.  I think all clients

16   should know that those lawyers who argued today were very well

17   served by their lawyers.  And I thought the briefing was

18   excellent.  I only wish we could get this kind of advocacy in

19   all of our cases, but we don't get to pick the advocates.

20         So, I thank you all, and I bid you a pleasant

21   afternoon and evening.

22

23

24

25         (Continued on the following page)

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

190912pharm1OA            Conference

1            MS. SHEAR:  Thank you, your Honor.

2            MR. CASEY:  Thank you.

3            - - -

4    Certified to be a true and correct

5    transcript of the stenographic record

6    to the best of my ability.

7    _____

   U.S. District Court
8    Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25