UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHARMACYCHECKER.COM, LLC,

                    Plaintiff,

            v.

NATIONAL ASSOCIATION OF BOARDS
OF PHARMACY, *et al.*,

                 Defendants.

No. 19-CV-7577 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Aaron Robert Gott, Esq.
Alexandra Shear, Esq.
Bona Law PC
Minneapolis, MN
New York, NY
*Counsel for Plaintiff*

Brian E. Casey, Esq.
Paul T. Olszowka, Esq.
Barnes & Thornburg LLP
South Bend, IN
Chicago, IL
*Counsel for National Association of Boards of Pharmacy*

Erik Thomas Koons, Esq.
Jana Irina Seidl, Esq.
Stephen Weissman, Esq.
Timothy Patrick Singer, Esq.
Baker Botts LLP
Washington, DC
*Counsel for National Association of Boards of Pharmacy*

Rachel Johanna Adcox, Esq.
Cristina Marie Fernandez, Esq.
Jeny Maier, Esq.
Axinn, Veltrop & Harkrider LLP
Washington, DC
*Counsel for Alliance for Safe Online Pharmacies*

Barry Werbin, Esq.
Nicholas Grant Olear Veliky, Esq.
Herrick, Feinstein LLP
New York, NY
*Counsel for Center for Safe Internet Pharmacies Ltd.*

John Tyler Mills, Esq.
Mercedes Colwin, Esq.
Ryan James Sestack, Esq.
Gordon Rees Scully Mansukhani LLP
New York, NY
*Counsel for LegitScript LLC*

Justin Ward Lamson, Esq.
Leslie Ellen John, Esq.
Elizabeth Weissert, Esq.
Jay N. Fastow, Esq.
Ballard Spahr LLP
New York, NY
Philadelphia, PA
*Counsel for Partnership for Safe Medicines, Inc.*

KENNETH M. KARAS, United States District Judge:

Plaintiff PharmacyChecker.com ("Plaintiff") brings this Action against the National

Association of Boards of Pharmacy ("NABP"), Alliance for Safe Online Pharmacies ("ASOP"),

Center for Safe Internet Pharmacies Ltd. ("CSIP"), LegitScript LLC ("LegitScript"), and

Partnership for Safe Medicines, Inc. ("PSM"; collectively "Defendants"), alleging that

Defendants unlawfully conspired to restrain trade in violation of § 1 of the Sherman Act, 15

U.S.C. § 1, and that NABP falsely advertised or promoted in violation of § 43(a) of the Lanham

Act, 15 U.S.C. § 1125.  (Am. Compl. ("AC") (Dkt. No. 82).)  Before the Court are the following

Motions: Defendants' Joint Motion to Dismiss (the "Joint Motion"), (Joint Not. of Mot. To

Dismiss by Defs. ("Joint Mot.") (Dkt. No. 100)), PSM's Motion to Dismiss (the "PSM Motion"),

(Def. PSM's Mot. To Dismiss the AC as to It with Prejudice ("PSM Mot.") (Dkt. No. 97)),

ASOP's Motion to Dismiss (the "ASOP Motion"), (Not. of Def. ASOP's Mot. To Dismiss the

2

AC ("ASOP Mot.") (Dkt. No. 104)), and LegitScript's Motion to Dismiss (the "LegitScript Motion"; collectively, the "Motions"), (Not. of Mot. ("LS Mot.") (Dkt. No. 119)).  The Joint Motion, PSM Motion, and ASOP Motion are brought pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Joint Mot.; PSM Mot.; ASOP Mot.)  The LegitScript Motion is brought pursuant to Rules 12(b)(2) and 12(b)(6).  (LS Mot.)  For the reasons that follow, the LegitScript Motion is granted, the Joint Motion and the ASOP Motion are denied, and the PSM Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint ("AC") and the documents it references, and are taken as true for the purpose of resolving the instant Motions.

Plaintiff is a Limited Liability Company organized under the laws of New York that offers an accreditation program for pharmacies and provides drug price comparison information. (AC ¶ 5.)  Unlike its competitors in these industries, Plaintiff offers pharmacy accreditation to, and provides comparative drug price information for, pharmacies operating worldwide.  (*Id.* ¶¶ 27, 33.)  However, Plaintiff's business is not limited to certifying and providing price information for foreign pharmacies.  For example, Plaintiff also accredits U.S. online pharmacies, and includes these U.S. online pharmacies in its price comparisons.  (*Id.* ¶¶ 40, 43.) The AC contains no allegations regarding the size of Plaintiff's foreign accreditation and price comparison businesses as compared to their U.S. equivalents.

While Plaintiff does not itself sell or import prescription drugs, it claims that the personal import of drugs from pharmacies outside the U.S. "remains under some circumstances in a legal gray area."  (*Id.* ¶ 24.)  While foreign drug imports are generally prohibited due to U.S. labeling

requirements, *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 789 (8th Cir. 2006), (*see also* Decl. of Erik T. Koons in Supp. of Joint Mot. ("Koons Decl.") Ex. C ("Google Non-Prosecution Agreement") 1 (Dkt. No. 102-1, at 81) ("Except under very limited circumstances . . . it is unlawful for pharmacies outside the United States to ship prescription drugs to customers in the United States.")), Plaintiff identifies a handful of purported exceptions where personal imports may be permitted, (AC ¶ 57). Defendants allow that personal imports "might" be permitted in certain, limited cases. (Mem. Of Law in Supp. of Joint Mot. ("Defs.' Mem.") 4 (Dkt. No. 101).) The AC makes no allegations regarding the conditions or legality of any foreign drug imports made by users of Plaintiff's pharmacy accreditation and drug price comparison services. (*See generally* AC.)

NABP is an association of state boards of pharmacy. (*Id.* ¶ 6.) It competes with Plaintiff in the pharmacy accreditation market through its Verified Internet Pharmacy Practice Sites ("VIPPS") program, its ".pharmacy" Verified Websites program, and its Internet Drug Outlet Identification Program. (*Id.*)

LegitScript is a Limited Liability Company organized under the laws of Oregon offering verification and monitoring services for online pharmacies. (*Id.* ¶ 9.) Like NABP, LegitScript also competes with Plaintiff in the pharmacy accreditation market. (*Id.*)

ASOP is an organization that represents the Pharmaceutical Researchers and Manufacturers of America ("PhRMA") to address the problem of online drug sellers and counterfeit drugs. (*Id.* ¶ 7.) NABP regularly participates in ASOP's meetings. (*Id.* ¶ 67(a).) One of ASOP's members, GoodRx, competes with Plaintiff in the market for comparative drug price information. (*Id.* ¶ 7.)

PSM is a nonprofit organization that has orchestrated a campaign against foreign drug imports and often works with PhRMA.  (*Id*. ¶ 10.)  PSM is an observer to ASOP, and regularly participates in ASOP meetings.  (*Id*. ¶¶ 10, 67(a).)

CSIP is an organization that includes internet commerce gatekeepers, including Google, Microsoft, Facebook, Mastercard, and UPS.  (*Id*. ¶ 8.)  It was organized and founded at least in part by ASOP and LegitScript.  (*Id*.)

In December 2018, NABP added Plaintiff's website and blog to its Not Recommended Sites list.  (*Id*. ¶¶ 87, 90.)  CSIP maintains a similar list, which is recognized by NABP as adhering to NABP's standards.  (*Id*. ¶ 94.)  In June and July of 2019, CSIP ran targeted online ads against Plaintiff.  (*Id*. ¶ 93.)  On July 21, 2019, users of the Bing search engine began seeing a red caution shield and a warning box when clicking on search results for pages from Plaintiff's website and blog.  (*Id*. ¶ 95.)  This change was driven by CSIP's "Principles of Participation," under which its members have agreed to use data-sharing tools to detect and target suspected illegitimate pharmacy websites.  (*Id*. ¶¶ 75, 93.)  The Bing warning caused Plaintiff to lose 76% of its web traffic from Bing.  (*Id*. ¶ 95.)

In addition, LegitScript or NABP allegedly convinced one vendor to list Plaintiff's website as "not safe," "malicious," or "pornography."  (*Id*. ¶ 84.)  In 2015, NABP, CSIP, ASOP, and LegitScript published articles disparaging Plaintiff, and in 2018 PSM did the same.  (*Id*. ¶ 85.)  NABP, CSIP, ASOP, LegitScript, and various companies that are members of PSM's collaborator PhRMA also jointly created the ".pharmacy" domain to serve a gatekeeping function.  (*Id*. ¶¶ 10, 80, 96.)  As a result of these actions, since March 2019, Plaintiff's site traffic from organic search results has dropped more than 78%, and its monthly click-through revenue has dropped more than 77%.  (*Id*. ¶ 109.)

5

Plaintiff alleges that these efforts, collectively, are a group boycott, which attempts to prevent Plaintiff from competing in the global markets for online pharmacy verification and comparative drug price information. (*Id.* ¶¶ 28, 30–36, 104.) Defendants have referred explicitly to the goal of coordinating their approach to online pharmacies via email, via press release, and in meetings. (*See id.* ¶¶ 69–73.) Further, Defendants share close business relationships, including common founders, (*id.* ¶¶ 67, 74), interlocking membership in organizations, (*id.* ¶¶ 7–8, 10, 68), attending the same meetings, (*id.* ¶¶ 7–8, 67(a)), and promotion of each other's products and activities, (*id.* ¶¶ 68, 77, 95).

Plaintiff separately alleges that NABP has violated the Lanham Act. NABP's website claims that sites on its Not Recommended List are unsafe and illegal, including Plaintiff's website and blog. (*Id.* ¶¶ 119–122.) According to Plaintiff, these claims are false and misleading. (*Id.* ¶¶ 126–32.) The purported purpose of these claims is to steer search engines and consumers away from Plaintiff's site and towards sites of NABP's affiliates, which fund NABP and its initiatives. (*Id.* ¶¶ 124, 134–35.) This has deceived or misled consumers, search engines, and pharmacy websites into not using Plaintiff's website, (*id.* ¶¶ 136–38), causing the harm discussed above.

B. Procedural Background

Plaintiff filed its Complaint on August 13, 2019. (Compl. (Dkt. No. 1).) The next day, Plaintiff moved for a preliminary injunction, requesting that the Court order NABP to remove Plaintiff's website and blog from its Not Recommended Sites list; order NABP to inform all parties to which it had distributed the Not Recommended Sites list that Plaintiff was removed; and order CSIP to accept the revised list, inform its members, and require its members to incorporate this revision into their implementation of the list. (Pl.'s Not. of Mot. and Mot. For

Prelim. Inj. (Dkt. No. 17); Pl.'s Corrected Mem. of Law in Supp. of Mot. For Prelim. Inj. (Dkt. No. 33); Aff. of Tod Copperman, MD in Supp. of Pl.'s Mot. For Prelim. Inj. (Dkt. No. 19)); Decl. of Aaron Gott in Supp. of Pl.'s Mot. For Prelim. Inj. (Dkt. No. 20).)[1]  On August 16, 2019, the Court entered Plaintiff's proposed Order To Show Cause, ordering a briefing schedule and scheduling oral argument.  (Dkt. No. 16.)  On August 30, 2019, CSIP filed a Limited Opposition to Plaintiff's application for a preliminary injunction.  (*See* Decl. of Marjorie Clifton in Supp. of CSIP's Partial Consent and Limited Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 36); Decl. of Barry Werbin, Esq. in Supp. of CSIP's Partial Consent and Limited Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 37); CSIP's Mem. of Law in Supp. of Its Partial Consent and Limited Opp'n to Pl.'s Mot. For A Prelim. Inj. (Dkt. No. 38).)  NABP opposed in full on the same date. (NABP's Brief in Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 40); Decl. of Paul Olszowka in Supp. of NABP's Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 41); Decl. of Carmen A. Catizone (Dkt. No. 42).)  On September 6, 2019, Plaintiff filed its Reply to NABP's Opposition, (Pl.'s Reply Brief to NABP's Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 53); Decl. of Aaron Gott in Supp. of Pl.'s Reply Brief to NABP's Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 54); Decl. of Lisa Mittwol (Dkt. No. 55); Aff. Of Tod Cooperman, MD in Supp. of Pl.'s Mot. For Prelim. Inj. (Dkt. No. 56)), and to CSIP's Limited Opposition, (Pl.'s Reply Brief to CSIP's Opp'n to Pl.'s Mot. For Prelim. Inj. (Dkt. No. 57)).  On September 11, 2019, the Court after oral argument denied Plaintiff's Motion for a Preliminary Injunction.  (Dkt. No. 73.)

---

[1] When filed on August 14, 2019, Plaintiff's preliminary injunction papers contained a deficiency.  (*See* Dkt. No. 15.)  Subsequently, the Plaintiff's re-filed Memorandum of Law contained an additional deficiency.  (*See* Dkt. No. 18.)  The text of this Opinion & Order cites the operative version of each document.

On October 4, 2019, the Parties stipulated to and the Court ordered a schedule for

Plaintiff to submit an amended complaint, and for Defendants to respond.  (Dkt. Nos. 80, 81.)

On October 21, 2019, Plaintiff filed its Amended Complaint.  (AC.)  On November 6, 2019,

NABP, PSM, and LegitScript filed letters requesting a pre-motion conference regarding their

contemplated motions to dismiss.  (Dkt. Nos. 85, 86, 87.)  Plaintiff replied on November 12,

2019, (Dkt. Nos. 89, 90, 91), and the Court scheduled a pre-motion conference, (Dkt. No. 92).

At the pre-motion conference, the Court adopted a briefing schedule for Defendants' Motions To

Dismiss.  (Dkt. (minute entry for Feb. 6, 2020); Dkt. No. 94.)

On March 13, 2020, the Defendants filed the Joint Motion.  (Joint Mot.; Defs.' Mem;

Koons Decl. (Dkt. No. 102); Decl. of Marjorie Clifton in Supp. of Joint Mot. ("Clifton Decl.")

(Dkt. No. 103).)  On the same date, PSM, (PSM Mot.; Mem. of Law of PSM in Supp. of PSM

Mot. ("PSM's Mem.") (Dkt. No. 98); Decl. of Leslie E. John, Esq. in Supp. of PSM Mot. ("John

Decl.") (Dkt. No. 99)), ASOP, (ASOP Mot.; Mem. of Law in Supp. of ASOP Mot. ("ASOP's

Mem.") (Dkt. No. 105); Decl. of Rachel J. Adcox in Supp. of ASOP Mot. ("Adcox Decl.") (Dkt.

No. 107)), and LegitScript, (LS Mot. ; Decl. ("Horton Decl.") (Dkt. No. 120); Mem. of Law in

Supp. of LS Mot. ("LS's Mem.") (Dkt. No. 121)), filed individual motions to dismiss.[2]  On April

17, 2020, Plaintiff opposed the Motions.  (Pl.'s Opp'n to Joint Mot. ("Pl.'s Mem.") (Dkt. No.

114); Pl.'s Opp'n to PSM Mot. ("Pl.'s PSM Mem.") (Dkt. No. 111); Pl.'s Opp'n to ASOP Mot.

("Pl.'s ASOP Mem.") (Dkt. No. 110); Pl.'s Opp'n to LS Mot. ("Pl.'s LS Mem.") (Dkt. No.

---

[2] When filed on March 13, 2020, LegitScript's motion to dismiss papers contained a
deficiency.  (*See* Dkt. No. 106.)  The text of this Opinion & Order cites the operative filings.

