# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

PharmacyChecker.com LLC,          )

                                   )

                   *Plaintiff*,    )

        v.                          )

                                   )     No. 7:19-cv-07577-KMK

National Association of Boards of Pharmacy,  )

Alliance for Safe Online Pharmacies,       )     Honorable Kenneth M. Karas

Center for Safe Internet Pharmacies Ltd.,    )

Partnership for Safe Medicines, Inc.        )

                                   )

                   *Defendants*   )

                                   )

_____)

## DEFENDANT NABP'S ANSWER
## TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant National Association of Boards of Pharmacy ("NABP"), for its Answer to the Amended Complaint, states and alleges as follows:

Unless expressly admitted herein, NABP denies the allegations set forth in the Amended Complaint. Moreover, NABP expressly denies that it engaged in any of the alleged wrongdoing described in the Amended Complaint, and any statement in the Amended Complaint which suggests that it did is false and is expressly denied.

NABP admits that Plaintiff purports to state a claim under the Sherman Act, 15 U.S.C. § 1, against the named Defendants and their constituent members, and that Plaintiff purports to state a claim under the Lanham Act, 15 U.S.C. § 1125(a), against NABP. NABP denies the remaining allegations contained in the "Nature of the Action" section of the Amended Complaint. Moreover, NABP denies any and all allegations of unlawful conduct contained in the section headings throughout Plaintiff's Amended Complaint.

1. The allegations in Paragraph 1 of the Amended Complaint relating to whether "[t]his Court has primary subject-matter jurisdiction over this action" are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 1.

2. NABP admits that it has accredited some pharmacies located in New York. To the extent the allegations in Paragraph 2 of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. The remaining allegations in Paragraph 2 relating to whether "[v]enue is proper in the Southern District of New York" and whether "[v]enue is also proper under 28 U.S.C. § 1391" are legal conclusions to which no response is required. To the extent a response is required, NABP denies the remaining allegations in Paragraph 2.

3. The allegations in Paragraph 3 of the Amended Complaint relating to whether "[a]ssignment to the White Plains is appropriate" are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 3. NABP further denies that PharmacyChecker.com ("PCC") has any claim against NABP, that NABP has engaged in any unlawful conduct, and that PCC is entitled to any relief.

4. The allegations in Paragraph 4 relating to whether "[t]his Court has personal jurisdiction over each of the defendants" are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 4, and specifically denies that it has conspired to harm or actually did harm PCC. To the extent the allegations in Paragraph 4 of the Amended Complaint are directed to parties other than NABP, no response is

required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

5.      The allegations in Paragraph 5 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

6.      NABP admits that it is organized under the corporate laws of the State of Kentucky and has its principal place of business in the State of Illinois. NABP admits that it is an association of boards of pharmacies principally in the United States. To the extent the allegations in Paragraph 6 of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. To the extent the allegations in Paragraph 6 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 6.

7.      NABP admits that it has participated in ASOP meetings at times. NABP further admits that Libby Baney is a registered lobbyist for NABP and that Bruce Longbottom serves on the executive board for the .pharmacy Verified Websites Program and serves on the ASOP Global Foundation Board. NABP states that Marty Allain is no longer the chair of the board of directors of the ASOP Global Foundation. To the extent the allegations in Paragraph 7 of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth

or falsity of those allegations and on that basis denies them. NABP denies the remaining allegations in Paragraph 7.

8. The allegations in Paragraph 8 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. To the extent the allegations in Paragraph 8 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations.

9. The allegations in Paragraph 9 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP admits that in the past it has recognized LegitScript's certification standards for verifying and classifying lawfully operating online pharmacies.

10. The allegations in Paragraph 10 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

11. NABP denies the allegations in Paragraph 11 of the Amended Complaint with respect to itself. NABP denies any allegation or suggestion that NABP has participated in any unlawful conduct or authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent any unlawful conduct. NABP further denies that Plaintiff is entitled to any relief. To the extent the allegations in Paragraph 11 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge

sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 11 with respect to other Defendants and/or other parties and on that basis denies them.

12.     NABP states that its constituents are the Boards of Pharmacy, which do not compete in any underlying product markets that PCC has alleged in this action. The allegations in Paragraph 12 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. To the extent the allegations in Paragraph 12 are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

13.     The allegations in Paragraph 13 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. To the extent the allegations in Paragraph 13 are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

14.     The allegations in Paragraph 14 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. NABP denies that it has engaged in any unlawful conduct, that it has caused PCC any harm, or that it is in any way responsible for PCC's alleged harm. NABP further denies that PCC is entitled to any relief. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 14 with respect to other Defendants and/or other parties and on that basis denies them.

15. NABP denies the allegations in Paragraph 15 of the Amended Complaint as incomplete, inaccurate, and/or misleading.

16. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 16 of the Amended Complaint, and on that basis denies them.

17. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 17 of the Amended Complaint, and on that basis denies them.

18. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 18 of the Amended Complaint, and on that basis denies them. NABP further denies the allegations in Paragraph 18 as incomplete, inaccurate, and/or misleading.

19. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 19 of the Amended Complaint, and on that basis denies them. The web page cited in Footnote 1 of the Amended Complaint is a document that speaks for itself and therefore no response is required.

20. NABP denies the allegations in Paragraph 20 of the Amended Complaint as incomplete, inaccurate, and/or misleading. To the extent the allegations in Paragraph 20 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP specifically denies that it is a "benefit" to consumers to fill prescriptions in different countries, or that they receive the "same medications" from foreign pharmacies.

21. NABP denies the allegations in Paragraph 21 of the Amended Complaint as incomplete, inaccurate, and/or misleading.

22.     The allegations in Paragraph 22 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 22.  To the extent the allegations in Paragraph 22 are directed to parties other than NABP, no response is required.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.  NABP further denies the allegations in Paragraph 22 as presenting an incomplete, inaccurate, and/or misleading view of the practice of pharmacy in the United States.

23.     The allegations in Paragraph 23 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 23.  NABP notes that Americans have a constitutional right to petition the government and advocate for their preferred policies.

24.     The allegations in Paragraph 24 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 24.  NABP specifically denies that personal importation constitutes a "legal gray area."  The sources cited in Footnote 2 of the Amended Complaint are documents that speak for themselves and therefore no response is required.

25.     NABP denies the allegations in Paragraph 25 of the Amended Complaint with respect to itself.  To the extent the allegations in Paragraph 25 are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 25 with respect to other Defendants and/or other parties and on that basis denies them.

26.     NABP denies the allegations in Paragraph 26 of the Amended Complaint with respect to itself.  To the extent the allegations in Paragraph 26 are legal conclusions, no response

is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 26 with respect to other Defendants and/or other parties and on that basis denies them.

27. NABP denies the allegations in Paragraph 27 of the Amended Complaint with respect to itself. To the extent the allegations in Paragraph 27 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 27 with respect to other Defendants and/or other parties and on that basis denies them.

28. NABP denies the allegations in Paragraph 28 of the Amended Complaint with respect to itself. To the extent the allegations in Paragraph 28 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 28 with respect to other Defendants and/or other parties and on that basis denies them.

29. NABP denies the allegations in Paragraph 29 of the Amended Complaint with respect to itself. To the extent the allegations in Paragraph 29 are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP specifically denies that it has violated Section 1 of the Sherman Act. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 29 with respect to other Defendants and/or other parties and on that basis denies them.

30. The allegations in Paragraph 30 is are legal conclusions to which no response is required. To extent a response is required, NABP denies the allegations in Paragraph 30. NABP specifically denies that PCC competes in any market relevant to this action.

31. The allegations in Paragraph 31 are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 31. NABP specifically denies that PCC's "verification" signals to consumers that their pharmacies practice either "ethically" or "lawfully" or that they "sell genuine prescription drugs dispensed from licensed pharmacies to patients with valid prescriptions." NABP further denies the allegations in Paragraph 31 as incomplete, inaccurate, and/or misleading.

32. NABP admits that it maintains a directory of its accredited online pharmacies. NABP admits that the directory of its accredited pharmacies that it maintains is useful to consumers when trying to identify and evaluate pharmacies. NABP denies that PCC's "directory of its online accredited pharmacies" is useful to consumers. To the extent the allegations in Paragraph 32 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 32, and on that basis denies them.

33. The allegations in Paragraph 33 are legal conclusions to which no response is required. To the extent a response is required, NABP admits that it "verifies" U.S.-based online pharmacy websites because those are the only online pharmacy websites that can lawfully sell prescription drugs to U.S.-based consumers. NABP denies there are safe international pharmacies that sell to consumers in the United States. NABP denies that PCC is engaged in the business of "reducing information asymmetries" for consumers. NABP denies PCC's remaining characterizations of PCC's business. NABP denies the remaining allegations in Paragraph 33.

34. To the extent the allegations in Paragraph 34 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those

allegations. NABP denies that it has "blacklisted" anyone. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 34 of the Amended Complaint, and on that basis denies them.

35. The allegations in Paragraph 35 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 35.

36. To the extent the allegations in Paragraph 36 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP further denies the allegations in Paragraph 36 as incomplete, inaccurate, and/or misleading. NABP incorporates by reference its responses to Paragraphs 54–56 of the Amended Complaint as if fully set forth herein. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 36 of the Amended Complaint, and on that basis denies them.

37. The allegations in Paragraph 37 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP admits that online pharmacies can improve consumer access to alternative sources of prescription drugs, and that those sources can—at times—provide lower prices. NABP also admits that the internet has "facilitated bad actors who engage in nefarious or unsafe practices" which include "selling counterfeit, adulterated, or otherwise unsafe drugs, trafficking in controlled substances and engaging in identity theft." NABP denies that this is an exhaustive list of nefarious or unsafe practices that bad actors can engage in. Other such bad actors, for example, knowingly and unlawfully sell drugs across international borders, avoiding important safety regulations and defying national efforts to maintain the safety of the drug supply. NABP admits that "rogue"

online pharmacies "often do not provide medicine from licensed pharmacies, dispense medication without requiring a valid prescription, practice unsafe pharmacy practices, and in some cases intentionally sell counterfeit drugs." NABP denies that this is an exhaustive list of the behavior of "rogue" pharmacies. NABP further denies Plaintiff's characterizations of online pharmacies as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 37.

38. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 38 of the Amended Complaint, and on that basis denies them.

39. NABP admits that it launched an accreditation program, VIPPS, in 1999. NABP specifically denies that VIPPS is of "little utility for many consumers." While NABP admits that VIPPS accredits pharmacies, NABP denies that the accreditation it provides is in any way analogous to the verification or accreditation provided by PCC. NABP denies the remaining allegations in Paragraph 39 of the Amended Complaint.

40. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 40 of the Amended Complaint, and on that basis denies them.

41. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 41 of the Amended Complaint, and on that basis denies them. To the extent the allegations in Paragraph 41 are legal conclusions, no response is required. NABP specifically denies that it "reached private agreements with key gatekeepers belonging to CSIP, including Internet search companies, such as Google and Bing, to incorporate NABP's Not

Recommended Sites list into aspects of their search engine rankings and/or results." NABP denies the remaining allegations in Paragraph 41.

42.     Upon reasonable belief, NABP states that PCC's list of "accredited online pharmacies" published on the Internet includes organizations other than pharmacies, such as a prescription referral service.

43.     NABP denies that PCC "empowers consumers" and PCC's allegations that it enables consumers to obtain the "lowest possible prices" for drugs. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 43 of the Amended Complaint and on that basis denies them.

44.     The allegations in Paragraph 44 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

45.     To the extent the allegations in Paragraph 45 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 45, and on that basis denies them. The web page cited in Footnote 3 of the Amended Complaint is a document that speaks for itself and therefore no response is required.

46.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 46 of the Amended Complaint, and on that basis denies them.

47.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 47 of the Amended Complaint, and on that basis denies them.  NABP  further denies the allegations in Paragraph 47 as incomplete, inaccurate, and/or misleading.

48.     To the extent the allegations in Paragraph 48 are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 48, and on that basis denies them.  NABP further denies the allegations in Paragraph 48 as incomplete, inaccurate, and/or misleading.

49.     To the extent the allegations in Paragraph 49 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 49 and on that basis denies them.

50.     To the extent the allegations in Paragraph 50 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the remaining allegations in Paragraph 50 with respect to itself.  NABP specifically denies that NABP's main concern is "not necessarily" the safety of online pharmacies.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 50 with respect to other Defendants and/or other parties and on that basis denies them.

51.     To the extent the allegations in Paragraph 51 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the remaining allegations in Paragraph 51 with respect to itself.  NABP

lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 51 with respect to other Defendants and/or other parties and on that basis denies them.

52.     The allegations in Paragraph 52 are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 52.  NABP specifically denies that PCC does not "facilitate[] the import of any [pharmaceutical] products."

53.     To the extent the allegations in Paragraph 53 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in the first sentence of Paragraph 53, and on that basis denies them.  NABP denies the remaining allegations in Paragraph 53 with respect to itself.   NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 53 with respect to other Defendants and/or other parties and on that basis denies them.

54.     The allegations in Paragraph 54 are legal conclusions to which no response is required.  To extent a response is required, NABP denies the allegations in Paragraph 54.  NABP further denies the allegations in Paragraph 54 as incomplete, inaccurate, and/or misleading.

55.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 55 of the Amended Complaint, and on that basis denies them.  To the extent this paragraph contains legal conclusions, no response is required.  To the extent a response is required,  NABP denies those allegations.  NABP specifically denies the legal conclusion that a "misbranded" drug with an unapproved label constitutes an FDA-approved drug.  NABP denies the remaining allegations in Paragraph 55.

56.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 56 of the Amended Complaint, and on that basis denies them.  To the extent the allegations in this paragraph are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP further denies the allegations in Paragraph 56 as incomplete, inaccurate, and/or misleading.

57.     The allegations in Paragraph 57 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 57, which rely on a willful misreading of the relevant statutes and regulations.  NABP further denies the allegations in Paragraph 57 as incomplete, inaccurate, and/or misleading.

58.     To the extent the allegations in Paragraph 58 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 58, and on that basis denies them.

59.     To the extent the allegations in Paragraph 59 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the remaining allegations in Paragraph 59 with respect to itself.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 59 with respect to other Defendants and/or other parties and on that basis denies them.

60.     To the extent the allegations in Paragraph 60 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the remaining allegations in Paragraph 60 with respect to itself.  NABP

lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 60 with respect to other Defendants and/or other parties and on that basis denies them. NABP specifically denies any characterization of PCC's activities or goals.

61.     To the extent the allegations in Paragraph 61 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 61 with respect to itself. NABP denies that it has participated in any unlawful conduct or "scheme," that it has harmed PCC, consumers, or competition, and that Plaintiff is entitled to any relief. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 61 with respect to other Defendants and/or other parties and on that basis denies them.

62.     To the extent the allegations in Paragraph 62 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP admits that it established its VIPPS in 1999 and denies the remaining allegations in the second sentence of Paragraph 62. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 62, and on that basis denies them.

63.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 63 of the Amended Complaint, and on that basis denies them.

64.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 64 of the Amended Complaint, and on that basis denies them.

65.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 65 of the Amended Complaint, and on that basis denies them.

66.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 66 of the Amended Complaint, and on that basis denies them.

67.     NABP admits that it has participated in ASOP meetings at times.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 67 of the Amended Complaint, including in Paragraphs 67a and 67b, and on that basis denies them.

68.     NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 68 of the Amended Complaint, and on that basis denies them.

69.     The email cited in Paragraph 69 of the Amended Complaint is a document that speaks for itself and therefore no response is required.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 69, and on that basis denies them.

70.     The press release cited in Paragraph 70 of the Amended Complaint is a document that speaks for itself and therefore no response is required.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 70, and on that basis denies them.

71.     NABP admits that it announced in 2011 that it hosted a "recent meeting" of CSIP participants.  NABP denies the remaining allegations in Paragraph 71 of the Amended Complaint.

72.     NABP admits that it participated in a meeting called a "Task Force on Internet Pharmacy Practice" in 2012.  NABP denies the remaining allegations in Paragraph 72 of the Amended Complaint.  NABP specifically denies that it engaged in a conspiracy or that it sought to "limit competition from online pharmacies."

73.     NABP denies the allegations in Paragraph 73 of the Amended Complaint, including Paragraphs 73a through 73d.  NABP specifically denies that it agreed with ASOP to "restrain competition by online pharmacies" and denies any plan to "coerce various internet gatekeepers" to do anything.  NABP further denies Plaintiff's quotations and characterizations of NABP statements in Paragraph 73 as incomplete, inaccurate, and/or misleading.  NABP denies the remaining allegations in Paragraph 73.

74.     The allegations in Paragraph 74 of the Amended Complaint are directed to parties other than NABP and therefore require no response.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

75.     The allegations in Paragraph 75 of the Amended Complaint are directed to parties other than NABP and therefore require no response.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.  The "Principles of Participation" cited is a document that speaks for itself and therefore no response is required.

76.     The allegations in Paragraph 76 of the Amended Complaint are directed to parties other than NABP and therefore require no response.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

77.     NABP denies the allegations in Paragraph 77 of the Amended Complaint with respect to itself. NABP specifically denies that it is a "co-conspirator" of PSM or any other Defendant and/or other party. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 77 with respect to other Defendants and/or other parties and on that basis denies them.

78.     NABP admits that it has informed search engines about the safety and compliance dangers of using third-party verification services that do not adhere to pharmacy laws and practice standards, including by selling foreign pharmaceuticals to U.S. consumers who may not lawfully import unapproved and/or mislabeled drugs. NABP states that it informed search engines of these risks in or around 2009. To the extent the allegations in Paragraph 78 of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP denies the remaining allegations in Paragraph 78.

79.     NABP admits that it included PharmacyChecker.com on the Not Recommended Sites list in or around 2010. The press release and website cited in Paragraph 79 of the Amended Complaint are documents that speak for themselves and therefore no response is required. NABP denies PCC's characterization of the purpose and motivation behind NABP's Not Recommended Sites list. NABP denies PCC's characterization of NABP's Not Recommended Sites list as a "blacklist." NABP denies that PCC does not "facilitate[] the sale of medication" and that it "presents no risk to patients." NABP admits that PCC contested the addition of PharmacyChecker.com to the NABP list in 2011 but denies any characterization of the grounds on which PCC contested the addition. NABP admits that it removed PharmacyChecker.com from

the Not Recommended Sites list in February 2011 but denies that such removal constituted any "admission" as characterized by Plaintiff. NABP denies the remaining allegations in Paragraph 79 and further denies those allegations as incomplete, inaccurate, and/or misleading.

80. NABP admits that it applied for and received the .pharmacy domain extension and that it administers the .pharmacy registry under contract with ICANN. NABP admits that NABP Foundation received financial support for the .pharmacy initiative from Pfizer, Merck, and Eli Lilly, among others. NABP admits that there are eligibility requirements for the .pharmacy domain. NABP admits that it consulted with others in developing the .pharmacy eligibility criteria in 2013 and 2014. NABP denies any inference that this activity was unlawful, or any inference of unlawful conspiracy. The creation of the .pharmacy domain name was a public process that PCC could and did provide public comment on. NABP admits that in June 2014 ICANN approved the application . NABP denies the remaining allegations in Paragraph 80 of the Amended Complaint.

81. NABP admits that in 2015 it sent a letter to ICANN. NABP denies any further characterization of this letter, which is publicly available and can speak for itself. NABP denies the remaining allegations in Paragraph 81 of the Amended Complaint.

82. To the extent the allegations in Paragraph 82 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies that it has "coerced" any pharmacies not to do business with PCC. NABP admits that on January 25, 2017, HealthWarehouse.com was a U.S. online pharmacy that was accredited by VIPPS. The email cited in Paragraph 82 is a document that speaks for itself and therefore requires no response. NABP denies the remaining allegations in Paragraph 82.

