UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PharmacyChecker.com LLC,

                    *Plaintiff*,

          vs.

National Association of Boards of
Pharmacy et al.,

                    *Defendants*.

Civil Action No. 7:19-cv-07577-KMK

**Plaintiff's Local Rule 56.1
Statement of Material Facts in
Opposition Defendants' Motion for
Summary Judgment**

Judge Kenneth M. Karas
Magistrate Judge Paul E. Davison

Plaintiff submits the following response to defendants' statement of material facts under Local Rule 56.1 in support of its opposition to defendants' motion for summary judgment.

## PRELIMINARY STATEMENT AND OBJECTIONS

On summary judgment, statements of fact—whether in an affidavit or Rule 56.1 statement—must be based on personal knowledge, supported by admissible evidence, and non-conclusory. *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002); Fed. R. Civ. P. 56(e); Local Rule 56.1. The Court should strike and disregard statements that "couch legal argument and analysis as fact and offer legal conclusions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 71 (2d Cir. 2001). *DeSio v. Singh*, No. 19 Civ. 3954 (JCM), 2021 WL 4449314, at *9 (S.D.N.Y. Sept. 28, 2021); *see also Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK), 2015 U.S. Dist. LEXIS 133650, at *60 (S.D.N.Y. Sep. 30, 2015) (Karas, J.) (legal assertions in Local Rule 56.1 statements or declarations "not entitled to any weight and [are] therefore disregarded").

Supporting documents that are unauthenticated, lacking in foundation or inadmissible hearsay should be stricken and disregarded as well. *See Degelman Indus. v. Pro-Tech Welding & Fabrication, Inc.*, No. 06-cv-6346, 2011 U.S. Dist. LEXIS 155984, at *6–7 (W.D.N.Y. May 31, 2011) (citing *Dedyo v. Baker Eng'g N.Y., Inc.*, No. 96 Civ. 7152, 1998 U.S. Dist. LEXIS 132, at *12–13 (S.D.N.Y. Jan. 13, 1998) ("[A] motion to strike is appropriate if documents or affidavits submitted in support

of a motion for summary judgment contain inadmissible hearsay, conclusory or incomplete statements, or evidence that has not been properly authenticated.").

Finally, the vast majority of defendants' massive evidentiary submission is irrelevant and unnecessary assuming the Court adopts the Second Circuit's standard for removing standing as set forth in defendants' briefing on summary judgment. Pl.'s Opp'n to Defs.' Joint Mot. for Summ. J. on Sherman Act § 1 Claim at 12-14. For brevity, plaintiff asserts this general objection to defendants' entire submission here rather than stating it individually statement by statement below.[1]

## I. Plaintiff PharmacyChecker.Com

1. The "primary reason" PCC provides information to U.S. consumers about international pharmacies selling into the U.S. is "to facilitate [the] purchase" of drugs from those pharmacies. DX 1, PI Hr'g Tr. 65:11–66:4.

**Plaintiff's Response:** Statement 1 is not supported by admissible evidence and is legal conclusion couched as fact. The excerpted portion of DX 2 is lawyer's argument, which should be disregarded and stricken because it is not a judicial admission and not admissible as evidence.

In any event, the statement is disputed. Plaintiff provides comparative drug pricing information and information about safe online pharmacies worldwide to visitors of its website worldwide. *See* Decl. of Gabriel Levitt ("Levitt Decl.") ¶ 3; *see*

---

1. Moreover, since plaintiff could not possibly identify each and every basis for objecting to defendants' 56.1 statement and accompanying evidentiary submission, plaintiff does not waive, but rather reserves, the right to assert such objections beyond phase 1 summary judgment.

*also* PX 2 (Google Analytics: Website User Locations); *cf.* Levitt Decl. ¶ 4. From plaintiff's formation in the early 2000s, plaintiff's central objective has been to examine the qualifications (i.e., practice and safety standards) of online pharmacies wherever they might be to provide worldwide visitors with information "to make good choices, [to] be safe, and … to get medication most affordably." *See* PX 9 (Tod Cooperman Deposition) 28:4–29:3.

## II. Personal Importation of Prescription Drugs

2.     PCC admits that personal importation of prescription drugs by U.S. consumers from foreign online pharmacies is illegal. DX 2, PCC_0384682 ("████████████████████ ████████████████████████████████████████████); DX 3, PCC_0161807 ("████████████████████████████████████████████ ██████████████████").

**Plaintiff's Response:** Statement 2 should be stricken because it is not supported by admissible evidence and because it is legal conclusion couched as fact. DX 2 and DX 3 should be disregarded as unauthenticated, lacking foundation and inadmissible hearsay as defendants intend to use them.

In any event, the statement is disputed.  As the FDA's website states: "In ***most*** circumstances, it is illegal for individuals to import drugs or devices into the U.S. for personal use because these products purchased from other countries ***often*** have not been approved by the FDA for use and sale in the U.S." *See* PX 3 (www.fda.gov/about-fda/fda-basics/it-legal-me-personally-import-drugs).  Drugs that are approved and properly labeled are legal to import. *See* PX 4 (Benjamin England Expert Report) at 13. Drugs that are approved but misbranded are legal to import if the requirements

for an exemption are met. *See* PX 4 at 13. Drugs that are not approved are permitted if they meet the requirements of the FDA's Personal Importation Policy. *See* PX 4 at 3–14; *see also* PX 5 (FDA Personal Importation Policy–www.fda.gov/industry/import-basics/ personal-importation); *see also* PX 38 (Congressional Research Service Report: Prescription Drug Importation).

3.      PCC admits that "████████████████████████████████████" DX 4, PCC_0229364; *see also* DX 5, PCC_0155279 (admitting that "██████ ███████████████████████████████████"); DX 6, Cooperman Dep. Ex. 3 (In response to "Is it legal to order prescription drugs online?" PCC website answers: "Some regulatory bodies, including the Food and Drug Administration (FDA), refer to such pharmacies as 'illegal' or 'fake' but such distinctions can mislead consumers and impede their access to affordable, safe and effective medication that they cannot obtain locally due to high U.S. drug prices."). PCC's expert admits that the Secretary of HHS has never implemented statutory provisions that would allow for personal importation, and he was unaware of any law that would permit U.S. consumers to import prescription drugs from any PCC accredited foreign pharmacies. *See* DX 7, England Dep. Tr. 179:9–18 ("Q: The secretary has never certified to Congress…the implementation of…Subsection J of [21 U.S.C. 4 §384]…correct? A: "I'm not aware that they have. I don't believe they have."); DX 8, England Dep. Ex. 4 (text of 21 U.S.C.A. § 384, which does not provide an exception allowing U.S. consumers to import foreign drugs for personal use.). PCC's expert tries to rely on the "pharmacist's

exception" to support unlawful personal importation. DX 9, England Report at 9; DX 7, England Dep. Tr. 297:20–298:21.

**Plaintiff's Response:** Statement 3 should be stricken because it is not supported by admissible evidence and is legal conclusion couched as fact. DX 4 and DX 5 should be stricken as unauthenticated, lacking in foundation and inadmissible hearsay. DX 5 does not support the proposition that plaintiff admits that buying prescription drugs internationally is "prohibited." The document says "restricted."

DX6 does not support statement 3 because the excerpt that defendants cite concerns pharmacies operating internationally—not legal importation. The document excerpt that does address legal importation says that importation for personal use is prohibited in "***most***"—but not all—circumstances.

As for DX 7, defendants assert that plaintiff's expert Benjamin England testified that the Secretary of Health & Human Services has not effectuated the statutory provision that allows personal importation of prescription drugs, and that Mr. England is unaware of any law permitting U.S. consumers to import prescription drugs legally. Those representations should be stricken as grossly inaccurate and misleading. Mr. England's testimony is that the statutory provision codifying the FDA guidance for legally importing prescription drugs for personal use (called "PIP") does not require the Secretary's certification to be effective, and that PIP is only one of the various ways in which prescription drugs may be imported legally. *See* PX 6 (Benjamin England Deposition) 179:3–180:11. Mr. England's report specifically sets

forth each of the statutory provisions and regulations under which prescription importation is legal.

Similarly, defendants claim as fact that Mr. England "tries to rely" on the "pharmacist's exception" to support legal importation is misleading. Mr. England's testimony is that prescription drugs can be lawfully imported in a number of ways—not only through so-called "pharmacist's exception." *See e.g.,* PX 4 at 5.

In any event, the statement is disputed. *See* PSOF ¶ 2.

4.      Both of PCC's founders testified that personal importation of prescription drugs is "technically" illegal under most circumstances. *See* DX 10, PCC 30(b)(6) Dep. Tr. 70:12–17 ("[U]nder most circumstances personal importation of prescription drugs is federally prohibited, but individuals are not prosecuted for personally importing prescription drugs), 79:5–9 ("Under most circumstances it's technically illegal to personally import prescription drugs, that's to give the people who come to our website clarity that there is this – that there is this law."); DX 11, Cooperman Dep. Tr. 215:4–14 (agreeing with statement in DX 12, Cooperman Dep. Ex. 11, that "Importing medication for personal use in the U.S. remains technically illegal under most circumstances."); *see also* DX 2, PCC_0384682 ("▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨").

**Plaintiff's Response: Undisputed**. However, the statement should be stricken because it is a legal conclusion couched as fact. DX 2 should be disregarded as unauthenticated, lacking in foundation and inadmissible hearsay.

5.     PCC admits that "████████████████████████████████████████████████████████████████████████████████████████" for importing prescription drugs, PCC_0227629.

**Plaintiff's Response:** The statement should be stricken because it is not supported by admissible evidence. DX 13 should be disregarded as unauthenticated, lacking in foundation and inadmissible hearsay.

In any event, the statement is disputed because it is overbroad and therefore misleading. *See* PSOF ¶ 2.

6.     PCC has admitted that "due to our government's actions, pharmacies in countries like Canada are not even permitted to advertise on search engines like Google to Americans." DX 14, Cooperman Dep. Ex. 8.

**Plaintiff's Response:**   The statement should be stricken because it is irrelevant and not supported by admissible evidence. The excerpted portion of DX 14 lacks foundation and is inadmissible hearsay as defendants intend to use it. It is Mr. Cooperman's commentary and not a company admission.

In any event, the statement is disputed because it is misleading. In 2011, Google agreed to pay $500 million in a non-prosecution agreement with the U.S. Department of Justice/Food and Drug Administration "for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States." *See* PX 36 (DOJ Press Release: "Google Forfeits $500 Million Generated by Online Ads & Prescription Drug

Sales by Canadian Online Pharmacies") at 1; *see also* PX 37 (Google Non-Prosecution Agreement).

7.      Indeed, in 2011 Google agreed to a $500 million penalty to resolve a DOJ and FDA investigation "for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States." See DX 15, Press Release, U.S. Dept. of Justice, Google Forfeits $500 Million Generated by Online Ads & Prescription Drug Sales by Canadian Online Pharmacies (Aug. 24, 2011), https://justice.gov/opa/pr/google-forfeits-500-million-generated-online-ads-prescription-drug-sales-canadian-online. The agencies took the position that Google knew and assisted in (i.e., facilitated) unlawful importation—it knew that "U.S. consumers were making online purchases of prescription drugs" from outside the U.S. and "provided customer support to [online foreign pharmacies] in improving the effectives of their websites" to reach U.S. consumers. *Id*. DOJ emphasized that "The importation of prescription drugs to consumers in the United States is almost always unlawful because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved because the drugs may not meet FDA's labeling requirements; may not have been manufactured, stored and distributed under proper conditions; and may not have been dispensed in accordance with a valid prescription." *Id*.

**Plaintiff's Response:   Undisputed**. However, the statement should be

stricken as irrelevant.

### III. Facts Relating to Plaintiff's Business Model

8.     More than ▨▨ of PCC's revenue from January 2015 through August 2021 comes from ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. DX 16, Farrar Report ¶ 14, Table 1 (analysis based on review of PCC_0000058, PCC_0000059, PCC_0000060, PCC_0000061, PCC_0000062, PCC_0000063, PCC_0000064, PCC_0126297, PCC_0323049_PC checking 2017, PCC_0323085_PC checking 2018, PCC_0323120_PC checking 2019, PCC_0323150_PC checking 2020, PCC_0323176_PC checking 2021,PCC_0323188_PC checking jan 2015 to J2021, PCC_0323504_PC check deposited, PCC_0401421, PCC_0401647, PCC_0142956, PCC_0126266, 20210831_579_000000043, 20210831_579_000000046, 20210831_579_000000049, 20210831_579_000000052, 20210831_579_000000055, 20210831_579_000000061, 20210831_579_000000058, 20210831_579-000000004, 20210831_579-000000021, 20210831_579-000000022, 20210831_579-000000027, 20210831_579-000000038, 20210831_579-000000014, 20210831_579-000000015, 20210831_579-000000012, 20210831_579-000000018, 20210831_579-000000019, 20210831_579-000000020).

