UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PHARMACYCHECKER.COM,

                          Plaintiff,

      v.

NATIONAL ASSOCIATION OF BOARDS
OF PHARMACY, *et al.*,

                        Defendants.

---

No. 19-CV-7577 (KMK)

OPINION & ORDER

Appearances:

Aaron Gott, Esq.
Bona Law PC
Minneapolis, MN
*Counsel for Plaintiff/Counter-Defendant*

James F. Lerner, Esq.
Bona Law PC
New York, NY
*Counsel for Plaintiff/Counter-Defendant*

Erik T. Koons, Esq.
Jana I. Seidl, Esq.
Timothy P. Singer, Esq.
Baker Botts LLP
Washington, DC
*Counsel for Defendant/Counter-Plaintiff National Association of Boards of Pharmacy*

KENNETH M. KARAS, United States District Judge:

        PharmacyChecker.com ("PCC") brings this Action against the National Association of

Boards of Pharmacy ("NABP"), Alliance for Safe Online Pharmacies ("ASOP"), Center for Safe

Internet Pharmacies Ltd. ("CSIP"), and Partnership for Safe Medicines ("PSM"; collectively,

"Defendants") alleging that Defendants unlawfully conspired to restrain trade in violation of

§ 1 of the Sherman Act, 15 U.S.C. § 1, and that NABP falsely advertised or promoted in

violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125.  (*See generally* Am. Compl. (Dkt. No. 82).)[1]  NABP brings counterclaims against PCC for violations of § 43(a) of the Lanham Act; §§ 349 and 350 of the New York General Business Law ("GBL"), N.Y. G.B.L. §§ 349, 350; and the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. CODE § 28-3904.  (*See generally* NABP's Answer & Counterclaims (Dkt. No. 148).)[2]  Before the Court is PCC's Motion To Dismiss NABP's Counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No. 190).)  For the following reasons, PCC's Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from the Counterclaims and are assumed to be true for the purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

#### 1.  Background to the Parties

NABP is a § 501(c)(3) non-profit organization organized under the corporate laws of Kentucky and with its principal place of business in Illinois.  (*See* Counterclaims ¶¶ 14, 21.) NABP was founded in 1904 to support and work with state and jurisdictional boards of pharmacy to protect the public health; its membership consists of all 50 state boards of pharmacy in addition to the boards of pharmacy in the District of Columbia, Guam, Puerto Rico, the U.S.

---

[1] PCC also originally brought claims against LegitScript LLC.  (*See* Am. Compl.) However, PCC's claims against LegitScript LLC were severed and transferred to the U.S. District Court for the District of Oregon.  (*See* Dkt. No. 219.)

[2] Hereinafter, the Court will refer to the portion of NABP's Answer and Counterclaims that contains NABP's Counterclaims, (*see* Answer & Counterclaims 52–123), as the "Counterclaims."

Virgin Islands, the Bahamas, and all 10 Canadian provinces.  (*See id.* ¶¶ 21, 22.)  NABP alleges that it "combines diverse skills and backgrounds, which helps NABP create innovative programs that meet the public health protection needs of today—with an eye on the future."  (*Id.* ¶ 24.)

PCC is a limited liability company organized under the laws of New York and with its principal place of business in New York.  (*See id.* ¶ 15.)  PCC operates a website that is purportedly designed to allow U.S. consumers to search for and purchase drugs from PCC's "accredited" foreign pharmacies, which PCC claims are more affordable than drugs purchased from U.S. pharmacies.  (*See id.* ¶¶ 48–60.)  However, NABP alleges that in reality, "PCC is engaged in the business of misleading consumers about the safety, legality, and pricing of unlawfully imported drugs from foreign 'pharmacy' affiliates that are subject to PCC's 'verification program'" and that "PCC directly and indirectly profits from misleading consumers and facilitating consumer purchases of these drugs from PCC's affiliate suppliers."  (*Id.* ¶ 1.)

Broadly, NABP alleges that PCC has "engaged in two simultaneous but intertwined campaigns to mislead consumers."  (*Id.* ¶ 19.)  "First, PCC has based its entire business model on affirmatively misleading consumers about the safety and legality of imported drugs sold through its website and their equivalence to [U.S. Food and Drug Administration ('FDA')]-approved drugs, as well as the legality, regulatory rigor, and origin of drugs sold through its website."  (*Id.*)  "Second, PCC has gone out of its way to directly attack and sully NABP's reputation because NABP's mission (in part) to encourage consumers to buy safe, legal pharmaceuticals is antagonistic to PCC's business model of profiteering off of encouraging, empowering, and facilitating the unlawful purchase of foreign drugs for personal use."  (*Id.*)

### 2.  PCC's Alleged Campaign to Mislead Consumers

As to PCC's "campaign" to mislead consumers, NABP alleges that through its website, PCC has made a series of misstatements that fall into one of five categories:

First, NABP alleges that PCC has made "statements that mislead consumers about the legality [of] personal importation and the relationship between foreign pharmaceuticals and FDA-approved pharmaceuticals." (*Id.* ¶¶ 62–80 (capitalization omitted).)  NABP identifies multiple instances in which PCC has claimed that while the FDA has not legalized personal importation of foreign drugs, no consumer has ever been prosecuted for personal importation, which NABP alleges encourages consumers to "break the law by purchasing foreign pharmaceuticals via PCC's website and the links PCC provides to its affiliate[] foreign drug suppliers." (*Id.* ¶ 68; *see also id.* ¶¶ 66–77.)  NABP also alleges that PCC "misleadingly equates foreign drugs and FDA-approved drugs" by obfuscating the fact that "[e]ven a brand-name drug sold under the same name in multiple jurisdictions may differ," including because "the drugs may use different inactive ingredients, different release mechanisms, or be manufactured in different facilities." (*Id.* ¶¶ 65, 77; *see also id.* ¶¶ 79–80.)