123).)[3]  On May 15, 2020, Defendants submitted their reply memoranda.  (Reply Mem. of Law in Supp. of Joint Mot. ("Defs.' Reply") (Dkt. No. 116); Reply Mem. of Law of PSM in Further Supp. of PSM Mot. ("PSM's Reply") (Dkt. No. 115); Reply in Further Supp. of ASOP Mot. ("ASOP's Reply") (Dkt. No. 118); Reply Mem. of Law in Further Supp. of LS Mot. ("LS's Reply") (Dkt. No. 122).)[4]  On September 29, 2020, Plaintiff filed a Notice of Supplemental Authority.  (Dkt. No. 124.)  Defendants responded on October 2, 2020.  (Dkt. No. 125.)  On the same date, Defendants submitted a Notice of Supplemental Authority.  (Dkt. No. 126.)  The Court held oral argument on the Motions on November 10, 2020.  (Dkt. (minute entry for Nov. 10, 2020).)

## II.  Personal Jurisdiction Over LegitScript

LegitScript argues, pursuant to Rule 12(b)(2), that this Court lacks personal jurisdiction over LegitScript.  (LS's Mem. 3–15.)  It further argues, pursuant to Rule 12(b)(6), that the AC fails to allege that LegitScript joined the alleged conspiracy, (*id*. at 15–16), and that Plaintiff's claim is barred by the statute of limitations, (*id*. at 17).  Because LegitScript moves to dismiss pursuant to Rules 12(b)(2) and (6), "the Court must first address the preliminary question[] of . . . personal jurisdiction before considering the legal sufficiency of the allegations in the amended complaint."  *Corrado v. N.Y. Unified Court Sys.*, 163 F. Supp. 3d 1, 10 (E.D.N.Y. 2016) (citation and quotation marks omitted), *aff'd*, 698 F. App'x 36 (2d Cir. 2017); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial consideration of

---

[3] When filed on April 17, 2020, Plaintiff's opposition to the Joint Motion and LegitScript Motion contained deficiencies.  (*See* Dkt. Nos. 112, 113.)  The text of this Opinion & Order cites the operative filings.

[4] When filed on May 15, 2020, LegitScript's reply memorandum contained a deficiency.  (*See* Dkt. No. 117.)  The text of this Opinion & Order cites the operative filing.

the issue of jurisdiction over the defendant [because] a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . .").

On a Rule 12(b)(2) motion to dismiss, a plaintiff has the burden of establishing that the court has jurisdiction over the defendant.  *See Kernan v. Kurz-Hastings, Inc*., 175 F.3d 236, 240 (2d Cir. 1999).  However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith . . . legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction."  *Jazini v. Nissan Motor Co*., 148 F.3d 181, 184 (2d Cir. 1998) (quotation marks and citations omitted); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp*., 84 F.3d 560, 566 (2d Cir. 1996).  "[A] prima facie showing of jurisdiction does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction."  *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc*., 975 F. Supp. 562, 564 (S.D.N.Y. 1997).  A plaintiff may "make this showing through [its] own affidavits and supporting materials[,] containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant."  *Whitaker v. Am. Telecasting, Inc*., 261 F.3d 196, 208 (2d Cir. 2001) (quotation marks and citations omitted).  While a court may consider materials beyond the pleadings, the court must credit a plaintiff's allegations in support of jurisdiction. *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

There are three requirements for the Court to exercise personal jurisdiction.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–61 (2d Cir. 2012).  First, "the plaintiff's

service of process upon the defendant must have been procedurally proper." *Id*. at 59.  Second,

"there must be a statutory basis for personal jurisdiction that renders such service of process

effective." *Id*.  Third, "the exercise of personal jurisdiction must comport with constitutional due

process principles." *Id*. at 60.  Here, LegitScript waived service, (Dkt. No. 24), so only the

second and third requirements are potentially at issue.  As to the second requirement, the Court

considers the two operative long-arm statutes—the Clayton Act's, 14 U.S.C. § 22, and New

York's, N.Y. C.P.L.R. §§ 301–02—and finds that neither provides a basis for personal

jurisdiction.  As a result, the Court does not consider the third requirement, and grants the

LegitScript Motion.

    A. The Clayton Act

    Section 12 of the Clayton Act contains a venue provision: a corporation may be sued

under the antitrust laws "in the judicial district whereof it is an inhabitant, but also in any district

wherein it may be found or transacts business."  15 U.S.C. § 22.  Section 12 also contains a

service of process provision: "all process in such cases may be served in the district of which

[the corporation] is an inhabitant, or wherever it may be found."  *Id*.[5]  The Second Circuit has

held that "the plain language of [§] 12 indicates that its service of process provision applies (and,

therefore, establishes personal jurisdiction) only in cases in which its venue provision is

satisfied."  *Daniel v. Am. Bd. of Emergency Med*., 428 F.3d 408, 423 (2d Cir. 2005).  Thus,

---

[5] The Court assumes without deciding that § 12 can serve as a basis for jurisdiction over
LegitScript, even though it is an LLC rather than a corporation.  *See Budicak, Inc. v. Lansing
Trade Grp., LLC*, No. 19-CV-2449, 2020 WL 758801, at *2–3 (D. Kan. Feb. 14, 2020) (applying
§ 12 analysis to LLC defendant).

whether the Court has jurisdiction under the Clayton Act hinges on whether LegitScript is "found or transacts business" in the district.[6]  The Court finds that it does not.

LegitScript is an LLC organized under the laws of Oregon, which maintains its principal place of business in Oregon.  (AC ¶ 9; Horton Decl. ¶ 3–4.)  It is not and has never registered as a foreign corporation in New York; it does not and has never maintained offices in New York; and it does not own property or possess a bank account in New York.  (Horton Decl. ¶¶ 5–6, 8–9.)  LegitScript employs one person who resides in New York.  (*Id.* ¶ 7.)  Half of his time is spent traveling outside New York, and his job is not focused on New York residents or businesses.  (*Id.*)  In addition, LegitScript certifies certain pharmacies and mental health providers in New York.  (*Id.* ¶ 11.)

In *Daniel*, the Second Circuit held that a similarly situated company did not "transact business" in the district.  428 F.3d at 429–30.  This company "certified an unspecified number of physicians in New York State and . . . communicated with them in the state."  *Id.* at 429.  Further, "application fees constitute[d] 99% of [this company's] revenue, and [it] received an unspecified amount of that revenue from the application fees of physicians in New York . . . ."  *Id.*  Finally, that company "mailed a copy of its application form to [the] plaintiff . . . in the district."  *Id.*  In finding these facts "insufficient to show that [the company] 'transacts business'" in the district, *id.*, the Second Circuit observed the following.  First, the company "neither develop[ed] its standards nor administer[ed] its certification examinations" in the district.  *Id.* at 430.  Second, the company did not "own or lease any real estate in the district," nor did it "maintain an office, telephone, bank account, or mailing address there."  *Id.*  Third, the company

---

[6] Here, the relevant district is the Southern District of New York.  *See Daniel*, 428 F.3d at 430 (holding, where cited contacts are with the State of New York, and not the Western District, that "[o]nly the latter contact is relevant to [§] 12 venue").

did not "advertise or solicit applicants for its certification examination in the district." *Id*. Fourth, the record suggested "no finding as to how much of [its] fee revenue derived from applicants" in the district. *Id*. The AC suggests that identical findings are appropriate here, as does the Horton Declaration. (*See generally* AC; Horton Decl.)

The one factor that distinguishes LegitScript from the defendant in *Daniel* is that LegitScript has an employee in New York. *Compare Daniel*, 428 F.3d at 430 ("[The defendant] employs no agent to carry on its operations or promote its activities in the [district].") *with* (Horton Decl. ¶ 7 ("LegitScript currently employs one (1) individual who is a resident of the State of New York.")). However, the Second Circuit in *Daniel* focuses not on the absence of an employee present in the district, but on the absence of an employee "to carry on its operations or promote its activities in the [district]." *Daniel*, 428 F.3d at 430. Here, LegitScript's employee in New York "is not focused on New York residents or New York businesses." (Horton Decl. ¶ 7.) Moreover, the case law rejects the proposition that a single employee can create general jurisdiction. *See Zibiz Corp. v. FCN Tech. Sols*., 777 F. Supp. 2d 408, 419 (E.D.N.Y. 2011) (collecting cases) ("[C]ourts in other jurisdictions have consistently found that the mere presence of an employee within the forum state [is] insufficient to confer general personal jurisdiction over an out-of-state corporate defendant."). Thus, the Court concludes that this single employee does not materially distinguish LegitScript from the defendant in *Daniel*, and finds that the AC's allegations about LegitScript do not "evidence[] the sort of practical, everyday business or commercial concept of doing business or carrying on business of any substantial character that

the Supreme Court has equated to 'transacting business' for purposes of [§] 12 venue." *Daniel*,

428 F.3d at 430 (alteration, citation, and some quotation marks omitted).[7]

### B. New York C.P.L.R.

#### 1. C.P.L.R. § 302(a)(3) – Out-of-State Tort

Section 302(a)(3) of New York's Civil Practice Law and Rules states that its courts have

personal jurisdiction over an out-of-state defendant where that defendant:

> commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302. As discussed *supra*, the AC does not allege that LegitScript transacts

business in New York. Thus, the Court considers only Section 302(a)(3)(ii).

Jurisdiction under C.P.L.R. § 302(a)(3)(ii) rests on five elements.

> First, that [the] defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that [the] defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that [the] defendant derived substantial revenue from interstate or international commerce.

*LaMarca v. Pak-Mor Mfg. Co*., 735 N.E.2d 883, 886 (N.Y. 2000).

Regarding the third element, the location of the injury, "[a]n injury . . . does not occur

within the state simply because the plaintiff is a resident." *Mareno v. Rowe*, 910 F.2d 1043,

1046 (2d Cir. 1990) (denying personal jurisdiction where the plaintiff "suffer[ed] the economic

consequences of his firing in New York, [but] the location of the original event which caused the

---

[7] Indeed, Plaintiff does not suggest in its opposition memorandum that personal jurisdiction is proper under the Clayton Act. (*See* Pl.'s LS Mem. 1–6.)

injury [was] New Jersey").  "[W]hen identifying the original event in order to place the situs of injury for the purposes of Section 302(a)(3), courts must disregard the location of the initial tort and focus on the place where the first effect of the tort that ultimately produced the final economic injury is located."  *In re Vitamin C Antitrust Litig.*, No. 05-CV-453, 2012 WL 12355046, at *7 (E.D.N.Y. Aug. 8, 2012) (alteration and quotation marks omitted) (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84–85 (2d Cir. 2001)).

Here, this element is not satisfied, because Plaintiff does not allege an injury in New York beyond economic harm.  Plaintiff alleges harm in the form of (1) decreased click-through revenue, (AC ¶ 109), and (2) lost business from online pharmacies, (*id.* ¶ 113).  In an analogous case, a court in this district held that "injuries . . . allegedly suffered from the loss of sales . . . did not occur 'within the state' of for the purposes of § 302(a)(3)(ii)."  *Barricade Books, Inc. v. Langberg*, No. 95-CV-8906, 2000 WL 1863764, at *5 (S.D.N.Y. Dec. 19, 2000).  Rather, "[t]he sites of these injuries were the locations where the two companies decided not to carry" the plaintiff's product.  *Id.*  Here, the AC does not allege the locations of the lost click-through revenue and business from online pharmacies.  (*See generally* AC.)  The location of these customers and pharmacies is the situs of Plaintiff's injury.  Thus, Plaintiff "has not articulated a non-speculative and direct injury to person or property in New York that goes beyond the simple economic losses that its New York-based business suffered."  *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 220 (2d Cir. 2013).  As a result, Plaintiff has not adequately pleaded personal jurisdiction as to Section 302(a)(3)(ii) against LegitScript.[8]

---

[8] The New York Court of Appeals decision in *Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159 (N.Y. 2011) is not to the contrary.  There, the court held that the situs of an alleged copyright injury was the plaintiff's place of business in New York.  *Id.* at 165.  It reached this conclusion for two reasons.  First, the alleged infringement was "online" and thus "dispersed throughout the country and perhaps the world."  *Id.* at 164.  Second, because of the "unique

2.  C.P.L.R. § 302(a)(2) – In-State Tort

Section 302(a)(2) states that New York courts have jurisdiction over an out-of-state

defendant where that defendant "commits a tortious act within the state, except as to a cause of

action for defamation of character arising from the act."  N.Y. C.P.L.R. § 302(a)(2).  "Antitrust

violations are tortious acts for jurisdictional purposes."  *Yellow Page Sols., Inc. v. Bell Atl.*

*Yellow Pages Co*., No. 00-CV-5663, 2001 WL 1468168, at *8 (S.D.N.Y. Nov. 19, 2001).

"[C]ourts in New York have found that where a plaintiff has presented a sufficient showing that

a conspiracy exists, personal jurisdiction may exist over a defendant based on acts that were

committed by his co-conspirators."  *Laborers Local 17 Health & Ben. Fund v. Philip Morris,*

*Inc*., 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998).  For purposes of analyzing jurisdiction, the Court

assumes but does not decide that LegitScript participated in the conspiracy alleged by Plaintiff.

(*See generally* AC.)

To establish jurisdiction under Section 302(a)(2), Plaintiff must allege in connection with

an act in New York "(1) that the out-of-state co-conspirator had an awareness of the effects of

the activity in New York, (2) that the New York co-conspirators' activity was for the benefit of

the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of

or on behalf of, or under the control of the out-of-state conspirators."  *Laborers Local*, 26 F.

---

bundle of rights granted to copyright owners," harm to the plaintiff arose in its domicile in New York—i.e. in the form of "diminishment of the incentive to publish or write."  *Id*. at 164. Subsequently, courts have noted that the New York Court of Appeals "carefully cabined its holding," and has declined to extend its reasoning even to copyright cases where the plaintiff failed "to allege facts demonstrating a non-speculative and direct New York-based injury to its intellectual property rights of the sort *Penguin* . . . recognized."  *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 219–20 (2d Cir. 2013).  Here, while Plaintiff "allege[s] that it was deprived of revenue or potential customers when the [websites] were viewed [or not viewed] on the Internet by third parties," *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc*., No. 16-CV-442, 2017 WL 449913, at *5 (S.D.N.Y. Jan. 18, 2017), it does not allege harm to its rights in copyrighted material, as did the plaintiff in *Penguin*.

Supp. 2d at 602; *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir.

2018) ("Under that statute, there is jurisdiction over a principal based on the acts of an agent

where the alleged agent acted in New York for the benefit of, with the knowledge and consent

of, and under some control by, the nonresident principal." (quotation marks omitted)).

"Although a defendant need not demonstrate a formal agency relationship between co-

conspirators, the third prong of this test is designed to capture the traditional indicia of an agency

relationship." *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 323 n.24

(S.D.N.Y. 2020).  In other words, Plaintiff must "connect the defendant with transactions

occurring in New York." *Yellow Page Sols.*, 2001 WL 1468168, at *8.

  Here, the AC does not allege that LegitScript had any relationship with acts committed to

further the conspiracy in New York.  Plaintiff alleges only one activity targeted at New York: a

billboard launched in this district by ASOP and CSIP.  (AC ¶ 2.)  The AC contains no allegations

connecting LegitScript to this billboard.  (*See generally* AC.)  Plaintiff also does not allege that

LegitScript's one employee in New York, or its accreditation of pharmacies and mental health

providers in New York, furthered the conspiracy.  (*Id.*)  Thus, Plaintiff has not adequately

pleaded personal jurisdiction as to Section 302(a)(2) against LegitScript.[9]

---

[9] As discussed, because the Court finds that no statute authorizes personal jurisdiction over LegitScript, the Court does not consider whether personal jurisdiction would be constitutionally permissible.

  That said, the constitutional standard for jurisdiction based on acts of co-conspirators appears to be more permissive than the standard under Section 302(a)(2).  Due process requires that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab*, 883 F.3d at 87.  Unlike the standard under Section 302(a)(2), the constitutional standard appears not to require that LegitScript have any connection with co-conspirator acts in the forum state.