83.     To the extent the allegations in Paragraph 83 of the Amended Complaint are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP admits that in March 2018, Healthwarehouse.com was an NABP-accredited U.S. online pharmacy.  NABP denies that it "coerced" or made a "threat" against anyone, or that it "prevented a U.S. online pharmacy that [NABP] views as operating in compliance with law and NABP's own standards from listing its prices on PharmacyChecker.com."  NABP lacks sufficient knowledge to form a reasonable belief as to the truth or falsity of the statements that "NABP's VIPPS program" allegedly made, "according to Healthwarehouse.com," or that they were made at all and on that basis denies them.  NABP further denies Plaintiff's quotations and characterizations of NABP's alleged statements in Paragraph 83 as incomplete, inaccurate, and/or misleading.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 83, and on that basis denies them.

84.     To the extent the allegations in Paragraph 84 of the Amended Complaint are directed to parties other than NABP, no response is required.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.  NABP denies that it has engaged in any conspiracy and denies that it has "persuaded" any security vendors to do anything.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 84, and on that basis denies them.

85.     To the extent the allegations in Paragraph 85 of the Amended Complaint, including Paragraphs 85a through 85h, are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the remaining allegations in Paragraph 85 with respect to itself.  NABP specifically denies that it has engaged in any

"coordinated misinformation campaigns" or any unlawful conduct, and denies that Plaintiff is entitled to any relief. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 85 with respect to other Defendants and/or other parties and on that basis denies them.

a. The allegations in Paragraph 85a of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

b. The blog post referenced in Paragraph 85b of the Amended Complaint is a document that speaks for itself and therefore no response is required. NABP denies Plaintiff's characterization of the blog post as "misleading." NABP denies any allegation or suggestion that NABP participated in any unlawful conduct and that Plaintiff is entitled to relief.

c. The allegations in Paragraph 85c of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

d. The allegations in Paragraph 85d of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable

belief as to the truth or falsity of those allegations and on that basis denies them.

e.  The allegations in Paragraph 85e of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. The sources cited in Paragraph 85e and in Footnote 4 of the Amended Complaint are documents that speak for themselves and therefore no response is required.

f.  The allegations in Paragraph 85f of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

g.  The allegations in Paragraph 85g of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

h.  To the extent the allegations in Paragraph 85h of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that

basis denies them. NABP admits that Dr. Catizone and Ms. Baney have appeared together on occasion. NABP further admits that Dr. Catizone has spoken publicly about pharmacy-related issues but denies that Dr. Catizone has engaged or participated in any alleged "misinformation campaigns." NABP denies that it has published or promoted anything as part of any "misinformation campaigns." NABP denies the remaining allegations in Paragraph 85h.

86. NABP incorporates by reference its responses to Paragraph 85 of the Amended Complaint, including Paragraphs 85a through 85h, regarding the so-called "misinformation campaigns," as if fully set forth herein. To the extent the allegations in Paragraph 86 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 86 with respect to itself. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 86 with respect to other Defendants and/or other parties and on that basis denies them.

87. NABP admits that in December 2018 it added PCC to its Not Recommended Sites list. NABP denies PCC's characterization of NABP's Not Recommended Sites list as a "blacklist." NABP denies that it made any "admission" in 2011 that PCC did not belong on the Not Recommended List. NABP web pages are documents that speak for themselves and therefore no response is required; NABP further notes that PCC has grossly mischaracterized these web pages. NABP admits that it has made changes to the language appearing on its Not Recommended Sites web page from time to time, but otherwise denies Plaintiff's quotations and

characterizations of NABP statements as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 87 of the Amended Complaint.

88.     The article cited in Paragraph 88 and Footnote 5 of the Amended Complaint is a document that speaks for itself and therefore no response is required. NABP further denies Plaintiff's quotations and characterizations in Paragraph 88 as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 88.

89.     To the extent the allegations in Paragraph 89 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP admits that PCC again disputed the addition of PharmacyChecker.com to the NABP list in 2018 but denies any characterization of the grounds on which PCC disputed the addition. NABP further denies PCC's claim that it "does not sell or process orders for the sale of medicine" as incomplete, inaccurate, and/or misleading. NABP admits that the Not Recommended Sites list contains rogue online pharmacies, including those that do not require a prescription and/or intentionally sell counterfeit drugs. NABP denies the remaining allegations in Paragraph 89. NABP specifically denies that NABP's actions "threaten public health by confusing consumers and Internet gatekeepers" in any way.

90.     NABP admits that it added PCC's blog to its Not Recommended Sites list. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 90 of the Amended Complaint and on that basis denies them. NABP states that PCC's blog facilitates steering patients to rogue online pharmacies through a search box on the blog's website and makes misleading statements on its blog with respect to the legality of personal importation and the safety of drugs from foreign countries that are not FDA approved.

91. NABP admits that it did not remove PCC from the Not Recommended Sites list. NABP admits that it has made changes to the language appearing on its Not Recommended Sites web pages over time. The web pages are documents that speak for themselves and therefore no response is required. NABP further denies Plaintiff's quotations and characterizations of NABP statements as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 91 of the Amended Complaint. For example, NABP denies that it revised its criteria for the Not Recommended Sites list specifically for the purpose of including PCC.

92. The allegations in the first sentence of Paragraph 92 of the Amended Complaint are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP denies PCC's characterization of NABP's Not Recommended Sites list as a "blacklist." The allegations in the second sentence of Paragraph 92 are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 92 with respect to itself, and restates and incorporates by reference its responses to Paragraphs 70 through 73 of the Amended Complaint as if fully set forth herein. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 92 with respect to other Defendants and/or other parties and on that basis denies them.

93. To the extent the allegations in Paragraph 93 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. The allegations in Paragraph 93 are directed to parties other than NABP and therefore require no response. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies

them. The sources cited in Paragraph 93 are documents that speak for themselves and therefore no response is required.

94. To the extent the allegations in Paragraph 94 of the Amended Complaint are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP denies PCC's characterization of NABP's Not Recommended Sites list as a "blacklist." NABP denies the remaining allegations in Paragraph 94.

95. To the extent the allegations in Paragraph 95 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 95 and on that basis denies them. NABP further denies Plaintiff's quotations or characterizations of NABP's statements or actions as incomplete, inaccurate, and/or misleading. The sources cited in Paragraph 95 and Footnote 6 of the Amended Complaint speak for themselves and therefore no response is required.

96. NABP admits that it applied to the ICANN to operate a generic top-level domain (gTLD) called ".pharmacy" and that international pharmacies selling medications into the United States are not eligible for the ".pharmacy" domain. NABP denies the remaining allegations in Paragraph 96 of the Amended Complaint with respect to itself. NABP further denies the remaining allegations in Paragraph 96 as to itself as incomplete, inaccurate, and/or misleading. To the extent the allegations in Paragraph 96 are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them.

97.     NABP admits that Walgreens, CVS, and Rite Aid have ".pharmacy" web addresses.  NABP denies the remaining allegations in Paragraph 97 of the Amended Complaint with respect to itself.  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 97 with respect to other Defendants and/or other parties and on that basis denies them.

98.     NABP admits that it engages in public education initiatives from time to time and encourages consumers to look for the .pharmacy domain.  NABP denies the remaining allegations in Paragraph 98 of the Amended Complaint and specifically denies Plaintiff's characterizations of NABP's operations or activities.  The first clause of Paragraph 98 is a legal conclusion to which no response is required.  To the extent a response is required, NABP denies those allegations including, but not limited to, the claim that it has engaged in any conspiracy or performed any actions as part of any purported conspiracy.  NABP denies any allegation or suggestion that NABP has engaged or participated in any unlawful conduct, and denies that Plaintiff is entitled to any relief.

99.     NABP admits that PCC does not hold a .pharmacy domain.  NABP also admits that ASOP holds two such domains, asopfoundation.pharmacy and buysaferx.pharmacy, LegitScript holds its own domain, legitscript.pharmacy, and NABP holds eight ".pharmacy" domains.  NABP denies the remaining allegations in Paragraph 99 of the Amended Complaint and specifically denies Plaintiff's characterizations related to the .pharmacy domain.

100.    To the extent the allegations in Paragraph 100 of the Amended Complaint are directed to parties other than NABP, no response is required.  To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those

allegations and on that basis denies them. NABP denies the remaining allegations in Paragraph 100.

101. NABP restates its responses to Paragraphs 1 through 100 of the Amended Complaint and incorporates by reference each preceding paragraph as if fully set forth herein.

102. NABP admits that the allegations in Paragraph 102 of the Amended Complaint reflect certain edited excerpts of Section 1 of the Sherman Act, 15 U.S.C. § 1.

103. The allegations in Paragraph 103 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 103 with respect to itself. NABP specifically denies that it has combined or conspired with anyone in violation of Sherman Act Section 1. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 103 with respect to other Defendants and/or other parties and on that basis denies them.

104. The allegations in Paragraph 104 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 104.

105. The allegations in Paragraph 105 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 105.

106. The allegations in Paragraph 106 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 106.

107. The allegations in Paragraph 107 of the Amended Complaint, including Paragraphs 107a through 107h, contain legal conclusions to which no response is required. To

the extent a response is required, NABP denies those allegations. NABP further denies the allegations in Paragraph 107 as incomplete, inaccurate, and/or misleading. With respect to itself, NABP denies that its conduct has harmed any market and denies the allegations in Paragraphs 107a, 107b, and 107d through 107h. With respect to other Defendants and/or other parties, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraphs 107a, 107b, and 107d through 107h, and on that basis denies them. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 107c of the Amended Complaint and on that basis denies them and denies that the allegations contained therein have any applicability to PCC. The F.T.C. opinion cited in Paragraph 107c and Footnotes 7 and 8 of the Amended Complaint relate to documents that speak for themself and therefore no response is required. The article cited in Paragraph 107h and Footnote 9 of the Amended Complaint is a document that speaks for itself and therefore no response is required.

108. To the extent the allegations in Paragraph 108 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations with respect to other Defendants and/or other parties and on that basis denies them. NABP denies the remaining allegations in Paragraph 108. NABP specifically denies that it has caused any injury to Plaintiff or harm to competition, and that Plaintiff is entitled to any relief.

109. The allegations in Paragraph 109 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. To the extent the allegations in Paragraph 109 are directed to

parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 109 and on that basis denies them.

110. To the extent the allegations in Paragraph 110 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations with respect to itself. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations with respect to other Defendants and/or other parties and on that basis denies them. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 110, and on that basis denies them. NABP denies PCC's characterization of NABP's Not Recommended Sites list as a "blacklist."

111. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the allegations in the first two sentences of Paragraph 111 of the Amended Complaint, and on that basis denies them. NABP denies the remaining allegations in Paragraph 111 and specifically denies that it has "artificially inflated the visibility" of its website or any other website and that it saw its average web traffic increase to six times its previous level. The Google search results cited in Paragraph 111 speak for themselves and therefore no response is required. NABP does not admit the veracity, authenticity, or admissibility of anything contained in those search results. NABP also notes that Google search results may be different for different users or at different times based on a variety of factors. Any characterization of those results is denied. NABP denies any suggestion that web traffic to the Not Recommended Sites list increased as a result of any alleged misconduct.

112. To the extent the allegations in Paragraph 112 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies any allegation or suggestion that NABP has participated in any unlawful conduct, that NABP has caused any harm to PCC, and that Plaintiff is entitled to any relief. To the extent Plaintiff quotes or incorporates any NABP statements in Paragraph 112, NABP further denies those allegations as incomplete, inaccurate, and/or misleading. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 112 relating to Plaintiff's web traffic, and on that basis denies them. The Bing search results and pop-up box cited in Paragraph 112 speak for themselves and therefore no response is required.

113. NABP admits that Healthwarehouse.com is an NABP-accredited U.S. online pharmacy. NABP denies that it has "threatened" any pharmacy. NABP denies that it has used PCC's accreditation list to add those pharmacies listed on it to the Not Recommended Sites list based on their affiliation with PCC. To the extent the allegations in Paragraph 113 are directed to parties other than NABP, no response is required. To the extent a response is required, NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of those allegations and on that basis denies them. NABP denies the remaining allegations in Paragraph 113.

114. To the extent the allegations in Paragraph 114 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 114 with respect to itself. NABP specifically denies that it has engaged in any unlawful actions, that it has caused any damage or injuries to PCC, and that PCC is entitled to any relief. NABP lacks knowledge

sufficient to form a reasonable belief as to the truth or falsity of the allegations in Paragraph 114 with respect to other Defendants and/or other parties and on that basis denies them.

115.   NABP restates its responses to Paragraphs 1 through 114 of the Amended Complaint and incorporates by reference each preceding paragraph as if fully set forth herein.

116.   NABP admits that the allegations in Paragraph 116 of the Amended Complaint reflect certain edited excerpts of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

117.   The allegations in Paragraph 117 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 117.

118.   NABP admits it added PharmacyChecker.com and PharmacyCheckerBlog.com to its Not Recommended Sites list in December 2018.

119.   The Not Recommended Sites webpage cited in Paragraph 119 of the Amended Complaint is a source that speaks for itself and therefore no response is required.  NABP further denies the allegations and the selectively quoted excerpts in Paragraph 119 as incomplete, inaccurate, and/or misleading.  NABP denies the remaining allegations in Paragraph 119.

120.   The web pages cited in Paragraph 120 of the Amended Complaint are sources that speaks for themselves and therefore no response is required.  NABP further denies the allegations and the selectively quoted excerpt in Paragraph 120 as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 120.

121.   The Not Recommended Sites webpage cited in Paragraph 121 of the Amended Complaint is a source that speaks for itself and therefore no response is required.  NABP admits that it makes changes to its website from time to time.  NABP denies the remaining allegations

and the selectively quoted excerpts in Paragraph 121 as incomplete, inaccurate, and/or misleading.

122. NABP admits the allegations in the first sentence of Paragraph 122 of the Amended Complaint. The Not Recommended Sites webpage cited in Paragraph 122 of the Amended Complaint is a source that speaks for itself and therefore no response is required. NABP further denies the allegations and the selectively quoted excerpt in Paragraph 122 as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 122.

123. The Not Recommended Sites webpage cited in Paragraph 123 of the Amended Complaint is a source that speaks for itself and therefore no response is required. NABP further denies the allegations and the selectively quoted excerpts in Paragraph 123 as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 123. The video demonstration cited in Footnote 10 of the Amended Complaint speaks for itself and therefore no response is required.

124. To the extent the allegations in Paragraph 124 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. The "site-specific pages" referenced in Paragraph 124 are sources that speak for themselves and therefore no response is required. NABP states that the site-specific pages are not indexed. NABP denies the remaining allegations in Paragraph 124. NABP specifically denies Plaintiff's characterizations of the purpose and effect of NABP web pages.

125. The Not Recommended Sites webpage cited in Paragraph 125 of the Amended Complaint is a source that speaks for itself and therefore no response is required. NABP admits

that it makes changes to its website from time to time. NABP denies the remaining allegations and the selectively quoted excerpt in Paragraph 125 as incomplete, inaccurate, and/or misleading.

126. To the extent he allegations in Paragraph 126 of the Amended Complaint are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 126.

127. NABP denies the allegations in the first sentence of Paragraph 127 of the Amended Complaint. NABP denies the allegations in the last sentence of Paragraph 127 and specifically denies that any NABP actions or omissions "make it more likely that consumers will purchase counterfeit or adulterated prescription medicines." NABP restates and incorporates its response to Paragraph 107h of the Amended Complaint as if fully set forth herein. NABP denies that PCC improves consumer safety. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 127 of the Amended Complaint, and on that basis denies them.

128. The allegations in the first sentence of Paragraph 128 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations. The Not Recommended Sites webpage cited in Paragraph 128 is a source that speaks for itself and therefore no response is required. NABP further denies the selectively quoted excerpts in Paragraph 128 as incomplete, inaccurate, and/or misleading. NABP denies that neither PharmacyChecker.com nor PharmacyCheckerBlog.com facilitate the sale of prescription medicine. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 128, and on that basis denies them.

129.    The allegations in Paragraph 129 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies the allegations in Paragraph 129.

130.    The allegations in the first sentence of Paragraph 130 of the Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, NABP denies those allegations.  The Not Recommended Sites webpage cited in Paragraph 130 is a source that speaks for itself and therefore no response is required.  NABP further denies the selectively quoted excerpts in Paragraph 130 and Plaintiff's characterizations of those selectively quoted excerpts as incomplete, inaccurate, and/or misleading.  NABP denies the remaining allegations in Paragraph 130.

131.    The video cited in Paragraph 131 and Footnote 11 of the Amended Complaint speaks for itself and therefore no response is required.  The remaining allegations in Paragraph 131 are legal conclusions to which no response is required.  To the extent a response is required, NABP denies those allegations.

132.    To the extent the allegations in Paragraph 132 of the Amended Complaint, including Paragraphs 132a through 132d, are legal conclusions, no response is required.  To the extent a response is required, NABP denies those allegations.  NABP denies the allegations in Paragraph 132 as incomplete, inaccurate, and/or misleading.  NABP denies that "[t]here is nothing inherently unsafe about personal importation."  NABP also specifically denies the allegations in Paragraph 132d that its "executive director publicly admitted that there is nothing wrong with personal importation programs where appropriate verification is present."  NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining

allegations in Paragraph 132, and on that basis denies them. The sources cited in Footnote 12 of the Amended Complaint speak for themselves and therefore no response is required.

133. The allegations in Paragraph 133 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies the allegations in Paragraph 133.

134. The Not Recommended Sites webpage cited in Paragraph 134 of the Amended Complaint is a source that speaks for itself and therefore no response is required. NABP further denies Plaintiff's selectively excerpted quotations and characterizations of NABP's statements or purpose in Paragraph 134 as incomplete, inaccurate, and/or misleading. NABP restates and incorporates its response to Paragraph 95 of the Amended Complaint as if fully set forth herein. The Bing search results and "warning box" cited in Paragraph 134 of the Amended Complaint speak for themselves and therefore no response is required. The allegations in the last sentence of Paragraph 134 are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations. NABP denies the remaining allegations in Paragraph 134.

135. To the extent the allegations in Paragraph 135 of the Amended Complaint, including Paragraphs 135a through 135g, are legal conclusions, no response is required. To the extent a response is required, NABP denies those allegations. The Not Recommended Sites webpage, the Google and Bing search results, and the Bing "warning box" cited in Paragraph 135 are not factual allegations and therefore no response is required. NABP further denies Plaintiff's selectively excerpted quotations and characterizations of NABP statements in Paragraph 135 as incomplete, inaccurate, and/or misleading. NABP denies the remaining allegations in Paragraph 135.

136. The allegations in the first sentence of Paragraph 136 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations. The article cited in Paragraph 136 and Footnote 13 of the Amended Complaint is a source that speaks for itself and therefore no response is required. NABP restates and incorporates by reference its responses to Paragraphs 109 through 112 of the Amended Complaint as if fully set forth herein. NABP lacks knowledge sufficient to form a reasonable belief as to the truth or falsity of the remaining allegations in Paragraph 136 of the Amended Complaint, and on that basis denies them.

137. The allegations in Paragraph 137 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations.

138. The allegations in Paragraph 138 of the Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, NABP denies those allegations.

## REQUEST FOR RELIEF AND DEMAND FOR JURY TRIAL

NABP denies that Plaintiff is entitled to any of the relief it requests or any other relief. Moreover, NABP denies that Plaintiff is entitled to a trial by jury on any claim. NABP requests that Plaintiff's Amended Complaint be dismissed with prejudice, the Court find that Plaintiff is not entitled to any judgment or relief, the Court enter judgment in favor of NABP, and that the Court award NABP its attorneys' fees, costs, and expenses, and such other and further relief as the Court deems just and proper.