**Plaintiff's Response:**   Defendants' characterization of the evidence is objectionable because it is not stated in the light most favorable to plaintiff as the

non-movant. Otherwise, the statement is **undisputed.** For completeness, according to Mr. Farrar, approximately ▨ of plaintiff's revenue from January 2015 through August 2021 ▨▨▨▨▨▨ *See* PX 10 (Mark Farrar Deposition Transcript) at 27:4. Approximately ▨ of plaintiff's revenue was for ▨▨▨▨ ▨▨▨▨. *See* PX 11 (Mark Farrar Expert Report) at 6 (Table 1). Mr. Farrar could not link any of plaintiff's revenue to drug transactions. *See* PX 10 at 17:19–18:7. And he did no analysis to determine the amount of revenue resulting from ▨▨▨▨ ▨▨▨▨▨. *See* PX 10 at 30:2–31:6 ("I didn't do any analysis of users of the website.").

9.     At most, . *See* DX 16, Farrar Report ¶¶ 16, 42, Tables 8 and 9.

**Plaintiff's Response:** Defendants' characterization of the evidence is objectionable because it is not stated in the light most favorable to plaintiff as the non-movant. Otherwise, the statement is undisputed. For completeness, approximately ▨ of plaintiff's revenue from January 2015 to August 2021 is from ▨▨▨▨▨▨. *See* PX 11 at 23 (Table 9); *cf.* Levitt Decl. ¶ 43. Plaintiff's revenue from U.S. pharmacies would be significantly higher if U.S. online pharmacies had not been coerced and dissuaded from participating in plaintiff's verification and/or drug price listing programs by defendants. *See, e.g.*, PX 22 ▨▨▨▨▨ email

(Jan. 25, 2017) (█████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████)); *see also* Levitt

Decl. ¶¶ 8–9**.** Indeed, during the relevant period, the number of U.S. based

pharmacies participating in plaintiff's Verification Program dropped from ███████

█████████████. *See* Levitt Decl. ¶ 10.

10.    PCC's other revenue streams, ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████. DX 16, Farrar Report ¶ 14.

**Plaintiff's Response: Undisputed.**

11.    The discount card, an offering that PCC says provides U.S. consumers

with discounts at local pharmacies, ███████████████████████████████

██████████████████████████████████ during the

relevant period. DX 16, Farrar Report ¶ 14. PCC makes little effort to market its U.S.

prescription discount card. *See* DX 17, Cooperman Dep. Ex. 7 ("█████████

██████████████████████████████"). In fact, PCC tells consumers that "██

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████" DX 104,

PCC_0156643.

**Plaintiff's Response:** The portion of statement 11 that plaintiff "makes little effort to market its U.S. prescription drug card" should be stricken as unsupported by admissible evidence. DX 104 should be disregarded as unauthenticated, lacking in foundation and inadmissible hearsay as defendants intend to use it. The quoted excerpt from DX 17 is inadmissible hearsay as defendants seek to use it.

In any event, the statement is disputed. The plaintiff's U.S. prescription drug discount card can be used in the United States to obtain prescription savings at U.S. brick-and-mortar pharmacies. Unlike click-through revenue from online pharmacies, plaintiff earns revenue from the discount card program ▰▰ when (1) a consumer uses the prescription drug discount card at a U.S. pharmacy and (2) saves money. *See* PX 7 (Gabriel Levitt Deposition) at 210:15–23 ("[F]or the discount card to generate revenue for PharmacyChecker a customer needs to both use it and save money? A. Yeah. Q. All right and every time someone successfully uses it and saves money, ▰▰▰▰▰▰▰▰▰? A. Correct.").

Plaintiff promotes the discount card visibly on its website: it is linked in the header of its website along with its verification and comparative pricing information. *See* PX 12 (PharmacyChecker.com Discount Card webpage). The webpage states: "Always show this free U.S. Prescription Discount Card to your local pharmacist to instantly get discounts . . . . [It] provides Americans with significant discounts at all major chains and most independent pharmacies nationwide. PharmacyChecker.com strives to provide comprehensive prescription savings information, which includes discount coupons and cards offered at U.S. pharmacies*."* PX 12.

12

In a May 2019 press release, plaintiff stated that "[e]ighty-eight percent of the top prescribed generics were cheaper in the United States than from Canada," according to its pricing analysis of the "40 most commonly filled generic prescriptions in the U.S. [comparing] U.S. pharmacy prices obtainable with [its] free drug discount card to prices (shipping included) at Canadian and other international pharmacies accredited in the PharmacyChecker Verification Program." *See* PX 13 (Press Release: "Generic Drugs 68% Cheaper in U.S. Than From Canada: U.S. Patients Advised to Look Locally for Generics, Internationally for Brand Name Medications") at 1; *see also* PX 7 at 222:10–22 (Q. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████); PX 9 (Cooperman Tr.) 227:16–20 ("Because we are not always just promoting – you know, we are not just out there to promote things that are going to generate revenue for us.").

12. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ DX 11, Cooperman Dep. Tr. 117:21–118:17; *see also* DX 18, Cooperman Dep. Ex. 4 (████████████████████████ ████████████████████████████████████████



**Plaintiff's Response:** This statement should be stricken because it is not supported by admissible evidence. The excerpted testimony in DX 11 is false and misleading. ▨▨▨▨ was not said or agreed to by the witness—it was a term used only by defendants' lawyer. "▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨" is another statement made at the deposition by defendants' lawyer—it is not witness testimony; rather, the witness's response to the relevant question was "▨▨▨▨▨▨" indicating disagreement with the statement as framed. DX 11 at 117:21–118:17.

In any event, the statement is disputed. One goal of plaintiff's drug price listing program is "▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨" *See* PX 14 (Exhibit 4 to Tod Cooperman Deposition) at PCC_0312293. The listing program also seeks to educate and "help [people] find the lowest prices on prescriptions" regardless of whether they are purchasing them online or locally, domestically or internationally by comparing drug prices from country to country and pharmacy to pharmacy. *See* PX 7 at 33:18–20; *see also* PX 15 (PharmacyChecker.com Drug Price Compare web page). In fact, PCC is well-known and publicly recognized as one of just a handful of companies that provide patients and policy makers with a resource that gives transparency to prescription drug prices in the United States and around the world—offering an understanding of a pharmaceutical industry that charges U.S. patients substantially more than

prescription drug customers in other parts of the world. *See, e.g.*, PX 16 (WSJ Article: "In Defense of Pharmacy Benefit Managers") ("Companies such as GoodRx, *Pharmacy Checker*, and SaveonMeds add transparency to the system and give patients the option to access affordable medication outside their pharmacy benefits.") (emphasis added))**.**

The FDA itself has directed the public to PharmacyChecker.com as a resource providing visitors with real-time comparisons of drug prices listed in the United States and abroad. *See* PX 39 (NBC News Article: "Import drugs may cost more than generics") at 2 ("The FDA also pointed to a Web site – PharmacyChecker.com – that provides consumers with real-time comparisons of drug prices in the United States and abroad.").

Finally, PharmacyChecker.com and PharmacyCheckerBlog.com are recognized internationally as an authoritative resource for information concerning prescription drug prices worldwide. *See* Levitt Decl. ¶ 15.

13.  *See* DX 10, PCC 30(b)(6) Dep. Tr. 200:15–21; *see also* DX 16, Farrar Report ¶ 14, Table 1. Over the relevant time period, DX 19, Kent Amended Report ¶¶ 39–40.

**Plaintiff's Response:** Disputed. As calculated by defendants' expert, Mark Farrar, *See*

PX 11 at 23 (Table 9). These clicks are generated by users worldwide. *See* Levitt Decl. ¶ 3.

14.    PCC's . DX 19, Kent Amended Report ¶ 16.

**Plaintiff's Response:** The statement is disputed as incomplete and therefore misleading. All accredited pharmacies are part of plaintiff's verification program. It is the decision of an accredited pharmacy whether it wants to participate in plaintiff's drug listing program—the listing program is not a requirement to receive accreditation. *See* DX 18 at PCC_0312296 ("The PharmacyChecker Listing Program is only open to online pharmacies, which are approved in the PharmacyChecker Verification Program. However, verified pharmacies are not required to participate in the Listing Program."). Those that do participate in the listing program pay an additional fee. Participating pharmacies then submit their prices for specific drugs to be listed on plaintiff's comparative drug pricing page. *See* PX 19 (PharmacyChecker Listing Program Agreement) § 1.0; *cf.* PX 15.

Plaintiff generates  *See* PX 15; *see* PX 17 (Nathan Walker Deposition) at 43:11–44:11. Levitt Decl. ¶ 18.



PX 17 at 54:2–8.

. *See* PX 17 at 44:24–45:5.

15.    PCC could

").

**Plaintiff's Response:**  Disputed. Plaintiff's business model is based upon its Verification Program and Listing program, which facilitates plaintiff's objectives to educate and "help [people] find the lowest prices on prescriptions" regardless of whether they are purchasing them online or locally, domestically or internationally by comparing drug prices from country to country and pharmacy to pharmacy. *See* PX 7 at 33:18–20; *see also* PX 15; *see also* PX 9 28:4–29:3. Concerning plaintiff's business model, Mr. Cooperman stated in his deposition that the cost-per-click model provided revenue sufficient

*See* PX 9 102:9–14

████████████████████████████████████████████████████

████████████████████████████

16.  PCC ██████████████████████████████████████

██████████████████████████████████████████████. *See* DX 11,

Cooperman Dep. Tr. 106:13–108:13 (███████████████████████

████████████████████████████████████████████████████

██████"); DX 20, Cooperman Dep. Ex. 5 (email from Nathan Walker describing

how PCC's cost-per-click system works); DX 19, Kent Amended Report ¶¶ 52–53

("████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████"); DX 21, Walker Dep. Tr. 40:5–8 ("Q. And

since the time you've been at the company has that bidding process been in place?

Yes."). For example, if a consumer goes to the PCC website and searches for Januvia,

the drug listings—including direct links to the online pharmacy pages where the

consumer can order the drug—are displayed in the order of which pharmacy paid

PCC the most for that listing. *See* image below from DX 22, PharmacyChecker.com,

https://pharmacychecker.com/januvia/#prices.



**Plaintiff's Response:** Defendants' characterization of the excerpted testimony in DX 11 is misleading. The witness did not say "▮▮▮▮▮▮▮▮" defendants' counsel did. The excerpted testimony also lacks foundation as the witness testified various times that he lacked the relevant knowledge to answer counsel's questions as framed.

In any event, the statement is disputed. By default, the drug pricing comparison tool displays the highest and lowest drug price listings at the top. After that, it displays drug prices based on bids from listing pharmacies. Plaintiff accredits pharmacies that meet the standards for its verification program but plaintiff does not measure user ratings, nor does it rank accredited pharmacies. *See* PX 27 (PharmacyChecker.com Verification Program Accreditation Standards and Guide); *see also* PX 35 (PharmacyChecker.com Verification Program Policies).

Plaintiff's Verification Program is similar to those maintained by defendants NABP and LegitScript's—where a pharmacy either meets the requirements for verification or it does not. Levitt Decl. ¶ 21. Only pharmacies that plaintiff verifies can choose to participate in the Listing Program. PX 7 at 198:3–5 ("You just cannot list on our site unless you have been vetted through our accreditation process ever, unequivocally.").

As defendants' internet expert testified, "██████████████████████ ████████████████" PX 18 at 124:16–17.



17.    Pharmacies ████████████████████████████████████ ███████████████████████████████████████████ DX 11, Cooperman Dep. Tr. 106:13–108:13; DX 19, Kent Amended Report ¶ 38 (███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████).

**Plaintiff's Response:** The testimony excerpted from DX 11 lacks foundation. The witness testified various times that he lacked the relevant knowledge to answer counsel's questions as framed. *See, e.g.*, DX 11 107:24–108:2 ("Again, I don't know if it's still that way, could be.").

In any event, the statement is disputed. Pharmacies ████████████████ ██████████████████ in the default view, but the highest and lowest prices are always displayed at the top of the page regardless ██████████████. Additionally, visitors may sort the results by price per pill/unit or by total price, ████████████████ ██████████████████. *See* Levitt Decl. ¶ 22.

18.    PCC's own expert, Benjamin England, ▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨, DX 7, England Dep. Tr. 391:9–11 ("▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨"), and called it "problematic in terms of potential conflict[s]" of interest, as "[o]rdinarily, an accrediting body is not in the business that they are accrediting." *Id*. at 372:12–22.