Second, NABP alleges that PCC "hides that the 'pharmacy' websites it links to are not pharmacies at all." (*Id.* ¶¶ 81–86 (capitalization omitted).)  NABP identifies multiple instances in which PCC has repeatedly used words and phrases like "pharmacy," "accredited pharmacy," and "reputable online pharmacy websites," when in reality each of the "pharmacies" listed on PCC's website and "verified" by PCC is a "pharmacy intermediary" that merely dispenses prescriptions from unidentified, third-party pharmacies. (*See id.*)

Third, NABP alleges that PCC has made "statements that mislead consumers on price." (*Id.* ¶¶ 87–108 (capitalization omitted).)  Specifically, NABP alleges that despite promising consumers that it is helping consumers find the lowest price for their prescription drugs, PCC actually steers consumers away from cheaper, generic drugs dispensed by U.S. pharmacies and toward more expensive and illegal foreign drug importation. (*See id.*)

Fourth, NABP alleges that PCC has made "statements that mislead consumers about the origin of the drugs they are buying." (*Id.* ¶¶ 109–14 (capitalization omitted).) Specifically, NABP alleges that many of the "pharmacies" listed on PCC's website and "verified" or "accredited" by PCC use a misleading name or logo to deceive consumers into believing that the "pharmacy" is Canadian or Canada-based, when in reality, the "pharmacy" dispenses drugs from a number of other countries, such as India, Mauritius, and Turkey. (*Id.*)

Fifth and finally, NABP alleges that PCC has made "statements that mislead consumers about the safety and trustworthiness of PCC's accredited pharmacies." (*Id.* ¶¶ 115–83.) NABP alleges that PCC both affirmatively represents that all of the "pharmacies" listed on PCC's website are "safe, trustworthy, and operating in compliance with Canadian or other regulatory requirements," when this is often not the case, and endorses similar misrepresentations made by these "pharmacies" themselves via PCC's accreditation process in which PCC guarantees that the marketing claims made by these "pharmacies" are "truthful and not misleading." (*Id.* ¶ 115.) NABP specifically identifies two PCC-affiliated "pharmacies"—PriceProPharmacy.com and Canadian Prescription Drugstore—which, among other things, represent themselves as Canada-based pharmacies when in reality, they are pharmacy intermediaries that dispense drugs from suppliers located in countries around the world that are not required to comply with Canadian regulatory standards. (*See id.* ¶¶ 132–83.)

### 3. PCC's Alleged Campaign to Harm NABP

As to PCC's "campaign" to harm NABP, NABP alleges that "PCC has, through its PharmacyChecker.com and blog sites, maliciously and specifically attacked NABP" in an effort to "falsely undermine NABP's reputation" via claims such as that "NABP bears responsibility for the opioid crisis or that NABP is responsible for pharmacy errors." (*Id.* ¶ 189.) NABP

alleges that PCC has used such "false claims to drive consumers away from safe domestic pharmacies and towards riskier foreign pharmacies that PCC 'verifies.'"  (*Id.* ¶ 190.)

On June 4, 2020, PCC published a blog post entitled "NABP and Opioid Death in the U.S." in which it claimed that "in its quest to 'educate' the public about the dangers of internet pharmacies and personal medicine imports, the [NABP] appears to have ignored the greatest pharmacy-related public health travesty happening right under its nose": the opioid epidemic. (*See* Decl. of Erik Koons in Opp'n to Mot. ("Koons Decl.") (Dkt. No. 202) Ex. A.)[3]  The author of the blog post (identified as the President of PCC) goes on to write:

---

[3] Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). Nevertheless, "the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (similar).  "Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'"  *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("[T]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations and quotation marks omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Both PCC and NABP have put before the Court full versions of two blog posts discussed in the Counterclaims.  (*See* Decl. of Aaron Gott in Supp. of Mot. ("Gott Decl.") (Dkt. No. 192) Exs. A (Dkt. No. 192-1) & B (Dkt. No. 192-2); Koons Decl. Exs. A & B.)  PCC argues that these blog posts were incorporated by reference into the Counterclaims, (*see* PCC's Mem. of Law in Supp. of Mot. 13 n.6 (Dkt. No. 191)), and it appears that NABP agrees, having also chosen to put these documents before the Court via its Opposition, (*see* NABP's Mem. of Law in Opp'n to Mot. 13 (Dkt. No. 201)).  In any event, the Court agrees with PCC that these two documents were clearly and substantially referenced in the Counterclaims, (*see* Counterclaims ¶¶ 189, 193, 194), and thus that the Court may consider them in ruling on PCC's Motion as incorporated by reference into the Counterclaims.

The Court also takes a moment to address NABP's vociferous claims that the versions of the blog posts put before the Court by PCC are "heavily edited" or not authentic.  (NABP's

I was wondering whether the NABP might pipe up about this. Afterall, it is the U.S. boards of pharmacy that are most responsible for regulating retail pharmacy sales. Isn't the NABP's main focus supposed to be public health as affected by retail pharmacy sales here in the United States? Instead, last week the NABP turned its attention to the dangers of internet pharmacies and rogue activity surrounding Covid-19. That's a noble topic, but it's also useful to deflect from breaking news about Big Pharmacy drug dealing! . . . Will the NABP speak up about how its accredited pharmacies, the drug companies that sponsor its annual meeting, and the entire 'legitimate' pharmaceutical supply chain are complicit in the deaths of hundreds of thousands of Americans from opioid drugs? Or will it keep talking about how it's important to warn Americans against buying lower-cost, safe medicines from international pharmacies?