  In a different case, this more permissive constitutional standard may control.  For example, *Charles Schwab* determined the personal jurisdiction of a federal court in California. *Id.*  There, the *Charles Schwab* test may stand alone, as California's long-arm statute is more

Nor does an alleged antitrust injury caused in New York suffice to establish personal jurisdiction over LegitScript, for two reasons. First, as discussed *supra*, the AC does not allege that Plaintiff suffered antitrust injury in New York. Second, the Court finds that antitrust injury in New York does not, standing alone, establish personal jurisdiction under Section 302(a)(2). District courts in the Second Circuit are split on this issue. *Compare Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01-CV-1574, 2002 WL 719471, at *3 n.6 (E.D.N.Y. Mar. 1, 2002) ("The [c]ourt is simply not persuaded by plaintiffs' bald assertion that the [c]ourt has jurisdiction over [the defendant] because anti-trust claims were alleged against him, causing injury within this state.") *and Yellow Page Sols.*, 2001 WL 1468168, at *8 (finding a lack of conspiracy jurisdiction under Section 302(a)(2) where "[the] [p]laintiffs have failed to allege specifically any tortious act performed by the moving defendants while in New York") *with Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 231–32 (W.D.N.Y. 1997) ("[I]f Plaintiffs suffered antitrust injuries in New York, the injury occurring in New York is sufficient to meet the

---

capacious than New York's. *See Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1091 (Cal. 1996) ("California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California."). At least one court has acknowledged that the showing of conspiracy jurisdiction required under the New York long-arm statute is different from that required by constitutional due process. *See Platinum & Palladium*, 449 F. Supp. 3d at 323 n.24 ("Conspiracy jurisdiction may thus be the rare issue where the jurisdictional analysis under the New York long-arm statute does not closely resemble the analysis under the Due Process Clause of the Fourteenth Amendment." (quotation marks omitted)).

The more permissive standard may also control where the defendant does not contest that jurisdiction is proper under the long-arm provision of the Clayton Act. *See, e.g.*, *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 695 n.11, 700–01 (S.D.N.Y. 2019) (applying the *Charles Schwab* test where "defendants have not challenged this [d]istrict's venue"); *Sullivan v. Barclays PLC*, No. 13-CV-2811, 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017) (same).

At least one court has applied the *Charles Schwab* factors to evaluate a court's personal jurisdiction without first considering whether a statutory long-arm provision applies. *See Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292–95 (S.D.N.Y. 2019). The Court is not persuaded to adopt this approach here.

requirement that a tortious act take place in New York under Section 302(a)(2).") *and Albert Levine Assocs. v. Bertoni & Cotti*, 314 F. Supp. 169, 171 (S.D.N.Y. 1970) (holding, where plaintiff "maintains its place of business in New York" and "was free to sell [its] products . . . [with] no geographical limitation[,] . . . the refusal [of a manufacturer] to sell [to the plaintiff] damaged plaintiff in New York[,] and that is where the claim arose").  The Court agrees with the courts that found that alleged antitrust injury caused by a co-conspirator in New York does not suffice to establish jurisdiction under Section 302(a)(2), for two reasons.  First, "[i]f jurisdiction could be established by this type of assertion, the distinction between [§] 302(a)(2) (tort within the state) and [§] 302(a)(3) (tort without the state, injury within the state) would become meaningless."  *Team Obsolete*, 2002 WL 719471, at *3 n.6.  This is because a co-conspirator in an antitrust action could commit a tort in New York, even "where there is no indication that the defendant was ever present within the state."  *Id*.  Second, the Second Circuit has held that physical presence in New York is required for jurisdiction under Section 302(a)(2), and there is no principled reason to apply a different requirement where jurisdiction is based on the act of a co-conspirator.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999) ("[The] defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)."); *Thackurdeen v. Duke Univ*., 130 F. Supp. 3d 792, 804 (S.D.N.Y. 2015) ("[T]he Court is required to apply the majority rule requiring the defendant to physically commit the tortious act within New York."), *aff'd*, 660 F. App'x 43 (2d Cir. 2016).

### 3.  Other Grounds for Personal Jurisdiction

Section 301 of New York's Civil Practice Law and Rules states that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  N.Y. C.P.L.R. § 301.  This provision allows for general jurisdiction, which "exists

only when a corporation's contacts with a state are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (citation and some quotation marks omitted). "A court with general jurisdiction over a corporation may adjudicate *all* claims against that corporation—even those entirely unrelated to the defendant's contacts with the state." *Id.* Here, it is straightforward that the Court lacks general jurisdiction over LegitScript. LegitScript maintains its principle place of business in Oregon and is organized under its laws. (Horton Decl. ¶¶ 3–4.) And, as discussed *supra*, the AC does not allege that LegitScript transacts business in New York. Thus, Plaintiff does not plead that the Court has general jurisdiction over LegitScript under C.P.L.R. § 301.

Section 302(a)(1) states that New York courts have jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state," and the "cause of action aris[es] from . . . these acts." N.Y. C.P.L.R. § 302. Here, as discussed, LegitScript does not transact business in New York. Thus, Plaintiff has not alleged that the Court has jurisdiction over LegitScript under C.P.L.R. § 302(a)(1).

Finally, Section 302(a)(4) states that New York courts have jurisdiction over a non-domiciliary that "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. § 302. Here, the AC does not allege that LegitScript owns property in New York. (*See generally* AC; *see also* Horton Decl. ¶ 8 (stating that LegitScript does not own property in New York).) Thus, Plaintiff has not alleged that the Court has jurisdiction over LegitScript under C.P.L.R. § 302(a)(4).

Because the Court on this record lacks personal jurisdiction over LegitScript, Plaintiff's claims against it must be dismissed. This dismissal is without prejudice. If Plaintiff wishes to

file a second amended complaint, it must do so within 30 days of the date of this Opinion &

Order.

### III.  Sherman Act Claim

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual

allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.

*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court, however, is not required to credit

"mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678 (quotation

marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the [C]ourt to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  Specifically, the plaintiff must allege facts sufficient to show "more

than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not

"nudged [his] claims across the line from conceivable to plausible, [the] complaint must be

dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).  Accordingly, the "purpose

of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal

sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding

its substantive merits."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotation marks

omitted).  To decide the motion, the Court "may consider the facts as asserted within the four

corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quotation marks omitted).

To establish a violation of Sherman Act § 1, Plaintiff must allege "the basic elements of an underlying antitrust conspiracy, which are: (1) a contract, combination, or conspiracy; (2) in restraint of trade; (3) affecting interstate commerce." *Gamm v. Sanderson Farms, Inc*., 944 F.3d 455, 465 (2d Cir. 2019) (quotation marks omitted).

The Movants argue, pursuant to Rule 12(b)(6), that Plaintiff fails to allege antitrust injury, both because Plaintiff facilitates unlawful conduct, (Defs.' Mem. 16–19), and because the AC does not allege harm resulting from a competition-reducing aspect of Defendants' conduct, (*id*. at 19–21). Movants separately argue that the AC fails to allege harm to competition. (*Id*. at 19–21.) Movants also argue that the AC fails to plead the existence of a conspiracy. (*Id*. at 21–26.) Additionally, Movants argue that the AC fails to plead plausible product and geographic markets. (*Id*. at 26–29.) They further argue that Plaintiff's claim is barred by the statute of limitations. (*Id*. at 30–31.) Finally, while it is not argued as an independent basis for dismissal, Movants separately argue that the Court should apply the rule of reason rather than the per se rule in considering Defendants' alleged conduct. (*Id*. at 29–30.) The Court denies the Joint Motion.

PSM and ASOP argue, pursuant to Rule 12(b)(6), that the AC fails to allege that PSM and ASOP, respectively, joined the alleged conspiracy, in part because PSM's and ASOP's advocacy statements are immune pursuant to the *Noerr-Pennington* doctrine. (*See generally* PSM's Mem; ASOP's Mem.) The Court denies the ASOP Motion, and grants in part and denies in part the PSM Motion.

A.  Plaintiff Adequately Alleges Antitrust Injury

"The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue."  *Daniel*, 428 F.3d at 438.  In addition, "plaintiffs must demonstrate that they themselves have sustained an 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).  This inquiry requires the Court "to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  Plaintiff must establish antitrust injury regardless of whether its claim proceeds under the per se rule or the rule of reason.  *Atl. Richfield*, 495 U.S. at 344 ("The need for this showing is at least as great under the per se rule as under the rule of reason.").

1. Illegality

Defendants argue that Plaintiff cannot suffer antitrust injury because "its asserted harm arises out of Defendants' alleged acts suppressing unlawful drug importation."  (Defs.' Mem. 16.)[10]  Defendants point to a handful of cases finding no antitrust standing where the plaintiff's business is illegal or enables illegal behavior.  (*Id.* at 16–19.)  The earliest of these cases is *Maltz v. Sax*, 134 F.2d 2 (7th Cir. 1943).  There, the Seventh Circuit considered whether "one engaged

---

[10] At the motion to dismiss stage, the Court does not accept this framing of Defendants' alleged conduct, which Plaintiff alleges is "pretextual."  (AC ¶ 105.)

in the business of making and selling gambling devices, the use of which is against public policy and unlawful, may recover damages under the Sherman Anti-Trust Act." *Id*. at 4. While the manufacture and sale of gambling devices was not illegal, their use was illegal. *Id*. The Seventh Circuit upheld the district court's judgment of dismissal of the plaintiff's complaint on two grounds. The first was unclean hands. *Id*. at 5. As Plaintiff correctly notes, (Pl.'s Mem. 11), unclean hands and other common law barriers to relief no longer apply to claims under the Sherman Act, *see Perma Life Mufflers, Inc. v. Int'l Parts Corp*., 392 U.S. 134, 138 (1968), *overruled on other grounds*, *Copperweld Corp. v. Indep. Tube Corp*., 467 U.S. 752 (1984). The second ground was that the plaintiff had "no legal right in a business, the conduct of which was gambling, for which he may obtain protection." *Maltz*, 134 F.2d at 5. Since "[h]e had no legal rights to protect[,] . . . defendants could not invade them." *Id*. Defendants argue that this second ground suggests dismissal in the instant Action. (Defs.' Mem. 17–18.)

*Maltz* was adjudicated on the pleadings. 134 F.2d at 3. However, among three more recent opinions that dismissed complaints on grounds similar to *Maltz*, all three were issued after discovery. *See Bubis v. Blanton*, 885 F.2d 317, 320 (6th Cir. 1989) (affirming post-trial dismissal of Sherman Act claim because the plaintiff did not have a liquor license, and thus had only an illegal interest in his allegedly-harmed business); *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, No. 08-CV-4548, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8, 2010) (finding no antitrust injury because the plaintiff's "purported injury stems from its own decision to manufacture and traffic in a device that is almost certainly illegal"); *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co*., 309 F. Supp. 2d 1156, 1170 (N.D. Cal. 2004) (holding that, because the

plaintiff's "conduct was unlawful by its own terms, [the defendants'] response . . . could not

inflict a[] cognizable antitrust injury"), *aff'd*, 158 F. App'x 807 (9th Cir. 2005).[11]

Further, at least one court has distinguished *Maltz* on the basis that, in *Maltz*, the entire

enterprise was geared towards facilitating illegality, whereas, in these other cases, the complaint

was vague, and a portion of the plaintiff's business was potentially legitimate. *See Linea*

*Internacional de Credito, S.A. v. W. Union Fin. Servs., Inc.*, No. 03-CV-6736, 2004 WL

1336302, at *3 (N.D. Ill. June 14, 2004) ("It is not clear from the complaint that plaintiff's

business is inseparably connected with gambling or that its services could only be used in

furtherance of gambling.  Therefore, *Maltz* does not control." (footnote omitted)).  In *Linea*

*Internacional*, there were no allegations of legal business activity; the complaint was simply

vague. *See id*. ("All that we can tell about [the plaintiff's] business at this juncture, though, is

that [the defendant] asserted that 'transactions between [the plaintiff's] customers and on-line

casinos necessitated the termination of the [c]ontract.'" (record reference omitted)).  This opinion

was issued at the motion to dismiss stage. *See id*. at *1.

At least one other court has found that a plaintiff may recover antitrust damages for any

period in which it alleged that it was operating legally, notwithstanding other periods of illegal

operations. *Monarch Marking Sys., Inc. v. Duncan Parking Meter Maint. Co*., No. 82-CV-2599,

1988 WL 23830, at *1 (N.D. Ill. Mar. 8, 1988).  In another case, the court ruled that a business

"engaged in wholly illegal enterprises" could not prove antitrust injury, but distinguished an

earlier Ninth Circuit case because the plaintiff there "was a business which engaged in wrongful

---

[11] While the opinion in *Realnetworks* was issued on a motion to dismiss, this came after "scores of depositions and filed myriad declarations . . . a bench trial involving numerous exhibits and fact and expert witnesses . . . [and an] order [that] included over nineteen pages of factual findings."  2010 WL 145098, at *3.

or illegal conduct only in part of its sizeable enterprise." *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060, 1068 (C.D. Cal. 1978). The court reached this conclusion on a motion for summary judgment. *Id.*

From these cases, the Court takes the following principle: where the plaintiff's enterprise is completely or almost completely illegal, or completely or almost completely geared towards facilitating illegality, that plaintiff cannot plead an antitrust injury.

This principle is consistent with the Eighth Circuit's decision in *Canadian Import*, a case that Defendants rely on heavily. There, the plaintiffs, a group of prescription drug consumers, alleged that the defendant drug companies had engaged in anticompetitive conduct, including blacklisting Canadian pharmacies suspected of selling drugs to American consumers. *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 788 (8th Cir. 2006). The Eighth Circuit found that "the Canadian prescription drugs at issue are not labeled in conformity with federal law, and that importation of the drugs is therefore prohibited." *Id.* at 789. The Eighth Circuit affirmed the district court's dismissal of the complaint, holding that

> [t]he absence of competition from Canadian sources in the domestic prescription drug market . . . is caused by the federal statutory and regulatory scheme . . . , not by the conduct of the defendants. Consequently, the alleged conduct of the defendants did not cause an injury of the type that the antitrust laws were designed to remedy.

*Id.* at 791. Since the plaintiffs were allegedly injured because they were prevented from acting illegally, the Eighth Circuit concluded at the motion to dismiss stage that the plaintiffs could not allege a valid antitrust injury. *Id.* at 791.

The allegations of the AC do not provide a similar basis for the Court to conclude that Plaintiff's business is completely or almost completely illegal, or completely or almost completely geared towards illegality. As mentioned, Plaintiff alleges that its business consists of

a number of presumably legal activities, including accrediting U.S. online pharmacies, (AC ¶ 40), and providing price comparisons for U.S. online pharmacies, (*id.* ¶ 43).  Plaintiff's ability to conduct these legal activities is harmed by Defendants' alleged conspiracy.  While the AC alleges that accrediting foreign pharmacies distinguishes Plaintiff from its competitors, (*id.* ¶ 33), it does not allege that all or almost all of Plaintiff's business relates to these foreign pharmacies, (*see generally id.*), *see also Linea Internacional*, 2004 WL 1336302, at \*3 (denying motion to dismiss where the complaint was vague regarding the legality of the plaintiff's business).

Plaintiff's admissions at oral argument on Plaintiff's motion for a preliminary injunction do not change this analysis.  At oral argument, Plaintiff stated that the "primary reason" to provide foreign pharmacy price information is "likely" to facilitate purchases from foreign pharmacies.  (Dkt. No. 96, at 65–66.)  However, this line of questioning was focused only on Plaintiff's providing prices from foreign pharmacies to U.S. consumers.  (*Id.* at 65.)  It did not concern the presumably legal aspects of Plaintiff's business, including accrediting and providing price comparisons for U.S. online pharmacies.