## **AFFIRMATIVE DEFENSES**

Subject to its responses to Paragraphs 1 through 138 of the Amended Complaint above, and upon information and belief, NABP asserts the following affirmative defenses in response to the allegations contained in the Amended Complaint. NABP incorporates by reference the affirmative defenses pleaded by other Defendants to this action. NABP reserves all rights to allege additional defenses based on the facts that become known through the course of discovery or otherwise.

### **Sherman Act Claim**

## **FIRST AFFIRMATIVE DEFENSE**

1. Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

## **SECOND AFFIRMATIVE DEFENSE**

2. Plaintiff's claims are time-barred, in whole or in part, by the applicable four-year statute of limitations under 15 U.S.C. § 15b and by the equitable doctrine of laches.

3. The vast majority of Plaintiff's Complaint alleges facts well outside the four-year period prior to filing this action on August 13, 2019.

4. For example, Plaintiff alleges that NABP unilaterally approached "Google, Bing, and Yahoo!" in 2008 "to persuade them to terminate their contracts with PharmacyChecker." Compl. ¶ 78.

5. Plaintiff also challenges NABP placing PharmacyChecker.com on its Not Recommended Sites List in 2010. Compl. ¶ 79. Plaintiff alleges it challenged NABP's decision to place it on this list. *Id.*

6.     As such, Plaintiff knew or should have known about the purported conduct that gave rise to its claims at least in 2010 but waited nine years before filing its Complaint.

7.     Plaintiff points to no facts supporting extraordinary circumstances that would justify its delay in bringing its action.

8.     Plaintiff's unreasonable and inexcusable delay in bringing its action has prejudiced NABP.

9.     NABP spends a considerable amount of resources on public safety campaigns, informing the public about the congressionally- and FDA-recognized dangers of unapproved drug use.

10.    Plaintiff seeks an injunction after sitting on its rights.

11.    As such, Plaintiff's claims are barred in whole or in part.

**THIRD AFFIRMATIVE DEFENSE**

12.    Plaintiff's claims are barred, in whole or in part, because Plaintiff does not have standing to state claims or sue for damages due to the unlawful nature of its business described below and in further detail in NABP's counterclaim.

**FOURTH AFFIRMATIVE DEFENSE**

13.    Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered actual, cognizable injury under the antitrust laws.

14.    Plaintiff's pleading shows that its business facilitates unlawful conduct, i.e., unlawful importation of foreign pharmaceuticals.

15.    For example, Plaintiff alleges that: "PharmacyChecker.com's exclusion from the market means. . . more restricted options for alternative sources of lower-priced prescription drugs both U.S.-based and abroad." Compl. ¶ 108.

16.     Plaintiff "allows consumers worldwide to find the lowest prices for their prescription medications, whether dispensed in the United States or abroad." *Id.* ¶ 5.

17.     Plaintiff's counsel conceded that Plaintiff's "primary" reason for providing price verification and accreditation information is to "facilitate" "unlawful importation" of pharmaceuticals into the U.S.  PI Tr. at 65–66.

18.     Plaintiff's entire business model exists to directly connect U.S. consumers to foreign pharmaceuticals that they cannot lawfully buy, as described in further detail in NABP's counterclaim.  For example, Plaintiff's website as well as blog contain a search box from Plaintiff's price comparison tool that allows consumers to search for and purchase foreign drugs from Plaintiff's "accredited" foreign pharmacies.

19.     Upon information and belief, Plaintiff receives revenue when consumers use its site to access the unlawful pharmacies that it "accredits" and features on its price comparison tool.

20.     Personal importation of foreign pharmaceuticals into the U.S. is unambiguously illegal.  As a matter of law, Plaintiff therefore can plead no facts establishing that any conduct by NABP caused harm of the kind the antitrust laws were intended to prevent—either to Plaintiff's own business or to consumers.  Rather, it is the "reality of the regulated environment," *i.e.*, the illegality of foreign drug importation under federal and state law, which caused any alleged "injury" to Plaintiff or to the market.

21.     Thus, Plaintiff's claims are barred, in whole or in part, because injuries alleged by Plaintiff, to the extent any exist, were caused, in whole or in part, by the statutory framework governing personal importation, or through acts or omissions on the part of Plaintiff, which is not the type of injury the antitrust laws were designed to address.

## FIFTH AFIRMATIVE DEFENSE

22.     Plaintiff's claims for equitable relief are barred by the doctrine of unclean hands due to Plaintiff's facilitation of unlawful importation described above and in further detail in NABP's counterclaim.

## SIXTH AFFIRMATIVE DEFENSE

23.     Plaintiff's claims are barred, in whole or in part, because the conduct alleged did not cause any harm or injury to consumers or competition.

24.     Plaintiff has not alleged any credible price, quality, or output effects in any relevant market.  There are no allegations that pharmacies were forced to pay higher fees for "verification services," nor are there any allegations that consumers were forced to pay more for price comparison information.  *See generally* Compl.

25.     Thus, Plaintiff's claims are barred in whole or in part.

## SEVENTH AFFIRMATIVE DEFENSE

26.     Plaintiff's claims are barred, in whole or in part, because it has failed to join all parties that are necessary for a just adjudication of its claims as described below.

27.     Plaintiff simply claims that "[i]t would be impractical and prohibitively costly . . . to name all of these parties" that Plaintiff alleges are the cause of its alleged injuries.  Compl. ¶ 14.

28.     Thus, Plaintiff's claims are barred in whole or in part.

## EIGHTH AFFIRMATIVE DEFENSE

29.     Plaintiff's claims are barred, in whole or in part, because NABP is not liable for the acts of any other Defendant or any other party or non-party, nor can it effect prospective relief that Plaintiff may be seeking from any other Defendant or any other party or non-party.

30.     Plaintiff alleges that its purported injury was caused by parties other than Defendants including named and unnamed third parties.  For example, "[D]efendants' constituent members are, in many cases, horizontal competitors who have consciously committed to this [alleged] common scheme," and the alleged "conspiracy . . . necessarily includes sub-conspiracies among the constituent members, who are in many cases the independent centers of decisionmaking in the underlying markets."  Compl. ¶ 13.

31.     Thus, Plaintiff's claims are barred, in whole or in part, because injuries alleged by Plaintiff, to the extent any exist, were caused, in whole or in part, by the conduct of other Defendants and/or third parties for whom NABP is not responsible and over whom NABP has no control, or through forces in the marketplace over which NABP has no control.

**NINTH AFFIRMATIVE DEFENSE**

32.     Plaintiff's claims are barred because NABP's alleged conduct was lawful, justified, and pro-competitive, constituted bona fide business practices, and was carried out in furtherance of NABP's independent and legitimate business interests.  Such conduct is evaluated under the rule of reason.

33.     NABP published its Not Recommended Sites List out of a desire to protect consumer health, an ethical standard designed to protect public safety.

34.     NABP's independent efforts to connect consumers to safe, lawful online pharmacies enhances overall efficiency and makes markets more competitive.

35.     Plaintiff's claims fail because NABP's challenged conduct has a procompetitive benefit that outweighs any alleged restraint on competition under the rule of reason.

## TENTH AFFIRMATIVE DEFENSE

36.     Plaintiff's claims are barred, in whole or in part, because none of NABP's challenged actions or omissions substantially lessened competition within any properly defined market.

37.     Plaintiff fails to adequately plead relevant product and geographic markets—a necessary component of its antitrust claims.  Thus, Plaintiff's claims are barred.

## ELEVENTH AFFIRMATIVE DEFENSE

38.     Plaintiff's claims are barred, in whole or in part, by the First Amendment and Noerr-Pennington Doctrine.

39.     Plaintiff alleges that "NABP's constituent members are entities that are controlled by wholesale distributors, pharmacy stores and pharmacists," Compl. ¶ 13, and that "Libby Baney is also registered as a lobbyist for the NABP," *id.* ¶ 7.

40.     Plaintiff also alleges that "[t]hrough lobbying, pharmaceutical and pharmacy interests influence U.S. law and enforcement policy through Congress, the White House, the U.S. Food and Drug Administration, U.S. Customs and Border Protection, and other government agencies."  Compl. ¶ 23.

41.     To the extent Plaintiff alleges that NABP violated the antitrust laws by engaging in such conduct, Plaintiff's claims are barred by the First Amendment and the Noerr-Pennington doctrine.

## TWELFTH AFFIRMATIVE DEFENSE

42.     Plaintiff is precluded from recovering damages, in whole or in part, because and to the extent of, its failure to mitigate alleged damages, if any.

43.     Plaintiff alleges Defendants' challenged conduct was motivated by the fact that Plaintiff "provided patients with (1) a way to reliably identify online pharmacies that operate safely worldwide, and (2) direct access to comparative drug price information not limited to U.S. pharmacies." Compl. ¶ 27.

44.     Plaintiff had a duty to mitigate any damages it may have suffered by ceasing to facilitate unlawful conduct by connecting consumers with international online pharmacies that sell or seek to sell foreign pharmaceutical products to customers in the U.S. as described above and in further detail in NABP's counterclaim.

45.     As Plaintiff failed to mitigate its alleged damages, its claims are barred in whole or in part.

## THIRTEENTH AFFIRMATIVE DEFENSE

46.     The relief sought by Plaintiff is barred, in whole or in part, because the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such alleged damages.

47.     Plaintiff alleges that as a result of Defendants' conduct it has lost site traffic and its monthly click-through rate dropped. Compl. ¶ 109. Plaintiff also alleges that "[m]ost of [its] revenue is directly related to its performance and visibility in search engine results." *Id.* ¶ 110.

48.     Plaintiff's business facilitates unlawful importation of foreign pharmaceutical products as described above and in further detail in NABP's counterclaim.

49.     For example, on the front page of its website, Plaintiff asks consumers "How Much can you save with an online pharmacy?" and then shows them "Savings on Popular Medications using Canadian and International Online Pharmacies."

50. Upon information and belief, Plaintiff does this as part of its unlawful business model where it makes money "verifying" and facilitating purchases from foreign pharmacies that violate U.S. law.

51. Determining how many patients would have used Plaintiff's site to access websites of pharmacies and then purchased pharmaceutical products from pharmacies dispensing lawfully in the U.S. versus engaging in unlawful importation of pharmaceutical products from foreign pharmacies but for Defendants' challenged conduct would require impermissible speculation and would be impossible to ascertain.

52. Thus, Plaintiff is not entitled to recover damages in whole or in part.

**Lanham Act Claim**

**FOURTEENTH AFFIRMATIVE DEFENSE**

53. Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

**FIFTEENTH AFIRMATIVE DEFENSE**

54. Plaintiff's claims for equitable relief are barred by the doctrine of unclean hands due to Plaintiff's facilitation of unlawful importation described above and in further detail in NABP's counterclaim.

**SIXTEENTH AFFIRMATIVE DEFENSE**

55. Plaintiff's claims are barred, in whole or in part, because the alleged NABP statements are not literally or impliedly false.

56. None of NABP's statements are false on their face or conflict with reality. For example, it is not false for NABP to represent its opinion that NRL sites "appear to be out of compliance with NABP['s own] patient safety and pharmacy practice standards" or "refer patients

to websites that operate in violation of NABP['s own] patient safety and pharmacy practice standards." Compl. ¶ 119.

57.     NABP's challenged statements about relative "risk," "safety," and "best practices" are also subjective opinion statements that cannot, by definition, qualify as false representations. Additionally, the law establishes that personal importation is "unsafe" and "risky."

58.     Most of NABP's challenged statements are disjunctive and qualified and cannot be false as a matter of law.

59.     None of NABP's challenged statements could cause consumer confusion given their accuracy.

60.     Thus, Plaintiff's claims are barred in whole or in part.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

61.     Plaintiff's claims are barred, in whole or in part, because the alleged NABP statements were not made in commercial advertising or promotion and they are protected by the First Amendment to the Constitution of the United States and do not fall under the purview of the Lanham Act.

62.     NABP is a non-profit policy organization whose challenged statements have a public purpose beyond the commercial as they are designed educate the public about the congressionally- and FDA-recognized dangers of unapproved drug use.

63.     As such, the challenged speech is fully protected by the First Amendment and not within reach of the Lanham Act.

64.     Thus, Plaintiff's claims are barred in whole or in part.

## EIGHTEENTH AFFIRMATIVE DEFENSE

65.     Plaintiff's claims are barred, in whole or in part, because NABP's challenged statements were not material within the meaning of the Lanham Act.

66.     Plaintiff has not alleged any facts that NABP's challenged statements misrepresent the nature, characteristics, qualities, or geographic origin of an inherent quality or characteristic of Plaintiff's products.

67.     Plaintiff has not alleged facts showing that NABP's challenged statements influenced or altered consumers' or pharmacies' purchasing decisions with respect to Plaintiff's products.

68.     As such, Plaintiff's claims are barred in whole or in part.

## NINETEENTH AFFIRMATIVE DEFENSE

69.     Plaintiff's claims are barred, in whole or in part, because  injuries, if any, suffered by Plaintiff were the result of its own conduct or the conduct of others outside the control of NABP, and therefore NABP is not liable for any such alleged injuries.

70.     For example, Plaintiff alleges that search engines make independent decisions on what sites to include in search results.  Compl. ¶ 137.

71.     Thus, Plaintiff's claims are barred, in whole or in part, because injuries alleged by Plaintiff, to the extent any exist, were caused, in whole or in part, by the conduct of third parties for whom NABP is not responsible and over whom NABP has no control, or through forces in the marketplace over which NABP has no control.

## TWENTIETH AFFIRMATIVE DEFENSE

72.     Plaintiff is precluded from recovering damages, in whole or in part, because and to the extent of, its failure to mitigate alleged damages, if any.

73.     Plaintiff challenges NABP's statement that entities on its Not Recommended Sites List "may: Dispense prescription medicine without a prescription[;] Dispense foreign or unapproved medicine[; or] Refer/link patients to sites that facilitate the dispensing of prescription medications in violation of state or federal law or NABP standards." Compl. ¶ 119.

74.     Plaintiff had a duty to mitigate any damages it may have suffered by ceasing to facilitate unlawful conduct by connecting consumers with international online pharmacies that sell or seek to sell foreign pharmaceutical products to customers in the U.S. as described above and in further detail in NABP's counterclaim.

75.     As Plaintiff failed to mitigate its alleged damages, its claims are barred in whole or in part.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

76.     The relief sought by Plaintiff is barred, in whole or in part, because the alleged damages sought are too speculative and uncertain, and because of the impossibility of the ascertainment and allocation of such alleged damages.

77.     Plaintiff alleges that "the inclusion of PharmacyChecker.com on [NABP's Not Recommended Sites"] list has had a profound negative effect on consumer web traffic to its website." Compl. ¶ 136. Plaintiff also alleges that "[m]ost of [its] revenue is directly related to its performance and visibility in search engine results." *Id.* ¶ 110.

78.     Plaintiff's business facilitates unlawful importation of foreign pharmaceutical products as described above and in further detail in NABP's counterclaim.

79.     For example, on the front page of its website, Plaintiff asks consumers "How Much can you save with an online pharmacy?" and then shows them "Savings on Popular Medications using Canadian and International Online Pharmacies."

80.     Upon information and belief, Plaintiff does this as part of its unlawful business model where it makes money "verifying" and facilitating purchases from foreign pharmacies that violate U.S. law.

81.     Determining how many search engines would have chosen to not include Plaintiff's site in search results and how many patients would have used Plaintiff's site to access websites of pharmacies and then purchased pharmaceutical products from pharmacies dispensing lawfully in the U.S. versus engaging in unlawful importation of pharmaceutical products from foreign pharmacies but for NABP's challenged conduct would require impermissible speculation and would be impossible to ascertain.

82.     Thus, Plaintiff is not entitled to recover damages in whole or in part.

*       *       *

# **COUNTERCLAIMS**

INTRODUCTION ................................................................................................ 52

THE PARTIES.................................................................................................... 56

JURISDICTION AND VENUE ......................................................................... 56

FACTUAL ALLEGATIONS .............................................................................. 56

   I.    PCC's Lawless Mission ...................................................................... 65

   II.   Pharmacy-Checker's False and Misleading Claims About its "Accredited" Pharmacies and the Legality, Safety, and Other Material Attributes of the Drugs they Sell to Unwitting U.S. Consumers ..................................................................................... 68

      A.   Statements that Mislead Consumers About the Legality Personal Importation and the Relationship Between Foreign Pharmaceuticals and FDA-Approved Pharmaceuticals ...... 69

      B.   PCC Hides that the "Pharmacy" Websites It Links to are Not Pharmacies at all......... 76

      C.   Statements that Mislead Consumers on Price ............................................. 79

      D.   Statements that Mislead Consumers About the Origin of the Drugs they are Buying . 84

      E.   Statements that Mislead Consumers about the Safety and Trustworthiness of PCC's Accredited Pharmacies..................................................................................... 90

   III.   PCC's False and Misleading Claims About NABP ................................... 105

   IV.   Harm to NABP....................................................................................... 111

First Counterclaim ............................................................................................ 114

Second Counterclaim ........................................................................................ 119

Third Counterclaim........................................................................................... 120

REQUEST FOR RELIEF .................................................................................. 122

DEMAND FOR JURY TRIAL .......................................................................... 123

Defendant/Counterclaim-Plaintiff National Association of Boards of Pharmacy ("NABP") for its counterclaims against Plaintiff/Counterclaim-Defendant PharmacyChecker.com LLC ("PCC") alleges as follows:

## <u>INTRODUCTION</u>

1. PCC is engaged in the business of misleading consumers about the safety, legality, efficacy, and pricing of unlawfully imported drugs from foreign "pharmacy" affiliates that are subject to PCC's "verification program."[1]  PCC directly and indirectly profits from misleading consumers and facilitating consumer purchases of these drugs from PCC's affiliate suppliers.

2. As part of this campaign, PCC has engaged in false and misleading public statements and advertising to misrepresent the character of its "verified" pharmacies and the safety and efficacy of the goods they sell.

3. By way of example only, once a consumer visits the PharmacyChecker.com site, PCC immediately encourages the consumer to search for where and how their prescriptions can be filled at what PCC leads consumers to believe are "pharmacies" that are, in reality, non-pharmacy "intermediaries" that purport to offer the lowest drug prices possible.  PCC tells consumers that these pharmacy intermediaries, which are in fact supplied by yet other hidden dispensing pharmacies, are safe, that they are regulated by government entities, that the drugs they

---

[1] PCC uses words like "verified" and "accredited" to describe companies that pay it money in exchange for access to U.S. consumers seeking to buy foreign drugs.  While NABP may use or repeat the words "verified" and "accredited" (with or without quotations) throughout these Counterclaims, NABP's use of such terms in connection with PCC's business model is not intended to suggest that NABP believes PCC's program is robust, credible, or ensures patient safety.  And while NABP provides its VIPPS (now known as Digital Pharmacy Accreditation) verification and accreditation program, PCC's verification/accreditation program is unlike and in no way a substitute for NABP's VIPPS/Digital Pharmacy Accreditation program.  Not all verification and accreditation programs across the globe are equal and, as part of these Counterclaims, NABP asserts that PCC's description of its program is misleading to consumers in a way that is harmful to consumers and NABP.

sell are equivalent to or the same as FDA-regulated drugs, and that any violations of the law are mere technicalities and they will not face sanction. Each of these statements is false and misleading.

4.      American consumers who encounter PCC's websites are and/or are likely to be deceived by PCC's false and misleading statements and indeed some rely on these statements to make purchases through PCC's "verified" pharmacy intermediaries and other "accredited" anonymous pharmacies. All or virtually all of these purchases, which PCC facilitates through its PharmacyChecker.com and blog site, violate state and/or federal law.