**Plaintiff's Response:**    The statement should be stricken because it is not supported by admissible evidence and is therefore misleading.    Mr. England's testimony that he "would have – have some concern" came in response to defense counsel's false claim that "revenue records from PharmacyChecker . . . have stated ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨" PX 6 at 390:2–391:11. Plaintiff does not rank or otherwise rate verified pharmacies. *See* Levitt Decl. ¶ 22.

For these reasons, the statement is disputed.

19.    PCC's bidding system is not disclosed to consumers using its website. *See* DX 23, About PharmacyChecker.com, https://www.pharmacychecker.com /aboutus (noting only that "Revenues are derived from fees generated from the PharmacyChecker Verification Program, pharmacy listings, U.S. Prescription Discount Card, and advertising.")

**Plaintiff's Response: Undisputed.** However, the statement is not material because all accredited pharmacies must meet all standards set forth in plaintiff's Verification Program.

20. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *See, e.g.*, DX 24, PCC_0277259

(██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████); DX 25, PCC_0363952 (███████████████████████████████████████

█████████████████████████████████████.

**Plaintiff's Response: Undisputed.** However, the statement is not material.

21.　　At　times,　PCC ████████████████████████████████████

████████████████████████████████████████████, DX 26, PCC_0277520

(██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████).

**Plaintiff's Response: Undisputed.** However, the statement is not material.

## A.  Plaintiff's Revenues

22.　　PCC's records establish that ████████████████████████████

████████████████████████████████████████████████████████████



████ DX 16, Farrar Report ¶¶ 16, 38, 41, Table 9. As with its ████████

**Plaintiff's Response:** Defendants' argumentative characterizations are objectionable ("substantially all," "overwhelming share"), but it is undisputed that ████████████████████████████████████████████████ is attributable ████████████████████████████████████████ ████████████████████████████████████████ is attributable ████████ ████████████████████████████████ DX 16, Farrar Report ¶¶ 16, 38, 41, Table 9. ████████████████████████████████████████ ████. *See* PX 23 (Peter Kent Expert Report (Redline)) at 25–26. ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████. PX 7 at 196:13–21 ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████. One online pharmacy testified that only ████ of paid clicks from

PharmacyChecker.com resulted in a drug transaction. *See* PX 26 58:1–15. Moreover, foreign pharmacies contributed ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████. *See* PX 11 at Table 9; *cf.* Levitt Decl. ¶ 25.

23.    PCC's co-founder Mr. Levitt testified on behalf of the company that ████████████████████████████████████████████████████████████████ *See* DX 10, PCC 30(b)(6) Dep. Tr. 188:6–24, 189:3–11 ("██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.").

**Plaintiff's Response:** The statement is not supported by admissible evidence, as DX 10 does not contain the excerpted testimony. In any case, the statement is undisputed.

24.    ████████████████████████████████████████████████████████████. *See* DX 27, Levitt Dep. Ex. 21; DX 10, PCC 30(b)(6) Dep. Tr. 193:6–14 (discussing Levitt Dep. Ex. 21); DX 21, Walker Dep. Tr. 89:22–90:5 (testifying that "I don't know if in my time here [2018 to 2022] we have ever had a U.S. pharmacy in the listing program"); *see also* DX 16, Farrar Report ¶¶ 16, 42, Tables 8 and 9 (██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████).

**Plaintiff's Response:** Defendants' characterization of the evidence is objectionable ("very few"), and the statement is otherwise disputed. Indeed, Mr. Levitt testified at his deposition that Exhibit 21 was "[a] spreadsheet that shows PharmacyChecker *accredited* companies and fees and dates." *See* PX 7 at 178:21–179:8 (emphasis added). Mr. Levitt offers no testimony that Exhibit 21 correctly or properly reflects reliable information concerning participants of plaintiff's Listing Program. Therefore, the Court should reject Defendants' specific premise and conclusion.

███ U.S. pharmacies **currently** participate in plaintiff's verification program[2]. The number and proportion of U.S. pharmacies previously participating in plaintiff's verification program was much higher. Levitt Decl. ¶ 26**.** Defendants have coerced or dissuaded U.S. pharmacies from participating in PCC's listing program, though the exact number is unknown as plaintiff has not been permitted that discovery. *See* Dkt. 166 ¶5.

For example, in January of 2017, ████████████notified plaintiff that it would no longer be participating in plaintiff's verification program because of threats by NABP that participating in plaintiff's verification program would risk its VIPPS accreditation with NABP. *See* Dkt. 19 (Affidavit of Tod Cooperman) ¶15. As another example, in January 2017, ████████████approached plaintiff about participating in plaintiff's Listing Program without participating in the Verification

---

2.     Defendants seem to be confusing the term "listing" with "verification." When plaintiff uses the term, it typically means the drug price listing program.

Program; it decided not to participate after NABP threatened to take away its VIPPS accreditation for publicly associating with plaintiff in any way. *See* Dkt. 19 ¶16; *see also* PX 22. This is significant because losing VIPPS status would also cause a pharmacy to lose its eligibility for its "pharmacy" domain. *See* Dkt. 19 ¶16. Defendants have also run targeted advertisements in the United States using "pharmacychecker" as a Google AdWord, which dissuades pharmacies (and consumers) from associating with or utilizing plaintiff's services. *See* Dkt. 19 ¶23.

25.     PCC's focus and reliance on foreign pharmacies predates the conduct alleged in its Amended Complaint. PCC did not have any U.S. pharmacies listing drug prices on its site in 2017, at least a year before PCC was added to a "not recommended" list. *See* DX 28, Barnes Dep. Tr. 63:6–25, 66:14–18; DX 29, Barnes Dep. Ex. 9 ("███████████████████████████████████████████ ███████████"); DX 30, Am. Compl. ¶ 118 (alleging PCC was added to list no earlier than November 2018). PCC's Vice President of Pharmacy Verification from 2016 to 2018 testified that, to her knowledge, PCC did not have any U.S. pharmacies listing prices on PCC's website during her employment at PCC. DX 28, Barnes Dep. Tr. 66:14–18.

**Plaintiff's Response:**  The excerpted testimony cited in DX 28 should be disregarded because it lacks foundation. The witness testified repeatedly, in response to hypothetical questions, that she was not involved with the listing program and otherwise lacks personal knowledge about it. *See* PX 30 65:2–4 ("I don't have any personal knowledge of that. That's not — again, the listing program was not my

domain."); *see also* 66:5–13 ("Again, I didn't deal with the listing program, so I don't know exactly what … pharmacies were listing there. … that wasn't my area").

In any event, the statement is disputed. At least eight U.S. pharmacies were part of plaintiff's Verification Program in 2017. *See* PX 1 *cf.*, Levitt Decl. ¶ 27(d). This number was depressed because of defendants' actions to intimidate U.S. pharmacies from associating with plaintiff. *See* Dkt. 19 ¶15; *see* PX 22. In April 2015, applied for the verification program and later expressed interest in participating in plaintiff's drug listing program. *See* Levitt Decl. ¶ 8. However, in January 2017 and again in March 2018, ◼◼◼◼◼◼◼◼◼◼was threatened with termination of its VIPPs certification if it did business with plaintiff. *See* Dkt. 19 ¶¶15–16; *see also* PX 22.

### B. Plaintiff's Web Traffic and Click-Through Revenue

26. ◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼◼◼◼. DX 19, Kent Amended Report ¶ 16; DX 10, PCC 30(b)(6) Dep. Tr. 199:3–13 (◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼).

**Plaintiff's Response:** The excerpt cited from DX 10 should be disregarded because it does not support the proposition claimed.

In any event, the statement is disputed. Most of plaintiff's accredited pharmacy websites present as international pharmacy websites, not as Canadian websites. Between January 2015 and August 2021 only ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨. *See* PX. 1; *cf.* Levitt Decl. ¶¶ 27–28.

27.    At all times relevant to this litigation, the ▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. DX 19, Kent Amended Report ¶ 39–40.

**Plaintiff's Response:**    The defendants' argumentative characterizations ("vast") are disputed, but it is undisputed that the majority of plaintiff's accredited pharmacies from January 1, 2015 to August 2021 were based outside of the United States. *See* Levitt Decl. ¶ 27.

28.    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. DX 19, Kent Amended Report ¶ 39–40 (analysis based on review of PCC_0296790_2015.01.01-2021.08.01_CPCDrugClicks.csv.CSV and PCC_0296791_2015.01.01-2021.08.01_CPCRatingClicks.csv.CSV); *see also* DX 21, Walker Dep. Tr. 89:22–90:5 (testifying that "I don't know if in my time here [2018 to 2022] we have ever had a U.S. pharmacy in the listing program"); DX 10, PCC 30(b)(6) Dep. Tr. 193:6–7 ("▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨"); DX 28, Barnes Dep. Tr. 63:6–25 (testifying that in 2017, the Listing Program did not have any U.S. pharmacies advertising prices); DX 29, Barnes Dep. Ex. 9 ("▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨").

**Plaintiff's Response:** DX 29 should be disregarded as unauthenticated, lacking in foundation and inadmissible hearsay. The excerpted testimony in DX 28 should be disregarded because it lacks foundation and does not stand for the proposition claimed. The quoted statement is that of defense counsel read into the record at the deposition—it is not witness testimony. The witness testified repeatedly, in response to hypothetical questions, that she was not involved with the listing program and otherwise lacks personal knowledge about it.

In any event, the statement is disputed. From January 2015 to August 2021, the total number of U.S. based pharmacies accredited by plaintiff totaled 36; however, *currently* there are only 8 U.S. based pharmacies. *See* PX 1; *cf.* Levitt Decl. ¶¶ 26–27.



29. ████████████████████████████████████████████
████████████████████. DX 19, Kent Amended Report ¶ 39–40. ████████
████████████████████████████████████████████████
████████████████████████████████████████. DX 19, Kent Amended Report ¶ 39–40.

**Plaintiff's Response:** Undisputed.

30. ████████████████████████████████████████████
████████████████████. DX 19, Kent Amended Report ¶ 40.

**Plaintiff's Response:** Undisputed.

31. ████████████████████████████████████████████
████████████████████. DX 10, PCC 30(b)(6) Dep. Tr. 199:3–13 (████████



**Plaintiff's Response:** Undisputed.

32. ████████████████████████████████████████ ████████████████████ during the time period for which IP address data was available. DX 19, Kent Amended Report ¶¶ 16, 68.

**Plaintiff's Response:** The statement is disputed because between ████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████. Levitt Decl. ¶ 45.

33. ████████████████████████████████████████ ████████████████████ during the time period for which IP address data was available. DX 19, Kent Amended Report ¶¶ 16.

**Plaintiff's Response:** The statement is disputed in that IP data is available for additional periods. Amended Report ¶16. Moreover, in Mr. Kent's amended expert

report he acknowledges that his consumer data, based on IP addresses, is not reliable for at least 2015-2018. *See* PX 23 at 3 ("I conclude that the IP address data from this period … was unreliable for determining the locations of Consumers."). Therefore, the Court should reject consideration of facts concerning consumer data, which defendants admit to be incomplete and flawed.

34. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓ during the time period for which IP address data was available. DX 19, Kent Amended Report ¶¶ 16, 67.

**Plaintiff's Response:** The statement as phrased ("directed to") is argumentative and vague. And the statement is disputed in that IP data is available for additional periods. Amended Report ¶16. Moreover, in Mr. Kent's amended expert report he acknowledges that his consumer data, based on IP addresses, is not reliable for at least 2015-2018. *See* PX 23 at 3 ("I conclude that the IP address data from this period … was unreliable for determining the locations of Consumers."). Therefore, the Court should reject consideration of facts concerning consumer data, which defendants admit to be incomplete and flawed.

One example of Kent's flawed analysis is his contention that from January 2015 to August 2021, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. DX 19, Kent Amended Report ¶16. Mr. Kent conclusion was then later amended ▓▓▓▓ *See* PX 23 ¶16.

35.     The table below shows . DX 19, Kent Amended Report ¶ 39.

[unable to copy image]

**Plaintiff's Response:** Undisputed.

36.     The only PCC-accredited website . *See* DX 19, Kent Amended Report ¶¶ 39, 64. ████████████ holds itself out as a U.S. "pharmacy" based in Miami, Florida, but relies solely on foreign pharmacies to fulfill orders. *See* ████████████ ████████████. Records produced by the parent company for ████████████████, in this litigation include contracts that ████████████ had with those pharmacies that dispensed drugs for it. Each of those contracts is with a foreign pharmacy. *See, e.g.*, DX 31, ████████████████; DX 32, Affordable00164 (Mauritius), DX 33, Affordable00185 (Turkey), DX 34, Affordable00192 (UK); DX 35, Affordable00209 (India). Approximately 95% of prescription drug orders placed with ████████ ███ went to patients in the U.S. *See* DX 36, DSC_EXT000000077.