(*Id.*) This post appeared beside a graphic that reads "Find Low Drug Prices from Verified Pharmacies" and includes a search bar with an instruction that reads "Type name of drug." (*Id.*) Beneath the search bar reads: "Search provided by PharmacyChecker.com." (*Id.*)

On February 7, 2020, PCC published another blog post entitled "U.S. Pharmacy Chains Harm Patients With Medication Errors; NABP Appears Silent," in which it claimed that: "Millions of medication errors have caused illness and death in America—and this problem has recently come into greater focus as pharmacists increasingly blow the whistle on their employers. Yet the [NABP] doesn't seem to be paying much attention to medication errors at U.S. pharmacies. Instead they choose to spend their time 'educating' the public about the dangers of prescription drug importation, warning Americans that it's not safe to buy lower-cost medicines

---

Mem. of Law in Opp'n to Mot. 13 (Dkt. No. 201).) While the Court recognizes that the versions of the blog posts put before the Court by PCC do not include the sidebar panels featuring PCC's search bar, and that it is NABP's position that the presence of the search bar is critical to NABP's counterclaims and thus PCC's Motion, NABP's suggestion that PCC or its counsel acted in bad faith is unwarranted. The most reasonable inference to draw from the absence of the sidebar panels in the versions of the blog posts submitted by PCC is that PCC's counsel either inadvertently omitted the sidebar panels or chose to include only the text of the at-issue blog posts when attempting to accomplish the often-bumpy task of saving a mutable website as a PDF. Indeed, PCC explains in its Reply that this is exactly what happened. (*See* PCC's Reply Mem. of Law in Supp. of Mot. 6 n.3 (Dkt. No. 215).) The Court will consider the versions of the documents put before the Court by NABP, but the Court declines to infer ill intent on the part of PCC.

from other countries over the Internet."  (Koons Decl. Ex. B.)  The author of the blog post (again

identified as the President of PCC) goes on to write that NABP has "even included

PharmacyChecker.com and this very blog (!) on a list of over 12,000 'Not Recommended

Sites'—websites that they have categorized as safety threats from importation that put people

and their families at risk.  We have sued them for defamation and antitrust violations."  (*Id.*)  The

blog post concludes with: "The NABP, like the boards they represent, would apparently rather

talk about the dangers of drug importation and the Internet than medication errors.  Why?  As I

see it, competition from Canadian and other foreign pharmacies with lower drug price are bad for

U.S. pharmacies.  Whereas medication errors truly appear to be a cost of doing business."  (*Id.*)

This post also appeared beside the same graphic and search bar.  (*See id.*)

NABP also alleges that on July 24, 2019, "PCC called its verification tool 'a critical

alternative to the [NABP] dot pharmacy (.pharmacy) program, which was funded by

pharmaceutical companies and excludes safe international pharmacies,'" and claimed that

"'NABP and other groups funded by drug companies engage in public information campaigns

scaring Americans against buying lower-cost medicine online from another country.'"

(Counterclaims ¶ 195.)  NABP alleges that PCC repeated its claim that NABP was

indistinguishable from "big pharma" on many other occasions, (*see id.* ¶¶ 199–200), and

attacked the integrity of NABP's VIPPS/Digital Pharmacy Accreditation Program, (*see id.*

¶ 197)—which NABP alleges is a fundamentally different than PCC's "accreditation" or

"verification" program because it "accredits the digital pharmacy practices of licensed

pharmac[ies] . . . that, as a baseline requirement, comply with state and federal law," such that

NABP and PCC are not competitors, (*see id.* ¶ 10).  Finally, NABP alleges that "PCC

has . . . made efforts to spread misinformation in the [Internet Corporation for Assigned Names

and Numbers ('ICANN')] ecosystem both about NABP and about importation," including by "attack[ing] NABP in a discussion of .pharmacy falsely claiming that 'NABP and other groups funded by drug companies engage in public information campaigns scaring Americans against buying lower-cost medication from another country.'"  (*Id.* ¶¶ 205, 206.)

NABP alleges that it has been harmed by the conduct laid out above—in addition to other, similar conduct not detailed—in several ways.  First, "NABP has had to divert resources from its core mission as a non-profit to respond to false, misleading, and scurrilous attacks from PCC both before and increasingly after the decision to add PCC to the not-recommended sites list," including to "employ a consulting firm to help navigate the ICANN ecosystem."  (*Id.* ¶¶ 212–13.)  Second, "NABP has had to" devote resources weekly to "respond to claims from consumers who have been misled by PCC, some of whom have reached out directly to NABP," including a physician who inquired about a website that was unlawfully selling pharmaceuticals to U.S. consumers that had been "verified" by PCC.  (*Id.* ¶¶ 214–15.)  Third, "NABP was forced to devote a significant amount of staff and contractor time—dozens of in-person hours—and other resources to determining whether PCC itself violated NABP policies—and possibly state or federal law relating to the sale and dispensing of prescription drugs."  (*Id.* ¶ 216.)  Finally, and more broadly, NABP alleges that it was forced to expend time and resources to correct the "pernicious myths" fomented by PCC as to the legality and safety of drug importation for the sake of consumers.  (*See id.* ¶¶ 217–29.)

B. Procedural History[4]

PCC filed its initial Complaint on August 13, 2019.  (*See* Compl. (Dkt. No. 1).)  After the

Court's denial of PCC's Motion for a Preliminary Injunction, (*see* Dkt. No. 73), PCC filed its

Amended Complaint on October 21, 2019, (*see* Am. Compl.).  On November 6, 2019, NABP,

PSM, and LegitScript filed pre-motion letters in anticipation of moving to dismiss PCC's

Amended Complaint.  (*See* Dkt. Nos. 85, 86, 87.)  After receiving responses from PCC, (*see* Dkt.

Nos. 89, 90, 91), the Court held a pre-motion conference and set a briefing schedule, (*see* Dkt.