Thus, at the motion to dismiss stage, the Court concludes that the AC does not establish that Plaintiff's enterprise is completely or almost completely illegal or geared towards illegality, and denies the Joint Motion insofar as it seeks dismissal on these grounds.[12]  At summary judgment, Plaintiff will no longer be sheltered by the vagueness of its AC.  If discovery supports Defendants' claim that the "primary purpose [of Plaintiff's business] is to facilitate unlawful

---

[12] The Court does not consider Plaintiff's argument that it has antitrust standing because the Sherman Act is important, and because equitable defenses like unclean hands and the doctrine of *in pari delicto* do not defeat a Sherman Act claim.  (Pl.'s Mem. 13–16.)  The Court notes, however, that at least one court has distinguished equitable defenses from a failure to allege a plausible antitrust injury.  *Realnetworks*, 2010 WL 145098, at \*6.

importation," (Defs.' Mem. 1 (quotation marks omitted)), it may advance the same argument at that juncture.[13]

### 2. Competition-Reducing Aspect

Defendants next argue that Plaintiff did not adequately allege harm resulting from "a competition-reducing aspect or effect of . . . [Defendants'] behavior." (Defs.' Mem. 19–21 (quoting *Atl. Richfield*, 495 U.S. at 344).)  Initially, *Atlantic Richfield* does not require that Plaintiff allege "[h]arm to [c]ompetition," (*id*. at 19), to establish antitrust injury, *see Gelboim v. Bank of Am. Corp*., 823 F.3d 759, 775 (2d Cir. 2016) (holding that "proof of harm to competition is not a prerequisite for recovery").  While the Second Circuit once suggested that "[w]ithout harm to competition, there can be no antitrust injury and, consequently, no antitrust standing," *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006), the Second Circuit in *Gelboim* clarified that this "dicta . . . cannot be reconciled with Supreme Court precedent," 823 F.3d at 777 n.16. [14]  Instead, to establish antitrust injury at this stage, Plaintiff must allege injury resulting from conduct with "an anticompetitive tendency." *Gelboim*, 823 F.3d at 776.  "No further showing of actual adverse effect in the marketplace is necessary." *Id*.

Courts have found no antitrust standing where the effect of the defendants' injury-causing conduct was not anticompetitive.  In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, the Supreme Court held that there is no antitrust injury where "the sole injury alleged is that competitors were

---

[13] The Court in this Opinion & Order notes several areas where Defendants may make similar arguments at the summary judgment stage.

[14] As a result, the Court does not follow the courts that prior to *Gelboim* held that a plaintiff must allege harm to competition to establish antitrust injury. *See, e.g.*, *Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 554–55 (S.D.N.Y. 2009), *aff'd*, 358 F. App'x 229 (2d Cir. 2009); *Attia v. Dollar Fin. Corp.*, No. 05-CV-7133, 2007 WL 1746806, at *1 (S.D.N.Y. June 15, 2007); *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc*., No. 01-CV-2669, 2002 WL 31164482, at *9 (S.D.N.Y. Sept. 30, 2002); *Yellow Page Sols.*, 2001 WL 1468168, at *11.

continued in business, thereby denying [the plaintiff] an anticipated increase in market shares."

429 U.S. 477, 484 (1977).  The Supreme Court concluded that "[i]t is inimical to the purposes of

these laws to award damages for the type of injury claimed here."  *Id*. at 488.  Courts have also

found no antitrust standing where the injury-causing aspect of the defendants' behavior was not

anticompetitive.  For example, in *Gatt Communications, Inc. v. PMC Associates, L.L.C.*, the

plaintiff participated for years in a scheme to rig bids for government contracts.  711 F.3d 68,

72–73 (2d Cir. 2013).  The plaintiff was kicked out of the scheme, and alleged that this exclusion

harmed its business.  *Id*. at 73–74.  The Second Circuit found no antitrust injury, stating that, to

the extent the bid-rigging scheme was unlawful, this was "only because of the harm [the scheme]

may cause—increased prices—to purchasers of [the bid-riggers'] products," and the plaintiff's

lost revenue from being kicked out of the scheme "is not an injury that flows from that which

makes bid-rigging unlawful."  *Id*. at 77; *see also Daniel*, 428 F.3d at 440 (holding that "[the]

plaintiffs cannot themselves state an antitrust injury when their purpose is to join the cartel rather

than disband it"); *Balaklaw v. Lovell*, 14 F.3d 793, 801 (2d Cir. 1994) (finding no antitrust injury,

despite assuming a per se Sherman Act violation, where the plaintiff "failed to win the exclusive

contract to practice anesthesiology").

Here, Plaintiff alleges that it "has now effectively been excluded from the market," (AC

2), and that this has caused harm to its business, (*id*. ¶¶ 108–14).  Unlike in *Brunswick*, the AC

does not allege that Defendants' conduct increases market competition.  (*See generally id*.)  And

unlike in *Gatt*, the AC does not allege an injury based on Plaintiff's exclusion from a conspiracy

or cartel.  (*Id*.)  Other courts have found antitrust standing when faced with similar claims.  *See,

e.g.*, *Ostrofe v. H.S. Crocker Co*., 740 F.2d 739, 742–43 (9th Cir. 1984) ("[The plaintiff's]

alleged injury was caused by the boycott, it was intentionally inflicted, and it was direct. [The

plaintiff's] injury flowed from a violation of antitrust policy, since it resulted from the elimination of competition in the market . . . and would be ameliorated by the restoration of competition in that market."); *Midland Telecasting Co. v. Midessa Television Co*., 617 F.2d 1141, 1145 (5th Cir. 1980) ("It is clear that in the present case the injury alleged flows directly from defendants' group boycott or refusal to deal."); *HM Compounding Servs., Inc. v. Express Scripts, Inc*., No. 14-CV-1858, 2015 WL 4162762, at *10 (E.D. Mo. July 9, 2015) ("[F]or purposes of a motion to dismiss, [the plaintiff] has sufficiently pled an antitrust injury by asserting that [the defendant] excluded it as a competitor from the marketplace.").

Thus, the Court concludes that the AC sufficiently alleges that its injury results from a competition-reducing aspect or effect of Defendants' behavior, and denies the Joint Motion insofar as it seeks dismissal on these grounds.

### B.  Plaintiff Adequately Alleges a Conspiracy Including NABP, CSIP, PSM, and ASOP

To establish a Sherman Act § 1 violation, Plaintiff must allege a "conspiracy[] in restraint of trade or commerce."  15 U.S.C. § 1.  A group boycott is one such conspiracy in restraint of trade or commerce.  *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).  Under the Sherman Act, "[i]ndependent action is not proscribed."  *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 761 (1984).  As a result, in order to prove a conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 183–84 (2d Cir. 2012) (alterations omitted) (citing *Monsanto*, 465 U.S. at 764).  In the criminal context, the Second Circuit has noted that "a conspiracy by its very nature is a secretive operation."  *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006).  Since the same is true in the Sherman Act

context, most complaints will allege conspiracy circumstantially.  *See Rossi v. Standard Roofing, Inc*., 156 F.3d 452, 465 (3d Cir. 1998) ("[P]laintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy.").  *Twombly* applies, so the allegations of conspiracy must be plausible.  550 U.S. at 570.  However, the Supreme Court has noted that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id*. at 556.  The Second Circuit has similarly stated that, at the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment."  *Anderson News*, 680 F.3d at 184.

### 1.  Existence

Plaintiff argues that the AC alleges direct and circumstantial evidence of a conspiracy.  (Pl.'s Mem. 21–30.)  The Court finds that the AC does not allege direct evidence of a conspiracy, but does allege circumstantial evidence of a conspiracy.

Direct evidence of a conspiracy "is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).  The Second Circuit has suggested that, to allege direct evidence, the plaintiff's injury must arise directly from the activity over which there is direct evidence of collaboration.  *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc*., 883 F.3d 32, 41 (2d Cir. 2018) (finding that the plaintiff did not allege a direct injury because its alleged harm arose from a broad conspiracy to restrain competition, not from standards promulgated by a professional association).  Here, Plaintiff argues that the alleged 2011 and 2012 meetings involving NABP,

CSIP, and ASOP suggest direct evidence of conspiracy. (Pl.'s Mem. 26.) The Court disagrees, because there are no allegations that Plaintiff was discussed at these meetings. (*See* AC ¶¶ 71–73.) Thus, as alleged, the meetings are not direct evidence of the alleged group boycott, though the Court considers them as potential circumstantial evidence.

To plausibly allege a conspiracy through circumstantial evidence, Plaintiff may allege, first, parallel action and, second, the parallel action "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id*. at 556. The Court considers these two factors in turn.

### a. Parallel Action

The Supreme Court has provided some examples of parallel action, including "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" and "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Id*. at 556 n.4 (alteration omitted). In *Starr v. Sony BMG Music Entertainment*, the Second Circuit held that the plaintiff sufficiently alleged parallel action. 592 F.3d 314 (2d Cir. 2010). It found that the following were "non-conclusory factual allegations of parallel conduct": (1) the defendants' agreement to launch two new services that charged unreasonably high prices, and (2) the defendants' refusal to do business with one of their competitors that offered a lower price. *Id*. at 323.

Here, the Court finds that the AC adequately alleges parallel action because its claims resemble those in *Starr*. First, Defendants jointly launched a new internet domain. Specifically,

the AC alleges that NABP, ASOP, and CSIP coordinated to develop the ".pharmacy" domain to play "a gatekeeping function." (AC ¶¶ 80, 96.) Second, Defendants also caused a refusal to do business with Plaintiff. The AC alleges that NABP added Plaintiff to its Not Recommended Sites list in December 2018, (*id.* ¶ 87), and that CSIP in June and July of 2019 ran targeted ads against Plaintiff and its member Bing, consistent with CSIP's Principles of Participation, labeled Plaintiff as risky in search results, based on NABP's Not Recommended Sites list, (*id.* ¶¶ 92–95).[15] While these refusals to do business did not occur precisely at the same time, "the Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (citing *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)) (finding parallel conduct where the plaintiffs alleged "two periods of production cuts of approximately one-two years each"); *see also Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) (holding that the plaintiff alleged a conspiracy even though capacity reductions occurred over a five-year period); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) (holding that "interdependence can be inferred from parallel conduct that is sequential rather than simultaneous" where parallel actions occurred over a two-year period). *But see In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) ("[T]ime lags of three to six months between pricing moves 'refute rather than

---

[15] Defendants argue that it is implausible that Defendants "somehow strong-armed these large, multi-national corporations[, such as Google, Microsoft/Bing, Facebook, Mastercard, PayPal, and UPS,] to boycott Plaintiff via CSIP's Principles of Participation." (Defs.' Mem. 2.) However, voluntary principles can plausibly influence the behavior of participating organizations. *See, e.g.*, Elise Groulx Diggs et al., *Business and Human Rights As A Galaxy of Norms*, 50 Geo. J. Int'l L. 309, 333 (2019) ("[V]oluntary standards adopted by major companies may constitute a private enforcement scheme when they are incorporated into contractual requirements.").

support' allegations of conspiracy[.]" (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131–32 (3d Cir.1999)), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).

### b.  Context Suggesting Agreement

Allegations of context suggesting agreement, which the Second Circuit refers to as "plus factors," may include: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).[16]  The Court considers each of these three potential plus factors in turn.

With regard to common motive, the Court finds that this is not a strong plus factor suggesting agreement.  The AC alleges that LegitScript and NABP are direct competitors of Plaintiff.  (AC ¶ 28.)  The AC does not make clear allegations about the motives of CSIP, PSM, or ASOP.  (*See generally id.*)  However, it does allege that PSM and ASOP either represent or have deep ties with PhRMA, (*id.* ¶¶ 7, 10), and that pharmaceutical companies wish to retain a captive market by preventing lower-price imports from international online pharmacies, (*id.* ¶ 22).  Thus, while some Defendants allegedly share some motives, similar motivation overall is not a strong plus factor in making plausible Plaintiff's alleged conspiracy.

Defendants' supposed concession of a similar motive does not change the Court's finding.  Defendants state that they have "similar interests and goals[:] promoting public health and the safety of the drug supply."  (Defs.' Mem. 25–26.)  Plaintiff argues that, by making this

---

[16] The Third Circuit has warned that "the first two plus factors may indicate that defendants operate in an oligopolistic market, that is, . . . market behavior is interdependent and characterized by conscious parallelism."  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011).

statement, "[D]efendants concede that they have 'similar interests and goals,' which confirms a common motive to conspire."  (Pl.'s Mem. 28.)  This argument contradicts the AC, which states that Defendants' safety motives are pretextual.  (AC ¶ 105.)  Thus, since it's not supported by the allegations in the AC, the Court does not consider this argument.

With regard to actions contrary to self-interest, the Court similarly finds that it is not a strong plus factor suggesting agreement.  "An action that is contrary to a firm's apparent economic self-interest is one that is implausible if undertaken alone, without the guarantee of cooperation by competitors."  *SourceOne Dental, Inc. v. Patterson Companies, Inc*., 310 F. Supp. 3d 346, 360 (E.D.N.Y. 2018).  Plaintiff alleges that NABP approached search engines to persuade them to end their contracts with PharmacyChecker.com in favor of either NABP or LegitScript, (AC ¶ 78), and that NABP requested that the International Corporation for Assigned Names and Numbers ("ICANN") take down any pharmacy domain not approved by NABP or LegitScript, (*id.* ¶ 81).  In both cases, NABP acted in a way that appears designed to benefit LegitScript, "its direct competitor."  (*Id.* ¶ 81.)  However, two considerations weigh against this being considered a major "plus factor."  First, this action contrary to self-interest is unrelated to Defendants' alleged parallel actions.  *See Mayor of Balt.*, 709 F.3d at 136 (listing as a plus factor "evidence that shows *the parallel acts* were against the apparent individual economic self-interest of the alleged conspirators" (emphasis added)).  Second, the acts contrary to self-interest were done by just one Defendant, and not in coordination with competitors.  *See SourceOne Dental*, 310 F. Supp. 3d at 360 ("An action that is contrary to a firm's apparent economic self-interest is one that is implausible if undertaken alone, without the guarantee of cooperation by competitors.")

35

With regard to a high level of interfirm communications, the Court finds that this is a plus factor suggesting agreement. Initially, membership in common trade associations and common attendance of trade shows indicates an opportunity to conspire, but it is not enough, standing alone, to provide the "plus factors" needed to allege a conspiracy. *See Capital Imaging Assocs*., 996 F.2d at 545 ("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."). The Second Circuit rejected the notion that a trade association forms a "walking conspiracy," instead requiring more particularized allegations about the role of individual members. *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234–35 (2d Cir. 1999) ("[The Second Circuit] require[s] a factual showing that each defendant conspired in violation of the antitrust laws, and have not adopted a 'walking conspiracy' theory in place of such a showing."); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) ("[A] trade association is not, just because it involves collective action by competitors, a 'walking conspiracy.'"); *Newton v. Am. Debt Servs., Inc*., No. 11-CV-3228, 2013 WL 5592620, at *9 (N.D. Cal. Oct. 10, 2013) ("A mere association . . . does not make a conspiracy."). Similarly, interlocking directorships "may indicate an opportunity to conspire, but affiliation does not by itself necessarily imply conspiracy to restrain trade." *Jicarilla Apache Tribe v. Supron Energy Corp*., 728 F.2d 1555, 1561 (10th Cir. 1984); *see also Harlem River Consumers Co-op v. Associated Grocers of Harlem, Inc*., No. 70-CV-4128, 1976 WL 1238, at *17 (S.D.N.Y. Mar. 5, 1976) (holding that "common membership . . . [and] interlocking directorates . . . [are] not sufficient to prove [a] conspiracy"). And allegations of overlapping board membership likewise indicate only an opportunity to conspire, including when the overt conspiratorial acts are bilateral. *In re High-Tech Emp. Antitrust Litig*., 856 F. Supp. 2d 1103, 1119 (N.D. Cal. 2012) ("[I]t is plausible to infer that the overlapping board membership here

provided an opportunity to conspire and an opportunity for transfer of the requisite knowledge and intent regarding the bilateral agreements.").