5.      Upon information and belief, PCC averages fewer than one million unique visitors per year.

6.      PCC has unilaterally determined and often announces as part of its commercial speech—and contrary to state and/or federal law—that these foreign drug suppliers are safe if they require a prescription, or if they include a consultation from a "pharmacist" licensed in some foreign jurisdiction, or if purchases are only for a limited 90-day supply or less and if they buy from a PCC-verified pharmacy. Under the circumstances relevant to these Counterclaims and this lawsuit, these are not representations that PCC can accurately make to American consumers. PCC is not a substitute for the FDA or state regulators. PCC simply lacks the resources of the United States government to ensure the safety of what is an undeniably vast and complex drug supply. And PCC's thicket of false and misleading statements and half-hearted, conflicting, and/or confusing purported disclaimers are an affirmative danger to consumer health and safety.

7.      PCC has also directly disparaged NABP, which independently works to create a vibrant marketplace for the safe, responsible, and lawful practice of pharmacy. PCC has used its online blog to make false, misleading, and disparaging statements about NABP while, and for the

purpose of, deliberately steering more and more consumers to PCC in order for them to engage in commercial transactions with PCC's affiliates via PCC's website and blog.

8.　For example, in a recent PCC blog post, PCC falsely alleged that NABP and pharmacies NABP accredits "are complicit in the deaths of hundreds of thousands of Americans from opioid drugs" and that NABP "ignored the opioid crisis." It then provided a link to consumers to buy pharmaceuticals through PCC's "verified" pharmacies.

9.　PCC has also falsely claimed that NABP was complicit with wholesale drug distributors in the wholesalers' alleged role in the opioid crisis because of alleged failings in NABP's wholesale accreditation programs. PCC's commercial speech is intended to enrich PCC to the detriment of NABP and patient safety.

10.　To be clear, PCC is not a direct competitor of NABP in Pharmacy Accreditation Services or any other product or service. While both companies use words like "verification" and "accreditation," they offer fundamentally different things. NABP, as part of its Digital Pharmacy Accreditation Program (formerly known as VIPPS), accredits the digital pharmacy practices of licensed pharmacy practices that, as a baseline requirement, comply with state and federal law. PCC offers an entirely different service, where it gives its stamp of approval to websites that meet PCC's own esoteric—and, as described below, false and misleading—standards. PCC deliberately attempts to muddy the waters so that consumers believe that PCC can offer services comparable to not just NABP but also government regulators with budgets of billions of dollars per year. Just as PCC is not a substitute for the FDA, it is not a substitute for NABP.

11.　PCC's campaign has caused NABP to suffer damage, including damage to its reputation, business, and good will. As a result of PCC's disparagement, NABP has, among other things, incurred damages including those relating to diverting scarce resources, assets, and the

attention of key personnel away from NABP's core missions and toward responding to and combatting PCC's false and disparaging statements and the damage such false and disparaging statements have caused NABP to suffer.

12.     PCC's unlawful and dangerous campaign, including its false and misleading commercial speech, is also consumer-oriented and has caused and, if left unchecked, will continue to cause damage to consumer health and safety. PCC has also caused consumers to unwittingly incur significant legal and financial risks, exposure, and liability. NABP has had to devote time and expend resources to correct these PCC-induced consumer misapprehensions.

13.     PCC's efforts have also undercut efforts by NABP to create a vibrant marketplace for safe, lawful, legitimate online pharmacy. There are thousands of bad actors on the internet that purport to be pharmacies that are not licensed, or that dispense unregulated drugs, or that even dispense without the legal right to dispense to the consumers that they are targeting. NABP has made it its mission to create a market for online pharmacy by giving consumers tools to differentiate legitimate online pharmacies that can lawfully sell to them and other websites that purport to be pharmacies but that do not comply with the laws and rules applicable to pharmacies. PCC has built its business model around blurring the line and misleading consumers about the difference between safe, lawful online pharmacies and websites that purport to be pharmacies, but pick and choose which aspects of pharmacy and pharmaceutical regulation that they comply with. NABP has had to devote time and money to correct consumer misapprehensions caused by PCC, and to protect the very existence of a legal, safe marketplace for online pharmacy.

## THE PARTIES

14.     Counterclaim-Plaintiff National Association of Boards of Pharmacy is organized under the corporate laws of the state of Kentucky and has its principal place of business in the State of Illinois.

15.     Counterclaim-Defendant PharmacyChecker.com LLC is a limited liability company organized under the corporate laws of the state of New York and with its principal place of business in the County of Westchester, New York.

## JURISDICTION AND VENUE

16.     This is an action in which NABP seeks economic and injunctive relief from PCC arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, New York statutory law, and District of Columbia statutory law.  PCC's unlawful acts have harmed the goodwill of NABP and caused real and significant economic damage and harm.

17.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a), as this action involves federal questions arising out of PCC's violations of the Lanham Act.  In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to claims arising under state law which are so related to the federal claims brought by NABP as to form part of the same case or controversy.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Counterclaim-Defendant resides in this judicial district and because, upon information and belief, a substantial portion of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

19.     PCC has engaged in two simultaneous but intertwined campaigns to mislead consumers. First, PCC has based its entire business model on affirmatively misleading consumers about the safety and legality of imported drugs sold through its website and their equivalence to

FDA-approved drugs, as well as the legality, regulatory rigor, and origin of drugs sold through its website.  Second, PCC has gone out of its way to directly attack and sully NABP's reputation because NABP's mission (in part) to encourage consumers to buy safe, legal pharmaceuticals is antagonistic to PCC's business model of profiteering off of encouraging, empowering, and facilitating the unlawful purchase of foreign drugs for personal use.  PCC maximizes its commercial interest by deriding NABP and by misleading consumers into purchasing foreign drugs via PCC's website, blog, and via its affiliated drug suppliers' websites.

**The NABP**

20.     NABP is an independent, international, and impartial association that assists its member boards and jurisdictions for the purpose of protecting the public health.

21.     NABP is a 501(c)(3) nonprofit organization founded in 1904.  NABP supports and works with state and jurisdictional boards of pharmacy, to protect the public health.

22.     NABP was initially established to assist the state boards of pharmacy in creating uniform education and licensure standards. NABP members consist of the 50 United States state boards of pharmacy, as well as the boards in the District of Columbia, Guam, Puerto Rico, the Virgin Islands, 10 Canadian provinces, and The Bahamas.

23.     NABP supports patient and prescription drug safety, through examinations that assess pharmacist competency, pharmacist licensure transfer and verification services, and various pharmacy accreditation programs.

24.     NABP combines diverse skills and backgrounds, which helps NABP create innovative programs that meet the public health protection needs of today—with an eye on the future.

## The FDCA and Pharmacy in the United States

25.     The United States has a "closed system" pharmaceutical regulatory regime which keeps drugs under the oversight of the FDA.  Under that system and prior to dispensing, drugs in the United States are continuously in the custody of a registered manufacturer, an authorized distributor, or a licensed healthcare provider.  The importation of prescription drugs outside of this "closed system" is, for purposes of these counterclaims and in all circumstances relevant to PCC's facilitation business, unlawful.

26.     In 2013, Congress introduced the Drug Supply Chain Security Act, which creates even more rigorous tracking systems, with the goal of quickly detecting and removing dangerous or potentially dangerous drugs from the drug supply chain.  This track-and-trace system is expected to be fully implemented by 2023; the FDA is currently implementing the system via pilot programs.

27.     The FDA has, contrary to PCC's commercial representations, repeatedly "expressed the view that virtually all importation of drugs into the United States by individual consumers violates the FDCA.  These drugs may not be approved and manufactured in accordance with the FDCA, they may not be appropriately labelled, or they may be dispensed without a valid prescription."  Each of these would be a violation of the FDCA.  In all or virtually all cases relevant here, personally imported drugs are from outside of the closed system.  There is no continuous chain of regulatory oversight by the FDA of their manufacturing, transportation, and storage because these drugs not made and kept continuously in the custody of registered manufacturers, authorized distributors, and licensed healthcare providers.

28.     PCC goes out of its way to obscure the difference between drugs manufactured abroad at FDA-regulated facilities (which may be overseen by other regulators in addition to the FDA) and drugs manufactured abroad in general. The critical distinction is not *where* drugs are

manufactured, but *under what regulatory oversight* they are manufactured. An FDA-approved drug manufactured under FDA's regulatory scrutiny in an FDA-approved factory in India or Israel that comes into the U.S. via an FDA-approved supply chain is an FDA-approved drug. It is subject—from manufacturing to dispensing—to oversight by U.S. regulators as part of a closed system. A non-FDA-approved drug may be made in those same countries—even in the same factories—but it is not the equivalent of an FDA-approved drug. It is not subject to the same oversight; it may be packaged for different uses; it may have different active or inactive ingredients; it may dissolve at a different rate; it may be stored differently.

29.     A foreign-manufactured FDA-approved drug is not equivalent to a non-FDA approved drug purchased online through a pharmacy intermediary from a PCC affiliate that will not tell consumers its real name or disclose its licensing information. It is misleading to suggest otherwise.

30.     Contrary to PCC's and its affiliated "verified" drug suppliers' representations to the consuming public that the purchase of foreign drugs from websites linked on PCC's platform are safe and identical to drugs legally dispensed in the United States, the FDA warns that, "without regulation of repackaging, storage conditions, and many other factors, drugs delivered to the American public from foreign countries may be very different from FDA approved drugs with respect to formulation, potency, quality, and labeling." *See In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 789 (8th Cir. 2006).

31.     Individuals have faced civil and criminal liability for aiding and abetting violations of the FDCA, as well as conspiracy to violate the FDCA. *See, e.g.* 21 U.S.C. § 331 (listing prohibited acts under the FDCA and prohibiting the "causing" of acts in addition to the acts themselves); 21 U.S.C. § 333 (listing penalties for violation of the FDCA); *United States v.*

*Dotterweich*, 320 U.S. 277, 284 (1943) (noting that misdemeanor violations of the FDCA are strict liability offenses); 18 U.S.C. § 545 (prohibiting importation of goods "contrary to law"); 18 U.S.C. § 371 (prohibiting conspiracy "to commit any offense against the United States, or to defraud the United States, or any agency thereof. . ."); 18 U.S.C. § 2 (providing that whoever "aids, abets, counsels, commands, induces, or procures. . . commission" of "an offense against the United States" is "punishable as a principal").

32.      Unlawful importation can also form the basis for a mail or wire fraud conviction, or conspiracy to violate the mail or wire fraud laws. *See* 85 C.F.R. 66568-66569 (debarment order against Keith Komar following his conviction for engaging in a conspiracy to "fraudulently import . . . misbranded bicalutamide and isotretinoin," and noting that Mr. Komar intended to sell the drugs on his website by way of false statements, including that the imported drugs were "high quality, safe, and approved medication meeting or exceeding the U.S. FDA standard").

33.      The Secretary of Health and Human Services is permitted to allow importation from Canada—but not any other country—but *only* after the Secretary makes a certification to Congress that such importation will "pose no additional risk to the public's health and safety" and that it will "result in a significant reduction in cost of covered products to the American consumer." *See* 21 U.S.C. § 384(l).  The Secretary has *never* made such a certification with respect to personal importation and thus it remains prohibited.

34.      Although HHS recently made certain certifications potentially allowing for some importation from Canada and no other country still strictly overseen by the FDA—and by states and government entities only—HHS has expressly declined to certify that the type of personal importation facilitated by PCC and its affiliates will "pose no additional risk to the public's health and safety" and that such personal importation will "result in a significant reduction in cost of

covered products to the American consumer." *See* 21 U.S.C. § 384 (requiring certification from the Secretary of Health and Human Services regarding safety and cost before allowing limited importation); 21 C.F.R § 251.1-21 (allowing importation from Canada of drugs that meet specific criteria overseen by certain delineated government sponsors, *not allowing personal importation from Canada or any other country*, regulating pharmacists and pharmacies that are part of any program under the rules, and requiring those pharmacies be "State-licensed," *i.e.* not foreign).

35.     In fact, a recent federal rulemaking expressly warned that "medications purchased online and imported through international mail, express couriers, and other means pose significant challenges for FDA and its ability to adequately safeguard the quality and safety of drugs taken by U.S. consumers." 84 Fed. Reg. 70796, 70800 (Dec. 23, 2019).

36.     The type of personal importation at issue in this federal rulemaking is the exact type of personal importation that PCC encourages and facilitates through its business model and the exact type of personal importation that PCC and its affiliates falsely and misleadingly advertise to consumers as safe, trustworthy, and lawful.  It is none of these things as a matter of fact and law.

37.     PCC knows that the rule did not allow for personal importation because its cofounder and president Gabriel Levitt submitted a comment to the federal rulemaking on behalf of PharmacyChecker and Prescription Justice, arguing that the FDA *should* implement 21 U.S.C. § 384(j) and expressly referencing the FDA's statement that it is "not proposing to implement the personal importation provisions" in § 384(j).  The comment also acknowledged the problem of "rogue Pharmacies that pretend to be Canadian," and stated that organizations like the Canadian International Pharmacy Association ("CIPA") and PCC accredit the safest "international pharmacies."  In other words, it distinguished international pharmacy accreditation from other pharmacy accreditation.  It also protested the FDA's reference to Canada Drugs Ltd. as an example

of a rogue online pharmacy. *See* Comment from PharmacyChecker and Prescription Justice, Comments on Proposed Rule "Importation of Prescription Drugs," Doc. No. FDA-2019-N-5711, Comment No. FDA-2019-N-5711-1239 (Mar. 10, 2020).

38.     The FDA has issued public safety warnings about the exact type of entities that PCC profits from, advertises for, and directly links to, which "purport to be from Canada or sell drugs approved in Canada," noting that "in many instances [imported drugs] are not actually from Canada and not approved by [the Canadian FDA analogue]… A 2005 FDA analysis of drugs imported through international mail facilities revealed that while nearly half of imported drugs claimed to be Canadian or from Canadian pharmacies, 85 percent of those drugs originated elsewhere and were fraudulently represented as Canadian." 84 Fed. Reg. 70796, 70800 (Dec. 23, 2019).

39.     In a 2015 Indictment of CanadaDrugs.com and its executives—then a PharmacyChecker.com verified pharmacy[2]—the United States Department of Justice went into detail about the requirements of the FDCA, including manufacturing requirements and the requirement that drugs be labelled in compliance with the Act, stating as follows:

> a.  The Food and Drug Administration ("FDA") was the agency of the United States responsible for regulating the manufacture, labeling, and distribution of drugs in the United States. Among other things, the FDA was responsible for enforcing the

---

[2] The internet archive includes a capture of PCC's "online pharmacy ratings page" from July 10, 2015—one week before the CanadaDrugs.com indictment was filed listing CanadaDrugs.com as an "approved" pharmacy and noting that it dispenses from Barbados, Canada, New Zealand, and the United Kingdom. CanadaDrugs.com is no longer listed as an approved pharmacy, and none of PCC's current approved pharmacies claim to dispense from Barbados. The indictment of Canadadrugs.com is discussed in more detail below because at least one of PCC's approved pharmacies requires that customers give it permission to share their personal health information with CanadaDrugs.com despite no warning from PCC of that pharmacy's link to the convicted company.

provisions of the Federal Food, Drug, and. Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), including regulating the distribution of prescription drugs.

b.  Before a new drug could be introduced into interstate commerce, it must have been the subject of an approved application filed with the FDA.  *See* 21 U.S.C. §§ 331(d), 355(a).  FDA approval was not only for the molecular entity itself (i.e. the active ingredient) but also included the manufacturing process and labeling.  *See* 21 C.F.R. § 314.50(i).

c.  FDA is responsible for regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, including the distribution of prescription drugs.  FDA's responsibilities include enforcing the FDCA's requirements that drugs bear labels and labeling that enable health care providers and consumers to use them in a safe manner and that the drugs are listed by and manufactured in facilities registered with the Secretary of the United States Department of Health and Human Services.  21 U.S.C. §§ 352(f), 352(o), 360(c), and 360(i).

d.  The FDCA establishes that a drug is deemed to be "misbranded" if it does not meet certain requirements of the statute, including if its labeling fails to bear adequate directions for use, 21 U.S.C. § 352(f), if information required to appear on the label is not in the English language (unless distributed solely in Puerto Rico or certain U.S. territories), 21 U.S.C. § 352(c), 21 C.F.R. § 201.15(c)(1), or if a drug came from a foreign drug establishment and the drug was not annually listed with the FDA by that establishment as one of the drugs which was being manufactured for commercial distribution in the United States, 21 U.S.C. §§ 352(o), 360(j).  In the

case of a prescription drug, a drug is also misbranded if its label fails to bear the symbol "Rx only." 21 U.S.C. § 353(b)(4)(A); 21 C.F.R. § 201.100(b)(1).

    e.    The FDCA prohibits the introduction, or causing the introduction, of misbranded or unapproved new drugs into interstate commerce. 21 U.S.C. §§ 331(a), (d).

40.    As discussed below, CanadaDrugs.com eventually pleaded guilty to selling misbranded and counterfeit drugs in violation of the FDCA.

41.    Pharmacies in the United States are also regulated by state boards of pharmacy and required to follow state[3] pharmacy laws where they are located as well as pharmacy laws where their patients are located. In almost every state, this means that pharmacies must be licensed in their home state and each additional state to which they dispense medication. There are only limited exceptions to the generally required non-resident state licensure.

42.    Online pharmacies that dispense in the United States must comply with the pharmacy rules in the states to which they dispense medication.

43.    While there are broad similarities in many state regulatory regimes, different states can and do take different approaches to ensure patient health, safety, and welfare.

44.    Licensed pharmacists help patients understand and manage their medication therapies, coordinate care, save patients money based on their unique insurance coverage and medication needs, detect prescribing errors, and counsel patients on how to identify and handle adverse reactions.

45.    Prescribing rules and standards can and do vary by jurisdiction, and upon information and belief pharmacists licensed in a given jurisdiction are responsible for knowing and following applicable standards.

---

[3] State in this context includes the District of Columbia and U.S. territories.

46.     State pharmacy regulators are empowered to discipline pharmacies and pharmacists that do not comply with pharmacy practice laws and rules; they also publicize when disciplinary or legal action has been taken against a pharmacy.

47.     State law also regulates which entities may be called a pharmacy.  In many states, an entity cannot hold itself out to be a pharmacy unless it is a licensed pharmacy.  *See, e.g.*, S.C. Code Ann. § 40-43-86(R)(1) ("It is unlawful for any person, except a pharmacist licensed under this chapter and pursuant to the regulations of the board of pharmacy to: (a) take, use, or exhibit the title 'pharmacist,' 'druggist,' 'pharmacy' . . . .").

## I.     PCC's Lawless Mission

48.     PCC's entire business model exists to directly connect U.S. consumers to foreign pharmaceuticals that they cannot lawfully buy.  PCC's blog, for example, extols the virtues of personal importation and links consumers to PharmacyChecker.com for the purpose of linking to PCC's affiliated foreign drug suppliers to unlawfully purchase drugs that the FDA has deemed unsafe.  PCC's accreditation business is devoted to this same singular goal of facilitating consumer purchases of foreign pharmaceuticals—PCC accredits these foreign drug suppliers for the sole purpose of featuring them on PCC's site, advertising these affiliated entities' products and prices, and linking directly to the foreign drug suppliers so consumers can consummate their unlawful and unsafe transactions.  PCC's price comparison tool is unmistakably designed to advertise what PCC describes as purportedly the lowest possible pricing, again for the direct and sole purpose of facilitating unlawful drug importation.  And PCC's drug discount card, which is a rebranded card available to consumers elsewhere, upon information and belief, is used to draw in consumers for the purpose of directing them to the PCC verified "pharmacies" referenced above that work in concert with PCC to facilitate unlawful personal importation.  In other words, all roads of PCC's

business lead consumers to PCC's price comparison tool and/or PCC's affiliated, foreign drug supply sites for the express purposes of fostering and profiteering from unlawful drug importation.

49. Upon information and belief PCC receives revenue when consumers use its site to access the unlawful pharmacies that it "accredits."

50. Upon information and belief, it is standard practice for online ad revenue to be paid to referring sites for conversions—namely sales—not simply for clicks.