**Plaintiff's Response:** Plaintiff objects to defendants' statement as incomplete and misleading insofar as it misconstrues agreements between accredited pharmacies**.** Plaintiff permits pharmacies that are both accredited under the verification program to work together, so long as each pharmacy submits, annually, a shared services agreement demonstrating that they are accredited and meeting all requirements of the verification program and Listing Program. *See* PX 33 (Online Pharmacy (website): Shared Services Agreement); *cf*. PX 34 (Dispensing Pharmacy: Shared Services Agreement Form).

37.     Similarly, although PCC's website lists PricePro Pharmacy as dispensing drugs from countries including the U.S., the General Manager of PricePro Scripts attested that all of the dispensing pharmacies used by PricePro from 2017 through the present to dispense prescription drugs to consumers who purchase those

drugs through the PricePro website are located outside of the U.S. *See* DX 37, PricePro Declaration.

**Plaintiff's Response:** The statement is disputed. PharmacyChecker.com does not list PricePro Pharmacy as a U.S. based dispensing pharmacy, plaintiff identifies PricePro as an international online pharmacy. *See* Levitt Decl. ¶ 32. PricePro works with several dispensing pharmacies, ones accredited by plaintiff, including a pharmacy licensed in the U.S. *Id.* As part of plaintiff's Verification Program, accredited online pharmacies often work with several dispensing pharmacies, so long as both are accredited by plaintiff. *Id.* Each year, affiliated accredited online and dispensing pharmacies are required to disclose their relationship and submit a Shared Services Agreement (*see* PX 33; *cf.* PX 34); and every six months, plaintiff confirms that the dispensing pharmacy is properly licensed in the jurisdiction in which it operates. *Id.*



## IV. Plaintiff's Website and Business Provide Information on Online Pharmacies and Drug Price Comparisons

38.     PCC's mission is to help U.S. consumers find and purchase lower-cost medicine from pharmacies outside the U.S. *See* DX 11, Cooperman Dep. Tr. 153:12–21 and DX 17, Cooperman Dep. Ex. 7 (" ████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████ "); DX 11, Cooperman Dep. Tr. 49:14–24 ("Q. You founded

PharmacyChecker.com when you saw that increasing numbers of Americans were looking on the Internet to save money on prescription medication but did not have adequate information to protect their health. So is it correct that your focus was helping Americans find more affordable medication online? A. Primarily, yes."); DX 11, Cooperman Dep. Tr. 154:8–24 ("Q: [D]o you agree with his statement that the mission is to help Americans find affordable medication? A: I think we do help Americans. That's part of our mission is to help Americans. . . . I think it's a significant portion of our mission."); DX 10, PCC 30(b)(6) Dep. Tr. 27:2–28:4 ("Sometimes the medication that Americans can afford is outside of the United States. Sadly, it happens a lot."); DX 28, Barnes Dep. Tr. 23:13–24 ("Q: … 'PharmacyChecker.com's decision to add Ms. Barnes to the team reinforces its commitment to ensure Americans to have access to safe, affordable medications.' Do you believe that to be a true statement? A. Yes. Q. And did you view your role as reinforcing the PharmacyChecker commitment to ensure Americans have access to safe, affordable medications? A. Yes."); DX 11, Cooperman Dep. Tr. 49:14–24 ("Q. You founded PharmacyChecker.com when you saw that increasing numbers of Americans were looking on the Internet to save money on prescription medication but did not have adequate information to protect their health. So is it correct that your focus was helping Americans find more affordable medication online? A. Primarily, yes."); DX 38, Cooperman Dep. Ex. 2 ("In 2002, Dr. Cooperman founded PharmacyChecker.com when he saw that increasing numbers of Americans were looking on the Internet to save money on prescription medication but did not have adequate information to

protect their health."); DX 39, Cooperman Dep. Ex. 1 ("PharmacyChecker fills a critical need for a growing number of Americans turning to the Internet to find affordable prescription medications, including from pharmacies outside the U.S.").

**Plaintiff's Response:** The statement is disputed. Plaintiff's mission "is to ensure that consumers are properly informed about purchasing safe and affordable medication online to meet their individual health needs" and "to help consumers afford medication they need." *See* PX 7 at 27:11-15; 28:5–11; 45:10–16. PharmacyChecker.com visitors are located worldwide. *See* Levitt Decl. ¶ 3.

39.     PCC solicits American consumers to use PharmacyChecker.com to find and import drugs from international pharmacies to save money. *See, e.g.*, DX 40, PCC_0143288 (); DX 41, Cooperman Dep. Ex. 12 (posting in which Cooperman "recommends looking internationally for those who can't afford the brand locally," and providing a price comparison chart for 11 drugs that can be purchased from accredited pharmacies through links on PharmacyChecker.com); DX 17, Cooperman Dep. Ex. 7 ("

"); DX 42, Our Testimonials, PharmacyChecker.com, https://pharmacychecker.com/testimonials; ("PharmacyChecker has been helpful by

… helping us compare costs and letting us know that less expensive Canadian drugs could be a viable option.").

**Plaintiff's Response:** DX 41 does not support this statement of fact. The quoted excerpt is from an internal email under the heading "DRAFT." DX 41 lacks foundation and is inadmissible hearsay as defendants attempt to use it. Further, DX 40 is not authenticated, lacks foundation, and is inadmissible hearsay as defendants intend to use it. Defendants' characterizations of the evidence ("solicit") are argumentative.

In any event, the statement is disputed as misleading. Plaintiff encourages visitors worldwide to use information on its website: "PharmacyChecker.com is an American company, launched in 2003, dedicated to helping patients across the world find the lowest prescription medication costs . . . .". *See* PX 15.

40. ████████████████████████████████████████████████
████████████████████████████████████████████████ during the time period for which IP address data was available. DX 19, Kent Amended Report ¶ 16. ████████████████████████████████████ ████████████████████████ during the time period for which IP address data was available. *See supra* paragraphs 32–34 (citing DX 19, Kent Amended Report ¶ 16).

**Plaintiff's Response:** The statement is disputed. plaintiff receives the same click-through fee regardless of a visitor's location. CPC fees are assessed solely based on a PharmacyChecker.com visitor's click and is not tied to what happens afterwards. *See* PX 17 at 44:24–45.5 and 54:2–8.

In his initial report and deposition, defendants' expert Peter Kent asserted that based on his calculations, 89% of click fees paid to plaintiff were generated by PharmacyChecker.com users in the United States and made up around 88% of total clicks from plaintiff to accredited pharmacies' websites. *See* PX 23 (Peter Kent Amended Expert Report) ¶16. Mr. Kent made calculations from two different data sets in preparing his report: PCC's proprietary database and Google Analytics. *See* PX 18 at 83:22–84:11. Plaintiff's proprietary database does not identify user geographic location, but Google does. *See* PX 7 at 198:6–14. Kent used a separate database of his own choosing to determine user location from the proprietary dataset, but in his report, Kent only disclosed conclusions about his self-made dataset. His calculations from the Google dataset showed significantly less click-through revenue generated by U.S. PharmacyChecker.com users. PX 18 at 102:23–107:9.

On June 15, Mr. Kent amended his report to state that U.S. consumers generated 69.4% of click fees paid (versus his prior conclusion of 89%) and 68.5% of total paid clicks (versus his prior conclusion of 88%). *See* PX 23 ¶16. Defendants claim Kent "discovered . . . anomalies" in the data he relied upon. Mem. at 5. In his amended report, Mr. Kent still did not provide conclusions from the separate Google Analytics dataset, despite concluding that the proprietary dataset he relied upon had anomalies. The proportion of clicks by U.S.-based PharmacyChecker.com visitors to accredited U.S. pharmacy websites also doubled in Kent's amended report (▨▨ ▨▨▨▨▨). *See* PX 23 at ¶16. Thus, at best, only ▨▨ of plaintiff's cost-per-click revenue and only ▨▨ of its total revenue relates at all to any user who is even

subject to U.S. importation law. *See* Levitt Decl. ¶ 45. And there is no evidentiary connection between these clicks and the sale of drugs or their importation (lawful or unlawful) into the United States. Plaintiff's cost-per-click revenue is generated whenever ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨. *See* PX 17 at 44:14–45:4. Plaintiff does not and has no ability to track visitor activity beyond its website. *See* PX 7 at 198:6–14. There is only one exception: plaintiff does receive revenue each time a visitor located in the United States uses plaintiff's U.S.-only pharmacy discount card at a participating brick-and-mortar pharmacy located within the United States; transactions which also cannot possibly lead to a personal importation into the United States. *See* PX 7 at 206:2–19.

41. PharmacyChecker.com targets ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. Ex. 23 at ¶¶ 51–52. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. ▨▨▨▨▨▨▨▨▨▨▨▨▨. Ex. 23 at ¶¶ 51–52.



**Plaintiff's Response:** This statement is disputed. Plaintiff's HTML meta tags reflect information plaintiff tracks so that PharmacyChecker.com users have an accurate idea of what to expect on plaintiff's website. *See* Levitt Decl. ¶ 33. For drug pages, these title tags accurately reflect the content of the pages: <title>Januvia Prices – U.S. &amp; International | PharmacyChecker.com</title>. Drug pages are comparative pricing tool pages, which display both U.S. and international drug prices.

42.     PCC lists prices for prescription drugs in U.S. dollars and no other currency, revealing its focus on traffic from U.S. consumers. *See* DX 43, Barnes Dep. Ex. 7 ("████████████████████████████████████"); DX 28, Barnes Dep. Tr. 52:22–54:15.

**Plaintiff's Response:** The statement should be stricken because it is argumentative and not supported by admissible evidence. DX 43 and DX 28 say nothing about plaintiff's "focus on traffic from U.S. consumers." The excerpt quoted from DX 28 is also lacking in foundation as Ms. Barnes repeatedly testified that she lacks the relevant knowledge regarding the listing program.

In any event, the statement is disputed. Plaintiff does list prices for prescription drugs in U.S. dollars. *See* DX 43, Barnes Dep. Ex. 7 ("████████████████ ████████████████████████████████"); DX 28 at 9–11, Barnes Dep. Tr. 52:22–54:15. The U.S. Dollar is the most prevalent global currency, and based on plaintiff's current database infrastructure, plaintiff is unable to provide accurate, real-time pricing data in multiple currencies. *See* Levitt Decl. ¶34.

43.     PCC's website has been published in English since 2003. See DX 44, Cooperman Dep. Ex. 10; DX 11, Cooperman Dep. Tr. 206:7–207:4. When PCC launched a Spanish version of the website in 2016, PCC focused on the value of this for Spanish speakers in the U.S., noting that "38% of Hispanics living in the U.S. speak mainly Spanish." DX 44, Cooperman Dep. Ex. 10. The press release announcing the Spanish version quoted PCC CEO Tod Cooperman as saying "No one living in the U.S. should have to forgo filling a prescription because of high drug prices, especially when lower prices on the same drugs are available to informed consumers. We are pleased to extend our information to the Spanish-speaking community." *Id*.

**Plaintiff's Response:**  Undisputed.

44.     PCC's "forte" is "international online pharmacies' prices." DX 10, PCC 30(b)(6) Dep. Tr. 51:23–52:2; *see also* DX 45, PCC 30(b)(6) Dep. Ex. 8 ("████████ ███████████████████████████████████████████████ ████████████████████████████████████████"); DX 46, Levitt Dep. Ex. 22 at 3–4 (admitting PCC has a "niche in international pharmacy verification and safety and drug pricing").

**Plaintiff's Response:** Undisputed.

45.     The home page for PCC's PharmacyChecker.com touts "Verified international & Canadian online pharmacy options." See DX 47, PharmacyChecker.com Home Page, https://pharmacychecker.com (pictured below).



**Plaintiff's Response:** Defendants' argumentative characterization ("touts") is objectionable, but that statement is undisputed in that PharmacyChecker.com's home page does state "Prescription Savings You Can Trust," and states "Verified international & Canadian online pharmacy options. Free U.S. pharmacy coupons." In larger print, it states "Compare drug prices and save up to 90%."

46.     PCC's web page listing its "Accredited Online Pharmacies" is titled "Accredited Canadian and International Online Pharmacies." *See* DX 48, PharmacyChecker.com Accredited Online Pharmacies, https://pharmacychecker.com/accredited-onlinepharmacies (pictured in part below).



**Plaintiff's Response:** Undisputed.

47.    PCC's starting page for drug price comparisons compares U.S. prices to Canadian and International prices and shows the percentage savings available for Americans who import drugs from foreign pharmacies rather than buying those drugs locally in the U.S. See DX 49, Cooperman Dep. Ex. 9 (comparison chart titled "Compare Drug Prices in the U.S. & Abroad Before You Buy" showing drug prices in the U.S., Canada, and other countries). The comparison chart displays potential drug price savings for U.S. consumers who import drugs from Canada or other countries rather than buying them "locally" in the U.S. *See* DX 49, Cooperman Dep. Ex. 9. (image below); *see also id.* ("Using PharmacyChecker.com, it's easy to compare drug

prices among trusted international mail order online pharmacies, including licensed

Canadian pharmacies, and *local U.S. pharmacies*.").