(minute entry for Feb. 6, 2020); Dkt. No. 94).

On March 13, 2020, Defendants filed a Joint Motion To Dismiss PCC's Amended

Complaint.  (*See* Not. of Joint Mot. (Dkt. No. 97); Defs.' Mem. of Law in Supp. of Joint Mot.

(Dkt. No. 100); Decl. of Erik T. Koons in Supp. of Joint Mot. (Dkt. No. 102); Decl. of Marjorie

Clifton in Supp. of Joint Mot. (Dkt. No. 103).)  On the same day, PSM, ASOP, and LegitScript

filed individual Motions To Dismiss PCC's Amended Complaint.  (*See* PSM's Not. of Mot.

(Dkt. No. 97); PSM's Mem. of Law in Supp. of Mot. (Dkt. No. 98); Decl. of Leslie E. John in

Supp. of PSM's Mot. (Dkt. No. 99); ASOP's Not. of Mot. (Dkt. No. 104); ASOP's Mem. of Law

in Supp. of Mot. (Dkt. No. 105); LegitScript's Not. of Mot. (Dkt. No. 106); Decl. of Rachel J.

Adcox in Supp. of LegitScript's Mot. (Dkt. No. 107); Decl. of John Horton in Supp. of

LegitScript's Mot. (Dkt. No. 108); LegitScript's Mem. of Law in Supp. of Mot. (Dkt. No. 109).)

On April 17, 2020, PCC filed responses to all four motions to dismiss.  (*See* PCC's Mem. of Law

in Opp'n to Joint Mot. (Dkt. No. 113); PCC's Mem. of Law in Opp'n to PSM's Mot. (Dkt.

No. 111); PCC's Mem. of Law in Opp'n to ASOP's Mot. (Dkt. No. 110); PCC's Mem. of Law in

---

[4] The procedural history of this case is lengthy and complex, involving a higher-than-average number of motions, which have often been briefed simultaneously.  (*See generally* Dkt.) The Court herein recounts only the procedural history relevant to the instant Motion.

Opp'n to LegitScript's Mot. (Dkt. No. 112).)  On May 15, 2020, Defendants jointly filed their Reply and PSM, ASOP, and LegitScript each filed individual Replies.  (*See* Defs.' Reply Mem. of Law in Supp. of Joint Mot. (Dkt. No. 116); PSM's Reply Mem. of Law in Supp. of Mot. (Dkt. No. 115); ASOP's Reply Mem. of Law in Supp. of Mot. (Dkt. No. 118); LegitScript's Reply Mem. of Law in Supp. of Mot. (Dkt. No. 117).)  The Court held oral argument on all four motions on November 10, 2020, (*see* Dkt. (minute entry for Nov. 10, 2020)), and on March 30, 2021, the Court granted LegitScript's Motion To Dismiss, denied Defendants' Joint Motion To Dismiss, denied ASOP's Motion To Dismiss, and granted in part and denied in part PSM's Motion To Dismiss, (*see* Dkt. No. 129).[5]

On May 11, 2021, ASOP and PSM each filed Answers to PCC's Amended Complaint, (*see* ASOP's Answer (Dkt. No. 147); PSM's Answer (Dkt. No. 150)), and NABP filed both an Answer and Counterclaims, (*see* NABP's Answer & Counterclaims).  CSIP filed its Answer on May 25, 2021.  (*See* CSIP's Answer (Dkt. No. 157).)

On August 9, 2021, PCC filed a pre-motion letter in anticipation of moving to dismiss NABP's Counterclaims.  (*See* Dkt. No. 171.)  After receiving a response from NABP, (*see* Dkt. No. 172), the Court held a pre-motion conference and set a briefing schedule, (*see* Dkt. (minute entry for Oct. 13, 2021); Dkt. No. 109).  PCC filed the instant Motion on November 17, 2021. (*See* Not. of Mot.; PCC's Mem. of Law in Supp. of Mot. ("PCC's Mem.") (Dkt. No. 191); Gott Decl.)  NABP filed its Opposition on December 21, 2021.  (*See* NABP's Mem. of Law in Opp'n to Mot. ("NABP's Mem.") (Dkt. No. 201); Koons Decl.)  PCC filed its Reply on January 10, 2022.  (*See* PCC's Reply Mem. of Law in Supp. of Mot. ("PCC's Reply Mem.") (Dkt. No. 215).)

---

[5] By virtue of the Court's granting of LegitScript's Motion To Dismiss, PCC's claims against LegitScript were later severed and transferred to the U.S. District Court for the District of Oregon.  *See supra* Note 1.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

12

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 94 (citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

    B.  Analysis

    NABP brings three counterclaims against PCC based on the conduct outlined above: (1) violation of § 43(a) of the Lanham Act, (*see* Counterclaims ¶¶ 230–244); (2) violation of GBL §§ 349 and 350, (*see id.* ¶¶ 245–53); and (3) violation of the CPPA, (*see id.* ¶¶ 254–63). PCC argues that all three claims are subject to dismissal because: (1) NABP has failed to allege that PCC proximately caused a commercial injury as required to state a claim under the Lanham Act, and in any event, PCC's alleged "campaign" to harm NABP is not actionable as non-commercial speech, (*see* PCC's Mem. 4–17); (2) NABP has failed to allege an actual, direct injury resulting from PCC's conduct, as required for its GBL claims, (*see id.* at 18–20); and (3) NABP has failed to allege a nexus between PCC's alleged conduct and the District of Columbia, NABP lacks standing to bring a CPPA claim, and NABP fails to allege a consumer-merchant relationship, each of which is independently fatal to NABP's CPPA claim, (*see id.* at 20–24).[6]

---

[6] PCC also argued in its opening brief that the Court should decline to exercise supplemental jurisdiction over NABP's state law claims after dismissing NABP's Lanham Act claim.  (*See* PCC's Mem. 17–18.)  However, NABP argues in Opposition that the Court should continue to exercise supplemental jurisdiction over NABP's state law claims even if NABP's

The Court will address these arguments to the extent necessary to decide the instant

Motion.