Alleged meetings are a sufficient plus factor only where they occur shortly before the alleged parallel action.  Vague reference to isolated discussions is not enough.  *Mayor of Balt.*, 709 F.3d at 136 ("[T]wo vague references to isolated discussions among only three defendants . . . are not enough plausibly to allege a 'high level' of interfirm communications.").  Allegations of specific meetings that were timed shortly before the alleged parallel conduct can establish circumstantial evidence of conspiracy.  *Anderson News*, 680 F.3d at 188.  The same principle applies to trade association meetings, when they occur shortly before the alleged collusive conduct.  *Miami Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 164 (W.D.N.Y. 2020).  One court has held that a single meeting held 9 to 12 months before the alleged conspiratorial acts "do[es] not raise suspicions, and therefore do[es] not provide factual context suggesting agreement."  *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 840–41 (N.D. Ill. 2019) (quotation marks omitted).

Here, Plaintiff makes two categories of allegations.  First, it alleges interlocking membership and frequent joint meeting attendance.  For example, a 2010 ASOP press release related to its campaign on safe online pharmacies states that NABP and PSM are observers, and that NABP "supports the ASOP mission, participates in meetings, and offers information."  (AC ¶ 70; Dkt. No. 99-2; *see also* AC ¶¶ 7 (alleging that an ASOP board member is a NABP employee, and NABP and ASOP share a lobbyist), 8 (alleging that ASOP is an original and ex-officio member of CSIP), 10 (alleging that PSM is an observer of ASOP and has funded research of at least one of ASOP's advisers), 67(a) (alleging that NABP and PSM are observers of ASOP and regularly participate in ASOP's meetings and initiatives).)  While these allegations create an

opportunity to conspire, standing alone they are not a sufficient "plus factor" to plausibly allege a conspiracy.

Second, Plaintiff alleges a handful of meetings and other communications suggesting that Defendants coordinated their plans to restrain online pharmacies. In a 2010 email, an Eli Lilly employee stated that "ASOP is the manner in which Lilly (and PhRMA as an observer) is working with other key stakeholders to . . . collaborate to address the problem of online drug sellers . . . ." (AC ¶ 69.) These stakeholders include NABP and PSM. (*Id.*) In a 2011 meeting, NABP and CSIP "discussed cutting off websites that promote online international pharmacy sales from key internet resources through the gatekeepers that compose CSIP." (*Id.* ¶ 71.) At a 2012 NABP meeting, (*id.* ¶¶ 72–73), an ASOP representative gave a presentation about "rogue [i]nternet drug outlets," (Dkt. No. 107-5 at 3), and NABP adopted as a recommendation that it should "[c]ontinue [i]nterfacing with [CSIP] and [e]ncourage CSIP to [s]upport [i]nternet [e]nvironments [t]hat [d]o [b]usiness [o]nly with [l]egitimate [o]nline [p]harmacy [w]eb [s]ites," (*id.* at 4). These quotes are drawn from the meeting notes, which are quoted in the AC. (*Id.* ¶ 73.) These allegations are sufficient circumstantial evidence of a conspiracy, as they speak directly to Defendants' intent to restrict online pharmacies.

A final plus factor is relevant: Defendants' joint press releases. Public statements are not among the plus factors identified in *Mayor of Baltimore* and *Twombly*. However, this list appears to be illustrative, not exhaustive. *Mayor of Balt.*, 709 F.3d at 136 (stating that "'plus factors' *may* include . . ." (emphasis added)). "[P]ublic statements are often considered relevant in determining whether a conspiracy was adequately alleged. . . . [T]hese statements are nearly always analyzed as 'plus factors.'" *In re Pork Antitrust Litig.*, No. 18-CV-1776, 2019 WL 3752497, at *8–9 (D. Minn. Aug. 8, 2019) (citations omitted). For example, public statements

by individual businesses calling for production cuts may be plus factors because they allow the industry to coordinate changes that are otherwise contrary to each business's unilateral self-interest. *Broiler Chicken*, 290 F. Supp. 3d at 798. The AC alleges a wide variety of Defendant press releases from 2015 through 2018—including similarly-timed press releases on the same issue—that promoted another Defendant's work on online pharmacies and/or disparaged Plaintiff. (AC ¶¶ 77, 85.) These press releases suggest that Defendants' intent did not change in the years between the meetings in 2010 through 2012 and the decision to add Plaintiff to the Not Recommended Sites list. Taken together, these allegations provide sufficient context to plausibly suggest agreement.

The fact that no single meeting or press release is alleged to have included all Defendants does not change the Court's conclusion. (*See* Defs.' Mem. 24–25.) Allegations of multiple bilateral meetings, each involving (a) one specific defendant, and (b) each other defendant, individually, are insufficient to allege an overall conspiracy. *See In re Actos End Payor Antitrust Litig.*, No. 13-CV-9244, 2015 WL 5610752, at *26 (S.D.N.Y. Sept. 22, 2015) ("[R]ather than describing advance planning and coordinated action by the [d]efendants, [the complaint] details the bilateral agreements between [a particular defendant] and each of the other [d]efendants that reflected their respective entry rights in each market under the statutory scheme."), *aff'd in part, vacated in part*, 848 F.3d 89 (2d Cir. 2017). However, an alleged series of identical bilateral agreements between a variety of different pairs of defendants, with multiple overlaps, is sufficient to allege a conspiracy. *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d at 1119–20 ("The fact that all six identical bilateral agreements were reached in secrecy among seven Defendants in a span of two years suggests that these agreements resulted from collusion, and not from coincidence.").

### 2. *Noerr-Pennington* Doctrine

PSM and ASOP argue that some of their statements are immune from antitrust liability under the *Noerr-Pennington* doctrine. (PSM's Mem. 6–10; ASOP's Mem. 14–15.) "Those who petition government for redress are generally immune from antitrust liability," unless petitioning activity, "ostensibly directed toward influencing governmental action, is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 56 (1993) (alteration omitted). Several courts in the Second Circuit have dismissed antitrust lawsuits on the pleadings based on *Noerr-Pennington*. *See, e.g*., *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P*., 129 F. Supp. 2d 578, 594 (W.D.N.Y. Feb. 25, 2000) (citing *Music Ctr. S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp*., 874 F. Supp. 543, 549 (E.D.N.Y. 1995)), *aff'd*, 229 F.3d 1135 (2d Cir. 2000); *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803, 818 (S.D.N.Y. 1979).

This rule is subject to two restrictions. First, not all advocacy is protected. Advocacy that is "engaged in private commercial activity, no element of which involve[s] seeking to procure the passage or enforcement of laws" is not immune. *Litton Sys., Inc. v. Am. Tel. and Tel. Co*., 700 F.2d 785, 807 (2d Cir. 1983); *see also United States v. Philip Morris Inc*., 304 F. Supp. 2d 60, 73 (D.D.C. 2004) ("[I]t certainly does not follow that all use of advertisements or public relations campaigns is to be automatically characterized as petitioning of the government, and therefore immunized under the *Noerr-Pennington* doctrine."). Distinguishing protected advocacy from commercial advertisement in many cases requires a factual determination. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc*., 365 U.S. 127, 142–43 (1961) (holding, based on "evidence in the record," that newspaper articles sought to influence the passage and enforcement of laws); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492,

499 (1988) (noting that the "context and nature of the activity" are important to identify when a private action is "'incidental' to a valid effort to influence government action," and, thus, immune).  At the pleadings stage, all inferences are drawn in favor of Plaintiff, so if an advertisement can be construed as unrelated to petitioning the government, it is.  Of course, conclusions drawn on the pleadings may not necessarily hold at a motion for summary judgment.

Second, immune statements may be admitted "to show the purpose and character of the particular transactions under scrutiny."  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015) ("Under the *Noerr-Pennington* doctrine, a defendant may not be held liable based solely on conduct that is protected by the First Amendment, but that does not mean that such conduct is altogether inadmissible or necessarily lacking in evidentiary value."); *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1321 (E.D.N.Y. 1996) ("A core principle of the *Noerr-Pennington* doctrine is that lobbying alone cannot form the basis of liability, although such activity may have some evidentiary value.").

The Court considers arguments by PSM and ASOP in turn.

### a.  PSM

PSM argues that its alleged public statements are immune under *Noerr-Pennington*. (PSM's Mem. 6–10; *see also* AC ¶¶ 69, 77, 85(e), 85(f).)  As a general matter, Plaintiff alleges a transition from government-focused efforts to "misinformation campaigns to scare consumers" and "private agreements with internet gatekeepers to unlawfully deprive consumers access to, and information about, safe online pharmacies."  (AC ¶ 59.)  To draw all inferences in Plaintiff's favor, PSM's statements must be construed in light of this alleged shift in strategy.  All of the following are plausibly alleged to be focused on the alleged private misinformation campaign,

and thus unrelated to petitioning the government: (1) the February 9, 2018 article citing NABP's conclusion that fake online pharmacies sell fentanyl, (*id.* ¶ 77; Dkt. No. 99-4), (2) the October 18, 2017 article announcing the winners of an ASOP award, (AC ¶ 77; Dkt. No. 99-5), (3) the August 25, 2017 article citing NABP's finding that only 4.2% of online pharmacies are safe, (AC ¶ 77; Dkt. No. 99-6), and (4) the 2018 article stating in part that PharmacyChecker.com's verifications cannot be trusted, (AC ¶ 85(f); Dkt. No. 99-7).  Each of these articles mentions some component of federal law.  (*See* Dkt. No. 99-4 (NABP study of pharmacy websites considers "if they comply with U.S. [f]ederal law"); Dkt. No. 99-5 (praising the work of Congressmen Michael C. Burgess and Eugene Green); Dkt. No. 99-6 (reporting NABP's "concern about pending drug importation legislation"); Dkt. No. 99-7 (the ".pharmacy" domain signals that websites "are properly licensed and follow applicable U.S. state and federal laws").) However, none of these references appears to seek to influence government policy, and all can be viewed as directed at a private audience, "to give the appearance of independent authenticity and authority."  (AC ¶ 77.)

PSM's 2017 advertising campaign is different.  (*Id.* ¶ 85(e); Dkt. No. 99-3.)  This article states "Urge the Senate to Reject Drug Importation Measures."  (Dkt. No. 99-3.)  Even drawing all inferences in Plaintiff's favor, this publicity campaign is aimed at influencing governmental action.  (*Id.*)  *See Noerr*, 365 U.S. at 142–43.  Thus, PSM is immune from antitrust liability based on this statement.

PSM argues that all of its publications were "published in furtherance of PSM's advocacy efforts to enforce laws against illegal drug importation."  (PSM's Mem. 9.)  While this may be true, the Court cannot draw this inference against Plaintiff at this stage.  Pending discovery, PSM may advance the same argument on a motion for summary judgment.

PSM argues that *Noerr-Pennington* shields the 2010 letter from an Eli Lilly employee to an Obama administration official, which lists PSM as a stakeholder.  (PSM's Mem. 9; *see also* AC ¶ 69; Dkt. No. 99-1.)  Even drawing all inferences in Plaintiff's favor, this email petitions the government, and cannot be a basis of liability.  However, it may serve as evidence of the conspiracy; considering the email to evaluate the "purpose and character" of Defendants' actions is consistent with *Pennington*.  *See* 381 U.S. at 670 n.3.  Further, this holding is not inconsistent with the Seventh Circuit's refusal to "aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized."  *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).  *Mercatus* immunized the defendants from a finding of liability based on their lobbying efforts; it did not concern whether the content of their lobbying may be introduced as evidence to support the plaintiff's allegations of conspiracy.  641 F.3d at 857.

PSM finally argues that *Noerr-Pennington* shields ASOP's 2010 press release, which lists PSM as a stakeholder and states that ASOP is "working to bring about policy changes."  (AC ¶ 70; Dkt. No. 99-2.)  Again, even drawing all inferences in Plaintiff's favor, this press release promotes ASOP's government lobbying efforts.  Thus, ASOP is immune from antitrust liability based on this statement.  However, as with the 2010 email, the Court considers the 2010 press release as indicating the "purpose and character" of Defendants' actions.  *Pennington*, 381 U.S. at 670 n.3.

Thus, the PSM Motion is granted insofar as it seeks immunity from liability based on (1) PSM's 2017 advertising campaign, (AC ¶ 85(e)), (2) the 2010 letter from an Eli Lilly employee to an Obama administration official, (*id.* ¶ 69), and (3) ASOP's 2010 press release, (*id.* ¶ 70).  While they may not be a basis of liability, the Court notes that these statements may be

considered as evidence of a conspiracy.  The PSM Motion is denied insofar as it seeks immunity for liability based on its other statements under the *Noerr-Pennington* doctrine.

### b.  ASOP

ASOP argues that some of its alleged actions should be shielded by *Noerr-Pennington*. (ASOP's Mem. 14–15.)  First, it claims that it should be immune from allegations related to its executive Libby Baney ("Baney") because she is a lobbyist.  (ASOP's Mem. 14; AC ¶¶ 7, 85(h).)  Drawing all inferences in Plaintiff's favor, the fact that Baney is a lobbyist does not mean that all of her work is related to petitioning the government, particularly in light of Defendants' alleged pivot from government-focused to private-focused advocacy.  (*See* AC ¶ 59.)  Second, ASOP claims that its members use it to address online pharmacies "through successful lobbying."  (ASOP's Mem. 14; AC ¶ 24.)  Again drawing all inferences in Plaintiff's favor, the Court cannot construe all of ASOP's activities as geared towards protected lobbying in light of Defendants' alleged pivot from government to private advocacy.  (*See* AC ¶ 59.) Pending discovery, ASOP may advance the same argument on a motion for summary judgment.

Thus, the ASOP Motion is denied insofar as it seeks immunity from liability based on the *Noerr-Pennington* doctrine.

### 3.  Participation of Individual Defendants

For each Defendant that allegedly participated in the conspiracy, Plaintiff must allege facts that plausibly suggest that it "joined the conspiracy and played some role in it."  *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42, 2011 WL 7053807, at *14 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (same); *In re Elec. Carbon Prod. Antitrust Litig.*, 333 F. Supp. 2d 303,

311–12 (D.N.J. 2004) (same); *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004) (same).  While NABP and CSIP are alleged to be the entities primarily responsible for "blacklisting" Plaintiff, this does not mean that ASOP and PSM played no role in the conspiracy.  "[T]hat [each defendant] might have had different motivations for joining the conspiracy, and was involved in only a portion of it, does not undermine the existence of the conspiracy itself or [each defendant's] role . . . ."  *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012).  "[E]ach conspirator need not have played a symmetric role to be part of a broader plot."  *In re Interest Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 706 (S.D.N.Y. 2018) ("Conspiracies, particularly when alleged among a large group, are not always tidy and symmetric. Conspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping.").

In particular, the Second Circuit has held that misleading advertising may give rise to an antitrust claim.  Under § 2 of the Sherman Act, "a plaintiff asserting a monopolization claim based on misleading advertising must overcome a presumption that the effect on competition of such a practice was de minimis."  *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  This presumption can be overcome "by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals."  *Ayerst*, 850 F.2d at 916.