51. Upon information and belief, PCC is also paid monthly by its so-called "verified" pharmacies to provide its certification so that these unlawful pharmacies can signal legitimacy to U.S. consumers and so those U.S. consumers will unlawfully purchase pharmaceuticals.

52. PCC claims that it was created "to meet a critical need," as "pharmacies and Canada began selling prescription drugs to Americans over the internet that they could not afford," and that they exist to "provide consumers, mostly in America, with information that helps them find the most affordable and safe prescription drugs from online pharmacies, including those located in Canada and other countries." They also started a blog to "fight back" against efforts to prevent Americans "from obtaining safe and more affordable prescription drugs from Canada and other countries." Contrary to PCC's representations, that its blog is somehow distinct from its PharmacyChecker.com site and is for consumer education purposes only, PCC's blog contains the same search box that exists on PharmacyChecker.com's price comparison tool that allows consumers to search for and purchase foreign drugs from PCC's "accredited" foreign pharmacies:



53.     The PharmacyChecker.com website also links to and maintains a dedicated page to the PharmacyChecker Blog, where it keeps an up-to-date list of PCC's blog entries with the most recent entries at the top.  PCC's suggestion that its blog is non-commercial in nature is fiction.

54.     On the front page of its website, PCC asks consumers "How Much can you save with an online pharmacy?" But rather than connect consumers with lawful online pharmacies, it shows them "Savings on Popular Medications using Canadian and International Online Pharmacies."

55.     After telling consumers that "it's easy to compare drug prices among trusted international pharmacies," PCC then tells consumers that "Comparing drug costs on PharmacyChecker.com helps you and your family save the most money,"  implying that consumers can and should save money by purchasing from their "accredited" pharmacies.

56.     PCC affirmatively tells consumers that the prices it provides come from pharmacies "verified as safe" that are "continuously monitored."  It also claims that the drugs they sell are "lawfully manufactured," "genuine," and "regulated."

57.     All of these claims are misleading.

58.     While PCC claims to be connecting consumers with foreign pharmacies in the name of "affordability," it has sidestepped the American system for making drugs affordable—genericization.  The front page of PCC's website highlights a number of brand-name medications including Nexium, and Zetia, and notes the "international pharmacy savings for these drugs.  Both of these drugs have been genericized however, and upon information and belief generic drugs are nearly always substantially cheaper than brand name drugs.  In fact, a 2004 FDA study found that

generic drugs are often cheaper than both Canadian brand-name drugs and Canadian-generic drugs.[4]

59.     Upon information and belief, more than 90% of prescription drugs dispensed in the United States are generic drugs.

60.     One of the benefits of connecting consumers with pharmacists that are actually licensed to dispense drugs to the patients that they are selling to is that those pharmacists can work with their patients and the patients' medical provider to determine when substituting a generic drug may be appropriate—saving the patient a substantial amount of money and not subjecting the patient to legal jeopardy including, but not limited to, the risk of confiscation of their drug shipment or the risk of law-enforcement contact.

II.     **Pharmacy-Checker's False and Misleading Claims About its "Accredited" Pharmacies and the Legality, Safety, and Other Material Attributes of the Drugs they Sell to Unwitting U.S. Consumers**

61.     PCC's website makes a variety of different claims that mislead consumers. These include:

    a.     Statements that mislead consumers about the legal risk of buying foreign pharmaceuticals and/or the relationship between non-FDA-regulated foreign pharmaceuticals and FDA-regulated pharmaceuticals;

    b.     Statements and design choices hiding that the pharmacy websites PCC sends consumers to are not pharmacies at all;

    c.     Statements that mislead consumers into believing that they are receiving the "lowest price" "worldwide" by buying through an anonymous foreign pharmacy rather than, for example, buying the generic version of a branded drug from their local pharmacy or working with their insurance company and/or a drug manufacturer to find the lowest domestic price on a branded drug;

    d.     Statements that mislead consumers about the origin of the drugs that they are buying;

---

[4] https://www.fda.gov/drugs/resources-you-drugs/study-us-generic-drugs-cost-less-canadian-drugs.

e. Statements that mislead consumers about the safety and trustworthiness of PCC's accredited pharmacies.

**A. Statements that Mislead Consumers About the Legality Personal Importation and the Relationship Between Foreign Pharmaceuticals and FDA-Approved Pharmaceuticals**

62. PCC goes out of its way to hide information on legality and to provide misleading information on the legality of purchasing drugs from foreign pharmacies. It does this as part of its unlawful business model where it makes money "verifying" and facilitating purchases from foreign pharmacies that violate U.S. law so that they can launder their reputation for U.S. consumers, and it makes money when U.S. consumers use links on its website to access those pharmacies.

63. PCC hides information about legality on its website, providing misleading information about risk (affirmatively telling consumers that they face no risk of arrest, and not mentioning the risk of confiscation), conflating more-regulated Canadian pharmacies with loosely regulated pharmacies in Caribbean free trade areas, implying that foreign pharmacies and pharmacists licensed in their home jurisdictions are as legitimate and trustworthy as or otherwise comparable to domestic pharmacies and pharmacists licensed in the U.S., and implying that foreign pharmaceuticals are as safe as—and even identical to—FDA-approved pharmaceuticals.

64. PCC tells consumers that they are dealing with "verified" pharmacies that they can trust, while sending unwitting consumers to "Pharmacy Intermediaries" that dispense through third party foreign pharmacies and dispensaries which refuse to provide their names or license numbers to consumers. It also "verifies" a number of pharmacies that go to great pains to make it appear to consumers that they are dispensing from Canada, providing only small-text disclaimers that they will likely ship drugs not from Canada but from other jurisdictions, including the Mauritius Free Trade Zone, India, or Turkey. PCC misleads consumers to think that they are dealing directly with

a "trusted" *Canadian pharmacy*, when in reality, he or she is dealing with an undisclosed and unregulated "intermediary" that will ship unregulated drugs from an anonymous company maintaining a warehouse somewhere in, for example, Turkey.

65. PCC misleads consumers into believing that the drugs that they are receiving are the same as or equivalent to FDA-regulated drugs. This is false. Even a brand-name drug sold under the same name in multiple jurisdictions may differ; the drugs may use different inactive ingredients, different release mechanisms, or be manufactured in different facilities. The drug will almost certainly be differently packaged with different instructions for patients, and it may not have been stored, manufactured, and/or transported in accordance with FDA-regulations. PCC goes to great pains to mislead consumers about the very real differences between FDA-regulated drugs and non-FDA-regulated foreign drugs. These differences can be dangerous.

66. In a November 18, 2020 post and email that PCC disseminated to consumers, PCC misleadingly represented that personal importation is lawful: "If you need your medication quickly, then you should consult your local pharmacy *and then you can purchase the rest of your prescription internationally.*" PCC's post then provides a link to PCC's "Verified Safe Pharmacies," where consumers can easily consummate their drug purchases.

67. PCC is more explicit elsewhere in its commercial speech regarding the purported legality of purchasing drugs through PCC's website, explicitly representing that, despite some alleged confusion regarding whether personal importation is lawful in the U.S., consumers "can do it!" In a March 5, 2021 post, PCC falsely and misleadingly represented to consumers regarding the legality of personal importation as follows:

The prices are much lower in Canada and federal law, despite what people think, actually allows us to import drugs from there. So, when thinking about this, consider Robbie Schneider, Adam Sandler's loyal sidekick in many films saying, "You can do it!"



68.     This same post goes on to represent that, "unlike with wholesale importation, federal law ranges from forgiving to expressly permitting otherwise prohibited importation for personal use." These representations are false and misleading and designed to and do encourage consumers to then break the law by purchasing foreign pharmaceuticals via PCC's website and the links PCC provides to its affiliates foreign drug suppliers.

69.     PCC even admitted—in a comment on the FDA's 2020 state-sponsored importation rule—that the FDA has not used authority from Congress to allow personal importation, that that authority, if exercised, would only allow imports from Canada if it were implemented, and that there is danger associated with the use of foreign pharmacies that pretend to be Canadian but dispense from elsewhere.

70.     The front page of PCC's website also tells consumers it provides "Prescription Savings You Can Trust" and includes a list of popular searches and the statement "Free U.S.

pharmacy coupons. Verified International & Canadian online pharmacy options. Compare drug prices and save up to 90%." PCC includes a "featured in" banner which represents that The New York Times, Yahoo Finance, Healthline USA Today, and the AARP, among others all approve of PCC's business model and recommend that consumers use PCC's platforms to purchase unlawful foreign drugs. A screenshot is below; because the entities are featured in a scrolling animated banner, some have been cropped:



71.     At a minimum, PCC's speech strongly implies that consumers can "trust" PCC's "verified pharmacy" options, that they can save on drugs through these pharmacies, and that they have the support of all of these recognizable organizations. None of these things are true.

72.     To imply that the purchase and importation of foreign drugs is both commonplace and legal, PCC posts glowing "consumer" reviews of PCC verified drug sellers that claim to be Canadian (as described later many of these sellers are not actually "pharmacies" and dispense from countries other than Canada). Again, implying that personal importation is a legal option, PCC

then asks "How Much can you Save with an Online Pharmacy" and shows consumers "Savings on Popular Medications using Canadian and International Online Pharmacies."



| Drug | Local U.S. Pharmacy Price | International Online Pharmacy Price | International Online Savings | Annual Savings |
|------|---------------------------|------------------------------------|-----------------------------|----------------|
| Nexium 40 mg | $768.02 | $27.99 | 96% | $2,960.12 |

     73.     The front page of PCC's  website also includes an auto-playing slide show, which includes statements that further mislead consumers regarding the legality of personal importation. In non-prominent white text against a light grey background, PCC represents to consumers: "The U.S. government has not legalized personal importation, but no one has ever been prosecuted for importing small quantities of medication for their own use. Ever."



74. Of course, the implication that the U.S. government has "not legalized" personal importation and that nobody has "ever been prosecuted" strongly suggests to consumers that the U.S. government has not addressed the issue at all and thus importation is lawful. And PCC's representation that importation of "small quantities"—an intentionally ambiguous term—is permissible is also, at best, misleading. Contrary to PCC's statements and misrepresentations, the U.S. government has affirmatively criminalized the precise personal drug importation at issue in this lawsuit.

75. This is the only mention of legality on the front page of PCC's website, it is displayed for only a few seconds and then disappears, and is designed to misleadingly give consumers the impression that they can and indeed should buy non-FDA-approved drugs from the foreign drug sellers that PCC hosts, advertises, and links to on its platform.

76.     Indeed, the FDA makes clear that it is "illegal for individuals to import drugs into the United States for personal use."[5]  In other words, PCC asks "is it legal," and answers "nobody has ever been prosecuted."  The two are not the same.  And elsewhere, PCC unambiguously reassures U.S. consumers that "You can do it!"

77.     In addition, PCC's "Price Comparison" page misleadingly equates foreign drugs with FDA-approved drugs.  For example, it states that "some but not all drugs sold in Canada are the exact same.  People tend to assume that drugs sold in the United States are made in the United States and drugs sold in Canada are made in Canada, which is often not the case. Medications sold in the U.S. and Canada are manufactured in countries located throughout the world."

78.     PCC's statements obfuscate the relevant issue—the issue is not *where* drugs are manufactured, but *under what regulatory oversight* they are manufactured.  An FDA-approved drug manufactured under FDA's regulatory scrutiny in an FDA-regulated facility in India or Israel that comes into the U.S. via an FDA-approved supply chain and that is dispensed by a licensed healthcare provider is an FDA-approved drug.  It is subject—from manufacturing to dispensing—to oversight by U.S. regulators as part of a closed system.  A non-FDA-approved drug may be made in those same countries—even in the same factories—but it is not the equivalent of an FDA-approved drug.  It is not subject to the same oversight; it may be packaged for different uses; it may have different active or inactive ingredients; it may dissolve at a different rate; it may be stored differently.

---

[5] https://www.fda.gov/about-fda/fda-basics/it-legal-me-personally-import-drugs.  The FDA has a "policy" of "not object[ing]" to some imports—for example, serious diseases with no approved U.S. treatment if the individual provides verification to the FDA.  Drugs for which there is an equivalent available in the U.S. do not fit within this policy.  There is no exception to the FDCA for cost.  The policy also does not make the importation "legal" in any sense.

79.     A foreign-manufactured FDA-approved drug is not equivalent to a non-FDA approved drug purchased online through a pharmacy intermediary from a PCC affiliate that will not tell consumers its real name or disclose its licensing information.  It is misleading to suggest otherwise.  The law is clear:  the types of drug purchases that PCC facilitates are unlawful and PCC's statements to the contrary are false, misleading, and have dangerous implications for patient safety.

80.     PCC's false and misleading representations regarding the legality and safety associated with personal importation of the cancer treatment drug Ibrance take on a particularly predatory character.  In a January 28, 2021 post, PCC represents that consumers face two choices in purchasing this drug: "The cancer treatment drug Ibrance, for example, is over $27,000 for a 90-day supply in the U.S. vs. $13,000 in Canada."  PCC goes on to state that "Canadian pharmacies and pharmacies in other countries could offer a practical lifeline for Americans" and that consumers should "shop at [drug suppliers] accredited through the PharmacyChecker Verification Program" to buy Ibrance.  PCC provides a link to these foreign pharmacies again misrepresenting that U.S. consumers can legally and safely purchase Ibrance and should do so to save over 50% or, in this case, $14,000.  PCC does not mention lawful options including, but not limited to, payment plans, manufacturer coupons, or options to work through insurers or government programs like Medicare, Medicaid, or the VA to lawfully achieve savings.  While PCC's savings advice sounds very appealing to U.S. consumers, it is also unlawful and the use of non-FDA-regulated drugs can jeopardize patient safety.

**B.  PCC Hides that the "Pharmacy" Websites It Links to Are Not Pharmacies at all**

81.     PCC's website contains an "Online Pharmacies" page that repeatedly uses the word pharmacy; referring to 'Accredited Canadian and International Online Pharmacies," it tells consumers that it is "Your trusted list of the best online pharmacies that sell safe, affordable

medication online."  It also calls those pharmacies "reputable, accredited, and monitored," and notes that "Accredited Pharmacies have locations in Canada, Australia, India, Mauritius, New Zealand, Turkey, the UK, and the United States."

82.    PCC's "online pharmacies" page and its list of affiliated purported "pharmacies" is false and misleading.  Once a consumer clicks the link they are greeted in large, bolded font with the words:  "Accredited Canadian and International Online Pharmacies."  Each such "pharmacy" also has a link that says "Visit Pharmacy."   A screenshot of the page and the first displayed "pharmacy" is below:



83.     There is a second link, however, to visit the "Pharmacy Profile."  Once you get to the second page, there is a table for each "International Online Pharmacy" showing the "PharmacyChecker verification status."  The table for PriceProPharmacy looks like the following:

| PharmacyChecker Verification Status | Verified |
|---|:---:|
| Prescription orders dispensed by licensed pharmacies | ✔ |
| Requires a Prescription | ✔ |
| International sales of controlled drugs to the U.S. prohibited | ✔ |
| Meets website security requirements | ✔ |
| Publishes customer privacy policy on website | ✔ |
| Publishes contact information on website for customer service | ✔ |
| Pharmacist consultation offered to customers | ✔ |
| Quantities marketed on website restricted to a maximum of 3 months' supply at a time | ✔ |
| Disclosure of pharmacy location to consumer prior to purchase | ✔ |
| Marketing claims are truthful and not misleading | ✔ |

84.     However, there is a hidden link on the "Prescription Orders dispensed by licensed pharmacies" box, which when clicked reveals the following disclaimer:



**Prescription orders dispensed by licensed pharmacies**

This is a pharmacy intermediary (i.e., one that does not have its own bricks and mortar pharmacy) that fills prescriptions only through pharmacies with verified pharmacy licenses.

85.     In other words, these purported "verified" "pharmacies" are not pharmacies at all. Upon information and belief, each and every "pharmacy" on the PCC Online Pharmacies page is a "pharmacy intermediary." This information is hidden by default to consumers. They are online middlemen for other "pharmacies." At the bottom of the page there is a list of countries with pharmacies that these "pharmacy intermediaries" use. For nearly all of the "verified dispensing pharmacies" used by the pharmacy intermediaries, PCC has a statement saying that the name and license number of the dispensing pharmacy are not being published by PCC at the request of the pharmacy intermediary.

86.     In other words, PCC tells consumers that it is sending them to "verified pharmacies," but instead it is sending them to intermediaries, and the true names and license numbers of the "pharmacies" they are purchasing from are hidden.

**C.  Statements that Mislead Consumers on Price**

87.     In addition to being riskier than FDA-regulated drugs, imported drugs are often more expensive than domestic drugs. Generic drugs—which make up the vast majority of prescription drugs dispensed in the United States—are often cheaper in the United States than anywhere else in the world. FDA-regulated generics are subject to the same oversight as FDA-regulated brand name drugs.

88.     In fact, PCC has structured its business, including its blog and its PharmacyChecker.com site, to direct consumers *away* from low-priced, legal, domestic generic drugs and *toward* the more expensive branded drugs sold by the "verified" foreign "pharmacies" that pay PCC a fee to be listed on PCC's website.

89.     State-regulated pharmacies are often required to take steps to save patients money. For example, a number of states require a pharmacist to dispense a less expensive generic version

of a drug even if a prescription is written for a brand drug.  Under New York law, a patient cannot independently purchase brand drugs without prescriber pre-approval.

90.     PCC's statements regarding consumers' ability to obtain the lowest possible prices from PCC's foreign affiliated drug suppliers are false and misleading, even with respect to some branded drugs.

91.     For example, PCC represents to consumers that "the lowest price for Januvia (sitagliptin phosphate) 25 mg is $1.02 per pill or unit for 84 pills or units at PCC-accredited online pharmacies."  Despite PCC's representation that the "lowest price" for Januvia is thus $85.68 from PCC's foreign affiliated drug supplier, many U.S. consumers can in fact lawfully purchase FDA approved Januvia prescriptions from safe, domestic pharmacies for as low as $5.00 per prescription—or more than $80 *less* than what PCC advertises as a consumer's "*lowest*" possible price.

92.     PCC's false and misleading representations come into closer focus when applied to an actual customer purchase experience.  When, for example, consumers from zip code 10601 search for the price of Januvia in the White Plains, NY area, PCC affirmatively represents to consumers that "the lowest price with a U.S. Prescription Discount Coupon" at U.S. pharmacies is $1,366.80 compared to $85.68 from PCC's international, online drug suppliers.



93.     PCC's representations, deliberately designed to steer White Plains and other consumers away from U.S. pharmacies and toward PCC and its affiliated foreign pharmacies, are false and misleading.

94.     Upon information and belief, insured consumers with a manufacturer discount coupon at the time of this search in May 2021, could purchase Januvia for as little as $5 from domestic pharmacies, not the "lowest" price of $1,366.80 that PCC advertises.  Thus, with a manufacturers' coupon, an insured U.S. patient could pay $5  (upon information and belief an insured patient could even pay $0) for his or her Januvia prescription.  But if he or she had done research on PCC, he or she might incorrectly believe his or her alternatives are paying thousands of dollars domestically, or hundreds of dollars through PCC and its affiliates for non-FDA regulated drugs that claim to be equivalent.

95.     PCC's speech is designed to scare consumers away from cheaper, lawful pharmaceutical purchases from domestic pharmacies and toward purchasing illegally via PharmacyChecker.com.

96.     PCC's false and misleading statements thus not only facilitate unlawful drug importation, they endanger patient health and may ultimately lead to American consumers paying more than they have to for their prescriptions.  PCC would have the Court believe that its consumers are making a rational decision to trade the safety of the American pharmaceutical regulatory system for savings; in fact, they may well get neither.