## Drug Prices in the United States, Canada, and Other Countries

The cost of medication is different from country to country and pharmacy to pharmacy. To find the lowest drug prices, it's often essential to compare medication costs locally and internationally. Using PharmacyChecker.com, it's easy to compare drug prices among trusted international mail order online pharmacies, including licensed Canadian pharmacies and local U.S pharmacies. Comparing drug costs on PharmacyChecker.com helps you and your family save the most money and avoid getting burned by rogue websites.

| Brand Name (Quantity & Strength) | USA | Canada | International | Highest Percentage Savings |
|---|---|---|---|---|
| Premarin (30 tablets, 0.625 mg) | $195.11 | $28.07 | $11.94 | 93% |
| Januvia (30 tablets, 100 mg) | $518.80 | $124.32 | $18.00 | 96% |
| Eliquis (60 tablets, 5 mg) | $526.21 | $126.32 | $34.20 | 93% |
| Advair Diskus (1 inhaler, 250/50 mcg) | $644.08 | $139.95 | $41.60 | 93% |

**Plaintiff's Response:** The statement is disputed because there is no admissible evidence that the prices are "for Americans who import drugs."

48. The Consumer Support page of PharmacyChecker.com is focused on U.S. consumers ordering drugs from outside the U.S, addressing frequently asked questions such as "How much can Americans save by purchasing their prescription drugs online?" (Answer: "[M]edication ordered from outside the U.S. can normally take 2-3 weeks to arrive. If ordering medication from India, it can take even longer."); "Is it safe to order medication online from a pharmacy outside the U.S.?" (Answer: "Online pharmacies based outside the U.S. are not "rogue" by definition. . . .[and] sell safe and effective medications internationally, including to consumers in the U.S." See DX 50, PharmacyChecker.com Support Page,

https:/pharmacychecker.com/support/ (pictured first below); DX 6, Cooperman Dep.

Ex. 3 (pictured second below);



a

**How much can Americans save by purchasing their prescription drugs online?**  ^

U.S. consumers could pay up to 90% less than what they pay at a local pharmacy — savings like this has meant thousands of dollars a year for users of PharmacyChecker price comparisons. Cost is the difference between patients adhering to their prescribed medication and having to go without it. Americans are forced to make tough decisions:  Do I pay my bills? Or should I skip my meds this week? This is unacceptable. Everyone deserves the opportunity and choice to purchase more affordable medication from licensed pharmacies, whether domestic or international.

**How fast is international prescription delivery?**  ^

Be advised that medication ordered from outside the U.S. can normally take 2-3 weeks to arrive. If ordering medication from India, it can take even longer. If you need your medication quickly, then you should consult your local pharmacy for immediate supply, and then you may want to purchase more internationally for future use. We publish a pharmacy profile for each accredited pharmacy in the PharmacyChecker Verification Program to provide consumers with specific details, such as particular shipping locations, shipping costs, and payment methods accepted by the pharmacy.

**Is it safe to order medication online from a pharmacy outside the U.S.?**  ^

Yes, as long as you buy from the safest international online pharmacies. With a valid prescription for the medication ordered, dispensed from a licensed pharmacy that is verified in the PharmacyChecker Verification Program, it is exceedingly safe. Peer-reviewed studies based on testing of prescription medication and online pharmacy practices, strongly demonstrate the safety of ordering medications from an international online pharmacy approved in the PharmacyChecker Verification Program. It is important to note, risks do exist when ordering medication from an unverified international online pharmacy, particularly one that does not require a prescription.

**Plaintiff's Response:**  The statement should be stricken because it is overly broad, not supported by admissible evidence that the Customer Support page overall is focused on Americans buying drugs from abroad. PharmacyChecker.com's "Customer Support" page includes a "frequently asked questions" section where plaintiff responds to questions most frequently asked by PharmacyChecker.com visitors located anywhere. *See* PX 24 (PharmacyChecker.com Consumer Support Page). The purpose is to educate and provide information visitors worldwide.

49.    PCC's CEO instructed its employees to answer questions from U.S. consumers on its website about the personal importation of drugs from abroad, telling employees to "█████████████████████████████████████████ █████████████████████████████████" DX 51, Cooperman Dep. Ex. 14; DX 52, Barnes Dep. Ex. 18.

**Plaintiff's Response:** The statement is disputed because the reference to "employees" (plural) should be stricken as unsupported by any admissible evidence and there is no support for the purported focus on U.S. consumers. In an email to one employee, plaintiff's CEO, Tod Cooperman, instructed her to ███████████ ████████████████████████████" and focus on questions "████████ ███████████████████." DX 51, Cooperman Dep. Ex. 14; DX 52, Barnes Dep. Ex. 18. Dr. Cooperman explained that "████████████████████████████ ████████████████████████████" DX 51, Cooperman Dep. Ex. 14.

50.     PCC has described itself as a "maverick" for recommending foreign pharmacy websites and providing "information to consumers about safe international pharmacies that sell to consumers in the United States." DX 30, Am. Compl ¶ 33; *see also id.* ¶ 2 ("PharmacyChecker.com is unique . . . in that it provides this information [about foreign pharmacies].").

**Plaintiff's Response:** Undisputed.

### V. PCC Does Not Facilitate the Purchase of Drugs by Any Users from Any Pharmacies Located Anywhere

### A. PCC Provides Links to Websites and Has No Interest in Drug Transactions

51.     PCC provides links to its accredited foreign pharmacies, including to pages where a consumer can order drugs, to facilitate the purchase of drugs from abroad. *See* DX 1, PI Hr'g Tr. 65:11–66:4 (The Court: "I don't understand what the reason is to provide information, including the link, except to facilitate that purchase" MS. SHEAR: That is likely the primary reason, your Honor, but in any event, that, in providing that information, is not illegal.'"); *see also* DX 53, Barnes Dep. Ex. 3 ("██

████████████████████████████████████████████

████████████████████████████████████████████

█████ ")

**Plaintiff's Response:** The excerpted portion of DX 1 is lawyer's argument, which should be disregarded because it is not a judicial admission and not admissible as evidence. The statement is also legal argument couched as fact.

In any event, the statement is disputed. Plaintiff does not "facilitate" the purchase of drugs. *See* PX 7 at 34:14–15 ("You asked me if we helped consumers purchase medication, and I said no."). Plaintiff publishes information about pharmacies it verifies both inside and outside the United States for PharmacyChecker.com visitors worldwide. *See id.* at 59:2–9.

52.    The following is a screenshot of a page that a U.S. consumer would see when searching for the drug Eliquis, https://www.pharmacychecker.com/eliquis/#prices:

[Unable to copy screenshot]

**Plaintiff's Response:**  This statement should be stricken because it is misleading. The screenshot is what any visitor would see regardless of location. Indeed, the screenshot shows that the top two listings are from ADV Care Pharmacy, which is located in Canada and only ships within Canada.

53.    PCC's revenues are directly tied to the amount of consumer traffic it drives to its accredited pharmacies. DX 11, Cooperman Dep. Tr. 76:14–16 ("And there's a fee paid if someone clicks for more information from our site to their site.");

*see also* DX 19, Kent Amended Report ¶ 54 ("

").

**Plaintiff's Response:** The statement is disputed. "Consumer traffic" and "drives" are characterizations of the evidence and misleading. Approximately ████ ██████████████████████████████████████████████. *See* PX 10 at 27:4. ████ ███████████████████████████████████████ ███████████████████████████████████████ ████. *See* PX 17 at 54:2–8.

Separately, the statement discounts the revenue generated by the verification program, which is not at all tied to traffic.

54.    PCC touts its ability to help consumers access and order drugs from foreign online pharmacies. DX 54, PCC_0143573 (███████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

).

**Plaintiff's Response:** The Court should strike this statement because it is not supported by admissible evidence and is irrelevant. DX 54 should be stricken as unauthenticated, lacking in foundation and inadmissible hearsay. It is an internal draft and does not support the statement substantively. "Touts" is argumentative.

In any event, the statement is disputed. What plaintiff says on its website is that it "helps people find the lowest prices on prescription medication among licensed U.S. and international pharmacies." *See* PX 25 (PharmacyChecker.com About Us Page). Plaintiff touts nothing about drug orders.

55.     PCC provides links to accredited pharmacy websites so that U.S. consumers who visit PharmacyChecker.com can find and purchase foreign drugs from its accredited foreign pharmacies. *See* DX 55, Cooperman Dep. Ex. 22 ("███████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████"); DX 10, PCC 30(b)(6) Dep. Tr. 303:17–24 ("████████████████████████████████████████████ ███████████████████████████████████████████████████████"), 66:12–21 (If U.S. consumers have made the decision to purchase foreign drugs, "we do recommend that they avail themselves of the PharmacyChecker verification work that we have done.").

**Plaintiff's Response:** The quoted portion of DX 55 is inadmissible hearsay as defendants seek to use it and should be disregarded anyway as a self-serving

statement authored by defendant NABP reciting the same position that is the focus of the motion for summary judgment.

In any event, the statement is disputed. Plaintiff provides links to accredited pharmacy websites because doing so is useful to consumers seeking the comparative drug pricing information PCC provides, and because links are a necessary component of a cost-per-click listing program. *See* Levitt Decl. ¶ 17.

56. PCC has also aided U.S. consumers in importing drugs obtain from PCC-accredited pharmacies in other countries. *See, e.g.*, DX 56, Cooperman Dep. Ex. 13 (directing consumers to PCC's drug listing page for Xtandi in a blog post explaining that "another less expensive option (short of traveling to another country) would be to order Xtandi from a verified international online pharmacy, which will send the medication to you from a licensed pharmacy in another country, such as Canada. Currently, several PharmacyChecker.com-verified online pharmacies sell Xtandi for about $41 per 40 mg capsule – about half the cost in the U.S. If you prefer to get your medication from a U.S. pharmacy, many pharmacies offer or accept discount cards which can bring the cost down a little, but only to about $75 per capsule."); DX 57, PCC_0227352 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); DX 12, Cooperman Dep. Ex. 11 (directing consumers to PCC drug listing pages in a price comparison chart titled "Drugs Being Dropped by U.S. Insurers in 2017 Are Available Outside of U.S.

For One-Quarter the Price," noting that "the same drugs are available online at much lower cost from licensed pharmacies in other countries"); DX 58, Cooperman Dep. Ex. 15 (██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

**Plaintiff's Response:** This statement should be stricken because it is not supported by any evidence. Moreover, the evidence DX 57 should be stricken as unauthenticated and inadmissible hearsay as defendants intend to use it.

The statement is disputed. Plaintiff has not aided U.S. consumers in purchasing or importing drugs. Plaintiff seeks to educate and "help [people] find the lowest prices on prescriptions" regardless of whether they are purchasing them online or locally, domestically or internationally by comparing drug prices from country to country and pharmacy to pharmacy. *See* PX 7 at 33:18–20; *see also* PX 15; *see also* PX 9 28:4–29:3. The AskPC blog is one tool that plaintiff uses to communicate with PharmacyChecker.com visitors and to give information in relation to commonly asked inquiries. *See* Levitt Decl. ¶ 50. PharmacyChecker.com is accessed by individuals from ██████████████████████████████████████████████. *See* PX 2; *cf.* Levitt

Decl. ¶¶ 4(a)–(d). Moreover, notwithstanding these interactions, it is Mr. England's expert opinion that "PharmacyChecker.com does not buy, sell, distribute, dispense, or process orders for drugs and its requirements for pharmacy participation in the accreditation program are *clearly consistent* with FDA's Personal Importation Policy and designed to ensure participating pharmacies conform to the FDA policy as mandated by Congress. (emphasis added). *See* PX 4 at 5.

### B. PCC's Facilitation of Illegal Importation Goes Far Beyond Providing Links to Foreign Websites

57.     PCC has actively intervened in transactions by U.S. consumers purchasing drugs from its accredited foreign pharmacies. For example, PCC has obtained replacement medications for U.S. consumers who had their drugs detained by federal officials at the U.S. border. *See* DX 60, PCC 30(b)(6) Dep. Ex. 17; DX 61, PCC_0237148 (████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████); DX 62, PCC_0386953

(████████████████████████████████████████████████████

████████████████████████████████████████████████); DX 5,

PCC_0155279 ("██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



'); DX 63, PCC_0267992–94

). With respect to

*See* DX 60, PCC 30(b)(6) Dep. Ex. 17; DX 61, PCC_0237148.