### 1.  Lanham Act Claim

Section 43(a) of the Lanham Act provides, in relevant part:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which in
> commercial advertising or promotion, misrepresents the nature, characteristics,
> qualities, or geographic origin of his or her or another person's goods, services, or
> commercial activities, shall be liable in a civil action by any person who believes
> that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  The Second Circuit has explained that to state a claim for false

advertising under the Lanham Act, a plaintiff must allege that (1) "the statement in the

challenged advertisement is false"; (2) "the defendants misrepresented an inherent quality or

characteristic of the product"; (3) the defendant placed the false or misleading statement in

interstate commerce"; and (4) "the plaintiff has been injured as a result of the misrepresentation,

either by direct diversion of sales or by a lessening of goodwill associated with its products."

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (alterations and quotation

marks omitted); *see also 3B Med., Inc. v. SoClean, Inc.*, 857 F. App'x 28, 29 (2d Cir. 2021)

(summary order) ("To state a false advertising claim, a plaintiff must plead 'that the challenged

message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce,

and (4) the cause of actual or likely injury to the plaintiff.'" (quoting *Church & Dwight Co. v.*

---

Lanham Act claim is dismissed because there is a logical relationship between NABP's state law
claims and PCC's claims.  (*See* NABP's Mem. 25.)  PCC did not address NABP's argument on
Reply.  (*See generally* PCC's Reply Mem.)  "By failing to respond to that argument in its Reply
Memorandum, [PCC] concedes the point for purposes of [the Motion]."  *Cornelius v. Macy's
Retail Holdings, Inc.*, No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019)
(collecting cases).

*SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016))).  PCC primarily argues that NABP has failed to state a cognizable false advertising claim under the Lanham Act because NABP has failed to sufficiently allege that it suffered a commercial injury that was proximately caused by PCC's conduct.  (*See* PCC's Mem. 4–11.)  PCC also argues that NABP's Lanham Act claim based on PCC's alleged "campaign" to harm NABP fails because the statements identified are not actionable commercial speech.  (*See id.* at 11–17.)  The Court need not address PCC's secondary argument because the Court agrees that NABP has failed to allege that it suffered a cognizable injury under the Lanham Act.

The Supreme Court in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), explained that in order to assert a claim for false advertising under the Lanham Act, a plaintiff must allege that it has suffered injuries which fall within the "zone of interests" protected by the statute and that its injuries were proximately caused by violations of the statute, *see id.* at 129–34.  Specifically, the Supreme Court held that "to come within the zone of interests in a suit for false advertising under [§ 43(a)], a plaintiff must allege an injury to a commercial interest in reputation or sales," *id.* at 131–32, and that "a plaintiff suing under [§ 43(a)] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff," *id.* at 133.  A showing of proximate cause "is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff."  *Id.* at 133–34.

Further, "[u]nder Second Circuit authority, the threshold required to show injury differs based on the nature of the advertisements and the parties' role as competitors."  *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 346 (S.D.N.Y. 2019).  "Where a

plaintiff's claim is directed to 'misleading, non-comparative commercials,' the injury 'accrues equally to all competitors; none is more likely to suffer from the offending broadcasts than any other.'" *Id.* at 346–47 (quoting *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988). Under such circumstances, "some indication of actual injury and causation would be necessary to ensure that a plaintiff's injury is not speculative." *Id.* (quoting *Merck*, 760 F.3d at 259). "By contrast, where the advertisement makes a materially false comparison to a specific, competing product, the false ad 'necessarily diminishes' the competing product in the minds of consumers, and 'injury may be presumed, because there was not the same concern of awarding damages for merely speculative injury.'" *Id.* (quoting *Merck*, 760 F.3d at 259).

Here, as a threshold matter, the Court finds that injury to NABP cannot be presumed because NABP has specifically alleged that PCC and NABP are not competitors, (*see* Counterclaims ¶ 10 ("To be clear, PCC is not a direct competitor of NABP in Pharmacy Accreditation Services or any other product or service.")), and has not alleged that PCC made any statements directly comparing a specific service of PCC's to a specific service of NABP's. While NABP alleges that "PCC deliberately attempts to muddy the waters so that consumers believe that PCC can offer services comparable to . . . NABP" and "PCC has . . . repeatedly attacked the integrity of NABP's VIPPS/Digital Pharmacy Accreditation program, NABP's Not Recommended Sites list, and the NABP organization itself, while promoting its own programs and services," (*id.* ¶ 10, 197), the Counterclaims are devoid of any allegations that PCC ever made a "materially false comparison to a specific, competing product" of NABP's. *Dependable Sales*, 377 F. Supp. 3d at 347; *see also Merck*, 760 F.3d at 260 ("[The Second Circuit] has expressly disfavored presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any

competitor's products." (emphasis omitted) (quoting *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir. 1994))).  Therefore, NABP must allege actual injury and causation to sustain its Lanham Act claim.