> The Second Circuit in *Ayerst* found that, at the motion to dismiss stage, an allegation that the representation was 'false and misleading in certain respects' was sufficient 'to go forward with the discovery process to substantiate its claim that the representation was clearly false, clearly material, and clearly likely to induce reasonable reliance.'

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*., 383 F. Supp. 3d 187, 240

(S.D.N.Y. 2019) (alteration omitted) (citing *Ayerst*, 850 F. 2d at 916), *reconsideration denied*,

No. 14-MD-2542, 2019 WL 2603187 (S.D.N.Y. June 25, 2019).  While *Ayerst* involved a § 2

claim, the Second Circuit has relied upon principles articulated regarding § 2 in evaluating a

claim under § 1.  *See MacDermid Printing Sols. LLC v. Cortron Corp*., 833 F.3d 172, 187 n.63

(2d Cir. 2016).[17]

With these principles in mind, the Court considers ASOP's, (ASOP's Mem. 7–19), and

PSM's, (PSM's Mem. 10–14), arguments that the Complaint does not allege facts to plausibly

suggest that they participated in the conspiracy.

### a.  ASOP

Together, three sets of Plaintiff's allegations suffice to establish that ASOP joined the

alleged conspiracy.  First, and most significantly, Plaintiff alleges statements indicating ASOP's

intent to collaborate with its alleged co-conspirators to restrict online pharmacies.  A 2010 email

from an Eli Lilly employee states that "ASOP is . . . working with other key stakeholders to . . .

collaborate to address the problem of online drug sellers."  (AC ¶ 69.)  The email identifies

NABP and PSM as stakeholders.  (*Id*.)  In addition, ASOP's representative gave a 2012

presentation at an NABP meeting regarding "rogue [i]nternet drug outlets, as well as the critical

points of the [i]nternet ecosystem, and how they can be utilized to curtail the rogue sites from

conducting business over the [i]nternet."  (Dkt. No. 107-5 at 3; *see also* AC ¶¶ 72–73.)  These

---

[17] Fifth Circuit case law is not the contrary.  *See Schachar v. Am. Acad. of Ophthalmology, Inc*., 870 F.2d 397, 399 (7th Cir. 1989) ("[W]hen a trade association provides information . . . but does not constrain others to follow its recommendations, it does not violate the antitrust laws.").  The court in *Schachar* referred to "truthful comparisons made in the competition between products," and concluded that "courts recognize that false and misleading statements may provide a basis for antitrust claims."  *Alt. Electrodes, LLC v. Empi, Inc*., 597 F. Supp. 2d 322, 331–32 (E.D.N.Y. 2009) (quoting *Ayerst*, 850 F.2d at 916).

statements suggest both a common motive and a high degree of communication.  *See Mayor of Balt.*, 709 F.3d at 136.

Second, Plaintiff alleges that ASOP participated in joint advocacy work related to the alleged "misinformation campaigns."  (AC ¶ 85.)  "ASOP . . . issued a false and misleading paid news release on August 18, 2015, wrongly linking PharmacyChecker . . . to an indictment related to illegal wholesale drug importation."  (*Id.* ¶ 85(a).)  In 2014 and 2015, ASOP jointly launched a billboard in New York with CSIP, (*id.* ¶ 2), and collaborated with CSIP "to fund, support, and carry out misinformation advertising campaigns," (*id.* ¶ 74).  Plaintiff also alleges regular joint appearances involving Baney from ASOP and Dr. Catizone from NABP "to promote content published as part of these misinformation campaigns."  (*Id.* ¶ 85(h).)  This advocacy suggests that ASOP's intent did not change in the intervening years since these meetings, which makes the alleged conspiracy more plausible notwithstanding the long time between the 2010 and 2012 statements and the alleged conspiratorial acts.  *See Tichy*, 376 F. Supp. 3d at 841.

Third, Plaintiff alleges routine communications and overlapping membership with other alleged members of the conspiracy, which provides opportunity for coordination.  Alleged co-conspirators NABP and PSM are "observers of ASOP and regularly participate in ASOP meetings and initiatives."  (AC ¶ 67(a).)  Baney, from ASOP, is a registered lobbyist for NABP.  (*Id.* ¶ 7.)  Marty Allain, the chair of the board of directors of the ASOP Global Foundation, is the senior manager for the pharmacy Verified Websites Program at NABP.  (*Id.*)  While these allegations could not independently establish a conspiracy, they make Plaintiff's claim more plausible by showing an opportunity to conspire.  *See Capital Imaging Assocs.*, 996 F.2d at 545.

In addition, ASOP played a role in the alleged conspiracy, because it made allegedly false statements about Plaintiff.  ASOP published a "FAQ" webpage "repeating various scare tactics

and false claims about the safety of online pharmacies" and including "an entire section dedicated to disparaging PharmacyChecker.com."  (AC ¶ 85(g).)  As discussed, "ASOP . . . issued a false and misleading paid news release on August 18, 2015, wrongly linking PharmacyChecker . . . to an indictment related to illegal wholesale drug importation." (*Id.* ¶ 85(a).)  These alleged false and misleading statements suffice to go forward with discovery. *See Keurig Green Mountain*., 383 F. Supp. 3d at 240 (holding that attacks on specific alleged marketing misstatements "are more appropriately raised on summary judgment").  However, Plaintiff at summary judgment will need to present evidence to overcome the presumption that their effect on competition was de minimis.  *See Ayerst*, 850 F.2d at 916.

At oral argument, ASOP stated that this lawsuit is no different from a cigarette producer suing a consumer advocacy nonprofit for antitrust violations in connection with an anti-smoking campaign.  (Oral Arg. Tr. 54 ("[T]wo consumer health watchdogs would not be able to launch an anti-smoking campaign without the prospect of antitrust liability to Philip Morris.").)  While this analogy has rhetorical appeal, the hypothetical cigarette producer plaintiff would likely be unable to plead competitive injury, for two reasons.  First, presumably unlike an anti-smoking campaign, ASOP singles out Plaintiff to "disparag[e]," while promoting Plaintiff's competitor LegitScript.  (AC ¶ 85(g).)  Second, also presumably unlike an anti-smoking campaign, the Court here infers that ASOP operates in part to "protect[] the alleged commercial interests of its . . . members," *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541 (4th Cir. 1998), which include Plaintiff's competitors GoodRx and LegitScript, (AC ¶ 7).  *See also Nat'l*

*Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.22 (1984) ("There is no doubt that the sweeping language of § 1 applies to nonprofit entities.").[18]

<u>b.  PSM</u>

Similar to ASOP, three sets of allegations suffice to establish that PSM joined the conspiracy.  First, and again most significantly, Plaintiff similarly alleges statements indicating PSM's intent to collaborate with its alleged co-conspirators to restrict online pharmacies.  Specifically, it alleges a 2010 email stating that PSM is a stakeholder, along with NABP, in ASOP's effort to "address the problem of online drug sellers."  (AC ¶ 69.)  Second, Plaintiff alleges that PSM issued a series of press releases in 2017 and 2018 that touted NABP's and ASOP's work related to online pharmacies and patient safety.  (*Id.* ¶ 77.)  As with ASOP, this allegation makes plausible that PSM's intent did not change post-2010.  Finally, Plaintiff alleges that PSM and NABP are "observers of ASOP and regularly participate in ASOP meetings and initiatives."  (*Id.* ¶ 67(a).)  As with ASOP, this provides PSM with opportunity to conspire with its alleged co-conspirators.

In addition, Plaintiff alleges that PSM played a role in the alleged conspiracy.  In 2018 it "published an article about the horrors of personal drug importation, . . . claiming that PharmacyChecker.com's verifications cannot be trusted and repeating false claims made by CSIP and ASOP."  (*Id.* ¶ 85(f).)  As with ASOP's public statements, while this alleged false

---

[18] To refute the presumption that "this membership affiliation renders ASOP's economic incentives coextensive with those of its members," (ASOP's Mem. 8), ASOP cites *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir. 2019).  There, the court rejected the plaintiff's argument that several of their law professors' close relationships with Barbri caused various law schools to collude against the plaintiff.  *Id.* at 580 ("[The plaintiff] does [not] attempt to explain why the administrators of the [law schools] would be invested in ensuring that professors at these schools can continue teaching Barbri courses on the side.").  This case is inapposite.  Law professors are not members but employees of a law school, so their interests are less prone to converge.

statement suffices to proceed with discovery, at the summary judgment stage Plaintiff will need to present evidence to overcome the presumption that their effect on competition was de minimis.  *See Ayerst*, 850 F.2d at 916.

### C.  Plaintiff Plausibly Alleges a Sherman Act Violation

The Court next considers whether Plaintiff has alleged a Sherman Act violation, and finds that it has.  In so doing, it considers Defendants' arguments that the Court should apply the rule of reason rather than the per se rule, (Defs.' Mem. 29–30), that Plaintiff fails to allege plausible product and geographic markets, (*id*. at 26–29), and that Plaintiff fails to allege harm to competition, (*id*. at 19–21).

### 1.  Rule of Reason vs. Per Se Standard

Defendants argue that the rule of reason is appropriate.  (Defs.' Mem. 29–30.)  Plaintiff argues that it has sufficiently alleged a group boycott that is a per se Sherman Act violation. (Pl.'s Mem. 31–32.)  At this early stage, the Court agrees with Plaintiff.

In evaluating potential Sherman Act violations, courts employ "two complementary categories of antitrust analysis."  *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978).  The first category includes agreements that are "illegal per se" because their "nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."  *Id*.  The second category includes "agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed."  *Id*.  For this second category of analysis, courts apply the rule of reason.  *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999). Defendants correctly argue that the rule of reason is the default.  (Defs.' Mem. 30.)  *See Nat'l Soc. of Prof'l Engineers*, 435 U.S. at 692 (noting that courts depart from the rule of reason only

for "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality"); *Cont'l T. V., Inc. v. GTE Sylvania Inc*., 433 U.S. 36, 49 (1977) (describing the rule of reason as "the prevailing standard of analysis"); *Bogan*, 166 F.3d at 514 ("The majority of allegedly anticompetitive conduct continues to be examined under the rule of reason." (citing *Capital Imaging Assocs.*, 996 F.2d at 543)).  However, the per se rule is applied to "conduct that is manifestly anticompetitive" and "would always or almost always tend to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp*., 485 U.S. 717, 723 (1988).  "[W]hen a restraint is deemed unlawful per se, the need to study an individual restraint's reasonableness in light of real market forces is eliminated." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc*., 551 U.S. 877, 886 (2007) (citation and quotation marks omitted).

Group boycotts are among the Sherman Act violations that may merit per se treatment. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co*., 472 U.S. 284, 290 (1985) ("[C]ertain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act."); *see also id*. at 294 ("Cases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.").  Courts consider three factors in determining whether a plaintiff has adequately alleged a group boycott.  First, has "the boycott . . . cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete"? *Id*. Second, do "the boycotting firms possess[] a dominant position in the relevant market"? *Id*. And third, are the practices "justified by plausible arguments that they were intended to enhance

51

overall efficiency and make markets more competitive"?  *Id.*  "Although a concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment, not every cooperative activity involving a restraint or exclusion will share with the per se forbidden boycotts the likelihood of predominantly anticompetitive consequences."  *Id.* at 295.  Finally, the Supreme Court has held that actions that "necessarily imply anticompetitive animus . . . thereby raise a probability of anticompetitive effect."  *Id.* at 296.

The Court finds that Plaintiff has sufficiently alleged the factors that contribute to the finding of a group boycott.  As to the first factor, Plaintiff has sufficiently alleged that Defendants' actions cut it off from its ability to receive traffic from search engines.  In particular, Plaintiff alleges that it was added to NABP's Not Recommended Sites list and targeted with negative ads by CSIP.  (AC ¶¶ 87, 90, 93.)  As a result, Plaintiff appeared with a warning box on search results from Bing, which led to a 76% reduction in traffic from Bing.  (*Id.* ¶¶ 92, 95.)[19] Overall, Plaintiff's traffic from organic search results has dropped more than 78%, and its click-through revenue has dropped more than 77% since March 2019.  (*Id.* ¶ 109.)  Plaintiff further alleges that most of its revenue "is directly related to its performance and visibility in search engine results."  (*Id.* ¶ 110.)

As to the second factor, Plaintiff has alleged enough facts for the Court to draw the inference that two of the boycotting entities—NABP and LegitScript—have a dominant position

---

[19] At oral argument, Defendants stated that Plaintiff has not alleged "any facts [showing] an agreement with those gatekeepers."  (Oral Arg. Tr. 32.)  Since these gatekeepers are not named as parties, it suffices that Plaintiff has alleged that Defendants "persuad[ed]" them "to deny relationships [Plaintiff] need[s] in the competitive struggle."  *Nw. Wholesale Stationers*, 472 U.S. at 294. (*See* AC ¶¶ 92–95.)

in the market for pharmacy accreditation.[20]  Plaintiff alleges that this market is "highly

concentrated."  (*Id*. ¶¶ 31, 107(f).)  Plaintiff further alleges that its exclusion from the market

"leav[es] only NABP and LegitScript as reasonable choices for pharmacies, consumers, and

vendors to choose from."  (*Id*. ¶ 107(f).)  Even though Plaintiff has alleged that it also competes

with non-party Canadian International Pharmacy Association (CIPA), (*id*. ¶ 31), the Court infers

that CIPA is a relatively small competitor with limited market power.

Plaintiff has not adequately alleged that boycotting entities occupy a dominant position in

the market for comparative drug information.  Plaintiff does allege that GoodRx is its competitor

in this market, an ASOP member, and "the leading provider of U.S.-only comparative drug price

information."  (*Id*. ¶¶ 7, 34.)  However, it does not make any specific claims about GoodRx's

role in the alleged conspiracy.  (*See generally id*.)  As discussed, the Second Circuit has rejected

the notion that a trade association forms a "walking conspiracy," and requires particularized

allegations about the role of individual members.  *AD/SAT*, 181 F.3d at 234–35.  Thus, Plaintiff

satisfies this requirement for only one of its two alleged markets.

As to the third factor, Defendants argue that courts apply the rule of reason where "the

alleged restraint relates to an ethical or industry standard reasonably designed to improve or

protect public safety."  (Defs.' Mem. 29.)  However, Defendants reference decisions that were

made after discovery; indeed, both were after trial.  *See Craftsmen Limousine, Inc. v. Ford Motor

Co*., 363 F.3d 761, 776 (8th Cir. 2004) (holding after trial that "[b]ecause the alleged restraints

were arguably based, at least in part, on safety concerns, they may have had some procompetitive

---

[20] The Court considers allegations regarding LegitScript only to the extent needed to
evaluate the Joint Motion, PSM Motion, and ASOP Motion.  *Cf.*, *In re Publ'n Paper Antitrust
Litig*., 690 F.3d 51, 55 (2d Cir. 2012) (holding that a reasonable jury could find a conspiracy
involving the defendant and a former defendant).

effects. It follows that an abbreviated per se analysis was inappropriate."); *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 221 (7th Cir. 1983) (holding after trial that "the presence of substantial evidence of . . . the 'patient care' motive . . . rendered the case inappropriate for per se treatment").  Here, at the pleadings stage, Plaintiff has alleged that "[c]onsumers are . . . less safe as a direct result of [D]efendants' conduct," (AC ¶ 107(h) (emphasis original)), and that Defendants' alleged safety motive is "pretextual," (*id.* ¶ 105).  In other words, the AC does not "admit that there is a procompetitive justification" for Defendants' conduct.  *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 388 (E.D.N.Y. 2004). "[Defendants'] various protestations that [Plaintiff] will not be able to prove its allegations will have to wait for summary judgment; at this early stage of the case, [Plaintiff] is entitled to an opportunity to try to make its case." *Consumers Warehouse Ctr., Inc. v. Intercounty Appliance Corp.*, No. 05-CV-5549, 2007 WL 922423, at *4 (E.D.N.Y. Mar. 26, 2007).