97.     PCC tells consumers that it is helping them "find the lowest price," but it directs consumers in the first instance to its own accredited pharmacies; consumers must jump through additional hoops to search for often lower prices at domestic pharmacies, and even then, PCC limits its search to domestic pharmacies relatively close to the consumers' homes.  Consumers

must enter a zip code to search for prices at domestic pharmacies, avoiding much of the benefits of the safe, lawful, online pharmacy ecosystem that NABP has fostered in the U.S. A consumer can more easily order drugs from Mauritius via PCC than compare domestic and/or generic drug prices.

98. PCC tells consumers that it will objectively permit them "find the lowest price," but then favors its own "verified" pharmacies:



99. PCC also tells consumers that it is helping them to "save the most money" and that foreign drugs "cost a lot less." For example, the page outlining its services states:

> The cost of medication is different from country to country and pharmacy to pharmacy. To find the lowest drug prices, it's often essential to compare medication costs locally and internationally. Using PharmacyChecker.com, it's easy to compare drug prices among trusted international online pharmacies, including licensed Canadian pharmacies and local U.S pharmacies. Comparing drug costs on PharmacyChecker.com helps you and your family save the most money and avoid getting burned by rogue websites. (Emphasis added).

100. PCC also states that "Educated consumers know that the best prices on prescription drugs can be found on the Compare Prices pages of our site." Upon information and belief, this statement is simply untrue for most drugs purchased by most consumers.

101.     The vast majority of drugs sold in the United States are generic drugs.  A number of studies have shown that generic drugs, regulated by the FDA, are as cheap or cheaper than foreign generic drugs and even foreign branded drugs, even setting aside the additional financial and legal risk of purchasing non-FDA-regulated foreign drugs.

102.     The PCC website shows consumers its "accredited" foreign pharmacies in the first instance.  If consumers elect to try and navigate PCC's system to perform more complicated additional searching, they can see some generic prices at an incomplete list of pharmacies but only within a single zip code *if* PCC lists the drug at all.  For a consumer to get the "best prices," he or she should be enabled to look at a broader slice of safe, lawful, online pharmacies than those PCC displays in his or her own zip code.

103.     A consumer looking at PCC's website will also not be able to compare the best prices available at pharmacies through from his or her health insurer, or affiliated pharmacies or pharmacy benefits managers, which can often offer a consumer significant savings even if he or she has not met a deductible.  PCC does not even mention these common methods of saving money on safe, domestic drugs.

104.     A consumer can also achieve savings by meeting a deductible faster or by paying from a Flexible Spending Account or Health Savings Account; purchases from foreign pharmacies, even PCC-accredited foreign pharmacies, will not help consumers achieve those savings.  PCC ignores all of this, instead steering consumers to its own truncated subset of foreign drug suppliers.

105.     PCC's blog also tells consumers that "the largest pharmacy savings on the Internet are from international online pharmacies which can offer you the lowest prices worldwide. These prices can be found on PharmacyChecker.com."  These statements are at best misleading.  PCC's business model depends on foreign pharmacies paying PCC for verification *and* for clicks.

106.     As a result, PCC claims to be providing consumers with "the lowest prices worldwide," but in fact it is privileging the prices offered by its own "verified pharmacies," without being up front with consumers that this is what they are doing.

107.     A consumer that could save money purchasing a generic at a safe, legal, domestic online pharmacy would never know it from PCC's website.  Instead, they are nudged toward purchasing brands.  These brands may be cheaper from foreign pharmacies than they are at domestic pharmacies (but often are not); they also are from outside the American regulatory system, and may in fact be materially different from the domestic brand.  PCC deliberately makes all of this information, at best, opaque.

108.     In other words, consumers importing drugs illegally through PCC's website sacrifice the safety of the FDA-regulated supply chain and the expertise and accountability of licensed and accredited pharmacists for savings that often do not even exist.

**D.  Statements that Mislead Consumers About the Origin of the Drugs They are Buying**

109.     PCC "pharmacies" hide the fact that they dispense from countries other than Canada and hide the names of the countries they dispense from; many display the word Canada or "Canadian" prominently, as well as Canadian maple leaf iconography, and only disclose late in the customer experience and in non-prominent text that consumers could easily miss that they are receiving drugs from countries other than Canada, and drugs that are not regulated by Canadian authorities.  Many of these pharmacies will not even ship to Canada.

110.     These are not just misrepresentations by PCC's foreign affiliates.  Rather, PCC warrants to consumers visiting PCC's platform that, as part of PCC's "accreditation" services, PCC verifies that the "[m]arketing claims [of its verified pharmacies] are truthful and not misleading."  PCC sanctions the marketing practices of each of these "pharmacy" affiliates and

indeed copies aspects of these affiliates' false and misleading marketing claims on PCC's internet sites.

111.    PCC describes these affiliates as "Canadian and International Online Pharmacies," "Accredited Canadian and International Online Pharmacies," and represents that "Using PharmacyChecker.com, it's easy to compare drug prices among trusted international online pharmacies, including licensed Canadian pharmacies…."

112.    Thus, despite PCC's guarantees that the marketing claims of its verified pharmacies are "truthful and not misleading," a number of these "pharmacies'" home pages give consumers the distinct impression that they are ordering drugs from Canada.

113.    When a consumer searches for a drug via PharmacyChecker.com and PCC's blog sites, the logo of the verified pharmacy intermediary is shown prominently in the results, while the shipping locations only appear in a much smaller and lighter font.

114.    Some of the misleading claims that PCC and its affiliates make that mislead consumers into believing that the foreign dispensary is a Canadian "pharmacy" that will ship drugs from Canada directly to the consumer's U.S. address include the below examples:

    a.    "PricePro Pharmacy": PCC's website displays the affiliate's name with a prominent Canadian maple leaf logo. The image below is from PCC's website.



    b.    While consumers would be right to assume from PCC's site that PricePro Pharmacy dispenses solely from Canada to the U.S., fine print reveals that it may actually dispense from a number of other countries, including India, Mauritius, and Turkey. Once linking from PCC's website to PricePro Pharmacy's site, consumers see the prominent

front page declaring, in large font: "Certified Canadian Pharmacy" and "Affordable online prescriptions shipped from Canada to the United States!"  This prominent "Canadian" branding, with only a note in fine print at the bottom of the page about dispensing from other international pharmacies, is misleading.  A screenshot of this website, which PCC represents to consumers as truthful and not misleading, is below.



c.      "Your Canada Drug Store": PCC displays this affiliate's "Canadian" branding and maple leaf logo on its platform.  In addition to being called Your Canada Drug Store, this affiliate prominently states on its website that it is a "Certified Canadian Prescription Referral Service."  A consumer who relies on this would be surprised to learn

that, in the sites FAQs, Your Canada Drug Store state that they are "not a pharmacy," and that, while they connect Canadian orders with Canadian Pharmacies, they also contract with dispensaries in "the UK, New Zealand, Australia, Turkey, Mauritius, and India." While PCC describes Your Canada Drug Store as a "pharmacy," Your Canada Drug Store claims that it is not in fact a pharmacy. The image below is from PCC's website.



d. "Canadian Prescription Drug Store Rx": PCC's platform also advertises Canadian Prescription Drug Store Rx. Despite its name, this PCC affiliate includes only a fine print disclaimer on its web page that it dispenses from pharmacies outside of Canada, which it claims are "fully licensed and independently verified." Canadian Prescription Drugstore will not even ship drugs to Canada.



e. "Canadian Pharmacy World": this PCC affiliate claims on its site to be an "online Canadian pharmacy" and "your premium online Canadian source for medications you trust." Like many of PCC's other linked affiliates, Canadian Pharmacy World includes only in fine print hidden at the bottom of its page a vague reference to "international pharmacies and fulfillment centers that are approved by the regulatory bodies in their respective countries." Despite representing itself as "your…Canadian Source" of drugs, Canadian Pharmacy World also dispenses from India, Mauritius, Turkey, and the UK. The image below is from PCC's website.

87



f. "<u>Canada Prescription Plus</u>": states prominently on its website that it is a "Licensed Canadian Pharmacy" and a "Trusted Canadian Pharmacy." There is no reference on the Canadian Prescription Plus homepage to the fact that this affiliate dispenses from other countries in addition to Canada including India, Mauritius, Turkey, and Australia. Canada Prescription Plus will not ship drugs to Canada. Upon information and belief the website blocks[6] Canadian IP addresses, so Canadian customers, or regulators, cannot even access it. Upon information and belief, blocking Canadian customers' ability to even access the website makes them a lower priority for Canadian regulators, and helps them evade the Canadian laws and regulations that it would otherwise need to comply with if it sold to Canadian consumers. Thus, drug sellers like Canada Prescription Plus evade U.S. federal and state pharmacy laws and regulations by operating outside the U.S. and evade Canadian laws and regulations by blocking Canadian consumers. The image below is from PCC's website.

---

[6] Upon information and belief, website users transmit their Internet Protocol (IP) address to a website when they visit. With this IP address a website owner can surmise a user's country of origin by cross checking the IP address against the IP addresses purchased by an Internet Service Provider or other third-party databases. This is not a perfect system; consumers can use Virtual Private Networks to change the IP address that a website sees when a consumer visits. A geographic block is a restriction on IP addresses from certain jurisdictions. Therefore if Canadian IP addresses are blocked, a web user with a Canadian IP address will receive an error message instead of the website that he or she is trying to visit.



g. "CanDrugstore.com": CanDrugstore.com also extols the benefits of Canadian pharmacies on its site. And despite having "Can" in its name, featuring a Canadian maple leaf in its logo, and representing on its front page that it is "located in Surrey, British Columbia, and is a well-respected Canadian Pharmacy," CanDrugstore.com actually dispenses from a host of other countries in addition to Canada, including Turkey, India, Mauritius, and Australia. Like other PCC affiliates, CanDrugstore.com only mentions "international fulfillment centers" and "dispensaries" in other countries in fine print. CanDrugstore.com will not ship drugs to Canada and, upon information and belief, even blocks Canadian IP Address so that Canadian customers and regulators cannot access it. The image below is from PCC's website.



h. "Maple Leaf Meds" which has a maple leaf in the logo, dispenses from countries outside of Canada, including Turkey, Mauritius, and India, and will not ship to Canada. The front page of Maple Leaf Meds states in large print: "Reputable Online Canadian Pharmacy – Maple Leaf Medications." Like other PCC affiliates, Maple Leaf Meds only mentions "international fulfillment centers" in fine print. Notably, while PCC represents that Maple Leaf Meds is a "pharmacy," fine print on the affiliate's site reveals that "Maple Leaf Meds is not a pharmacy." The image below is from PCC's website.



    i.    "<u>Medications Canada</u>": in addition to featuring "Canada" in its name, this affiliate invites consumers to "Check Canadian Pharmacy Prices." Although Medications Canada also dispenses from India, Mauritius, and Turkey, Medications Canada does not state anywhere on its front page that it dispenses from locations other than Canada. Medications Canada will not ship to Canada and, upon information and belief, even blocks Canadian IP Address so that Canadian customers cannot access it. The image below is from PCC's website.



    j.    Other "Pharmacy Intermediaries" purport to ship worldwide, including to customers in Canada, but, upon information and belief, block consumers with Canadian IP addresses (and thus actual Canadian customers and regulators). This includes globalcarerx.com, canadacloudpharmacy.com, drugmart.com, planetdrugsdirect.com, drugmartdirect.com, doctorsolve.com, pharmstore.com, and pharmapassport.com.

**E. Statements that Mislead Consumers about the Safety and Trustworthiness of PCC's Accredited Pharmacies**

115.    PCC misleads consumers regarding the safety and trustworthiness of each of the foreign online drug sellers that it directly profits from in at least two material ways. First, PCC represents to consumers that each such affiliate is safe, trustworthy, and operating in compliance with Canadian and other regulatory requirements when, in fact, this very often is false and

misleading. Second, despite PCC's verification guarantee that the "marketing claims" of its pharmacy intermediary partners are "truthful and not misleading," these websites offer consumers a veritable thicket of false and misleading information.

116. PCC makes its own false and misleading representations and adopts equally dubious representations made by its drug supplier affiliates for the express purpose of inducing consumers to buy foreign drugs unlawfully and unsafely. PCC advertises these affiliated drug suppliers' prices on PCC's websites, encourages consumers to shop from these affiliated suppliers, and provides a direct link to the affiliates' websites where consumers are further misled into purchasing what they believe to be safe and legal drugs from PCC "approved" or "verified" "pharmacies." PCC profits directly from this scheme to facilitate unlawful and unsafe drug purchases.

117. The front page of PCC's website includes a section purporting to describe PCC values, including "Safety," stating that the international online pharmacies that PCC verifies are "vetted for consumer safety" and linking to a "List of Safe Pharmacies." Below that is a statement about their Verification program: "The PharmacyChecker Verification Program helps consumers verify international online pharmacies to find out if they meet high standards of pharmacy practice."

118. These statements are misleading; the affirmative statements that these foreign pharmacies are "safe" and "vetted" are at odds with the regulatory regime in the United States to ensure pharmacy safety, which includes oversight by the FDA as well as state pharmacy regulatory boards. Consumers, used to buying pharmaceuticals in a contained and regulated environment, may be misled into believing PCC's statements that its "accredited" drug suppliers are somehow equivalent in terms of safety, reliability, and legality to their local regulated pharmacy.

119.     Below that on the main page of the PharmacyChecker.com website is a statement with the header "Buying Medication Internationally" that says "Millions of Patients purchase medicine from Canada and other countries each year. You can do so more safely by sticking to PharmacyChecker-accredited pharmacies."  There is no mention of legality.

120.     In a November 25, 2020 posting, which PCC also disseminated to consumers by email, PCC similarly represented that "we know that millions of Americans already use pharmacy websites, located in Canada or elsewhere, to afford their prescriptions.  And we pledge to continue to provide those people with the information necessary to do so safely."  PCC's statements here both misrepresent the safety of personal importation and its statement that "millions of Americans" personally import foreign drugs misleads consumers into believing that such importation is legal.

121.     PCC also publishes on its site a slideshow stating that: "The FDA has never reported anyone harmed by a medication they ordered from an international pharmacy requiring a valid prescription."  This is sourced to a footnote that attributes it to "PharmacyChecker.com research."  PCC's statements are designed to and have the effect of misleading consumers.

122.     The FDA expressly warns consumers about pharmacies that are "located outside of the United States" or that do not have a "U.S. state-licensed pharmacist" available to answer questions, noting that these pharmacies "often sell medicines that can be dangerous because they may: [h]ave too much or too little of the active ingredient you need to treat your disease or condition[;] [n]ot contain the right active ingredient[;] [c]ontain the wrong or other harmful ingredients"; or that medication may not be stored properly.[7]

---

[7] https://www.fda.gov/consumers/consumer-updates/how-buy-medicines-safely-online-pharmacy.

123. The fact is that the FDA has excellent visibility into drugs at all stages of the regulatory "closed system," and only limited visibility into drugs that pass illegally outside of the closed system. The fact that, according to PCC, the FDA has never (1) reported (2) anyone harmed (3) by a medication (4) they ordered (5) from an international pharmacy (6) requiring a valid prescription[8] is so qualified as to be misleading. If the FDA seized counterfeit medication before it got to the consumer, that would not count. If a relative ordered medication for the consumer, that would not count. If the FDA reported someone harmed by medication from an international pharmacy but failed to state whether that pharmacy required a valid prescription, that might not count either.

124. The FDA recently issued an import alert for Planet Drugs Direct, calling for the "detention without physical examination" of "Foreign Manufactured Unapproved Drugs Promoted to Individuals in the U.S.," noting that these drugs "present serious safety risk and effectiveness concerns." The list of firms and their products subject to detention includes "Planet Drugs Direct."[9]

125. Planet Drugs Direct remains a PharmacyChecker-approved pharmacy as of May 7, 2021,[10] despite the fact that all prescription drug products it sends into the U.S. are subject to detention without examination. Its website still bears the PCC seal of approval, as seen in the lower right of the screenshot below.

---

[8] While Federal law requires that prescription drugs be dispensed only pursuant to a "written prescription of a practitioner licensed by law" to administer a given drug, *see* 21 U.S.C. § 353(b)(1), in practice, the FDA is not the primary arbiter of prescription validity. That role lies with state regulators.

[9] https://www.accessdata.fda.gov/cms_ia/importalert_197.html.

[10] https://www.pharmacychecker.com/pharmacies/seal/5a41c9ba-cdfa-4aa2-b75e-810bca2c6139/.



126.     The FDA has repeatedly warned of the dangers of personal importation and of the dangers posed by foreign drugs from unknown sources. The FDA states that consumers should "only buy prescription medication from state-licensed pharmacies located in the U.S." and has identified counterfeit mail-order drugs.[11]

127.     In addition to conspicuous claims that drugs are from Canada, followed by hidden claims that drugs may in fact be dispensed from other locales (and thus not meet Canadian regulatory standards), PCC and its affiliates go out of their way to hide from consumers even the identities of who is actually supplying the drugs, from where the drugs are in fact sourced, and on what terms the drugs are being sold to consumers.  All the while falsely and misleadingly representing to the consuming public that the drugs they will eventually ingest are safe and lawful to acquire.

---

[11] https://www.fda.gov/drugs/drug-safety-and-availability/counterfeit-versions-cialis-tablets-identified-entering-united-states

128. Many of PCC's affiliated sellers also promise safety policies, for example recall policies, that simply do not exist. Thus, in the event of a product safety recall from a government regulator, and despite PCC's guarantee that the "marketing claims" of its pharmacy intermediary partners are "truthful and not misleading," consumers who purchase these drugs through PCC and its affiliates would likely never know if their foreign-sourced drug were subject to such a safety recall thus endangering the health of the consuming public. These companies also expressly disclaim any warranties of the merchantability or fitness for purpose of the drugs they sell. This shows that these companies view their promises of safety as essentially empty. Their guarantee of safety ends where taking actual legal and financial responsibility for the products they sell begins.

129. PCC's affiliates also go out of their way to hide their own identity—even their corporate identities—to disclaim even the most basic warranties for the pharmaceutical products they sell, to disclaim that they are selling anything at all, and to shift risk onto the consumer.

130. This section will highlight certain examples—PriceProPharmacy.com and Canadian Prescription Drugstore—but these practices persist across PCC's "verified" pharmacy affiliates.

131. Nearly all of PCC's "verified" pharmacies make similar misrepresentations, despite PCC guaranteeing to consumers that these websites marketing is truthful and accurate and thus will not mislead consumers.

### i. PriceProPharmacy.com

132. PCC tells consumers that: PriceProPharmacy.com is a pharmacy, that PriceProPharmacy.com's "Marketing claims are truthful and not misleading," and that PriceProPharmacy is an "Accredited . . . Online Pharmac[y]," and that they "sell safe and affordable medication." None of these claims are correct. Among other things, the marketing

claims of PriceProPharmacy.com are wildly misleading, with broad disclaimers hidden in the fine print, and PriceProPharmacy disclaims being a pharmacy. PriceProPharmacy.com even disclaims that it sells anything to consumers.

133. Their FAQ page also includes a prominent badge that tells consumers "*we* ship all across the USA." (emphasis added).



134. All of these claims are misleading.

135. For example, PriceProPharmacy.com tells consumers that it is a "Certified Canadian Pharmacy," that it is an "Online Canadian Pharmacy for U.S. Residents," that their "fulfillment centers" enable consumers to "buy popular Canadian drugs online," that they are a "legitimate and licensed online source for the safest and highest quality brand and generic medication," and that "[l]ocated in the beautiful province of British Columbia in Canada, Price Pro Pharmacy and its supplier affiliates are all fully licensed, verified, and accredited by PCC."

136. Similarly, the "About Us" section of the PricePro website talks about "Our Canadian Pharmacy" and about "ordering cheap medication from Canada through Price Pro," and asking "why order meds from Canada?" There is only one fleeting mention that "PricePro also associates with international pharmacies that are approved by regulatory authorities in their

respective countries," but even this is followed by "join millions of happy, money-saving consumers ordering their prescriptions through Canada with PricePro today."