**Plaintiff's Response:** The statement should be stricken because it is irrelevant and overly broad based on the cited evidence, which shows one instance where it appears as though replacement medication had been sent to a customer by the international pharmacy at issue (not by plaintiff). Otherwise, defendants mischaracterize the quoted excerpts and/or they are inadmissible hearsay as defendants attempt to use them. DX 63 does not contain an attachment contrary to defendants' representation and the email that is contained in DX 63 does not stand

for the propositions claimed. Defendants' characterizations ("actively intervene") are argumentative.

In any event, the statement is disputed. "It would rarely happen" that an online pharmacy would hear from plaintiff about a customer. *See* PX 26 (Deposition of Solaris Transcript (July 7, 2022)) at 47:19–48:12 (deposition of former verified pharmacy in Canada, also stating "we didn't have a lot of . . . customers that came from PharmacyChecker."). Roughly, plaintiff receives about ████████████ from visitors who are seeking assistance with an issue involving plaintiff's accredited pharmacies. *See* PX 7 at 112:2–18. By comparison, defendants' expert concluded that plaintiff earned cost-per-click revenue from approximately ███████████ by PharmacyChecker.com users from January 1, 2015 to August 20, 2021. *See* PX 23 ¶¶ 39–40.

Regardless, not even the pharmacy would be able to "prove that [the complaining party] was a customer that came from PharmacyChecker." *See* PX 26 at 50:23–51:5.

58.     PCC's proffered expert, Benjamin England, is aware that the FDA has enforced the law against personal importation at the U.S. border by detaining drugs ordered from PCC-accredited foreign pharmacies. DX 7, England Dep. Tr. 392:6–400:11. England "would have preferred that there be some inquiry with respect to why the FDA had stopped the shipment with the detention before [making] a recommendation to – to bring it back in" by requesting that the accredited pharmacy send a replacement shipment. *Id.* at 398:5–399:14.

**Plaintiff's Response:** The statement should be stricken as irrelevant.

In any event, the statement is disputed as incomplete. Mr. England also testified that compliance officers "detain a lot of things that are ultimately released;" it is whether the article "may appear to violate the law. That's all the compliance officer is asserting when they detain something." PX 6 at 395:5–398:3. Their knowledge at the time of inspection may be inaccurate because it is incomplete. S*ee* PX 6 at 67:18–69:12.

59.     PCC assigned personnel to actively "intervene" and "intercede" on behalf of U.S. consumers who purchased drugs from PCC-accredited foreign pharmacies and had complaints about their orders. *See, e.g.*, DX 28, Barnes Dep. Tr. 84:25–85:4 

; DX 64, Barnes Dep. Ex. 13 ("

); DX 65, PCC_0226297 ("

; DX 66, PCC_0227489 (same); DX 67, PCC_0231951 ("



"); DX 68, PCC_0246381 ("

"); DX 69, PCC_0337474 (

); DX 70, Barnes Dep. Ex. 6

);

DX 71, Barnes Dep. Ex. 14 (helping a consumer by following up with
about an order a consumer's physician had placed); DX
72, Barnes Dep. Ex. 16 (numbering added) (responding to consumer that "[i]f the
online pharmacy was a member in our program, I can assist," requesting "(1)
[s]tatement authorizing PC employee to contact the online pharmacy on your behalf;
(2) [d]ate the order was placed with the online pharmacy; [and] (3) Order Number.
Once I receive this information, I can contact our member to obtain information about
the medication dispensed."); DX 73, Barnes Dep. Ex. 17 ("I have gotten in touch with
our contacts at _____ about your complaint. If they
have not contacted you within one week of this email, please contact Kelly or me.");

DX 10, PCC 30(b)(6) Dep. Tr. 274:18–275:2 ).

**Plaintiff's Response:** The statement of material fact should be stricken because it is irrelevant and unsupported by admissible evidence. Defendants' characterizations ("actively") are argumentative. And DX 70 should be disregarded as unauthenticated, lacking on foundation and inadmissible hearsay as defendants seek to use it.

The statement is disputed. Plaintiff responds to queries from visitors worldwide who purchased prescription drugs, but it is unknown whether they visited plaintiff's website or not.

60. PCC's employees field and respond to customer complaints and intervene on customers' behalf to facilitate foreign drug purchase transactions—i.e., they help consumers for example address delivery details, obtain refunds for orders of prescription drugs, and follow up on order errors. *See, e.g.*, DX 28, Barnes Dep. Tr. 84:25–85:4; DX 64, Barnes Dep. Ex. 13 ("If you would like us to assist you with a customer complaint we can intervene on your behalf. Please email a statement authorizing PharmacyChecker to contact the pharmacy on your behalf."); DX 74, PCC_0154920 (███████████████████████████████████████ );

DX 75, PCC_0153678 ("████████████████████████████████████████



"); DX 76, PCC_0153685 (same); DX 77, PCC_0153686 (same); DX 78, PCC_0155295 (same); DX 79, PCC_0138806

); DX 80, PCC_0161984 (

); DX 10, PCC 30(b)(6) Dep. Tr. 274:11–276:22 (discussing the types of requests customers make and the ways in which PCC intervenes to help); DX 73, Barnes Dep. Ex. 17 (Ms. Barnes apologizes to a customer who had issues with an order and tells the customer, PCC "will attempt to assist in the resolution on [her] behalf."); DX 5, PCC_0155279

("

")

**Plaintiff's Response:** The statement should be stricken as irrelevant and unsupported by admissible evidence. The cited excerpts of DX 28 are irrelevant and lack foundation as the witness made it clear she was merely confirming that

defendants' counsel read an exhibit correctly. The cited portions of the document that defendants' counsel read at the deposition constitute inadmissible hearsay as defendants intend to use them. DX 74 is not what defendants purport it to be; indeed, it is not a document listing various complaints by PharmacyChecker.com visitors— but rather contains questions or inquiries concerning the website and the cost of prescription medication. DX 75, 76, 77 and 78 should be stricken as unauthenticated, lacking in foundation and inadmissible hearsay as defendants intend to use them. DX 79 is not what defendants purport it to be; indeed, it is not an excel spreadsheet containing the information Defendant purportedly states it contains; rather, it is a CPC invoice for an accredited pharmacy. *See* PX 42. DX 5 should be stricken as inadmissible because such is a draft response that is not addressed to any person.

For completeness, of more than 16,963,529 total users of PharmacyChecker.com between January 1, 2015 and August 1, 2021, plaintiff has record of receiving approximately 35 complaints. *See* PX 2 and 29; *cf.* Levitt Decl. ¶ 38. There is often no way to know that a person who submits a complaint actually clicked through from PharmacyChecker.com to the accredited pharmacy. *See* PX 26 49:23– 50:5. Nevertheless, plaintiff stands behind its verification program and actions taken in relation to PharmacyChecker.com's user complaints. Indeed, plaintiff takes various actions to monitor pharmacy compliance with its Verification Program standards. *See* prior responses; PX 27, 29; PX 30 (Barnes Tr.) at 86:20–25. Some of those complaints request refunds for transactions with accredited online pharmacies that occurred, and plaintiff conveys the complaint to the pharmacy to discuss and

investigate. *See* PX 7 at 274:24–275:7 ("They might want to get their product, they might want to get a refund, those are two of the main ones. . . . If the communication with the online pharmacy ends up helping [the complaining party get the solution they are looking for], then, great, yeah."). Sometimes this resulted in resolution of the website user's issues. *See id.*; PX 29.

61.     The PCC website's Consumer Support page, DX 50, links to a customer complaint form. *See* DX 103, PharmacyChecker.com Pharmacy Complaint Page, https://pharmacychecker.com/pharmacy-complaint. The form states: "We're sorry if a PharmacyChecker accredited online pharmacy has let you down. Below, you have the opportunity to file a complaint with us about the pharmacy. For us to process your complaint, you must authorize us to contact the company on your behalf. Please describe the problem you had with the pharmacy, and we will do our best to resolve the issue." Under "Desired Action," the form allows the consumer to choose between the options of a full refund, a partial refund, send replacement product, or other.

**Plaintiff's Response:** Undisputed.

62.     PCC assists consumers with obtaining refunds from its accredited pharmacies for purchases that are not fulfilled. DX 73, Barnes Dep. Ex. 17 (apologizing to a customer who had issues with an order and tells the customer, PCC "got[]in touch with [its] contacts at ▨▨▨▨▨▨▨▨▨▨▨▨ about [a U.S. consumer's] complaint" to arrange for the accredited pharmacy to "send[ ] the order by expedited air mail but if not to receive a refund").

**Plaintiff's Response:** The statement is irrelevant and its breadth is not supported by admissible evidence. Defendants cited evidence shows a total of one possible refund. Plaintiff, for completeness incorporates by reference its statement ¶ 60, *supra*.

Otherwise, the statement is undisputed.

63.    PCC follows up and works with accredited pharmacies on consumers' behalf regarding order errors and issues. DX 71, Barnes Dep. Ex. 14 (Kelly Ann Barnes helping a consumer with a missing order confirmation by following up with ██████████████████about an order a consumer's physician had placed); DX 72, Barnes Dep. Ex. 16 (following up on a consumer reporting receipt of drug with different pill "marking" and container than the domestic version of the same drug: "If the online pharmacy was a member in our program, I can assist. I need your permission to contact the pharmacy member on your behalf as well as the following additional information…Statement authorizing PC employee to contact the online pharmacy on your behalf [;] Date the order was placed with the online pharmacy [;] Order Number [.] Once I receive this information, I can contact our member to obtain information about the medication dispensed."); DX 73, Barnes Dep. Ex. 17 (apologizing to a consumer having issues with an accredited pharmacy and reporting that PCC "got[]in touch with [its] contacts at ██████████████████████ about [a U.S. consumer's] complaint" to arrange for the accredited pharmacy to "send[ ] the order by expedited air mail but if not to receive a refund").

**Plaintiff's Response:** The statement should be stricken as irrelevant and overly broad based on the cited evidence regarding two new complaints, as Ex. 17 was previously noted in ¶ 62 above. Plaintiff, for completeness incorporates by reference its statement ¶ 60, *supra*.

Otherwise, the statement is undisputed.

64. PCC responds and assists customers when they receive incorrect or unmarked medication. *See, e.g.*, DX 81, PCC_0228959 ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████ DX 82, PCC_0400812 ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

).

**Plaintiff's Response:**

64.    The statement should be stricken as irrelevant and overly broad based on the cited evidence showing a total of 2 consumer complaints. Plaintiff, for completeness incorporates by reference its statement ¶ 60, *supra*.

Otherwise, the statement is undisputed.

65.    PCC guides individual U.S. users in making drug selections. DX 28, Barnes Dep. Tr. 47:4–49:5 (explaining steps taken to help user determine which option was best for purchasing drugs).

**Plaintiff's Response:** The statement should be stricken because it is argumentative, irrelevant and not based on admissible evidence. The sole evidence cited is deposition testimony regarding one draft document. The excerpted testimony comprises the witness agreeing that defendants' counsel correctly read that document. The quoted excerpt of the document, in turn, is inadmissible hearsay as defendants seek to use it—the witness's testimony is that the exhibit is a draft and thus, not an example of plaintiff communicating anything to the public. In any event, the visitor's location is unknown and there is nothing to indicate she was a U.S. consumer.

For these reasons, the statement is disputed.

66.    PCC communicates with its accredited pharmacies on behalf of consumers about price changes in pharmaceutical drugs they sell. DX 10, PCC 30(b)(6) Dep. Tr. 275:8–276:3 ("



**Plaintiff's Response:** The statement should be stricken because it is irrelevant. In any event, the statement is **undisputed**. When a PharmacyChecker.com visitor asks plaintiff about a price discrepancy between what is listed on PharmacyChecker.com and the pharmacy's own website, plaintiff "will speak to the online pharmacy and say you should update your prices." PX 7 at 275:8–17. Plaintiff's information is only valuable to users if it is accurate. *See* Levitt Decl. ¶ 34.

67.     PCC even guides individual U.S. users in making selections among foreign pharmacies. DX 28, Barnes Dep. Tr. 47:4–49:5 (explaining steps taken to help user determine which option was best for purchasing drugs).

**Plaintiff's Response:** The statement should be stricken because it is argumentative, irrelevant and overly broad based on the evidence cited to show one instance of the conduct alleged. Additionally, there is no admissible evidence of even one instance. The excerpted testimony is inadmissible hearsay as defendants seek to use it and comprises the witness agreeing that defendants' counsel correctly read an exhibit. The witness's testimony is that the exhibit is a draft as is clear on its face, *i.e.,* it is not an example of plaintiff "guiding" anything.

In any event, the statement is disputed, also for the reasons stated in plaintiff's response to ¶ 66, *supra*.