This brings the Court to the fundamental defect in NABP's Lanham Act claim: NABP has failed to allege that it is a market participant, which fatally undermines any claim of injury proximately caused by PCC's conduct.  At bottom, NABP's allegations amount to the following: PCC's business model of encouraging consumers to illegally import potentially dangerous foreign prescription drugs is antithetical to NABP's mission of promoting prescription drug safety according to U.S. standards, and has led NABP to take often costly steps to counter PCC's misinformation.  *See supra* I.A.  And, when PCC launched counteroffensives against NABP by attacking NABP's integrity and credibility, NABP had to expend additional time and resources to respond.  *See id.*  However, NABP does not allege that it markets a particular product or service or that it is a participant in the market for pharmacy accreditation or verification such that PCC could have plausibly caused NABP to suffer any "injury to a *commercial* interest in reputation or sales," *Lexmark*, 572 U.S. at 132, via any of this activity.  The closest NABP comes to such an allegation is its references to NABP's VIPPS/Digital Pharmacy Accreditation program, (*see* Counterclaims ¶¶ 10, 184, 189, 197, 232), but NABP does not allege that it derives any revenue from this program—or from any other program (which is only logical, given that NABP is a § 501(c)(3) non-profit organization).  Therefore, NABP does not—and, indeed, cannot—allege that PCC's "deception of consumers cause[d] them to withhold trade" from NABP, as required to allege injury under the Lanham Act.  *Lexmark*, 572 U.S. at 133; *cf. Casper Sleep v. Mitcham*, 204 F. Supp. 3d 632, 641 (S.D.N.Y. 2016) (finding that the plaintiff adequately alleged proximate cause and injury where "[the] plaintiff alleges, in relevant part, that

[the defendant's] statements . . . caused [the] plaintiff lost sales and diminished its goodwill in the marketplace").[7]

None of NABP's arguments in Opposition is persuasive.  First, NABP argues that it has alleged reputational harm based on its allegations that PCC has repeatedly attacked NABP's integrity and accused NABP of being in the pocket of "big pharma."  (*See* NABP's Mem. 6.) However, an allegation of "reputational harm" on its own is not sufficient to state a claim for injury under the Lanham Act; rather, "a plaintiff must allege an injury to a *commercial interest* in reputation or sales."  *Lexmark*, 572 U.S. at 131–32 (emphasis added).  And while NABP might allege that PCC's various "attacks" caused reputational harm to NABP in a colloquial sense, NABP has not alleged reputational injury causing consumers to "withhold trade" from NABP. *Id.* at 133.

Second, NABP argues that "[d]iversion of resources alone establishes Lanham Act injury where an organization, as here, is forced to expend resources to combat misrepresentation from the Defendants' alleged false advertising and disparaging statements."  (NABP's Mem. 7 (quotation marks omitted) (citing *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, No. 16-CV-6986,

---

[7] While NABP argues in its Opposition that PCC has used its "attacks [against NABP] to drive consumers away from NABP's accreditation program and accredited pharmacies and encouraging them to use PCC's' 'competing' service," (NABP's Mem. 6 (citing Counterclaims ¶¶ 190–92, 201)), this is not a faithful recitation of NABP's allegations in the Counterclaims.  In the Counterclaims, NABP specifically alleges that "PCC uses these false claims to drive consumers away from *safe domestic pharmacies* and toward riskier foreign pharmacies that PCC 'verifies.'"  (Counterclaims ¶ 190 (emphasis added).)  This allegation could potentially state a claim for injury on behalf of a "safe domestic pharmacy," but it cannot state a claim on behalf of NABP, which is not itself a pharmacy.  Indeed, this allegation would not even state a claim for injury on behalf of NABP if NABP had alleged, for instance, that NABP received a cut of domestic pharmacy sales.  *See Lexmark*, 572 U.S. at 133–34 (explaining that the plaintiff's required showing of "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising . . . is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff").

18

2018 WL 3973011, at *2 (E.D.N.Y. Aug. 20, 2018) ("*D'Avolio*") and then citing *PetConnect Rescue, Inc. v. Salinas*, No. 20-CV-527, 2020 WL 2832468, at *4 (S.D. Cal. June 1, 2020)).) However, neither of the cases NABP cites stands for such a proposition. Instead, the portions of both *D'Avolio* and *PetConnect Rescue* cited by NABP discuss injury-in-fact for purposes of Article III standing. *See D'Avolio*, 2018 WL 3973011, at *2 (finding that the plaintiff has individual standing to sue because "it has spent considerable financial resources to combat misrepresentations from the [d]efendants' alleged false advertising and disparaging statements"); *see also PetConnect Rescue*, 2020 WL 2832468, at *4 (finding that the plaintiff "has alleged a cognizable injury in fact" because "[a]n organization has direct standing to sue when it establishes that the defendant's behavior has frustrated its mission and caused it divert resources in response to that frustration of purpose"). Yet, the Supreme Court specifically held in *Lexmark* that a cause of action under the Lanham Act is not available simply to "anyone who can satisfy the minimum requirements of Article III." *Lexmark*, 572 U.S. at 129. Instead, a plaintiff must allege that their injury falls within the zone of interests protected by the statute and that their injury was proximately caused by violations of the statute, which the Court has already explained NABP has not adequately alleged. *See supra*.

Third, NABP appears to argue that there is authority for the proposition that a plaintiff can allege an actionable injury under the Lanham Act by alleging that it voluntarily diverted resources as a result of the defendant's conduct. (*See* NABP's Mem. 8 (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2018) ("*Browning*") and then citing *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 580 F. Supp. 634, 641 (S.D.N.Y. 1984)).) But here, again, neither of the cases NABP cites stands for such a proposition. Like *D'Avolio* and *PetConnect Rescue*, *Browning* also discusses injury-in-fact for purposes of Article III standing,

*Browning*, 522 F.3d at 1166, though unlike *D'Avolio* and *PetConnect Rescue*, in the entirely inapposite context of "an appeal of a preliminary injunction barring enforcement of a Florida voter registration statute as being preempted by two federal statutes," *id.* at 1155. And *Cuisinarts* merely references the fact that "[t]here is precedent for the recovery of corrective advertising expenses incurred by a plaintiff to counteract the public confusing resulting from a defendant's wrongful conduct" as damages in overruling the plaintiff's objection to a magistrate judge's ruling that the plaintiff was not entitled to discover the defendant's advertising costs. *Cuisinarts*, 580 F. Supp. at 641 (citation omitted). Moreover, the question of whether NABP "voluntarily" diverted resources is beside the point: to state a claim for injury under the Lanham Act, a plaintiff must allege commercial harm, and because NABP does not allege commercial harm, it fails to state a claim under the Lanham Act.[8]

Accordingly, NABP's Lanham Act claim is dismissed.