Finally, Plaintiff sufficiently alleges anticompetitive animus that raises a probability of anticompetitive effects.  NABP is a direct competitor of Plaintiff in the market for pharmacy accreditation.  (AC ¶ 6.)  ASOP member GoodRx is a direct competitor of Plaintiff in the market for comparative drug price information.  (*Id.* ¶ 7.)  As discussed, the Court infers that ASOP operates in part to "protect[] the alleged commercial interests of its . . . members," *Va. Vermiculite*, 156 F.3d at 541.  Since "a direct competitor [i]s the driving force behind the concerted refusal" to allow Plaintiff the ability to appear in search engine results, *Bennett v. Cardinal Health Marmac Distrib., Inc.*, No. 02-CV-3095, 2003 WL 21738604, at *4 (E.D.N.Y. July 14, 2003) (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 208 (1959)), Plaintiff has sufficiently alleged that the group boycott is a result of competitive animus, and is

among the group boycotts that are likely to restrict competition without offsetting efficiency gains.

The Court reaches the same conclusion with respect to both product markets. As discussed, Plaintiff's claim with respect to the market for prescription drug price information satisfies only two of the three factors for alleging a group boycott. It does not allege that the boycotting firms have a dominant market position. However, "a concerted refusal to deal need not necessarily possess all [three] traits to merit per se treatment." *Nw. Wholesale Stationers*, 472 U.S. at 295. In *Northwest Wholesale Stationers*, the Supreme Court discussed the importance of the market dominance factor: "[b]ecause the [boycotting party] occupied such a dominant position . . . that the boycott would devastate the nonmember, the [Supreme] Court concluded that the refusal to deal with the nonmember would amount to a per se violation of § 1." *Id*. at 291. Here, given its alleged 78% decline in site traffic from organic search results, (AC ¶ 109), its alleged 77% decline in monthly click-through revenue, (*id*.), and its allegation that "[m]ost of PharmacyChecker.com's revenue is directly related to its performance and visibility in search engine results," (*id*. ¶ 110), the Court is satisfied that Plaintiff alleges a sufficiently "devastat[ing]" boycott, notwithstanding ambiguity about the boycotting parties' share of the market for prescription drug price information.

Thus, the Court finds that Plaintiff has adequately alleged a per se violation. This finding is without prejudice; Defendants will have the opportunity to demonstrate the public safety rationale of their actions on summary judgment, and to argue that this rationale supports application of the rule of reason.

### 2.  Product and Geographic Markets

Defendants argue that Plaintiff has failed to plausibly allege the relevant market or markets.  (Defs.' Mem. 26–29.)  "[M]arket definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage."  *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (quotation marks omitted).  However, "there is 'no absolute rule' against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way."  *Id.* (citation omitted).  "Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the plaintiffs' complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market."  *Id.*

Plaintiff correctly argues that "[m]arket definition is a means—not an end; it merely aids in the search for competitive injury."  (Pl.'s Mem. 30.)  In *F.T.C. v. Indiana Federation of Dentists*, the Supreme Court stated that "[s]ince the purpose of the inquiries into market definition . . . is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for [such] an inquiry."  476 U.S. 447, 460–61 (1986) (quotation marks omitted).  Thus, the standard market definition inquiry is due to the need to allege harm to competition under the rule of reason.  *See id.* at 459–61 (considering the significance of market definition while applying the rule of reason); *see also supra* (concluding that the requirement to allege harm to competition comes from the rule of reason inquiry).  Consistent with *Indiana Federation of Dentists*, several courts have held that a plaintiff alleging a per se injury need not allege a market definition.  *See, e.g.*, *In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001) ("[R]equiring market definition . . . in all cases would undermine the presumption of anticompetitive effect in the

context of per se antitrust violations" (citing *Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213

F.3d 118, 123 (3d Cir. 2000))); *see also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d

1111, 1119 (10th Cir. 2008) ("[G]roup boycott. . . [is a] per se violation[], so [the plaintiff's]

failure to allege a relevant market is not fatal to [its] claims."); *Int'l Television Prods. Ltd. v.*

*Twentieth Century-Fox*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985) ("If . . . a [per se] violation is

alleged, the plaintiffs need not show a deleterious impact on competition." (citation omitted)); *cf.*

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481, 2014 WL 4277510, at *24

(S.D.N.Y. Aug. 29, 2014) ("[T]he pleading burden as to market definition is lower for per se

violations of § 1."), *aff'd*, 833 F.3d 151 (2d Cir. 2016).

 However, Plaintiff must allege product and geographic markets in order to establish a per

se violation.  The Second Circuit has clarified that "it is an element of a per se case to describe

the relevant market in which we may presume the anticompetitive effect would occur."  *Bogan*,

166 F.3d at 515; *see also Meijer, Inc. v. Barr Pharm., Inc.*, 572 F. Supp. 2d 38, 49 n.14 (D.D.C.

2008) ("[C]ourts must evaluate relevant market dynamics prior to condemning a restraint as a per

se violation of the antitrust laws.").  The Court is not aware of any basis to distinguish a market

definition inquiry for purposes of the rule of reason from a market definition inquiry for purposes

of evaluating an alleged per se violation.  Thus, the Court applies the standard from the rule of

reason case law to evaluate whether Plaintiff has alleged a group boycott that merits per se

treatment.

 Regarding the product market, "an antitrust complaint must explain why the market it

alleges is the relevant, economically significant product market."  *Concord Assocs.*, 817 F.3d at

54.  "If a complaint fails to allege facts regarding substitute products, to distinguish among

apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of

demand . . . a court may grant a Rule 12(b)(6) motion." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc*., 812 F. Supp. 387, 391–92 (S.D.N.Y. 1993). Where the plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). "Any viable relevant market . . . must take into account any reasonably interchangeable substitutes for the product in question." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001).

Regarding the geographic market, "[c]ourts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006). The plaintiff may, but is not required to, allege a geographic market that is smaller than nationwide. *See Tampa Elec. Co. v. Nashville Coal Co*., 365 U.S. 320, 327 (1961) ("[T]he 'line of commerce' affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area.").

Here, Plaintiff alleges the worldwide online pharmacy verification market and the worldwide comparative prescription drug pricing markets. (AC ¶¶ 30–36.) The Court finds that Plaintiff has adequately alleged these two markets.

The Court notes that Defendants' arguments focus on the over-breadth of Plaintiff's alleged product markets. (*See* Defs.' Mem. 28–29.) Where complaints are dismissed on the pleadings, it is typically because the alleged market is too narrow. *See, e.g., Concord Assocs*., 817 F.3d at 54 (affirming dismissal of a complaint that alleged harm to the "racing/gaming

market in the Catskills region" without alleging "why their proposed resort differs from the variety of other options for tourists to combine a gambling trip, access to natural resources, and other related activities available more or less the same distance from the NY Metro area"); *Mathias*, 152 F. Supp. 2d at 481–82 (dismissing complaint where alleged market was "home delivery subscriptions of the Daily News," and there was "no discussion of other products in the market that potentially compete with the Daily News, of arguably competing products that should not be included the market, or of the factors that make the Daily News a unique market" (alteration omitted)); *Re-Alco Indus.*, 812 F. Supp. at 392 (dismissing complaint where the plaintiff "made no showing why [one particular health education program's] materials should be considered a market unto themselves, as distinguished from the market suggested by defendants—all health education materials for elementary schools").

With respect to the alleged market for pharmacy verification, Defendants do not suggest that this market is too narrow. Nor do Defendants identify any relevant substitutes. (*See generally* Defs.' Mem.) Further, the Court infers that the AC's allegation that Plaintiff's product is "unique," (AC ¶ 33; *see also* Defs.' Mem. 28), serves to differentiate it from its competitors in the market, not to categorize it in a separate market. Thus, the Court finds that Plaintiff has plausibly alleged a market for pharmacy accreditation.

With respect to the alleged market for comparative prescription drug pricing information, Defendants argue that the defined market is too narrow because "Plaintiff does not allege that drug purchasers cannot easily turn to a host of alternative internet sources to find ubiquitous information about online pharmacies around the globe." (Defs.' Mem. 29.) However, because Defendants do not suggest any specific interchangeable products available from internet sources, the alleged market is plausible despite the absence of such allegations. Defendants also argue

that none of them competes in this market.   (*Id.*)  Generally, there is no requirement that the plaintiff be "a participant in the same market as the defendant," so long as the complaint alleges that the markets are "inextricably intertwined," thereby "suppl[ying] the reason defendants would bother to corrupt some market in which they do not participate."  *In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 311 (S.D.N.Y. 2017), *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).  In these circumstances, "the conspirators use[] the plaintiff's injury as the means, fulcrum, conduit, or market force to realize their illegal ends."  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 160–61 (2d Cir. 2016) (quotation marks omitted).  Here, Plaintiff alleges that Defendants are trying to disrupt consumer access to international price information, "to create and enforce new territorial market restraints through private agreements."  (AC ¶ 25.)  Further, ASOP's member GoodRx competes in this market.  (*Id.* ¶ 34.)  Both factors provide "reason[s] defendants would bother to corrupt some market in which they do not participate."  *N. Sea Brent*, 256 F. Supp. 3d at 311.

Finally, Defendants argue that both markets "cannot be global as a matter of law." (Defs.' Mem. 28.)  Plaintiff alleges that the market for information about accredited pharmacies and drug prices is global because pharmaceutical products are substitutable internationally.  (AC ¶ 36.)  As discussed, Defendants admit that personal imports of drugs "might" be allowed in some circumstances.  (Defs.' Mem. 4.)  Since personal imports may in some circumstances be legal, the Court cannot conclude at the motion to dismiss stage that the alleged markets are not global as a matter of law.  While Defendants may raise the same argument on a motion for summary judgment, at this early stage the Court finds that Plaintiff's alleged markets suffice to support its claim of a per se injury.

### 3.  Harm to Competition

The Joint Motion argues that the AC should be dismissed because it does not allege harm to competition.  (Defs.' Mem. 19–21.)  Plaintiff correctly argues that it must show harm to competition only under the rule of reason.  (*See* Pl.'s Mem. 17.)  *See Tops Markets, Inc. v. Quality Markets, Inc*., 142 F.3d 90, 96–97 (2d Cir. 1998); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs*., 996 F.2d 537, 543 (2d Cir.1993); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc*., 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007).  By contrast, "*allegations* pleading harm to competition are not required to withstand a motion to dismiss when the conduct challenged is a per se violation."  *Gelboim*, 823 F.3d at 775; *see also id*. at 776 ("[R]equiring a plaintiff to demonstrate that an injury stemming from a per se violation of the antitrust laws caused an actual adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a per se violation into a case to be judged under the rule of reason . . . ." (quoting *Pace Elecs., Inc. v. Canon Comput. Sys., Inc*., 213 F.3d 118, 123–24 (3d Cir. 2000))).  Because the Court finds that Plaintiff alleges a per se violation, it does not need to allege harm to competition, and the Joint Motion is denied insofar as it seeks dismissal on these grounds.[21]  Defendants may advance the same argument on summary judgment, particularly if they are able to establish that the rule of reason controls.

### D.  Plaintiff's Claims Are Not Barred by the Statute of Limitations

Defendants argue that Plaintiff's Sherman Act claims are barred by the statute of limitations. (Defs.' Mem. 30–31.)  Their principle argument is that "alleged conduct more than

---

[21] The Court thus does not consider Defendants' argument that Plaintiff fails to allege harm to competition, (*see* Defs.' Mem. 19–21), including its argument that Plaintiff cannot "claim[] harm to competition in the 'related market(s) for prescription medication,'" (Defs.' Reply 9).

four years before the commencement of this action (August 13, 2015 and earlier) should not be considered." (*Id.* at 30.)

The statute of limitations for Sherman Act claims is four years.  15 U.S.C. § 15b.

In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . , as to those damages, the statute of limitations runs from the commission of the act.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  "Evidence of claims which cannot give rise to liability because of a statute of limitations may be introduced to show the nature of the transactions under scrutiny and to establish a continuing course of conduct." *Colorado ex rel. Woodard v. Ramsour Bros.*, No. 84-CV-802, 1986 WL 7823, at *6 (D. Colo. July 9, 1986).

Here, Plaintiff filed its Complaint on August 13, 2019.  (Dkt. No. 1.)  All of the conduct that allegedly gave rise to damages claims occurred after August 13, 2015.[22]  Where Defendants allegedly played a role in the conspiracy and the AC alleges a date, these acts likewise allegedly occurred after August 13, 2015.[23]  Where Defendants allegedly played a role in the conspiracy and the AC does not allege a date, there is no basis for the Court to grant the Joint Motion on statute of limitations grounds.  *See Natkin v. Am. Osteopathic Ass'n*, No. 16-CV-1494, 2019 WL 1763242, at *15 (D. Or. Apr. 22, 2019) ("The fact that no date is alleged . . . means that

---

[22] NABP added Plaintiff to its Not Recommended Sites list in December 2018.  (AC ¶ 87.)  CSIP's actions reducing Plaintiff's availability in search results occurred in June and July 2019.  (*Id.* ¶¶ 93–95.)

[23] ASOP allegedly issued a false and misleading paid news release on August 18, 2015, (AC ¶ 85(g).)  PSM in 2018 published a false and misleading article concerning PharmacyChecker.com.  (*Id.* ¶ 85(f).)

[Defendants] cannot rely on the statute of limitations on a motion to dismiss.").[24]  Alleged acts prior to August 13, 2015 may be introduced as evidence of a continuing conspiracy.

Thus, the Joint Motion is denied insofar as it seeks to dismiss the AC because its claims are barred by the statute of limitations.

## IV.  Lanham Act Claim

To plead a claim under § 43(a) of the Lanham Act, the AC must allege that (1) "the statement in the challenged advertisement is false," (2) "the defendants misrepresented an inherent quality or characteristic of the product," (3) "the defendant placed the false or misleading statement in interstate commerce," and (4) "the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (alterations, citations, and quotation marks omitted).[25]  Plaintiff alleges a Lanham Act claim only against NABP.  (AC 51.)  NABP argues, pursuant to Rule 12(b)(6), that Plaintiff has not satisfied the first requirement that the statement be false, (Defs.' Mem. 32–37), or the third requirement that the statement be placed in interstate commerce, (*id.* at 37–39).  The Court denies the Joint Motion with respect to these arguments.

### A.  Plaintiff Adequately Alleges Falsity

"To prove that first element, a plaintiff must show one of two different theories of recovery: the challenged advertisement is (1) literally false or (2) likely to mislead or confuse

---

[24] ASOP's FAQ webpage is undated.  (AC ¶ 85(g).)  Plaintiff also alleges that NABP or LegitScript persuaded vendors to categorize PharmacyChecker.com as not safe, malicious, or pornography, but provides no date for this action.  (*Id.* ¶ 84.)

[25] At least one court has found that false statements about a competitor's product can be the basis for a Lanham Act violation.  *See Manning Int'l Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 438 (S.D.N.Y. 2001).

consumers ('impliedly false')." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d

629, 638 (S.D.N.Y. 2018) (citing *Merck Eprova AG*, 760 F.3d at 255).  Disjunctive statements—

two claims separated by "or"—are not literally false if one part of the statement is true.  *Border*

*Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1347 (M.D. Fla. 2006).  To allege that a

statement was impliedly false, "the plaintiff must allege that consumers or retailers were misled

or confused by the challenged advertisement and offer facts to support that claim." *Lokai*

*Holdings*, 306 F. Supp. 3d at 639.  The complaint must do more than "identify[] a broad swath of

people [that were] allegedly deceived." *Liberty Counsel, Inc. v. GuideStar USA, Inc*., 737 F.