137.     It is only in the fine print at the bottom that PricePro says:

> PriceProPharmacy.com dispenses prescription medications and over the counter products from Canada through our affiliated Canadian pharmacy which is duly licensed in the province of British Columbia, Canada by the College of Pharmacists of British Columbia. PriceProPharmacy.com also uses affiliated international pharmacies that are approved by regulatory authorities in their respective countries and certified by PharmacyChecker.
>
> These affiliated facilities and international fulfillment centers dispense medications which they acquire in their home countries or internationally from countries like Australia, New Zealand, India, Turkey, United Kingdom, Germany and other European Union member states.

138.     In other words, once American consumers link from PCC's website to its affiliates page, they are faced with the misleading impression that PriceProPharmacy will send them medication from Canada when, instead, the affiliate can supply drugs from "affiliated facilities and international fulfilment centers" located in other countries, which in turn may have acquired the medication in their home countries or internationally from "countries like" Australia, New Zealand, India, Turkey, United Kingdom, Germany and other European Union member states.

139.     Despite prominent references to Canada, PriceProPharmacy dispenses from "supplier affiliates" all over the world, including Mauritius, India, and Turkey.  These supplier affiliates are not required—under PCC's program—to follow Canadian pharmacy standards.

140.     In addition, PriceProPharmacy elsewhere denies being a pharmacy at all.

141.     Their "Terms of Sale" page, hidden at the bottom, clearly states that "PriceProPharmacy (PriceProPharmacy.com™) is a marketing entity located in Surrey, British Columbia, Canada. PriceProPharmacy.com™ is not engaged in conducting sales, but rather engages in the business of facilitating sales transactions on behalf of authorized pharmacies both within Canada and internationally."

142.     In other words, they are a middleperson.  They are not a pharmacy.  They do not ship drugs.  Some other unidentified person or entity, not verified by any legitimate governmental or other agency, that obtained the subject drugs from undisclosed sources outside the FDA's "closed system," ships these drugs internationally to U.S. consumers who are led to believe—from PCC's and PriceProPharmacy's sites—that they are lawfully obtaining drugs from a *Canadian pharmacy* that has been "verified" by PCC.  None of these consumer expectations, created via PCC's false and misleading commercial marketing, are satisfied.

143.     What's more, despite PCC's guarantee that their affiliates' websites "sell safe and affordable medication," these websites claim they are not even in the sales business.

144.     A consumer dealing with PriceProPharmacy could reasonably believe that he or she is receiving drugs from PriceProPharmacy that conform to Canadian standards.  Unless he or she reviews the contract of adhesion terms and conditions—which, upon information and belief, very few consumers do—he or she would have no idea that PriceProPharmacy is not a pharmacy.

145.     Even these terms and conditions are far from straightforward.  For example, they include a limited power of attorney where the consumer agrees to disclose his or her personal health information to seemingly unrelated company—CanadaDrugs.com. There are no other mentions of CanadaDrugs.com on PriceProPharmacy's website, and no information provided to tell a consumer *why* his or her personal health information is being disclosed to this seemingly unrelated third party.  In fact, Canada Drugs was convicted of selling mislabeled and counterfeit drugs in the United States in 2018.

146.     Canada Drugs and a number of related entities were sentenced to forfeit $29 million, pay a fine of $5 million, and to "permanently cease" illegal operations and surrender

domain names to the United States after being convicted and sentenced in the United States District Court for the District of Montana for selling counterfeit and misbranded prescription drugs.

147. Executives of CanadaDrugs.com were also convicted and required to pay fines and serve sentences of probation and home confinement.

148. The indictment of CanadaDrugs.com notes that "CANADA DRUGS purchased its inventory from questionable sources and ultimately sold counterfeit versions of the drugs Altuzan and Avastin to physicians in the United States."

149. It is not at all clear why PriceProPharmacy would need to share consumer data with CanadaDrugs.com, but it is clear that, while verified as safe and trustworthy by PCC, CanadaDrugs.com was a business that did real harm by obfuscating the sources of its drugs and selling misbranded and counterfeit drugs, including counterfeit cancer drugs for use by United States patients.

150. A consumer—without significant diligence—will not even know that their information is being shared with a criminal organization that sold counterfeit cancer drugs into the United States.

151. In short, a consumer dealing with PriceProPharmacy has no idea who they are dealing with despite PCC's stamp of approval for PriceProPharmacy and PCC's broad claims up front about safety, quality, and sourcing. PriceProPharmacy.com relies on buried disclaimers and secret supplier identities to protect it from actually having to take responsibility following the law, communicating with consumers about subsequent developments such as drug safety recalls, or even that consumers are buying what they think they are buying or dealing with who they think they are dealing with.

152.    Further, PriceProPharmacy, despite prominently claiming to offer the "safest and highest quality" drugs, then expressly disclaims all warranties for the products it sells, including the "the implied warranty of merchantability and fitness for a particular purpose."

153.    In other words, PriceProPharmacy prominently promises that consumers are getting the best possible goods, and then—buried in fine print—*disclaims* all responsibility for giving consumers adequate goods.

154.    They also tell consumers that they "offer a Recall Policy" and include a term that the "customer agrees to review the Recall Policy each time it submits an order." Upon information and belief, PriceProPharmacy.com does not make a recall policy available to consumers for them to review.

155.    In addition to manually scouring the PriceProPharmacy.com website, which did not turn up such a policy, an internet search of the term "'recall policy' inurl:pricepropharmacy.com" reveals that the only instances of the term "Recall Policy" on PriceProPharmacy's website are in the Terms of Sale and Terms of Use for the site.

156.    There is, in other words, no actual recall policy.

157.    It simply cannot be the case that a "legitimate and licensed online source for the safest and highest quality medication" has no plans to inform consumers about critical safety recalls. Even drugs closely scrutinized by regulators are recalled from time to time. But because drugs sold via PCC affiliates like PriceProPharmacy are outside the FDA's "closed system" and the safety assurances that the system supports, patients are at risk. This risk is directly attributable to PCC's false and misleading representations and PCC's facilitation of purchases from entities like PriceProPharmacy.

158.    There are more terms that go to the very heart of the problem with PCC's misleading business model—consumers who order from PCC have no idea who they are actually dealing with; anonymous lawbreakers simply use PCC to launder their reputations and hide their identities; and consumers who buy drugs via PCC and its intermediaries are taking a significant risk.

159.    For example, clause 17 of the terms of sale states that "PriceProPharmacy.com™ is a Canadian business registered in the Province of Manitoba."

160.    An entity search via the Manitoba Companies Office reveals that there is no registered company under "PriceProPharmacy.com," "Price Pro Pharmacy," or even "Price Pro." There is a Price Pro Homes Ltd.

161.    The Victoria British Columbia Corporate registry does show that at one point a "PriceProPharmacy.com, Inc." was registered, but it changed its name to "Quantus Care Inc." in 2018.

162.    Quantus Care Inc. does appear to be a registered business in British Columbia— but not Manitoba—and nowhere does the corporate entity appear on the PriceProPharmacy.com website.

### ii.    Canadian Prescription Drugstore

163.    PCC makes similar misrepresentations on its websites about Canadian Prescription Drugstore and facilitates consumer purchases by:  (i) recommending Canadian Prescription Drugstore to consumers; (ii) making false and misleading statements about Canadian Prescription Drugstore's safety and business operations; and (iii) then directly linking consumers eager to purchase foreign pharmaceuticals with Canadian Prescription Drugstore's internet website.

164.     PCC has generated income from Canadian Prescription Drugstore including by verifying Canadian Prescription Drugstore and facilitating consumer purchases of foreign drugs via Canadian Prescription Drugstore's internet marketplace. Upon information and belief, Canadian Prescription Drugstore uses PCC's Pharmacy Listing and Price Listing Services.

165.     PCC's website states that "Pharmacy Listing and Price Listing programs are fee-based. A participating online pharmacy can cancel at any time after an initial three-month listing period. The online pharmacy will receive monthly click-thru reports and can set spending limits."

166.     In short, the more successful PCC is at facilitating consumer purchases from Canadian Prescription Drugstore and other foreign online drug suppliers through its false and misleading representations, the more money PCC makes.

167.     PCC also tells consumers that Canadian Prescription Drugstore's marketing claims are "truthful and not misleading," that Canadian Prescription Drugstore is "legitimate," "safe," or "reputable," and even that it is a pharmacy. Consumers need to look past plain, straightforward, and false statements on the face of Canadian Prescription Drugstore's website and navigate a web of ambiguous and hidden disclaimers and legalese to even learn part of the truth about Canadian Prescription Drugstore's business model: that they are not a pharmacy, that they are not Canadian, and that they disclaim any warranty that the drugs they dispense are safe or that the pharmacy services they provide are sufficient.

168.     Despite PCC's guarantee that the marketing claims of Canadian Prescription Drugstore are "truthful and not misleading," and even their claims that Canadian Prescription Drugstore—like all their verified pharmacies—is "reputable" and legitimate, Canadian Prescription Drugstore engages in a practice of misleading consumers about the quality and safety of the medication it is selling, while at the same time, and like PCC, relying on buried, half-hearted

and misleading disclaimers seeking to evade responsibility for the product they are selling, denying they are selling anything at all, and denying that they have any obligations to consumers.

169.     On the face of their website, Canadian Prescription Drugstore tells customers that it provides "Trust, Savings, Safety—Since 2004," and that it has an "industry leading six point guarantee," including a "Safety" guarantee that "Medications [are] dispensed only by fully licensed pharmacists," and a Quality guarantee of "Genuine brand and generic products shipped in original manufacturer's packaging."

170.     They also tell consumers that they are a "pharmacy," they are "one of the oldest and most trusted online pharmacies," and that "our fully licensed pharmacists and pharmacy technicians ensure safe and professional care of your orders."

171.     It is only in tiny, lighter font, appearing below a British Columbia address, that they note that they dispense medication from "pharmacy partners around the world," including India, Turkey, Singapore, and England.

172.     Notably, this list is different from the list of dispensing countries PCC's represents Canadian Prescription Drugstore dispense from on PCC's website. PCC's list includes Mauritius, and does not include England or Singapore.

173.     Canadian Prescription Drugstore also tells consumers that "many legal experts disagree with the FDA's position [that virtually all importation of prescription drugs is a violation of the law] . . . stating that such importation is permitted under certain federal and state laws," and that "[t]he FDA itself provides the public information on how to import medications safely." These statements are false.

174.     In other words, Canadian Prescription Drugstore goes out of its way to make consumers believe that clear law is actually a grey area.  Ironically it does this in hard-to-read grey text on grey background.

175.     Even Canadian Prescription Drugstore's privacy policy is designed to make it seem like all orders come from Canadian pharmacies, stating:

> When you place your order with Canadian Prescription Drugstore, we refer your prescription along with your personal contact information and medical history to our fully licensed Canadian Online Pharmacy for doctor review and dispensing. Under very strict Canadian Online Pharmacy regulations, our pharmacy and doctors are obliged by law to keep your information under confidence, to be used exclusively for the purposes of approval and dispensing of your prescription order.

176.     In its terms of use, Canadian Prescription Drugstore calls itself "an online pharmacy prescription drug service," and asks consumers to verify that they are of age to purchase "Canadian Online Pharmacy Medications."  This language is designed to lead consumers to believe that he or she is: (1) dealing with a pharmacy; and (2) purchasing drugs that are either from Canada or subject to regulation by Canada.  Neither is true.

177.     PCC also describes Canadian Prescription Drugstore as a "pharmacy," requiring that consumers find a hidden link to reveal that they are actually just a pharmacy intermediary. Canadian Prescription Drugstore only discloses in fine print at the bottom of its website to customers linking to its site from PCC that it "is a prescription drug online pharmacy referral service that partners with licensed pharmacies for Canadian Prescriptions."

178.     Upon information and belief, it is unlawful in all or nearly all states in the United States for an entity to hold itself out as a pharmacy when not licensed pursuant to that state's pharmacy regulatory regime.

179.     Like PriceProPharmacy.com, Canadian Prescription Drugstore also "disclaim[s] any representations and warranties of its prescription drugs or Pharmacy services including

medication warranties of merchantability, prescription drug fitness and usefulness for a particular online prescription purpose."

180.     Thus not only does Canadian Prescription Drugstore refuse to stand behind the drugs consumers buy from it despite its so-called "six point guarantee," it also refuses to stand behind any "Pharmacy services" it provides.

181.     In the terms and conditions section it hedges still more, telling consumers that, rather than being a pharmacy or directly providing pharmacy services, it "specializ[es] in the business of assisting pharmacies both within Canada and internationally [to] pursue prescription pharmacy services."

182.     Notwithstanding     PCC's     direct     statement     to     its     customers     that CanadianPrescriptionDrugstore.com is a safe and legal source from which PCC customers can obtain foreign drugs, CanadianPrescriptionDrugstore.com does not even pretend to have a recall policy.  Thus, notwithstanding PCC's representations to consumers that this internet "pharmacy" is safe and legal and PCC linking consumers to make purchases from this affiliated site, a consumer who bought a drug that was the subject of a safety recall would likely never receive notice from either PCC or the affiliated online drug facilitator that the patient was in potentially grave danger.

183.     The bottom line is that consumers really have no idea who they are dealing with when they purchase from this and other affiliates of PCC, which PCC falsely and misleadingly verifies as safe and trusted and then encourages consumers to purchase drugs from them via a direct PCC link.

### III.     PCC's False and Misleading Claims About NABP

184.     Since 1999, with the launch of its VIPPS program, NABP has worked tirelessly to enhance consumer access to safe, legal online pharmacies.

185.    This has meant giving consumers a way to avoid "rogue" pharmacies and bad actors that purport to sell prescription drugs online, but which do not follow the laws of the jurisdictions into which they are selling.

186.    Companies including payment processors and ad-sellers can face significant civil and even criminal liability for connecting consumers to these rogue lawless entities.

187.    As a result, NABP has taken several different approaches to help allow online pharmacy to become a safe, competitive marketplace for law-abiding sellers.  This includes verification of pharmacies that operate safely and lawfully online and a not-recommended sites list to screen out pharmacies and entities that purport to be pharmacies but do not follow the applicable regulatory scheme.

188.    NABP has also worked with a variety of stakeholders and ICANN to create the .pharmacy top-level domain, which is available to any online pharmacy that meets the requirements.

189.    PCC has, through its PharmacyChecker.com and blog sites, maliciously and specifically attacked NABP.  This includes statements that NABP bears responsibility for the opioid crisis or that NABP is responsible for pharmacy errors.  PCC has published numerous direct attacks against the NABP and its programs are false and misleading.  PCC falsely claims or suggests that NABP is a "front group" for "Big Pharma;" that NABP's Not Recommended Sites, VIPPS/Digital Pharmacy Accreditation, and .pharmacy programs are untrustworthy due to unspecified "commercial interests," "industry funding," or even "potential[] pressure from the FDA;" that NABP wrongly conflates rogue pharmacies with "safe" international online pharmacies; that NABP is somehow involved in "backwards partnerships" to "censor" online pharmacies; and that NABP is somehow "endangering patients" and confusing them into

purchasing more counterfeit drugs. These statements falsely undermine NABP's reputation and consumer trust and confidence in NABP's programs, activities, and indeed in the integrity of the organization itself.

190. PCC uses these false claims to drive consumers away from safe domestic pharmacies and towards riskier foreign pharmacies that PCC "verifies."

191. PCC's blog prominently links to PharmacyChecker.com and gives consumers the option to directly search for drug prices via PCC's "accredited" unlawful foreign pharmacy intermediaries. PharmacyChecker.com similarly links to and maintains a dedicated page for "Blog News," providing an up-to-date list of blog entries and links to the entries. PharmacyChecker.com and PCC's blog are one and the same—merely different pages of PCC's web presence, which is singularly devoted to commercially exploiting U.S. consumers unlawful importation of drugs.

192. PCC has used its blog to make false, misleading, and disparaging statements about NABP while guiding consumers to purchase drugs via PharmacyChecker.com.

193. For example, on June 4, 2020, PCC published a post titled "NABP and Opioid Death in the U.S." claiming that NABP and its accredited pharmacies "are complicit in the deaths of hundreds of thousands of Americans from opioid drugs" and that NABP "ignored the opioid crisis." It also claims that NABP was somehow complicit by association with wholesale distributors for their alleged role in the opioid crisis because of NABP's alleged deficient wholesaler accreditation programs. These allegations and implications are scurrilous and false. Statements like these are very damaging to a non-profit organization whose mission includes devotion to fostering patient safety.

194.     PCC also claimed, on February 7, 2020, that NABP "isn't paying much attention to medication errors at U.S. pharmacies" and implying that NABP and verified pharmacies are not protecting public health and failing to catch medication errors.

195.     On July 24, 2019, PCC called its verification tool "a critical alternative to the National Association of Boards of Pharmacy (NABP) dot pharmacy (.pharmacy) program, which was funded by pharmaceutical companies and excludes safe international online pharmacies." "[T]he NABP and other groups funded by drug companies engage in public information campaigns scaring Americans against buying lower-cost medicine online from another country."

196.     Like the others, PCC's post was surrounded by links enabling and encouraging patients to purchase and import foreign drugs through PCC and its accredited sites.

197.     PCC has also repeatedly attacked the integrity of NABP's VIPPS/Digital Pharmacy Accreditation program, NABP's Not Recommended Sites list, and the NABP organization itself, while promoting its own programs and services.  As described above, PCC's "verification" is fundamentally different from the services offered by NABP, but PCC uses misleading statements to make consumers wrongly believe that they are comparable.  PCC accredits international pharmacies without any guarantees that these pharmacies comply with the laws of the jurisdictions they are selling from or selling into.  NABP through its VIPPS/Digital Pharmacy Accreditation Program only accredits domestic pharmacies and requires that—among other things—these pharmacies be in compliance with any applicable state and federal law.

198.     On the PCC page titled "Consumer Safety Guide to Online Pharmacies," PCC states that, "[i]n the case of the NABP ... programs – safe international online pharmacies are wrongly viewed as 'rogue' or 'unapproved' – we believe due to commercial interests of U.S. pharmacies, pharmaceutical industry funding, and potentially pressure from the FDA."

199.     A PCC blog post from August 16, 2019 discussing PCC's lawsuit against NABP and other co-defendants bears the title, "PharmacyChecker vs. Big Pharma Front Groups and Allies."

200.     A PCC blog post from July 26, 2019 calls for consumers to "Verify Online Pharmacies if Going International with PharmacyChecker Alternative to NABP's Program."  In this post, PCC states: "NABP-approved pharmacy sites are too expensive for so many. Folks need an alternative to this pharmaceutical industry-funded program."

201.     PCC further states that "[u]nfortunately, the NABP's initiative might confuse consumers about online pharmacy safety and affordability."  PCC then tells consumers, "For those who need the international pharmacy option, Americans can count on PharmacyChecker.com."

202.     A PCC blog post from April. 25, 2019 titled "Do Google & Bing censor online pharmacy search results? Pharmaceutical companies have called for censorship" claims that Google and Bing rely on NABP's Not Recommended Sites and .pharmacy program to perpetrate the so-called "censorship" against "online pharmacies."

203.     A February 6, 2019 PCC blog entry contains the section heading, in large font, "Bing's Backwards Partnership with the NABP."  PCC states:

> [T]he NABP's NRL also includes safe international online pharmacies that are accredited and monitored by PharmacyChecker, and there are still countless rogue websites that are not on their list.  The result: when people search Bing looking to buy medicine online, they are warned against buying from sites that are proven to sell real, lawfully-manufactured medicines and end up buying counterfeit drugs from a rogue site that lacks Bing's warning. (emphasis in original).