68.    PCC has published over 500 blog posts on its website, many responding to consumer inquiries about drug importation or suggesting drugs to import using PCC's website and accredited pharmacies, in an effort to attract traffic to PharmacyChecker.com, which is then funneled to PCC-accredited pharmacies in exchange for click-through fees. *See* DX 28, Barnes Dep. Tr. 78:21–79:18 (testifying that PCC prepared at least 500 responses to consumer inquiries about online prescription availability during Ms. Barnes' tenure); DX 70, Barnes Dep. Ex. 6 (█████████████████████████████████████████████ █████████████████████████████████████████████); DX 28, Barnes Dep. Tr. 45:23–46:13; DX 83, Barnes Dep. Ex. 12 (█████████████████ █████████████████████████████████████████████ ████████████); DX 28, Barnes Dep. Tr. 80:1–14; DX 51, Cooperman Dep. Ex. 14 ("█ █████████████████████████████████████████████ ████████████████████████████"); DX 58, Cooperman Dep. Ex. 15 ("████████████████████████████████████████ ████████████████████"); DX 84, PCC_0306271 (████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████); DX 85, PCC_0344050 ("█████████████████████████████████████████████

████████████████████████████████████"); DX 86, Lucia Mueller, *Namenda (memantime): Made in America; Cheaper Abroad*, PharmacyChecker.com, Dec. 29, 2019, https://pharmacychecker.com/askpc/namenda-made-in-america-cheaper-abroad ("Namenda is significantly cheaper outside the U.S. And you can get it from a trustworthy, credentialed pharmacy. PharmacyChecker identifies the safest international online pharmacies so you don't have to get lost in the swamp of dangerous, rogue websites out there posing as legitimate pharmacies.").

**Plaintiff's Response:** The statement should be stricken because it is irrelevant, argumentative, a legal conclusion, and not supported by admissible evidence. The first quoted excerpt of DX 28 should be stricken because it is mischaracterized and lacks foundation—the witness merely testified that defendants' counsel correctly read an exhibit. Further, counsel's questions say nothing about "consumer inquiries about online prescription availability," or drug importation so the testimony does not support the proposition claimed anyway.

DX 70 should be stricken as lacking in authentication and foundation and as inadmissible hearsay as defendants seek to use it. The second quoted excerpt of DX 28 is inadmissible hearsay as defendants seek to use it and the quoted excerpt merely comprises the witness agreeing that defendants' counsel correctly read an exhibit. The witness's testimony is that the exhibit is a draft as is clear on its face, *i.e.,* it is not an example of plaintiff communicating anything to any consumer. The third quoted excerpt of DX 28 is not on topic.

DX 51 does not support the proposition claimed and is inadmissible hearsay as defendants seek to use it. The quoted excerpt of DX 58 is inadmissible hearsay as defendants seek to use it. DX 85 and 86 do not support the broad proposition for which they are cited.

In any event, the statement is disputed. There are more than 500 blog posts at PharmacyCheckerBlog.com, none of which involve consumer inquiries. *See* Levitt Decl. ¶ 50**.** The consumer inquiries to which defendants are referring are from the "Ask PC" program, through which PharmacyChecker.com visitors can submit questions pertaining to five categories: medication savings, health & medicine, drug importation, online pharmacy safety, and drug price reports. Any visitor can ask a question and plaintiff does not know whether any particular visitor is seeking to purchase drugs. Questions are answered by a panel of experts and published on the website. Plaintiff has received 1604 questions and has published 430 responses.

69. When responding to consumer questions, PCC emphasizes the option to purchase prescription drugs imported from outside the U.S. *See, e.g.,* DX 28, Barnes Dep. Tr. 112:1–113:15.

**Plaintiff's Response:** The statement should be stricken as overly broad and unsupported by admissible evidence based on the one instance defendants purport to show. Defendants' characterization of the evidence ("emphasizes") is argumentative. Additionally, the excerpted testimony of DX 28 lacks foundation. The witness's testimony comprises that defendants' counsel correctly read an exhibit.

In any event, the statement is disputed. When responding to PharmacyChekcer.com visitor questions, plaintiff typically explains drug prices in and outside the United States. PX 30 at 46:14–47:14. Plaintiff, for completeness, incorporates by reference its response ¶ 68, *supra*.

### C. PCC Knowingly Disregards U.S. Law in Its Programs

70.  PCC does not verify that its accredited pharmacies are safe. DX 28, Barnes Dep. Tr. 174:9–13 (testimony of PCC's Vice President of Pharmacy Verification and Information that "I don't know that it was anyone's job at PharmacyChecker to verify that online pharmacies were safe—including my own.").

**Plaintiff's Response:** The statement should be stricken as overly broad, irrelevant and unsupported by admissible evidence. The one quoted excerpt of one witness's testimony lacks foundation.

In any event, the statement is disputed. Plaintiff cannot ***guarantee*** that any of its accredited pharmacies are safe, just as no entity (including NABP) can guarantee the safety of any pharmacy. *See* PX 30 at 172:15–24 ("I felt as though in pharmacy practice, generally speaking, that you can't guarantee what's done in a pharmacy regardless of what standards or regulations are in place.").

71.  PCC makes no effort to verify that i██████████████████████ ████████████████. *See, e.g.,* DX 11, Cooperman Dep. Tr. 85:13–14 ("██ ████████████████████████████████").

**Plaintiff's Response:** Plaintiff's characterizations in the statement ("makes no effort to verify") are argumentative and the statement is irrelevant and overly broad based on the minimal evidence quoted.

In any event, the statement is disputed. Ms. Barnes testified that plaintiff would conduct audits to ensure accredited pharmacies were not listing or dispensing controlled substances to the United States. *See* PX 30 at 56:11–58:9. Additionally, plaintiff takes a number of steps to monitor its accredited pharmacies' compliance with required verification program practice and safety standards, including periodic audits, conducting mystery shopping, remote monitoring of websites, and inspections performed by plaintiff's personnel. *See* PX 27.

72. PCC conveys to users of its website that it is " DX 40, PCC_0143288.

**Plaintiff's Response:** The statement should be stricken because it is a legal conclusion couched as fact. DX 40 should be disregarded because it is not authenticated, lacks foundation, and is inadmissible hearsay as defendants offer it. The document does not appear to be a copy of plaintiff's website.

In any event, the statement is **undisputed**. For completeness, plaintiff's 30(b)(6) representative testified that PharmacyChecker.com publicly describes the

law in the most conservative way possible in order for people to understand their rights under the current state of the law. *See* PX 7 83:21–84:24.

73.     PCC's proffered expert, Mr. England, testified that he does not know whether any pharmacy accredited by PCC actually ships drugs that comply with FDA's labeling and approval requirements, DX 7, England Dep. Tr. 281:3–282:2; ships drugs that comply with FDA's approval requirements and qualify for a drug labeling exemption, *id*. at 282:13–284:12; or in fact complies with the FDA's personal importation policy, *id*. at 404:19–405:14.

**Plaintiff's Response:**  The statement is disputed and should be stricken because it is misleading. Mr. England testified that it was outside the scope of his assignment to determine whether any verified pharmacy actually ships drugs that comply with FDA's labeling and approval requirements. *See* PX 6 at 281:3–282:2.

74.     Kelly Ann Barnes, PCC's Vice President of Pharmacy Verification and Information from 2016 to 2019, testified that she could not say when something was legal or illegal, but told PCC website users that personal importation is technically illegal. DX 28, Barnes Dep. Tr. 179:23–180:6 ("Q. Well, the flip side of when it's legal is when it's illegal, and you can't -- you can volunteer all these reasons why you think various things are illegal but you can't tell me when it's illegal? A. That's correct.").

**Plaintiff's Response:**  The statement should be stricken because it is a legal conclusion couched as fact and the excerpted testimony lacks foundation. The witness testified that, sitting at the deposition years after leaving plaintiff's employment, that she "did not know" the answer to defendants' broad question regarding legality

because the answer is fact bound and depends on the situation. *See* PX 30 at 179:9–22.

For those reasons, the statement is disputed as to the first clause. As to the second, the website speaks for itself and its contents are undisputed. For completeness, plaintiff's 30(b)(6) representative testified that PharmacyChecker.com describes the law in the most conservative way possible in order for people to understand their rights under the current state of the law. *See* PX 7 at 83:21–84:24.

75.     PCC does not and cannot guarantee that any medications sold by PCC-accredited pharmacies are manufactured in FDA-approved manufacturing facilities. DX 87, Barnes Dep. Ex. 27 (▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨).

**Plaintiff's Response:** Undisputed.

76.     PCC knows that "most medications imported for personal use that will come from a foreign pharmacy will not meet the definition of an FDA-approved drug." DX 88, Cooperman Dep. Ex. 16; *see* 104, PCC_0340238 ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨").

**Plaintiff's Response:** The statement should be stricken because it is a legal conclusion couched as fact. DX 89 should be disregarded because it is unauthenticated, lacking in foundation and inadmissible hearsay as the defendants seek to use it.

In any event, the statement is disputed. Plaintiff has no way of knowing the proportion of medications that will come from a foreign pharmacy that would not meet the definition of an FDA-approved drug. Mr. England testified that even FDA cannot know that. PX 6 at 331:7–16 ("And so the FDA doesn't know whether they're – they're adulterated, misbranded, or unapproved. So it just – it sort of proves too much."). What is stated on plaintiff's website is conservative, for example, providing PharmacyChecker.com visitors official statements made by the FDA. *See,* e.g., PX 5 at 2 ("In most circumstances, it is illegal for individuals to import drugs or devices into the U.S. for personal use because these products purchased from other countries often have not been approved by the FDA for use and sale in the U.S.").

77. PCC makes no effort to verify that its accredited pharmacies are licensed by any of the 50 states to which they ship, and admits that they "are probably not" licensed to dispense in all 50 U.S. states despite offering to ship prescription drugs to the entire U.S. *See* DX 11, Cooperman Dep. Tr. 353:10–354:9.

**Plaintiff's Response:** The Court should disregard this statement of fact because it is irrelevant and defendants' characterizations ("no effort to verify") are argumentative. Separately, defendants cite nothing in support of the statement that "PCC makes no effort to verify" so it should be stricken regardless.

In any event, the statement is undisputed.

**D. PCC Has Accredited and Promoted Pharmacies Under Criminal Indictment and Convicted of Drug Crimes**

78.     PCC-accredited foreign pharmacies have been indicted for violating U.S. law. The most notable example is Canada Drugs. *See, e.g.,* DX 90, Cooperman Dep. Ex. 18 (indictment of PCC-accredited foreign pharmacy Canada Drugs); DX 91, Cooperman Dep. Ex. 21 (DOJ press release titled "Canadian Drug Firm Admits Selling Counterfeit and Misbranded Prescription Drugs Throughout the United States"); DX 92, PCC_0312421 (███████████████).

**Plaintiff's Response:**   The Court should disregard this statement of fact because it is irrelevant. The statement is also overbroad—the evidence defendants cite concerns only one pharmacy, and not pharmacies plural as defendants purport.

In any event, the statement is disputed. CanadaDrugs.com was a plaintiff-accredited online pharmacy from 2005 to March of 2018. CanadaDrugs.com itself was not accused of violating U.S. law—the government investigation involved a separate wholesale business that was never accredited by plaintiff. *See* PX 31 (Thorkelson Opinion). Plaintiff is unaware of any indictment anywhere against one of its accredited online pharmacies. *See* Levitt Decl. ¶ 51**.**

79.     PCC promoted Canada Drugs even after an investigation found that it had distributed counterfeit cancer drugs that lacked any active ingredient from a faulty supply chain. *See* DX 93, Levitt Dep. Ex. 19 ("Unlike a rogue online pharmacy, CanadaDrugs.com meets very high standards of pharmacy practice and is approved in the PharmacyChecker.com Verification Program").

**Plaintiff's Response:**  The Court should disregard this statement of fact as irrelevant.

In any event, the statement is disputed. Plaintiff, for completeness incorporates by reference here its response ¶ 79, *supra*.

80.     PCC acknowledges FDA findings that "nearly half of imported drugs in the study were reported to be Canadian or from Canadian pharmacies, [yet] 85% of those drugs originated elsewhere and were fraudulently misrepresented as Canadian," and that "Internet pharmacies offering to sell purportedly Canadian drugs to U.S. patients are often run by overseas criminal enterprises selling counterfeit and substandard drugs that are transshipped to third-party countries, such as Canada, to create a more trustworthy appearance." DX 88, Cooperman Dep. Ex. 16.

**Plaintiff's Response:**  The Court should disregard this statement of fact because it is irrelevant, not supported by admissible evidence and is a legal conclusion couched as fact.

In any event, the statement is disputed. There is no reference to FDA findings in DX 88, nor does that document contain any of the quoted content. Separately, DX 88 appears to be published at prescriptionjustice.org, which is a nonprofit that is not owned or controlled by plaintiff. The same document states that "Under many circumstances, it is expressly legal to import FDA-approved drugs." DX 88.