### 2. New York General Business Law §§ 349 and 350 Claims

"Section 349 [of the GBL] prohibits 'deceptive acts or practices in the conduct of any business, trade[,] or commerce,' whereas [§] 350 prohibits 'false advertising in the conduct of any business, trade[,] or commerce.'" *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (alterations omitted) (quoting N.Y. G.B.L. §§ 349, 350). "'The standard for recovery under . . . § 350, while specific to false advertising, is otherwise identical to [§] 349,' and therefore the Court will merge its analysis of the two claims."

---

[8] While not dispositive, the Court also must point out that NABP's many allegations that it was damaged because it was forced to "divert[] scarce resources, assets, and the attention of key personnel away from NABP's core missions," strike the Court as curious, given that one of NABP's alleged "missions" is to "support[] patient and prescription drug safety." (Counterclaims ¶¶ 11, 22.) Surely, part of that "mission" includes expending resources to combat alleged misinformation concerning prescription drugs—such as the legality and safety of foreign prescription drug importation.

*Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (citation omitted) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195, n.1 (N.Y. 2002)); *see also Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802 (S.D.N.Y. 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same" (alteration in original) (citation omitted)).  To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Wynn*, 2021 WL 168541, at *2 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Cosgrove*, 520 F. Supp. 3d at 575 (adopting the same standard); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (same).

PCC argues that NABP has failed to state a cognizable claim under either §§ 349 or 350 because NABP has failed to sufficiently allege that it suffered an actual, direct injury resulting from PCC's conduct.  (*See* PCC's Mem. 18–20.)  The Court agrees.

The New York Court of Appeals has explained that "a plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) (citing *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995)).  It is for this reason that a plaintiff may not recover for an "indirect" or "derivative" injury; that is, "when the loss arises solely as a result of injuries sustained by another party." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1145 (N.Y. 2004).  Consistent with this principle, the New York Court of Appeals held in *Blue Cross* that a plaintiff-insurance company could not bring a § 349 claim

against a group of tobacco companies based on the defendant-tobacco companies' alleged "deceptive practices designed to mislead the public regarding the harmful and addictive properties of cigarette smoking." *Id.* at 1142.  The plaintiff-insurance company sought to recover the costs of additional health care services provided to insureds as a result of the insureds' being convinced to take up smoking by the defendant-tobacco companies' deceptive practices, *see id.* at 1143, but the New York Court of Appeals found that the defendant-tobacco companies were not entitled to recover under § 349 because the defendants did not suffer an actual, direct injury, *see id.* at 1144.  Rather, the court found that the plaintiff's claimed injuries were "indirect because the losses it experienced arose wholly as a result of smoking related illnesses suffered by [the insureds]." *Id.* at 1145.  Similarly, in *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834 (N.Y. 2009), the New York Court of Appeals held that the City of New York (the "City") could not bring a § 349 claim against an out-of-state cigarette retailer-defendant who deceptively marketed "tax free" cigarettes to City residents to encourage residents to purchase cigarettes from the defendant and illegally avoid paying the City's high excise taxes, *id.* at 836–37.  The City sought to recover the amount of the unpaid cigarette tax revenue, *id.* at 837, but the New York Court of Appeals found that the City could not recover because "[t]he City's claimed injury here is just as indirect as the insurer's was in *Blue Cross*." *Id.* at 838.  The court explained that "[q]uite simply, had the allegedly deceived consumers not been improperly induced to purchase [the] defendants' cigarettes then the City would have no claim to lost tax revenue." *Id.*

Here, the Court finds that NABP has alleged only an indirect injury predicated on the alleged injury to consumers caused by PCC's deceptive practices, and thus, NABP is not entitled to recover under either §§ 349 or 350.  Again, NABP alleges that it has been injured because it

has been forced to take costly measures to counter PCC's misinformation regarding the legality and safety of foreign prescription drug importation and—after PCC launched counteroffensives against NABP—to defend NABP's integrity and credibility.  *See supra* I.A.  But each of these alleged injuries is ultimately dependent on an alleged injury to *consumers*.  NABP makes clear in the Counterclaims that "NABP has had to devote a considerable amount of time and resources fighting these pernicious myths from PCC and directing consumers to sites that conduct pharmacy safety" because "*consumers* are harmed by false beliefs about the allowability and legality of importation."  (Counterclaims ¶¶ 217–18 (emphasis added); *see also id.* ¶ 226 ("NABP has had to devote time and money to correct *consumer* misapprehensions caused by [PCC], and to protect the very existence of a legal, safe marketplace for online pharmacy." (emphasis added)).)  Moreover, because NABP does not allege that it engages in any revenue-producing activity, the only purpose of expending resources to counter PCC's attacks on NABP's integrity and credibility is to protect NABP's reputation with consumers and other industry actors so that NABP can better protect consumers from harm in the future.  (*See id.* ¶¶ 212–13 ("NABP has had to divert resources . . . to respond to false, misleading, and scurrilous attacks from PCC [which] has harmed and continues to harm NABP's ability to carry out its core public health mission [as a non-profit].").)