App'x 171, 172 (4th Cir. 2018).  The complaint must provide "further factual enhancement." *Id*.

For example, it is insufficient to allege that "consumers who perform a Google search . . . will

see the [disparaging] website on the first page of results," unless the plaintiff asserts "facts to

support a conclusion that any potential [customers] are likely to be dissuaded." *Davis v. Avvo,*

*Inc*., 345 F. Supp. 3d 534, 544 (S.D.N.Y. 2018).  "Subjective claims about products, which

cannot be proven either true or false, are not actionable under the Lanham Act." *Groden v.*

*Random House, Inc*., No. 94-CV-1074, 1994 WL 455555, at *5 (S.D.N.Y. Aug. 23, 1994), *aff'd*,

61 F.3d 1045 (2d Cir. 1995).  Indeed, allegations made in a complaint can indicate that a term or

phrase is subject to multiple interpretations and, thus, "not unambiguous." *Fischer v. Forrest*,

286 F. Supp. 3d 590, 618 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020).

The Court divides NABP's alleged statements into two groups: statements about

safety/risk, and statements about legality. The Court considers each in turn.

### 1.  Safety and Risk

Plaintiff alleges that NABP made four false statements related to safety and risk.  First,

the Not Recommended Sites list "includes websites that 'are known to be unsafe' or that 'may:

Dispense prescription medicine without a prescription; Dispense foreign or unapproved medicine; or Refer/link patients to sites that facilitate the dispensing of prescription medications in violation of state or federal law or NABP standards.'"  (AC ¶ 119 (alterations omitted).)  Second, "[o]rdering drugs from these websites put you and your family at risk."  (*Id*.)  Third, "[t]he following sites are all known to be unsafe."  (*Id.* ¶¶ 121, 122.)  Fourth, "[u]sing websites on the NRL to purchase drugs may put you or your loved ones at risk."  (*Id.*¶ 123.)

Courts are divided on whether such statements about safety and risk are objective or subjective.  *Compare Precision IBC, Inc. v. PCM Capital, LLC*, No. 10-CV-682, 2011 WL 5444114, at *15 (S.D. Ala. Oct. 17, 2011) (finding these claims are objective because an allegation of "safety problems is capable of being proven true or false," and allegations that a product "fail[s] to meet safety standards is not vague or subjective"), *report and recommendation adopted*, 2011 WL 5444111 (S.D. Ala. Nov. 10, 2011) *with Aviation Fin. Co. v. Chaput*, No. 14-CV-8313, 2015 WL 13203653, at *17 (S.D.N.Y. Mar. 12, 2015) (finding the opposite because identifying "risk" speaks to "vague and possibly subjective consequences that cannot be proven true or false").

Between these two poles, the Eleventh Circuit has posited a middle ground: "statements regarding serious safety concerns arguably could be construed as more than general statements of opinion."  *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010).  Rather than "subjective statements regarding the efficacy or superiority of a product[,] . . . they can be viewed as expressing an objective risk of serious consequences that fairly implies a basis for that statement."  *Id*.  Further, "the proposition of serious safety risks . . . could be judged true or false based on empirical testing of the product."  *Id*.  Thus, recognizing "the importance of context when analyzing false advertising claims," the court concluded that, because these "statements of

opinion regarding serious safety concerns were generally made in the same sentence as a reference to its 'findings[,]' . . . they clearly indicated that the findings were the basis of and support for the expressions of safety concerns." *Id.* at 1311–12.

Following the Eleventh Circuit, the Court holds that even if NABP's statements about safety are opinions (and not facts) they are particularly likely to mislead because they appear to have a factual basis. For example, NABP states that the sites on the NRL are "known to be unsafe." (AC ¶¶ 121, 122; Dkt. No. 102-1 at 108.) Like the references to "findings" in *Osmose*, the word "known" suggests a basis, and is thus particularly likely to mislead.

Consistent with this conclusion, the Court further determines that Plaintiff has adequately alleged that consumers were misled. In particular, Plaintiff has alleged that these statements "send a negative signal to search engines that a listed site is a risk to users" and "frighten consumers away from a listed site while directing them to NABP affiliates." (AC ¶ 124.) It has also alleged that these signals have "had a profound negative effect on consumer web traffic to its website." (*Id.* ¶ 136; *see also id.* ¶ 109 (alleging declines in site traffic from search results and click-through revenue).)

Thus, the Joint Motion is denied insofar as it seeks dismissal because Plaintiff fails to allege false statements about safety and risk.

### 2. Illegality

Plaintiff alleges that NABP made two false statements related to its illegality. First, "'[a]void [t]hese [w]ebsites' [on the Not Recommended Sites list] because they 'appear to be out of compliance with state and federal laws or NABP patient safety and pharmacy practice standards.'" (*Id.* ¶ 119.) Second, "websites on the list . . . are 'acting illegally or do not follow best practices.'" (*Id.* ¶ 120.)

These statements are alleged to be literally false as they relate to PharmacyCheckerBlog.com, but not as they relate to PharmacyChecker.com.  Since both statements are disjunctive, if one element of each statement is true, they cannot be literally false.  The AC contains no allegations regarding PharmacyChecker.com's compliance with "NABP patient safety and pharmacy practice standards," (*id.* ¶ 119), or "best practices," (*id.* ¶ 120).  Thus, these statements cannot be the basis of liability because of their literal falsity, at least as they relate to PharmacyChecker.com.  Plaintiff's blog is a different matter.  The AC does allege that "NABP's statements about PharmacyCheckerBlog.com are literally false, because it is a policy advocacy blog that does not even arguably meet any criteria that NABP lists on the Not Recommended Sites list." (*Id.* ¶ 129.)  Thus, Plaintiff has successfully alleged that NABP's statements about its blog are literally false.[26]

The Court finds that the statements about the legality of PharmacyChecker.com are alleged to be impliedly false because they are likely to mislead or confuse consumers.  Plaintiff alleges that NABP conflates PharmacyChecker.com with "illegal or rogue sites" that "are located outside the U.S." and are "faking [their] licenses."  (*Id.* ¶ 131.)  Plaintiff further alleges that NABP has earlier stated about Plaintiff: "clearly they serve a purpose, and they help consumers, and we serve a different purpose, or maybe just slightly different."  (*Id.* ¶ 88.)  According to Plaintiff, this conflation in light of NABP's prior statements "shows that NABP is intentionally misleading the relevant purchasing public."  (*Id.* ¶ 131.)  "[W]here a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers

---

[26] At the pleadings stage, the Court does not consider NABP's argument that "the .com and the blog . . . are one and the same."  (Oral Arg. Tr. 94.)  NABP may raise this argument at summary judgment.

are, in fact, being deceived." *Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960

F.2d 294, 298 (2d Cir. 1992) (quotation marks omitted).

Within this framework, Plaintiff adequately pleads intent. Rule 8 requires that intent be

alleged plausibly. *Iqbal*, 556 U.S. at 686–87 (2009) ("[Rule 9] does not give [the plaintiff]

license to evade the less rigid—though still operative—strictures of Rule 8."). Plaintiff has

reached this bar, alleging a motive to deceive because NABP competes with Plaintiff, (AC ¶ 6),

and due to an inconsistency with NABP's prior statements, (*id.* ¶¶ 88, 131).

Plaintiff also adequately pleads egregious misconduct. Generally, "a high level of

evidence is required to show the kind of 'egregious' misconduct required to meet this standard."

*Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 421 (S.D.N.Y. 2013)

(alterations omitted). Courts have found that plaintiffs have failed to meet this bar where, for

example, no evidence suggested that the defendants were aware of the misleading effect, *Tiffany,*

*Inc. v. eBay, Inc.*, No. 04-CV-4607, 2010 WL 3733894, at *4 (S.D.N.Y. Sept. 13, 2010) (finding

that plaintiff failed to present evidence of "egregious misconduct" because "nothing in the record

indicates that [the defendant] was aware that consumers were being misled"), or the alleged

deception was common in the industry, *Johnson & Johnson-Merck Consumer Pharm. Co. v.*

*Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 132 (3d Cir. 1994) (finding no egregious

misconduct where the defendant's intent to mislead "is of a kind regrettably pervasive

throughout the . . . industry"). Here, Plaintiff alleges that NABP intended to deceive, (AC ¶¶ 6,

131 (noting that NABP competes with Plaintiff, and that its derogatory statements contradicted

its prior statements)), and the record does not suggest that such deception is common in the

industry. Thus, the AC plausibly alleges that NABP's conduct was egregious such that, if the

evidence is consistent with the allegations, a jury might conclude that NABP behaved

egregiously. *See Merck Eprova AG v. ProThera, Inc*., No. 08-CV-35, 2010 WL 9098310, at *7

(S.D.N.Y. Oct. 20, 2010) ("[I]t is for a jury to determine whether the parameters of [the

d]efendant's conduct was egregious.").

Thus, the Joint Motion is denied insofar as it seeks dismissal because Plaintiff fails to

allege false statements about its illegality.  NABP may raise the same arguments at summary

judgment should Plaintiff be unable to present evidence that NABP's speech actually misled

consumers, or that Plaintiff is entitled to a presumption that consumers were deceived.  *See*

*Merck Eprova AG*, 760 F.3d at 256.

B.  Plaintiff Adequately Alleges Commercial Speech

In the Second Circuit, to be "commercial advertising or promotion" under the Lanham

Act, a statement must be: "(1) commercial speech, (2) made for the purpose of influencing

consumers to buy defendant's goods or services, and (3) although representations less formal

than those made as part of a classic advertising campaign may suffice, they must be disseminated

sufficiently to the relevant purchasing public." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d

Cir. 2004) (quotation marks omitted).  As Plaintiff notes, (*see* Pl.'s Mem. 37), NABP does not

contest the third element.  The Court finds that Plaintiff sufficiently alleged that NABP's

representations were disseminated.[27]

The Supreme Court initially defined commercial speech as "speech which does no more

than propose a commercial transaction." *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of*

---

[27] Several cases are consistent with the view that Plaintiff has satisfied this requirement.
*See, e.g., Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263,
295–96 (S.D.N.Y. 2016) (finding that statements "posted on a public Internet forum" were
"disseminated sufficiently"); *Cannella v. Brennan*, No. 12-CV-1247, 2014 WL 3855331, at *4
(E.D. Pa. Aug. 6, 2014) ("[F]alse and misleading negative comments about the plaintiff's
business posted on an internet website, may be properly brought under [§] 43(a).").

*Physics*, 859 F. Supp. 1521, 1537 (S.D.N.Y. 1994) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 113 S. Ct. 1505, 1513 (1993)).  However, it has broadened this definition to include "expression related solely to the economic interests of the speaker and its audience." *Gordon & Breach*, 859 F. Supp. at 1537 (quoting *Discovery Network*, 113 S. Ct. at 1513).  That a nonprofit "stood to benefit from publishing [its statements]—even that they intended to benefit—is insufficient by itself to turn the [statements] into commercial speech."  *Id.* at 1541 (citing *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795–96 (1988)).

The Second Circuit has held that publications discussing a matter of public concern are not commercial speech.  *Boule v. Hutton*, 328 F.3d 84, 91–92 (2d Cir. 2003).  However, since "many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety, . . . [t]here is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 n.5 (1980).  "[A] 'hybrid' communication, i.e., one that combines commercial and non-commercial elements, may nonetheless be 'commercial' where (1) it is an advertisement; (2) it refers to a specific product or service; and (3) the speaker has an economic motivation for the speech."  *Enigma Software Grp.*, 194 F. Supp. 3d at 294; *see also Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66–68 (1983).

Here, NABP's alleged statements meet all three of these requirements.  First, the AC alleges that NABP's statements "propose commercial transactions (e.g. 'Buy safely' with a link to a list of NABP affiliates)."  (AC ¶ 135(c); *see also id.* ¶¶ 123, 134.)  The Court finds that these allegations are sufficient to categorize NABP's statements as advertisements.  One court has held that a product review was an advertisement where it "provide[d] links . . . where consumers

70

c[ould] make purchases" from a competitor. *GOLO, LLC v. Higher Health Network, LLC*, No. 18-CV-2434, 2019 WL 446251, at *8–9 (S.D. Cal. Feb. 5, 2019). Another court has held that promoting affiliates' products as superior to the products of the affiliates' competitor "unmistakably constitute[d] advertisements." *Enigma Software*, 194 F. Supp. 3d at 294. Here, Plaintiff alleges that NABP's disparaging comments about it are on the same website as both exhortations to buy from other providers, and a link to a list of specific alternative providers. (AC ¶¶ 123, 134, 35(c).) By contrast, the cases NABP cites find no advertisement where ratings publications "simply provide[d] information" and "d[id] not themselves propose[] a commercial transaction." *Davis v. Avvo, Inc*., 345 F. Supp. 3d 534, 540 (S.D.N.Y. 2018); *see also Gordon & Breach*, 859 F. Supp. at 1539 (accepting the defendants' position that their speech did not "propos[e] a commercial transaction"), *holding modified by Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48 (2d Cir. 2002). (*See* Defs.' Mem. 38.) Second, as discussed, these advertisements refer consumers to specific NABP affiliates from which to "[b]uy safely." (AC ¶ 135(c).) Third, the AC alleges that NABP competes with Plaintiff in the market for pharmacy accreditation, which provides economic motivation for its speech. (*Id*. ¶ 6.) Thus, Plaintiff has plausibly alleged that NABP's statements were commercial speech.[28]

For the same reasons, the Court concludes that Plaintiff has alleged that NABP's statements were "made for the purpose of influencing consumers to buy defendant's goods or

---

[28] At oral argument, NABP argued that "Plaintiff in order to establish commercial speech needs to show that the speech drove consumers to buy Defendants' goods and services." (Oral Arg. Tr. 97.) The Court is not aware of cases holding that speech is not commercial unless a transaction occurs, and neither case cited by NABP at oral argument supports this view. *See Baiqiao Tang v. Wengui Guo*, No. 17-CV-9031, 2019 WL 1207859, at *4 (S.D.N.Y. Mar. 14, 2019); *Enigma Software*, 194 F.Supp.3d at 293–95. (*See also* Oral Arg. Tr. 98–99 ("I don't think that . . . as a matter of meeting the pleading standard on a Lanham Act claim that you have to show that a consumer transaction actually occurred.").)

services," since they promoted NABP-affiliated sites over Plaintiff-affiliated sites. (*Id.* ¶¶ 123,

134, 35(c).)  Thus, the Joint Motion is denied insofar as it seeks dismissal because Plaintiff fails

to allege that NABP placed its statements in interstate commerce.[29]

### V.  Conclusion

For the foregoing reasons, the Joint Motion is denied, the PSM Motion is granted in part

and denied in part, the ASOP Motion is denied, and the LegitScript Motion is granted.  The

Court will hold a status conference via teleconference on ___May 18, 2021___ at __10:30 AM__.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos.

97, 100, 104, 119).

SO ORDERED.

DATED:       March 30, 2021
             White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[29] Referring to Plaintiff's blog, NABP claim at oral argument that "NABP's statement about a noncommercial entity by definition can't be commercial speech."  (Oral Arg. Tr. 102.) This argument is not in NABP's briefing, which focuses on the character of NABP's statements, not Plaintiff's operations.  (*See* Defs.' Mem. 37–39.)  As a result, the Court does not consider this argument.  *See Ebin v. Kangadis Family Mgmt. LLC*, 45 F. Supp. 3d 395, 398 n.2 (S.D.N.Y. 2014) (declining to consider oral argument position that "was not briefed in [the defendants'] papers and so was not preserved for the purposes of this motion").  NABP may raise this argument at summary judgment.