204.     PCC also stated: "Bing's System Encourages People to Order Counterfeit Medications."  This section claims that Bing's "system" "scare[] [patients] away from online pharmacies that can help them and into the arms of a rogue online pharmacy."  The section goes on to state, "[t]he head of the NABP, Carmen Catizone, should know that this is wrong and

endangering patients." PCC's statements that NABP and it's then Executive Director are complicit in encouraging consumers to buy counterfeit medications and scaring consumers to rouge pharmacies is false and misleading and injurious to NABP.

205. PCC has also made efforts to spread misinformation in the ICANN ecosystem both about NABP and about importation. For example, PCC funds the Prescription Justice Institute ("PJI"), which recently put out what it calls the "Brussels Principles." In creating these Principles, PJI claimed that it worked with "companies, internet policy experts, NGOs, and Trade Associations," and that they want to deter "dangerous rogue online 'pharmacies.'"

206. Upon information and belief, PCC has made overt and hidden efforts to harm NABP's reputation within the ICANN ecosystem. For example, PCC recently attacked NABP in a discussion of .pharmacy falsely claiming that "NABP and other groups funded by drug companies engage in public information campaigns scaring Americans against buying lower-cost medicine online from another country." The article also claims that NABP's administration of the domain excludes "safe international online pharmacies, including licensed Canadian pharmacies, that sell to Americans." As explained above, PCC's claims that international online pharmacies—particularly the pharmacies it verifies—are safe or "licensed" are misleading.

207. These attacks can be particularly harmful because ICANN is an international organization; its constituents, members, and leadership are often not familiar with laws regarding the practice of pharmacy or importation. ICANN is an internet-infrastructure-focused organization, not a pharmacy-focused organization. Educating these members in spite of a constant onslaught of misleading claims from PCC and its allies costs NABP both time and money.

208. NABP has had to divert resources to countering PCC's false narratives that its so-called "verified" pharmacies are "safe," "trusted," "technically legal," or that individual consumers

will not face sanction for unlawful importation. NABP has also had to divert resources to countering PCC's false attacks against NABP.

209. For example, each and every so-called "pharmacy-intermediary" that PCC has verified is on NABP's not-recommended sites list. These intermediaries sell and/or process payments for drugs that are dispensed at non-FDA regulated drugs from undisclosed dispensaries all over the world with pharmacy standards that are different from the U.S. and jurisdictions like Mauritius, Barbados, Turkey, and India where pharmacy standards (and export standards in particular) fall well short of U.S. standards. They squarely fit within the criteria for NABP's not-recommended sites list because they sell pharmaceuticals in a manner not consistent with state and/or federal law, and/or clearly inconsistent with NABP's standards.

210. The conduct and statements alleged herein are not an exhaustive list—PCC has engaged in similarly false, misleading, and deceptive acts throughout its existence, including making similarly false and misleading statements throughout its website, blog, and elsewhere.

## IV. Harm to NABP

211. NABP has been harmed by both PCC's false and misleading claims to consumers described above, and PCC's false and misleading claims about NABP.

212. First, NABP has had to divert resources from its core mission as a non-profit to respond to false, misleading, and scurrilous attacks from PCC both before and increasingly after the decision to add PCC to the not-recommended sites list.

213. For example, NABP has had to employ a consulting firm to help navigate the ICANN ecosystem. As part of that effort, the firm has, on NABP's behalf, had to respond or escalate to NABP both direct and indirect attacks on NABP from PCC, which costs NABP both time and money. NABP is a non-profit, and this resource diversion has harmed and continues to harm NABP's ability to carry out its core public health protection mission.

214.     Second, NABP has had to respond to claims from consumers who have been misled by PCC, some of whom reached out directly to NABP.  For example, NABP has had to respond to an inquiry from a physician about a website that was unlawfully selling pharmaceuticals into the United States and which had been "verified" by PCC.

215.     NABP staff typically devote resources almost every week responding to questions that—upon information and belief—arise out of misleading information from PCC.

216.     Third, NABP was forced to devote a significant amount of staff and contractor time—dozens of person-hours—and other resources to determining whether PCC itself violated NABP policies—and possibly state or federal law relating to the sale and dispensing of prescription drugs (including aiding and abetting violations of the FDCA or conspiracy to violate the FDCA).

217.     Consumers are harmed by false beliefs about the allowability and legality of importation; not only do they risk prosecution—or at least law enforcement contact—but there is a serious risk that their medication will be confiscated or delayed at the border (leaving them out the purchase price or forcing them to go without) or that they will receive medication that is different from the FDA-approved equivalent, has lost potency due to improper handling or storage, or was improperly dispensed by a someone other than a pharmacist licensed in the relevant jurisdiction applying different standards and applying different rules.

218.     NABP has had to devote a considerable amount of time and resources fighting these pernicious myths from PCC and directing consumers to sites that conduct pharmacy safely.  For example, its staff and consultants spent a significant number of person-hours preparing and sending a staff member to Berlin to attend the Internet Governance Forum to respond to PCC's

false and misleading claims about online pharmacy in and in conjunction with the PCC-backed "Brussels Principles."

219. PCC's efforts have also undercut efforts by NABP to create a marketplace for safe, lawful, legitimate online pharmacy.

220. The internet can be the wild west. Individuals and companies can mask their identities and fleece consumers for various ends, ranging from brazen or subtle scams, gathering of personal information, to selling consumers products that are not what they purport to be.

221. There are thousands of bad actors on the internet that purport to be pharmacies that are not licensed, or that dispense unregulated drugs, or that even dispense without the legal right to dispense to the consumers that they are targeting.

222. It was not a foregone conclusion that a marketplace for safe, legal, legitimate online pharmacy could exist in this environment.

223. NABP has made it its mission to create a market for online pharmacy by giving consumers tools to differentiate legitimate online pharmacies that can lawfully sell to them and other websites that purport to be pharmacies but that do not comply with the laws and rules applicable to pharmacies.

224. PCC's pernicious business model, and the false and misleading statements it makes to support its business model, threaten both the very existence of a legitimate market for online pharmacy and NABP's work to create that market.

225. PCC built its business model around blurring the line and misleading consumers about the difference between safe, lawful online pharmacies and websites that purport to be pharmacies but pick and choose which aspects of pharmacy and pharmaceutical regulation that they comply with.

226. NABP has had to devote time and money to correct consumer misapprehensions caused by PharmacyChecker, and to protect the very existence of a legal, safe marketplace for online pharmacy.

227. This includes, among other things, a considerable expenditure of resources surrounding the decision to add PharmacyChecker.com to the Not Recommended Sites list. This effort took a significant number of person-hours.

228. NABP has also had to devote employee time reviewing websites that PCC has verified as part of its broader effort to maintain the Not-Recommended Sites list. This includes sites like Planet Drugs Direct, which is the subject of a recent FDA import alert.

229. For these reasons and others, NABP has been harmed in its business and reputation by the actions of PCC.

## First Counterclaim
## (Violation of the Lanham Act)

230. Counterclaim-Plaintiff realleges by reference the counterclaim allegations in Paragraphs 1 through 229 above.

231. Section 43(a) of the Lanham Act provides in relevant part that "Any person who… in connection with any goods or services. . . uses in commerce. . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which – (A) is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods or serves by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C.A. § 1125(a).

232. Counterclaim-Defendant's conduct, described above, in making false, disparaging, and misleading statements about the National Association of Boards of Pharmacy constitutes product disparagement and false advertising. The advertisements and promotional activities—in the forms of statements made to the media, statements made to the public, and articles published on defendant's website and blog are likely to mislead, or have misled, consumers as to the nature, quality, and characteristics of the services authorized by NABP—specifically the safety, scrupulousness, and legality of NABP's VIPPs/Digital Pharmacy Accreditation program and of pharmacies verified pursuant to that program.

233. Counterclaim-Defendant's statements constitute advertising and promotion; they are not mere policy advocacy. Among other things, PCC's blog includes a prominent link in the top corner to PharmacyChecker.com, as well a search box that invites consumers to 'find Low Drug Prices from Verified Pharmacies' and a search box inviting consumers to "Type name of drug." The search takes consumers to almost exclusively foreign pharmacy results provided by PharmacyChecker.com. PharmacyChecker.com receives listing fees from all the PharmacyChecker "accredited" or "verified" "pharmacies" listed on its website and which appear in the search results when consumers use the search box.

234. Counterclaim-Defendant's statements and commercial efforts are likely to cause, and have caused consumers to believe that NABP is indifferent to and complicit in the opioid crisis, that NABP is part of an effort to "scare" patients away from affordable medication, that NABP has independently made a policy choice to exclude "safe international online pharmacies" from selling into the United States.

235. PCC's conduct, described above, constitute false and misleading descriptions of fact and false and misleading representations about the nature, characteristics, quality, and

geographic origin of the goods and services provided by PCC and the affiliated drug suppliers that PC claims to "verify." Specifically, PCC makes an affirmative effort to mislead ordinary consumers about the legality of personal importation, about the origin of pharmaceuticals sold by its so-called "verified" pharmacies, about the regulatory status of the pharmaceuticals sold by foreign pharmacies, about the origin of goods sold by foreign pharmacies and equivalence to FDA-regulated pharmaceuticals, and about the origin and equivalence of pharmaceuticals sold by domestic pharmacies to non-FDA-regulated foreign pharmaceuticals.

236. Counterclaim-Defendant's statements and commercial efforts about the legality of drugs sold by its foreign but verified pharmacies can and do mislead consumers about the safety of drugs sold through those pharmacies, the regulatory status of drugs sold through those pharmacies, and even the origin of drugs sold through those pharmacies. PCC-verified "Your Canada Drug Store," for example, dispenses pharmaceuticals from, among other places, India, Mauritius, New Zealand, and Turkey. "Canadian Prescription Drugstore" will not ship drugs to Canada. In addition, while it may be true that private citizens are not ordinarily charged for importing drugs, it is misleading to state that these individuals "are not pursued or prosecuted." Consumers are also misled into believing, for example, that drugs from Mauritius are subject to the same regulatory rigors as drugs from Canada, or that drugs from Canada are the same as drugs sold in the U.S. Even the idea that consumers can identify and compare "verified pharmacies" on PCC's website is misleading. Consumers must click through at least three web pages to learn that all of the so-called Pharmacies on PCC's list of "Accredited Canadian and International Online Pharmacies" are in-fact "Pharmacy-Intermediaries" and not Pharmacies at all. The names and licenses of every single "Verified Dispensing Pharmacies" are hidden from consumers.

237. Defendant's use of the terms "Verified" and "Accredited" are likely to cause confusion among consumers who may believe that these pharmacies are operating lawfully. Consumers must scroll to the bottom of the page to find a hidden-by-default disclaimer that claims first that Ordering Medication from online pharmacies is legal, but then that it is "technically not legal" for individuals to import prescription drugs. Further, PCC claims that all its verified pharmacies have orders reviewed by a "licensed pharmacist and dispensed from a licensed pharmacy," obfuscating who licenses these pharmacies and pharmacists and what they are licensed to do—in almost no cases are they licensed in accordance with state and federal law to dispense prescription drugs to U.S. Consumers.

238. The nature, quality, and characteristics of online pharmacy and of NABP and PCC are material to the purchasing public. PCC's false and misleading advertising is likely to, and indeed has, influenced consumer purchasing decisions. PCC has misled consumers into making purchasing decisions that expose themselves to significant legal and safety risks.

239. Consumers have also been misled about the potential savings they would receive from purchasing their medications through PCC which would influence their purchasing decisions.

240. NABP has been forced to divert staff time and limited non-profit resources to respond to and counter the false advertisements of PCC about NABP itself, about the safety and legality of personal importation, about the (lack of) equivalence of FDA-approved drugs and non-approved or misbranded foreign drugs, and about the safety and legality of pharmacy-checker's so-called verified pharmacies. This includes time responding to consumer inquiries; working with ICANN consultants to respond to false and misleading statements by PCC and its allies, and even maintaining its "not-recommended sites" list and related literature to explain to consumers the

danger of purchasing drugs via sites like PharmacyChecker.com or its so-called "verified" pharmacies.

241.    Despite the fact that NABP and PharmacyChecker have fundamentally different missions, engage in fundamentally different activities, and offer fundamentally different products and services, PharmacyChecker's false and misleading statements have harmed NABP's commercial and reputational interests.  NABP is engaged in—among other things—making safe, lawful online pharmacy available to consumers, creating the circumstances in which a true competitive online pharmacy market can thrive.  Nevertheless, NABP has been injured in its commercial interest in its reputation—and more broadly, as PCC has limited the upside of lawful online pharmacy to brick-and-mortar pharmacists, since they may be undercut by rogue foreign actors who do not play by the rules.  NABP is thus in the class of persons Congress sought to protect and did protect with the Lanham Act from the scurrilous conduct of PCC.

242.    Due to Counterclaim-Defendants' unlawful acts and statements, NABP has suffered and will continue to suffer damage, including damage to its reputation, business, and good will.

243.    Counterclaim-Defendant's conduct has caused, and, if not enjoined, will continue to cause immediate and irreparable damage to Counterclaim-Plaintiff's rights, business, reputation, and good will in a manner that cannot be adequately calculated or compensated with money damages alone.

244.    Due to Counterclaim-Defendant's violations of the Lanham Act, Counterclaim-Plaintiff is entitled to injunctive relief, actual, compensatory, punitive, and statutory damages in an amount to be determined at trial, disgorgement of Counterclaim-Defendants' profits, attorneys'

fees, costs, and disbursements, and any other harms the court may assess pursuant to—among others—15 U.S.C. §§ 1116 and 1117(a).

**Second Counterclaim**
**(Deceptive Acts and Practices in Violation of**
**New York General Business Law §§ 349 and 350)**

245.     Counterclaim-Plaintiff realleges by reference the counterclaim allegations in Paragraphs 1 through 244 above.

246.     Counterclaim-Defendant has made false and misleading statements about the nature, quality, and characteristics of NABP, as well as the nature, quality and characteristics of the "verification" and "accreditation" services it provides.

247.     These misrepresentations by Counterclaim-Defendant were made with the express intention of confusing, misleading, and deceiving members of the public into believing that: (1) its verified pharmacy intermediaries and their dispensaries are safe, trusted, and the equivalent of regulated U.S. pharmacies selling FDA-regulated drugs; (2) NABP is a shill for "big pharma" and indifferent to or neglectful of the genuine safety requirements of pharmacy and the needs of consumers; and (3) that NABP is otherwise disreputable or untrustworthy.  Indeed, PCC represents to the public that NABP has been complicit in the opioid crisis and responsible for the deaths of thousands of Americans.

248.     The nature, quality, and characteristics of online pharmacy and of NABP and PCC are material to the purchasing public.  PCC's deceptive acts are likely to mislead reasonable consumers acting reasonably under the circumstances into adopting false and dangerous beliefs about the safety and legality of purchasing or importing medication online.  These deceptive acts are likely to mislead, and have misled, reasonable consumers into making purchasing decisions that expose themselves to significant legal and safety risks.  These deceptive acts are also likely to

mislead reasonable consumers about the potential savings they would receive from purchasing their medications through PCC.

249.     Upon information and belief, PCC's misleading statements and misrepresentations are willful and knowing, and constitute wrongful conduct under the New York General Business Law §§ 349-350.

250.     Counterclaim-Plaintiff has been harmed and will continue to be harmed by Counterclaim-Defendant's acts and practices unless Counterclaim-Defendant is restrained.

251.     Consumers and the general public have also been harmed and will continue to be harmed by Counterclaim-Defendant's acts and practices unless Counterclaim-Defendant is restrained.  PCC's deceptive acts are consumer-oriented and harm the public interest in New York.

252.     Counterclaim-Plaintiff does not have an adequate remedy at law.

253.     Counterclaim-Plaintiff has suffered damages proximately caused by Counterclaim-Defendant and is entitled to injunctive relief, actual, compensatory, and punitive damages in an amount to be determined at trial, disgorgement of Counterclaim-Defendant's profits, attorneys' fees, costs, and disbursements.

**Third Counterclaim**
**(Violation of the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3904)**

254.     Counterclaim-Plaintiff realleges by reference the counterclaim allegations in Paragraphs 1 through 253 above.

255.     Counterclaim-Defendant has engaged in unfair or deceptive trade practices in violation of D.C. Code § 28-3904, including to:

> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

> (b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have;

(d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(e-1) Represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(f) fail to state a material fact if such failure tends to mislead;

(f-1) Use innuendo or ambiguity as to a material fact, which has a tendency to mislead; and

(g) disparage the goods, services, or business of another by false or misleading representations of material facts.

256.     Counterclaim-Plaintiff brings its claims on behalf of itself and the consumers and general public of the District of Columbia under D.C. Code § 28-3905(k)(1)(A)-(D).

257.     Among other things, Counterclaim-Defendant has made false and misleading statements about the nature, quality, and characteristics of NABP, as well as the nature, quality and characteristics of the "verification" and "accreditation" services it provides.

258.     These misrepresentations by Counterclaim-Defendant were made with the express intention of confusing, misleading, and deceiving members of the public into believing that:  (1) PCC's verified pharmacy intermediaries and their dispensaries are safe, trusted, and the equivalent of regulated U.S. pharmacies selling FDA-regulated drugs; (2) NABP is a shill for "big pharma" and indifferent to or neglectful of the genuine safety requirements of pharmacy and the needs of consumers; (3) that NABP is otherwise disreputable or untrustworthy.

259.     Counterclaim-Defendant has also failed to give consumers material information about the legality and quality of unlawfully imported drugs available through PCC's pharmacy intermediaries.

260. PCC has also represented that transacting with these pharmacy intermediaries will give consumers rights to goods, even though the right to those goods is prohibited by law—namely unlawfully imported, non-approved, and mislabeled foreign pharmaceuticals.

261. The nature, quality, and characteristics of online pharmacy and of NABP and PCC are material to the purchasing public.

262. Counterclaim-plaintiff does not have an adequate remedy at law.

263. Counterclaim-Plaintiff has suffered damages proximately caused by Counterclaim-Defendant and is entitled to injunctive relief, actual, compensatory, and punitive damages in an amount to be determined at trial, disgorgement of Counterclaim-Defendant's profits, attorneys' fees, costs, and disbursements.

## REQUEST FOR RELIEF

WHEREFORE, NABP requests that this Court:

A. Enter judgment against Counterclaim-Defendant;

B. Declare that Counterclaim-Defendant's conduct violates 15 U.S.C. § 1125(a);

C. Declare that Counterclaim-Defendant's conduct violates N.Y. Gen. Bus. Law §§ 349 and 350;

D. Declare that Counterclaim-Defendant's conduct violates D.C. Code §§ 28-3901 through 28-3913;

E. Enjoin Counterclaim-Defendant from continuing their unlawful acts;

F. Award NABP compensatory damages under 15 U.S.C. § 1125(a);

G. Award NABP its costs and expenses of this action, including reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 1117(a);

H.    Award NABP compensatory damages and reasonable attorney's fees, as provided in N.Y. Gen. Bus. Law §§ 349(h) and 350-e(3);

I.    Award NABP compensatory and punitive damages, and reasonable attorney's fees, as provided in D.C. Code § 28-3905(k)(2);

J.    Award NABP pre- and post- judgment interest at the applicable rates on all amounts awarded;

K.    Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in these Counterclaims; and

L.    Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Counterclaim-Plaintiff hereby demands a trial by jury on all claims.

Respectfully submitted,

Dated: May 11, 2021
Washington, D.C.

/s/ Erik T. Koons
Erik T. Koons (*pro hac vice*)
Jana I. Seidl (*pro hac vice*)
Timothy P. Singer (*pro hac vice*)
Baker Botts L.L. P.
700 K St. NW
Washington, DC 20001
Telephone: (202) 639-7973
Facsimile: (202) 585-1086
erik.koons@bakerbotts.com
jana.seidl@bakerbotts.com
timothy.singer@bakerbotts.com

*Counsel for Defendant National Association of Boards of Pharmacy*