81.     Many of PCC's accredited websites ███████████████████ ████████████████████████ DX 19, Kent Amended Report ¶ 90.

**Plaintiff's Response:** The statement is disputed. Most of plaintiff's accredited pharmacy websites hold themselves out as international pharmacy websites, not as Canadian websites. Between January 2015 and August 2021 ▨▨ ▨▨ of accredited pharmacies were holding themselves out as Canadian. *See* PX. 1; *cf.* Levitt Decl. ¶¶ 27–28. Plaintiff requires accredited pharmacies to correct geographic locations that may be misleading. *See* PX 26 at 43:4–44:9.

82. PCC has continued to accredit and work with foreign pharmacies that violate U.S. law despite knowing that these pharmacies were under investigation or indictment. DX 94, PCC_0357300 (▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨.

**Plaintiff's Response:** The statement should be stricken as irrelevant, overbroad, and unsupported by admissible evidence. DX 94 concerns one foreign wholesale business (not an accredited pharmacy) under indictment with no finding, at the time, that the U.S. law had, in fact, been violated.

For all of these reasons, the statement is disputed. Plaintiff, for completeness incorporates by reference here its response ¶ 79, *supra*.

### E. PCC's Accredited Pharmacies Have Been Found in Violation of the FDA Act for Selling Misbranded and Unapproved Drugs

83. PCC's accredited pharmacies have received warning letters from the FDA for selling misbranded and unapproved drugs. *See, e.g.,* DX 95, England Dep. Ex. 11 (warning letter from FDA to PCC accredited pharmacy Global Drug Supply for "caus[ing] the introduction of unapproved new drugs and misbranded drugs into the United States (U.S.) by shipping to U.S. customers" in violation of the FD&C Act);

DX 96, PCC_0335233 (⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯⨯).

**Plaintiff's Response:** The statement should be stricken as irrelevant, overbroad and unsupported by admissible evidence. The documents cited concern one foreign pharmacy, and DX 96—the email purporting to list Global Drug Supply as a member—is dated months ***prior*** to the warning letter.

For all of these reasons, the statement is disputed. For completeness, 193 pharmacies have participated in plaintiff's verification program since January 2015. *See* Levitt Decl. ¶ 27. Compared to that, based on an FDA subpoena response concerning all information relating to plaintiff-accredited pharmacies, defendants are aware of a small number of warning letters from the FDA. In fact, the FDA's production in relation to the defendants' subpoena returned materials for only three pharmacies: Canada Drugs, Global Drug Supply, and Solaris Pharmacy. Plaintiff investigates and takes appropriate remedial action upon discovery of warning letters from the FDA. *See, e.g.*, PX 41 at PCC_0320848. Finally, a warning letter is merely a statement of the FDA's belief that a "certain activity is occurring and believes that activity is . . . a violation of the law." PX 6 at 337:14–22.

84.     PCC's accredited pharmacies have been found in violation of numerous provisions of the Food Drug and Cosmetics Act and warned to cease shipping violative products to U.S. consumers.

**Plaintiff's Response:** The statement should be stricken as irrelevant and unsupported by admissible evidence. None of the exhibits cited shows a violation found for any provision of the FDCA.

For that reason, the statement is disputed. *See, e.g., infra* paragraphs 85–87.

85.     In 2012, the FDA issued a warning letter to PCC-accredited foreign pharmacy Global Drug Supply, see DX 96, PCC_0335233 (█████████████ ██████████████████████████████████████); DX 97, PCC_0246316 (████████████████████████████████████), having determined that Global Drug Supply "cause[d] the introduction of unapproved new drugs and misbranded drugs into the [U.S.] by shipping to U.S. consumers in violation of sections 301(a), 301(d), and 505(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) [21 U.S.C. §§ 331(a), 331(d), and 355(a)]" *See* DX 98, FDACDER000207_000232. The FDA requested that Global Drug Supply "immediately cease shipping violative drug products to U.S. consumers." *Id.*

**Plaintiff's Response:** The statement should be stricken as irrelevant. The statement is also disputed because FDA did not "determine" that Global Drug Supply violated the law. Rather, a warning letter is merely a statement of the FDA's belief that a "certain activity is occurring and believes that activity is . . . a violation of the law." PX 6 at 337:14–22.

86.     Global Drug Supply was warned by the FDA again in 2016. *See* DX 99, Cooperman Dep. Ex. 19; DX 95, England Dep. Ex. 11 (stating that the FDA had determined that Global Drug Supply "cause[d] the introduction of unapproved new

drugs and misbranded drugs into the United States by shipping to U.S. consumers in violation of the [FD&C Act]" and requesting that "Global Drug Supply immediately cease shipping violative drug products to U.S. consumers"); DX 11, Cooperman Dep. Tr. 330:7–343:11.

**Plaintiff's Response:** The statement should be stricken as irrelevant and is disputed for the reason stated in Plaintiff's Response to statement 85.

87.     In 2012, the FDA issued a warning letter to PCC-accredited pharmacy Canada Drugs. *See* DX 100, FDACDER000001_000090 ("The [FDA] recently reviewed your websites (listed in the table located at the bottom of this letter and in the attachment) and has determined that your websites offer products for sale in violation of the Federal Food, Drug, and Cosmetic Act (FD&C Act). More specifically, the websites listed below offer unapproved and misbranded new drugs for sale in violation of sections 301(a), 301(d), 502(a), 502(f), and 505(a) of the FD&C Act [21 U.S.C. § § 331(a), 331(d), 352(a), 352(f), 355(a)]. We request that you immediately cease marketing violative drug products to United States consumers."); DX 11, Cooperman Dep. Tr. 270:14–271:4; 273:18–20 (acknowledging that Canada Drugs was an accredited pharmacy in PCC's program).

**Plaintiff's Response:** Undisputed, but statement should be stricken as irrelevant.

88.     PCC knows that FDA "black box" warnings are missing from imported drugs sold by its accredited pharmacies, which creates a risk for U.S. consumers. DX 11, Cooperman Dep. Tr. 334:17–339:23 (acknowledging that the FDA has issued

warning letters to PCC accredited pharmacies for shipping drugs omitting black box warnings required by U.S. law and that "[i]f that information wasn't provided, that would be a risk").

**Plaintiff's Response:** The statement should be stricken because it is irrelevant, lacks foundation, is not supported by admissible evidence, and is a misrepresentation of the testimony cited. In the excerpted testimony in DX 11, the witness merely confirmed that defendants' counsel correctly read an exhibit. The witness then specifically called out for defense counsel that the exhibit says nothing about missing warnings for imported drugs sold by plaintiff's accredited pharmacies. DX 11 at 338:2–20. And the witness made clear that he lacks the relevant knowledge beyond reading the exhibit on its face. DX 11 at 338:21–339:10.

For all of these reasons, the statement is disputed. Additionally, plaintiff's Verification Program policy 16-02, titled "Medications Requiring Special Dispensing Considerations," effective April 16, 2018, requires

> Members that dispense MRSDC internationally must adhere to the strictest applicable requirements for safety and monitoring recommendations. This means a dispensing pharmacy must adhere to the applicable black box warning and suggested monitoring required from the jurisdiction where the pharmacy resides unless the jurisdiction where the medication will be dispensed to is stricter. (For example, the U.S. FDA requires black box warnings to medication package inserts and has strict requirements for medications identified as REMS and REMS w/ETASU, pharmacies dispensing to consumers to the U.S. would follow the U.S. FDA requirements (i.e. black box warning, REMS and ETASU.

See PX 35 at PCC_0146116.

89. PCC acknowledges that its accredited pharmacies could have shipped controlled substances to consumers and PCC would have no way of knowing or preventing it. *See, e.g.,* DX 10, PCC 30(b)(6) Dep. Tr. 279:12–18, 280:14–24; DX 101, PCC_0396706 ("███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████").

**Plaintiff's Response:** The statement should be stricken because it is irrelevant and not supported by admissible evidence. The excerpted testimony in DX 10 is off topic. DX 101 does not stand for the notion that plaintiff would have "no way of knowing or preventing" a controlled substance being shipped. To the contrary, the excerpted quote of DX 101 is that plaintiff could not "***automatically***" know whether or not PharmacyChecker.com-verified websites are listing controlled drugs." DX 101. Moreover, the top email in that same document that defendants cite states "there ***is*** a flag for controlling substances and an alert to consumers that plaintiff verified online pharmacies are prohibited from dispensing controlled substances to consumers in the U.S." *Id.* (emphasis added).

For all of these reasons, the statement is disputed. Additionally, Ms. Barnes testified that plaintiff would conduct audits to ensure accredited pharmacies were not listing or dispensing controlled substances. *See* PX 30 at 56:11–58:9.

90.    PCC is aware that PCC-accredited foreign pharmacies dispense medication in blister packaging and not in child-safe packaging. DX 89, PCC_0340238 ("█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████").

**Plaintiff's Response:** The statement should be stricken because it is irrelevant and not supported by admissible evidence, which says nothing about accredited pharmacies (as opposed to online pharmacies generally). The one document defendants cite—DX 89—should be stricken as unauthenticated, lacking in foundation and inadmissible hearsay as defendants seek to use it.

For all of these reasons, the statement is disputed. Additionally, the statement is inaccurate, as many drugs that are approved by the FDA are manufactured outside the United States. PX 6 at 69:12–70:20; 152:21–153:6.

91. PCC is aware that PCC-accredited pharmacies have dispensed alternative or substitute drugs instead of the drug indicated on a patient's prescription. DX 102, PCC 30(b)(6) Dep. Ex. 36 ("████████████████████████████████████
████████████████████████████████████████████████



").

**Plaintiff's Response:** The statement should be stricken because it is irrelevant, overly broad and not supported by admissible evidence. The document at issue concerns a single pharmacy—not pharmacies plural as defendants purport.

For these reasons, the statement is disputed. Additionally, pharmacies are suspended or terminated from the verification program for such violations. *See* PX **27**. When plaintiff discovered this pharmacy dispensed a substitute drug not on a patient's prescription, the pharmacy was suspended. DX 102.

92.     PCC has recommended that a U.S. consumer buy foreign drugs in violation of U.S. patent laws. *See, e.g.,* DX 59, PCC_0143683 (███████████████████████████████████████████████████████████████████████████████████).

**Plaintiff's Response:** The statement should be stricken because it is irrelevant, lacks foundation, is a pure legal conclusion, and is not unsupported by admissible evidence. Separately, DX 59 does not support the notion that plaintiff recommended purchasing foreign drugs or violating U.S. patent laws.

For these reasons, the statement is disputed.

93.     PCC has continued to accredit and promote foreign pharmacies even after U.S. consumers have alerted PCC of receiving mislabeled or otherwise non-compliant drugs from them. *See, e.g.,* DX 81, PCC_0228959 (███████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████).

**Plaintiff's Response:** This statement should be stricken because it is irrelevant, overly broad and unsupported by admissible evidence. The document defendants cite concerns one pharmacy—not pharmacies plural as defendants purport. Separately, DX 81 does not support the proposition that plaintiff "continued to accredit and promote" the pharmacy that was the subject of the complaint.

For these reasons, the statement is disputed.

94.     PCC is aware that drugs sold outside the U.S. are not exactly the same as the FDA approved version of the drug sold in the U.S., ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ *See, e.g.,* DX 2, PCC_0384682 (███████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

).

**Plaintiff's Response:** The statement should be stricken because it is irrelevant, overly broad and not supported by admissible evidence. DX 2 is unauthenticated, lacking in foundation and inadmissible hearsay as defendants seek to use it. Further, it concerns one instance involving one drug—not drugs plural. Moreover, the document is clearly labeled "draft", and thus is not evidence of plaintiff communicating anything to a consumer.

For all these reasons, the statement is disputed.

## PLAINTIFF'S ADDITIONAL STATEMENTS OF FACT

95. Plaintiff's verifications and price comparisons have been recommended and referenced by the New York Times, Wall Street Journal, AARP Magazine, People's Pharmacy, Yahoo Finance, Kaiser Health News, and many others. Levitt Decl. ¶ 48.

96. Plaintiff is not a pharmacy and does not sell, dispense, or distribute drugs. Levitt Decl. ¶ 47.

97. Plaintiff, NABP, and LegitScript are all competitors in the online pharmacy verification market, and each requires pharmacies to meet and maintain its standards of practice to be accredited. Levitt Decl. ¶ 21.

**CERTIFICATE OF SERVICE**

I, Lisa Mittwol, hereby certify that on this 20th day of July 2022, I caused a copy of Plaintiff's Local Rule 56.1 Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment be served upon counsel of record via the Court's electronic filing system.

_____
LISA MITTWOL