Indeed, a recent case from a court in the Eastern District of New York, *Voters for Animal Rights v. D'Artagnan, Inc.*, No. 19-CV-6158, 2021 WL 1138017 (E.D.N.Y. Mar. 25, 2021) ("*D'Artagnan*"), is instructive.  In *D'Artagnan*, a non-profit organization "dedicated to advancing the interests of citizens who support animal protection" brought §§ 349 and 350 claims against a foie gras producer that the plaintiff alleged had misled consumers "by advertising that [it] raised ducks in humane conditions," when in fact its production practices

were inconsistent with a reasonable consumer's understanding of "humane." *Id.* at *1–2.  The plaintiff alleged that it was harmed because the defendant's deceptive advertising had "been effective in changing consumer attitudes towards a ban on foie gras production," thus "directly decreas[ing] the effectiveness of [the plaintiff's] efforts to reduce fois gras consumption" and "requir[ing] [the plaintiff] to expend its resources to counter [the] [d]efendant's misrepresentations." *Id.* at *1 (quotation marks omitted).  The *D'Artagnan* court held that the plaintiff had failed to allege a cognizable injury under either §§ 349 or 350 because "[the] [p]laintiff's asserted injuries are derivative of injuries to consumers, not direct injuries," explaining that "the consumers, not [the] [p]laintiff, are allegedly being misled and injured by [the] [d]efendant['s] misrepresentations" and thus, "[the] [p]laintiff's alleged injury—the additional expenses it incurs to combat [the] [d]efendant['s] harmful advertisements to consumers who would not support fois gras if given accurate information . . . is too remote and indirect." *Id.* at *7–8.  In short, "[u]nless and until consumers are mislead by [the] defendant['s] conduct, there is no injury to [the] [p]laintiff." *Id.* at *8.  The same is true here.

At bottom, NABP is correct to observe that "[t]he standards under §§ 349 and 350 are substantially the same as those applied to claims brought under [§] 43(a) of the Lanham Act," (NABP's Mem. 18 (alterations omitted) (quoting *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 518 (S.D.N.Y. 2012))), and NABP's §§ 349 and 350 claims fail for largely the same reasons that NABP's Lanham Act claimed failed.  Accordingly, NABP's §§ 349 and 350 claims are dismissed.

### 3.  D.C. Consumer Protection Procedures Act Claim

The CPPA prohibits "engag[ing] in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby," and sets forth a host of conduct that qualifies as such an "unfair or deceptive trade practice."  D.C. CODE § 28-3904.  "The

[CPPA] affords a panoply of strong remedies, including treble damages, punitive damages[,] and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1004 (D.C. 2020) (quoting *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006)).  However, the statute's protections extend only to "consumer goods and services that are purchased or received in the District of Columbia."  *Id.* (quotation marks omitted); *see also* D.C. CODE § 28-3901(c) ("This chapter establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia."); *Fastov v. Christie's Int'l PLC*, No. 97-CV-578, 2006 WL 8460194, at *9 (D.C. Mar. 1, 2006) ("[T]he court finds nothing in the CPPA to indicate that the District of Columbia intended the statute to operate extraterritorially. . . .").

PCC argues that NABP has failed to allege a sufficient nexus between PCC's alleged conduct and the District of Columbia, which is fatal to NABP's CPPA claim.  (*See* PCC's Mem. 20–22.)  The Court agrees.

NABP has alleged that it is a non-profit corporation organized under the laws of Kentucky and with its principal place of business in Illinois, and that PCC is a limited liability company organized under the laws of New York and with its principal place of business in New York.  (*See* Counterclaims ¶¶ 14–15.)  Therefore, PCC's activities directed at NABP clearly did not take place in the District of Columbia.  *See, e.g.*, *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010) ("We also agree with [the defendant] that [the plaintiff] cannot state a claim under the CPPA.  [The plaintiff] invokes the protection of the [CPPA] even though he is a resident of Michigan, [the defendant] is a Delaware corporation headquartered in Maryland, and nothing related to the dispute between the two occurred in the District of Columbia.").

25

NABP's arguments to the contrary are, again, unavailing.  NABP argues that it has alleged a sufficient nexus between PCC's alleged conduct and the District of Columbia, pointing to its allegations that (1) "[NABP] brings its claims on behalf of itself and the consumers and general public of the District of Columbia," (Counterclaims ¶ 256), (2) "NABP members consist of the 60 United States state boards of pharmacy, as well as the board[] in the District of Columbia," (*id.* ¶ 22), and (3) PCC has made false statements on the internet, which reaches consumers in the District of Columbia, (*see generally id.*), (*see* NABP's Mem. 20–21).  While "public interest organizations are empowered to bring suits on behalf of the interests of a consumer or a class of consumers" under the CPPA, *Animal Legal Def. Fund v. Hormel Foods Corp.*, 258 A.3d 174, 183 (D.C. 2021) (quotation marks omitted)—and the Court will assume for the sake of argument that NABP is such a public interest organization, (*but see* PCC's Mem. 23)—NABP's bare allegations that one of its member-organizations is located in the District of Columbia and that it has brought this Action on behalf of consumers who reside in the District of Columbia, who may have accessed PCC's website, are textbook "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678.  Put another way, the Court will not infer from NABP's conclusory allegation that it has brought its CPPA claim "on behalf of . . . the consumers and the general public of the District of Columbia," (Counterclaims ¶ 22), the requisite factual circumstance that a consumer within the District of Columbia actually "purchased or received" a good or service from PCC, D.C. CODE § 28-3901(c).

Accordingly, NABP's CPPA claim is dismissed.

### III.  Conclusion

For the foregoing reasons, PCC's Motion is granted.  The Clerk of Court is directed to terminate the pending motion at Dkt. No. 190.

Because this is the first adjudication of NABP's counterclaims on the merits, the dismissal is without prejudice.  To the extent NABP has a good faith basis for filing amended counterclaims, it must do so within 30 days of the date of this Opinion & Order.  Failure to properly and timely amend will result in dismissal of the counterclaims with prejudice, without further notice.

SO ORDERED.

Dated:    September 20, 2022
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge

27