UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PharmacyChecker.com LLC,<br>*Plaintiff*,<br>vs.<br>National Association of Boards of Pharmacy et al.,<br>*Defendants*. | Civil Action No. 7:19-cv-07577-KMK<br>Plaintiff's Opposition to Defendant NABP's Motion to Exclude the Expert Testimony of Dr. Jonathan Hochman<br>Judge Kenneth M. Karas<br>Magistrate Judge Victoria Reznik |

# TABLE OF CONTENTS


INTRODUCTION ........ 1
SUMMARYOF DR. JONATHAN HOCHMAN'S REPORT AND METHODOLOGY . 1
LEGAL STANDARD ........ 6
ARGUMENT ........ 7
I. DR. HOCHMAN'S TESTIMONY MEETS THE *DAUBERT* STANDARD ........ 7
A. Dr. Hochman's Opinions Rest on a Reliable Factual Predicate ........ 7
B. Dr. Hochman Applies Accepted Methodologies to Confirm His Conclusions about the Effects of NABP's Statement on PCC's Website Traffic ........ 10
1. *Analysis of produced documents and data and publicly available information.* ........ 14
2. *Structural Break Analysis.* ........ 14
C. NABP's Attacks on Dr. Hochman's Methodology Are Baseless ........ 11
II. THE COURT SHOULD NOT EXCLUDE DR. HOCHMAN'S TESTIMONY BECAUSE NABP MISREPRESENTS DR. HOCHMAN'S QUALIFICATIONS, THE FACTS, AND LAW ........ 13
A. A Single *Daubert* Decision Does Not Negate Dr. Hochman's Qualification ........ 13
B. NABP Misrepresents the Law ........ 14
1. *Dr. Hochman's choice of dataset does not render his methodology unreliable.* ........ 14
2. *Dr. Hochman properly limited his analysis to web traffic causation* ........ 14
3. *Expert testimony may include reasonable inferences about the continuing or cumulative impact on ongoing events.* ........ 14
C. NABP Misrepresents the Contents of the Report ........ 18
III. NABP'S *DAUBERT* CHALLENGE TURNS ON FACT DISPUTES ........ 22
CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18, 21 (2d Cir. 1996) ............................................................*passim*

*In re Broiler Chicken Antitrust Litig.*,
No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ................................. 11

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (SDNY 2022) ........................................................... 7, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................*passim*

*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (S.D.N.Y. 2011) ....................................................... 15

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............................................... 7, 14, 15

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......................................................................... 17

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
103 F. Supp. 2d 268 (S.D.N.Y. 2000) ....................................................... 17

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...................................................................... 7, 15

*In re Namenda Direct Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018) ....................................................... 11

*Nimely v. City of N.Y.*,
414 F.3d 381 (2d Cir. 2005) ................................................................ 23

*Oliver v. AMEX Co.*,
No. 19-CV-566 (NGG)(SJB), 2024 WL 100848 (E.D.N.Y. Jan. 9, 2024)............... 22

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) .................................... 18, 19, 20, 21

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ........ 22

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) ........ 15

*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015) ........ 23

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 2445 13-MD-2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) ........ 23

*Zesty Paws LLC v. Nutramax Labs., Inc.*,
157 F.4th 194 (2d Cir. 2025) ........ 1-2

**Statutes and Rules**

15 U.S.C. §§ 1051 *et seq.* ........ 2

Fed. R. Evid. 702 ........ *passim*

Fed. R. Evid. 703 ........ 11, 17, 18

## INTRODUCTION

The National Board of Pharmacy ("NABP") has twice moved and failed to have some or all of PharmacyChecker.com LLC's ("PCC") search engine optimization ("SEO") and technical expert's traffic analysis excluded from the record. Now, for yet a third time, NABP seeks to have Dr. Hochman's report excluded—this time under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). But NABP misrepresents nearly every component essential to the Court's consideration of its motion: the law, the facts, and Dr. Hochman's opinions. Without those misrepresentations, there is no basis to challenge Dr. Hochman's methodology.

There is no basis to exclude Dr. Hochman's opinions. His report provides a straightforward analysis, grounded in widespread SEO principles and the facts in the record, including documentary evidence, data produced by the parties, deposition testimony, and publicly available information.

## SUMMARY OF DR. JONATHAN HOCHMAN'S REPORT AND METHODOLOGY

PCC retained Dr. Hochman to analyze if, and to what extent, being listed on NABP's "Not Recommended List" ("NRL") harmed PCC's website's organic search traffic. A Lanham Act case requires, among other elements, that the plaintiff must establish the cause of the actual or likely injury to the plaintiff. *Zesty Paws LLC v. Nutramax Labs., Inc.*, 157 F.4th 194, 197 (2d Cir. 2025).

Dr. Hochman reviewed the record evidence to assess the cause of the dramatic decline in PCC's website traffic. This included PCC's traffic and revenue trends, documentary evidence describing NABP's role serving as an integrated verification

partner with Google and Bing, documentary evidence describing Google's web page ranking algorithm, and the effect of any confounding factors that could have been responsible for a dramatic decline in web traffic to PCC's website subsequent to NABP's placement of PCC on the NRL. Based on a review of the data and evidence, and application of well-accepted principles in the fields of search engine optimization, online advertising, and Internet technology, Dr. Hochman reached the following conclusions:

***First***, a correlation of search engine updates and trends in PharmacyChecker.com's web traffic suggests a causal relationship between those trends and the addition of PCC's websites to NABP's NRL.

***Second***, the alleged "blacklisting" against PCC caused PCC's ranking in search engine results and resulting web traffic to deteriorate. Neither the contemporaneous state of PCC's website and SEO efforts, nor changes in market conditions explain the decrease in PCC's web traffic.

***Third***, the loss of web traffic had a significant and lasting financial effect on PCC.

**Summary of Facts**

PCC verifies and accredits online pharmacies and provides website users with information to assist them in finding reasonably priced prescription medication online. It predominantly generates revenue when users click on a hyperlink on PCC's website that directs to PCC-accredited pharmacies, a common revenue model known as "pay-per-click." Dkt. No. 513, Ex. G, Expert Report of Jonathan Hochman (Apr. 1,

2025) ("Hochman Rep.") ¶ 23; Dkt. No. 513, Ex. B, Supplemental Expert Report of Jonathan Hochman (May 1, 2025) ("Hochman Supp. Rep.") ¶ 23. PCC's revenue is dependent on user clicks to the listings on its website. *Id.* In late 2018, NABP put PCC on its NRL. As of December 2025, PCC has not been removed from the NRL, and Google continues to rely on NABP accreditation for its pharmacy advertisements in the United States. Safe.Pharmacy, Not-Recommended Sites (visited Dec. 10, 2025);[1] Hochman Rep. ¶ 33; Hochman Supp. Rep. ¶ 33.

Contrary to the assertions in NABP's motion, Dr. Hochman does not argue that Google- and Bing-specific traffic data is required to support his causation opinion. He relies on total organic traffic data, which overwhelmingly reflects Google traffic—the dominant U.S. search engine—while also capturing Bing traffic, the second-largest U.S. search engine. Hochman Rep. ¶ 48; Hochman Supp. Rep. ¶ 48; Dkt. No. 513, Ex. A, Deposition of Jonathan Hochman (June 9, 2025) ("Hochman Tr.") at 77:19–24. The remaining search engines that NABP purports to have a significant impact on its web traffic analysis, like Yahoo, DuckDuckGo, and Yandex, combined, constitute less than 6% of the U.S. search engine market. Hochman Rep. ¶ 48 n.36; Hochman Supp. Rep. ¶ 48 n. 38 (*see* source column labeled 2019). Dr. Hochman explains that total organic traffic is a reasonable and widely accepted proxy for Google- and Bing-driven traffic, and thus fully capable of showing the effect of NABP's statements on PCC's website traffic. And in its ruling on NABP's motion for sanctions, the Court (Reznick, M.J.) opined, "As the parties conceded during the September 2025 Discovery conference,

1. NRL, https://safe.pharmacy/not-recommended-sites.

the produced data shows that most of the total organic search traffic comes from Google for every period such data was measured." Dkt. No. 502 at 17.

Dr. Hochman analyzed PCC's monthly user sessions to its website between January 2015 and July 2021. The greatest month-to-month increase in PCC's user sessions and the greatest month-to-month decrease in PCC's user sessions correspond with Google core updates in and around the addition of PCC to NABP's NRL. Hochman Rep. ¶¶ 42–46; Hochman Supp. Rep. ¶¶ 42–46.

Dr. Hochman's analysis relies on publicly available information regarding Google's algorithm, which describes a causal chain of credibility signals that affect Google's evaluation of a website, not one singular HTML hyperlink between the NRL and PCC's website as NABP suggests. Dkt 512 at 17. Google's web page ranking system considers many signals, and the effects of any changes in these signals are observable after a Google core update. Hochman Rep. ¶¶ 47–59; Hochman Supp. Rep. ¶¶ 47–59. For example, Google has publicly stated that its automated ranking system "uses a mix of many different signals to rank great content" and seeks to align those signals with what human beings would consider is great content under Google's Expertise-Authoritativeness-Trustworthiness ("E-A-T") criteria. Dr. Hochman's report further describes in detail how Search Quality Evaluators ('raters") of search engine quality apply especially rigorous standards when assessing webpages involving reputation in the medical context. Where high levels of expertise or authoritativeness are required, raters are instructed to rely on external expert opinions, like those of professional organizations, to evaluate information about a

website from sources outside of the website itself. Hochman Rep. ¶ 52; Hochman Supp. Rep. ¶ 52.

Dr. Hochman's deposition testimony is consistent with this explanation, even though NABP has taken it out of context. When NABP asked Dr. Hochman if there was a link—meaning an HTML link—from NABP's website to PCC's website, Dr. Hochman stated: "No. . . . I'm using the word link in a [] logical sense . . . ***I'm not asserting that there's an HTTP link there***. I'm just saying there's a [] reference. They're [] naming that site as a bad site." Hochman Tr. at 172:11–18.

Though Google's PageRank system, one component of its broader ranking framework, does consider HTML links, Dr. Hochman's report is not limited to that single signal. Hochman Rep. ¶ 59; Hochman Supp. Rep. ¶ 59. His entire report explains that Google's webpage ranking system relies on multiple signals, including evaluations by human raters, algorithmic relationships inferred from language and semantic associations, and hyperlink structures. Hochman Rep. ¶¶ 47–59; Hochman Supp. Rep. ¶¶ 47–59. NABP's attempt to reduce this multifaceted analysis to a single HTML link mischaracterizes both Dr. Hochman's testimony and Google's ranking methodology.

Dr. Hochman's testimony also relies on publicly available information regarding at least six instances of NABP's statements causing a decrease in PCC's website traffic, as well as the documented pharmacy verification relationship between NABP and Google. Hochman Rep. ¶ 33-39, 60; Hochman Supp. Rep. ¶¶ 33–39, 60; *see also,* Dkt. No. 82. Further, Dr. Hochman relies on at least nine different

publicly available sources detailing NABP's relationship with Google (and Bing), including one that describes Google's potential suppression of websites believed to be NABP-unverified online pharmacies and a "warning banner" on the Bing search engine when a user attempts to access any of the sites identified on the NABP NRL. Hochman Rep. ¶¶ 33–39; Hochman Supp. Rep. ¶¶ 33–39.

**Summary of Methodology**

Dr. Hochman conducted a comprehensive, methodical investigation and analysis of the factual information outlined above. Hochman Rep. ¶¶ 23–69; Hochman Supp. Rep. ¶¶ 23–70. Drawing on his specialized expertise as an SEO and technical expert, Dr. Hochman then performed a structural break data analysis and ran three different computer models to detect structural breaks in PCC's web traffic data. Hochman Rep. ¶ 68; Hochman Supp. Rep. ¶¶ 69-70. All models detected a binary break (divided the data into two) in March of 2019, which is the date of the Google update that would have caused PCC's web traffic to decline after being placed on NABP's NRL. *Id.*

## LEGAL STANDARD

Federal Rule of Evidence 702 requires courts to ensure that expert testimony rests on a reliable foundation and is relevant to the task at hand. An expert opinion is inadmissible if the expert has no "reliable basis in the knowledge and experience of [the relevant] discipline" or if the opinion is not "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 589–92 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). This standard applies to all expert

testimony proffered under Rule 702, whether involving scientific, technical, or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–51 (1999).

The Court determines whether the reasoning and methodology underlying each proffered opinion are reliable. *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022). Part of the Court's gatekeeping duty is determining whether testimony will assist the jury to understand evidence or determine a fact at issue. *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009); *Capri Sun,* 595 F. Supp. 3d at 120–21. This analysis is grounded in the merits of the expert's opinions, not the vehemence of the opposing party in disputing factual issues that a jury must determine or that party's insistence that the proffered expert is not as capable as its own.

## ARGUMENT

### I. DR. HOCHMAN'S TESTIMONY MEETS THE *DAUBERT* STANDARD

Dr. Hochman establishes that NABP's placement of PCC on its NRL reduced web traffic to PCC's website. While NABP may disagree with Dr. Hochman's conclusions, it has no legitimate basis to argue these conclusions are not admissible: they correctly derive from the empirical and publicly available data and are analyzed through common and reliable statistical analyses used within the SEO and internet technology community.

#### A. Dr. Hochman's Opinions Rest on a Reliable Factual Predicate

Dr. Hochman's opinions are based on reliable and sufficient data. While NABP raises certain factual issues that NABP cites as supposed indications that Dr. Hochman's opinions are unreliable, it ignores or omits many facts cited by Dr.

Hochman. In particular, NABP tries to obscure the information cited regarding the volume of web traffic well-established as coming from Google. Among the facts Dr. Hochman relied on for his reports and testimony:

- Approximately 90% of search engine traffic in the United States is from Google. NABP has repeatedly attempted to omit or ignore this fact by lamenting that it cannot tell which data is Google's, but even the Court (Reznick, M.J.) has confirmed the nearly similar traffic rates between the aggregate traffic report and that of Google in this case. Dkt. 502 at 17; Hochman Rep. ¶ 48; Hochman Supp. Rep. ¶ 48.
- Google's web page ranking algorithm consists of many signals, not a singular HTML hyperlink. Despite NAPB's strawman argument, Dr. Hochman relies on at least eleven publicly available sources describing Google's multi-signal webpage ranking system, including sources directly from Google. Hochman Rep. ¶¶ 47–59; Hochman Supp. Rep. ¶¶ 47–59. These sources describe the processes, identities, and criteria that formulate this multi-signal system that relies on human raters, algorithmic relationships inferred from language and semantic associations, and hyperlink structures combined. *Id.*
- NABP has a documented relationship with Google that affects web search results. Dr. Hochman relies on at least nine different publicly available sources detailing NABP's relationship with Google (and Bing), including one that describes Google's potential suppression of websites it believes to be online

pharmacies[2] unverified by NABP and a "warning banner" on the Bing search engine when a user attempts to access any of the sites identified on the NABP NRL. Hochman Rep. ¶¶ 33–39; Hochman Supp. Rep. ¶ ¶¶ 33–39.

- PCC's website experienced a dramatic decline in traffic in March of 2019, the same time as the Google algorithm update that would have considered PCC's placement on the NRL. Dr. Hochman analyzed PCC's monthly user sessions to its website between January 2015 and July 2021. The greatest month-to-month increase in PCC's user session and greatest month-to-month decreases in PCC's user sessions correspond with Google core updates in and around the adding of PCC to NABP's NRL. Hochman Rep. ¶ 46; Hochman Supp. Rep. ¶ 46.
- Alternative causes do not explain the decrease in traffic. Dr. Hochman's report discusses why PCC's website optimization, market changes, or additional market competitors could not have caused the dramatic loss in web traffic at the time of Google's core updates in 2019. Hochman Rep. ¶ 62; Hochman Supp. Rep. ¶ 62.
- PCC is still on NABP's NRL. As of December 2025, NABP has not removed PCC from the NRL, and therefore, the alleged cause of harm still remains in effect. NRL, *supra* note 1.

---

2. PCC is not an online pharmacy.

### B. Dr. Hochman Applies Accepted Methodologies to Confirm His Conclusions about the Effects of NABP's Statements on PCC's Website Traffic

Dr. Hochman's testimony cannot be excluded under *Daubert* because his methodology is sound. An expert opinion is inadmissible if the expert cannot show that he has a "reliable basis in the knowledge and experience of the relevant discipline or if the opinion is not supported by appropriate validation – *i.e.*, 'good grounds' based on what is known must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589–90, 592 (citation modified); *Capri Sun*, 595 F. Supp. 3d at 120. And, notwithstanding NABP's arguments to the contrary, the fact is, Dr. Hochman's methodology has been accepted by courts and SEO experts.

#### *1. Analysis of produced documents and data and publicly available information*

First, Dr. Hochman methodically reviewed the data and documents produced by the parties, as well as the publicly available information regarding the inner workings of Google's webpage ranking algorithm and NABP's verification relationship with Google, and then synthesized the information based on his expertise. *See generally*, Hochman Rep. and Hochman Supp. Rep. At its most basic level, this is the type of analysis contemplated by Federal Rule of Evidence 703, which permits an expert to base an opinion on facts or data in the case the expert has been made aware of or personally observed. Fed. R. Evid. 703.

### 2. *Structural Break Analysis*

After reviewing the data and documents produced by PCC, and publicly available information, Dr. Hochman ran three different computer models to detect structural breaks in data. Hochman Rep. ¶ 68; Hochman Supp. Rep. ¶ 69. These models detect points in linear time data where trends shift. *Id*. Dr. Hochman configured the models to consider the entirety of PCC's session data and to look for a binary break—that is, to divide the data into two periods based on its trends. *Id*. All three models identified March 2019 as the breakpoint where a dramatic change in trends of PCC's data traffic occurred. *Id*. This statistical break analysis is a commonly accepted methodology in data analytics. *Id.* n.66; *In re Namenda Direct Purchaser Antitrust Litig*., 331 F. Supp. 3d 152, 176 (S.D.N.Y. 2018) (where the expert found a structural break in the data at the same time a certain strategy was implemented by the defendants); *see also, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *8–9 (N.D. Ill. May 27, 2022) (where the expert employed a structural break test and analysis to identify significant changes in broiler supply).

## C. NABP's Attacks on Dr. Hochman's Methodology Are Baseless

NABP's claim that Dr. Hochman's conclusions regarding NABP's statements causing a decrease in web search rankings are based on "bare speculation" or "ipse dixit" is without merit. Dkt. No. 513 at 6, 18. Mere "ipse dixit" is a conclusory opinion lacking sufficient basis, contrasted by an expert opinion supported by methodology and application to the facts. *Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir. 1996).

As described above, Dr. Hochman's conclusions rely on a reliable factual

predicate including NABP's statements, publicly available information regarding NABP's relationship with search engines, publicly available information regarding Google's web page ranking algorithm, PCC's web traffic data, and an investigation into potential alternative causes into PCC's dramatic decline in website traffic. *See generally*, Hochman Rep. *and* Hochman Supp. Rep. He assesses causation based on the facts regarding NABP's statements regarding PCC, relationship with Google, and PCC's website traffic with the mechanisms of Google's multi-signal webpage ranking system and the timing of Google's algorithm updates. Dr. Hochman also assesses potential confounding factors, including Google algorithm changes, changes in the marketplace, and changes in PCC's SEO strategy. *See generally*, Hochman Rep. and Hochman Supp. Rep. Dr. Hochman's analysis is further supported by statistical modeling, which shows the Google update that would have incorporated PCC's existence on the NRL occurred in March 2019, the same month PCC experienced a dramatic decrease in web traffic. Hochman Rep. ¶ 68; Hochman Supp. Rep. ¶ 69.

NABP puts forth an unsupported conclusory statement ("the only way he could have analyzed webpage rankings is by doing a before and after keyword search analysis!") to suggest that Dr. Hochman's methodology is unreliable. Dkt. No. 513 at 14. Merely because NAPB's expert chose to run a different test than Dr. Hochman does not render Dr. Hochman's own methodology unreliable, nor is it a basis for exclusion under *Daubert*. The trier of fact determines the credibility and weight of such competing analyses. *Boucher*, 73 F.3d at 21.

Dr. Hochman's conclusions are not "bare speculation" or "ipse dixit"; they are a data-driven, evidence-based expert inference, consistent with accepted methodology in search engine analytics. Dkt. No. 513 at 6, 18. These facts demonstrate that his opinions are the product of reliable methods applied reliably to the facts of this case and therefore satisfy Rule 702 and *Daubert*.

## II. THE COURT SHOULD NOT EXCLUDE DR. HOCHMAN'S TESTIMONY BECAUSE NABP MISREPRESENTS DR. HOCHMAN'S QUALIFICATIONS, THE FACTS, AND LAW

### A. A Single *Daubert* Decision Does Not Negate Dr. Hochman's Qualifications

Dr. Hochman's expertise in the field of SEO, online advertising, and internet technology, and his capacity to provide informed opinions are firmly grounded in years of knowledge, skills, experience, training, and education. Fed. R. Evid. 702. For example:

- He has over 30 years of experience in online marketing, advertising, SEO, and internet technology. Hochman Rep. ¶ 3; Hochman Supp. Rep. ¶ 3.
- He has three degrees in computer science from Yale University, including a Ph.D., and was teaching fellow there during his studies. Hochman Rep. ¶¶ 4–5; Hochman Supp. Rep. ¶¶ 4–5.
- He has given numerous speeches and written many articles on the topic. Hochman Rep. Ex. A.
- He is also a technology entrepreneur, whose companies focus on technology, digital marketing, advertising, and SEO, and currently is

employed as a lecturer in the Yale Department of Computer Science. Hochman Rep. ¶¶ 6–9, 11–12; Hochman Supp. Rep. ¶¶ 6–9, 11–12.

- He has testified as an expert witness for major clients like Delta Airlines and Duracell (batteries). Hochman Rep. ¶¶ 14–15; Hochman Supp. Rep. ¶¶ 14–15.

NABP points to a *Daubert* decision from nearly a decade ago in which his opinion was excluded, but not on the basis of his qualifications as an expert. Dkt 512 at 16. He recently testified in *Delta Air Lines, Inc. v. Marriott Int'l, Inc.*, where he provided an analysis of organic Google search traffic for relevant keywords and explained the mechanisms of the Google search engine. No. 1:20-cv-01125 (N.D. Ga. Nov. 12, 2025) (Declaration of James F. Lerner, Ex. 1 (N.D. Ga. Nov. 12, 2025) at 91–100).

Dr. Hochman's years of experience as an expert in his field—and as an expert witness in court—demonstrate his extensive knowledge on SEO, internet technology, and online advertising, and qualify him as a competent expert.

### B. NABP Misrepresents the Law

#### *1. Dr. Hochman's choice of dataset does not render his methodology unreliable.*

Dr. Hochman's reliance on a dataset for overall search engine traffic—instead of a dataset separating out traffic by search engine as NABP purports to prefer—does not render his opinions inadmissible, particularly because the more granular dataset NABP prefers would add nothing of relevance to Dr. Hochman's analysis. Under Rule 702, an expert's opinion is admissible if, among other things, the opinion is based on

sufficient "facts or data." Fed. R. Evid. 702.

Courts in this district have repeatedly held that Rule 702 does not require an expert to use every conceivable data source or a perfect dataset; rather, the expert must base his opinion on "good grounds, based on what is known." *Fosamax*, 645 F. Supp. 2d at 173 (citing *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)); *Daubert*, 509 U.S. at 580 (explaining, that as long as the evidence rests on good grounds, it should be tested by cross-examination, rather than excluded from jurors' scrutiny). Courts routinely admit expert testimony based on indirect or circumstantial data where the expert's methods are scientifically valid. *See, e.g.*, *Daubert*, 509 U.S. at 590–91 (emphasizing evaluation of the methodology rather than the conclusions themselves); *Kumho Tire*, 526 U.S. at 147 (extending Daubert's reliability standard to all expert testimony).

Indeed, the admissibility analysis under *Daubert* relies on the reliability of the methodology, not on the conclusions they generate or whether the expert has used every dataset possible. 509 U.S. at 595; *Deutsch v. Novartis Pharms. Corp*. 768 F. Supp. 2d 420, 449–50 (S.D.N.Y. 2011) (admitting expert opinion based on circumstantial evidence). Even an expert's reliance on indirect evidence is neither unusual nor disqualifying; it reflects standard scientific practice. As courts have consistently emphasized, challenges to the assumptions or data go to weight, not admissibility. *See, e.g.*, *Boucher*, 73 F.3d at 21.

NABP's argument rests on a strawman. NABP itself invented, and then refuted, the notion that Dr. Hochman's opinion depends on a posited, non-existent

singular HTML hyperlink between the NRL and PCC's website. Dkt 512 at 17. That theory finds no support in the record. As set forth in the factual summary above, Dr. Hochman's testimony describes a causal chain of credibility signals that affect Google's evaluation of websites. Hochman Rep. ¶¶ 47–59; Hochman Supp. Rep. ¶¶ 47–59. Google's web page ranking system considers many signals, and the effects of any changes in these signals are observable after a Google core update. *Id*. NABP's attempt to reduce this multifaceted analysis mischaracterizes both Dr. Hochman's testimony and Google's ranking methodology.

NABP improperly minimizes the scope of Dr. Hochman's analysis, ignoring that his opinion is based on a multi-signal, integrated system of evidence demonstrating that NABP's statements caused PCC's decline in web traffic. Disagreement with an expert's conclusions, however, is not a basis for exclusion under *Daubert*. 509 U.S. at 589–95; Fed. R. Evid. 702.

***2. Dr. Hochman properly limited his analysis to web traffic causation.***

As an SEO expert, Dr. Hochman deliberately confined the focus of his analyses to the web traffic causation. Yet NABP argues that Dr. Hochman's report should be excluded because he did not analyze PCC's revenue data. Dkt 512 at 30. This is not only contrary to Federal Rule of Evidence 702 and the *Daubert* legal standard, it is a non sequitur. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 599–600 (Blackmun, J., concurring). PCC's revenue loss is merely incidental to his opinion on web traffic causation, and he does not purport to be an expert in accounting, economics, or damages. Hochman Rep. ¶ 18; Hochman Supp. Rep. ¶ 18. His assignment was only

to analyze the cause of the dramatic decrease in PCC's web traffic, and that's what he did.

It is hardly controversial that a loss of website traffic led to a loss of revenue. Dr. Hochman's inference between the loss of website traffic and the loss of revenue is exactly the kind allowed by the Federal Rules of Evidence. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data . . . that the expert has been made aware of or personally observed." The term "inference" is covered by the broader term "opinion."). PCC predominantly generates revenue when users click on links on PCC's website that direct to PCC-accredited pharmacies—a common revenue model known as pay-per-click. Hochman Rep. ¶ 23; Hochman Supp. Rep. ¶ 23. PCC's revenue is dependent on user clicks to the pharmacy listings on its website. *Id*. Therefore, generating traffic to its website is imperative to PCC's business model, because reduced traffic to the website means reduced clicks on the website, and resulting loss in pay-per-click revenue. *Id*. Dr. Hochman's conclusions regarding a decline in revenues are based on the task he was hired to perform—an analysis of the cause of the dramatic decrease in PCC's website traffic.

### ***3. Expert testimony may include reasonable inferences about the continuing or cumulative impact of ongoing events.***

NABP suggests that Dr. Hochman's testimony regarding any effect of NABP's statements on PCC's web traffic post-2019 should be excluded because that is not where he performed his analysis. Dkt. 512 at 29. But "an expert may base an opinion on facts or data . . . that the expert has been made aware of or personally observed. Fed. R. Evid. 703. And "[t]rained experts commonly extrapolate from existing data."

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). So long as the underlying data and methodology are reliable, experts are not required to base their opinions ***exclusively*** on empirical data. *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).

Dr. Hochman's report thoroughly explains the factual basis for his opinions, including web traffic data, publicly available information, and Google algorithm updates. *See generally*, Hochman Rep. Moreover, as of December 2025, PCC has not been removed from the NRL, and Google continues to rely on NABP accreditation for its pharmacy advertisements in the United States. NRL, *supra* note 1; Hochman Rep. ¶ 33; Hochman Supp. Rep. ¶ 33. Dr. Hochman rationally concludes the cause of the harm to PCC's web traffic has persisted since 2019. *Id*. Dr. Hochman's extrapolation of the data is precisely the sort of reliable analysis contemplated by Rule 702.

**C. NABP Misrepresents the Contents of the Report**

NABP distorts the contents of Dr. Hochman's report while omitting some of its key premises. Properly represented, there is no basis to exclude Dr. Hochman's opinions.

***Google and Bing Search Engine Traffic***. Google Search comprises nearly 90% of the United States search engine market, with Bing comprising an additional 6%–8%. Hochman Rep. ¶ 48; Hochman Supp. Rep. ¶ 48; Hochman Tr. at 79:11-14. Dr. Hochman *did* analyze Google and Bing data, because it constitutes the overwhelming majority of U.S. search engine traffic. NABP's assertion that Dr. Hochman's data is insufficient is baseless.

***Not Solely a Temporal Correlation***. Further, contrary to NABP's

characterizations, none of Dr. Hochman's analyses are based solely on temporal correlation. The temporal correlation in *R.F.M.A.S., Inc. v. So*, the case NABP cites to support its theory, was based on several factors—none of which, as discussed in turn below, are present in Dr. Hochman's testimony. 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010).

*Alleged Failure to Justify Underlying Assumptions.* In *R.F.M.A.S.*, the court excluded expert testimony in part because the experts did not explain their assumption with enough detail to allow defendants' counsel and the jury to test their conclusions. *Id.* at 269. While the experts knew the alleged conduct included copying some of the plaintiff's jewelry line, they did not articulate which pieces were protected by the plaintiff's copyright and which individual pieces or designs were allegedly infringed by the defendant. *Id.*

There is no parallel here. Dr. Hochman explicitly identifies his assumptions: "I understand that this litigation, in part concerns allegations that defamation by [NABP] impacted internet traffic to the [PCC] website . . . [and] PCC allege[d] that their listing on NABP's 'not recommended' list harmed the PCC's website's organic search rankings." Hoffman Rep. ¶ 17; Hochman Supp. Rep. ¶ 17. He then identifies the exact dates that NABP put PCC on the NRL. *Id.* Furthermore, as demonstrated by its own *Daubert* motion, NABP did not have issues identifying Dr. Hochman's underlying assumptions—it devotes much of its brief to arguing why those assumptions are incorrect.

*Purported Failure to Understand the Alleged Legal Violation.* In *R.F.M.A.S*,

the court excluded the expert testimony in party because the experts did not understand the legal violation. The experts merely identified "confidential information" generally and failed to identify what trade secrets were stolen, how the defendants allegedly used the stolen trade secrets, or how the defendants' use of the trade secrets harmed the plaintiff. 748 F. Supp. 2d at 270.

That problem is absent here. Dr. Hochman expressly identifies the legal violation, explaining that the case "concerns allegations that defamation by [NABP] impacted internet traffic to the [PCC] website," and that PCC claims that NABP's listing of PCC on the NRL harmed the PCC website's organic search rankings. Hochman Rep. ¶ 17; Hochman Supp. Rep. ¶ 17. He further states his assignment was to determine if and to what extent, inclusion on NABP's "not recommended" list harmed the PCC website's organic search traffic. Hochman Rep. ¶ 18; Hochman Supp. Rep. ¶ 18.

*Purported Failure to Describe the Illegal Conduct*. In *R.F.M.A.S.*, the court said, the experts "fail to spell out in their reports the factual basis for their conclusions; rather, it appears that they proceeded through their investigations into causation without articulating even for themselves what, precisely, defendants' assumed conduct consisted of." 748 F. Supp. 2d at 270. But Dr. Hochman plainly spells out NABP's assumed conduct: putting PCC on NABP's NRL list. Hochman Rep. ¶¶ 17–18; Hochman Supp. Rep. ¶¶ 17–18. Hochman describes in detail NABP's

actions to which he attributes PCC's traffic loss. Hochman Rep. ¶¶ 33–39; Hochman Supp. Rep. ¶¶ 33–39.

*Purported Failure to Consider Alternative Explanations.* NABP accuses Dr. Hochman of a failure to cite alternative causes, but *R.F.M.A.S.* itself indicates that an expert, "need not necessarily have considered every alternative theory of causation advanced by defendants in order for their testimony to be admissible; if they had failed to consider one or even several of the obvious other possible causes, this might not be fatal to their testimony." 748 F. Supp. 2d at 273. In *R.F.M.A.S.*, the experts did not simply fail to consider *every* plausible alternative cause; the record showed they failed to investigate *any* alternative cause. *Id.*

That is not the case here, as Dr. Hochman identified all the obvious possible alternative explanations and then ruled them out. Dr. Hochman indicated that PCC optimized and redesigned its website in 2018 and implemented an SEO plan in January 2018, so the dramatic decreases in web traffic in March 2019 were unlikely caused by its own website design or lack of SEO. Hochman Rep. ¶ 62; Hochman Supp. Rep. ¶ 62. He also investigated market changes, and his research showed that the demand for prescription medications in the United States increased from 2016 to 2022, that PCC did not suffer excessively from the entry of new market competitors, and concluded that market conditions could have caused the dramatic loss in web traffic to PCCs website. Hochman Rep. ¶ 63; Hochman Supp. Rep. ¶ 63. Finally, Dr. Hochman listed in detail Google's core updates relevant to this matter and how likely those updates were to have caused the dramatic decrease in traffic to PCC's website,

and concluded that "PCC's persistent loss of traffic does not appear related to any core update unrelated to NABP's alleged defamation of PCC." Hochman Rep. ¶ 64; Hochman Supp. Rep. ¶ 64. Therefore, it is manifestly incorrect to say that Dr. Hochman failed to investigate any alternative causes.

In fact, NABP admits Dr. Hochman investigated alternative causes—but then dismisses them as "superficial." Dkt 512 at 21. For example, NABP cites in its own brief that Dr. Hochman analyzed and ruled out at least one Google algorithm and market competitor as the cause of the dramatic decline in web traffic the PCC's website. *Id*. This argument goes to weight, not admissibility. *Boucher*, 73 F.3d at 21.

NABP's cited case law does not support its legal arguments and therefore, Dr. Hochman's testimony should not be excluded because Dr. Hochman's analysis resulted in an evidence-based conclusion.

## III. NABP'S *DAUBERT* CHALLENGE TURNS ON FACTUAL DISPUTES

NABP raises factual disputes to support its arguments for exclusion. But disagreements over the facts or assumptions underlying an expert's opinion go to their weight, not admissibility. *Boucher*, 73 F.3d at 21; Fed. R. Evid. 702. The Second Circuit has held that the *Daubert* gatekeeping function applies at the summary judgment stage because a court can, and should, resolve admissibility where no genuine dispute of material fact remains. *Raskin v. Wyatt Co*., 125 F.3d 55, 66 (2d Cir. 1997).

The parties have factual disputes on important issues. It would be highly unusual for an expert's opinions not to reflect any of these. "[Parties] will have the opportunity to convince the fact finder that [an] expert opinion is erroneous. . . . [B]ut

these are not issues to be resolved on this [Daubert] motion." *Oliver v. AMEX Co.*, 19-CV-566 (NGG) (SJB), 2024 WL 100848, at *7 (E.D.N.Y. Jan. 9, 2024); *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (explaining that an expert's assumption of certain facts generally do not render an expert's testimony inadmissible unless they are so unrealistic and contradictory as to suggest bad faith).

That Dr. Hochman relies on certain facts and assumptions and not others is not a reason to exclude his testimony; his job is to assist the factfinder in resolving those questions. *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (the expert testimony is meant to assist the trier of fact in making factual determination); *Daubert*, 509 U.S. at 591; *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 13-MD-2445, 2020 WL 6887885, at *37 (E.D. Pa. Nov. 24, 2020) ("Here, the parties' disagreement is a dispute of fact not an issue of reliability under *Daubert*. Such disputes must be resolved by a fact-finder at trial.").

NABP will have the opportunity to argue to the factfinder that Dr. Hochman should have relied on certain facts and not others. Those are classic questions that goes to weight, not admissibility. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Boucher*, 73 F.3d at 21 ("[O]ther contentions that the assumptions are unfounded 'go to the weight, not admissibility.' ").

## CONCLUSION

For all of these reasons, NABP's motion to exclude Dr. Hochman's testimony

should be denied.

Respectfully submitted,

DATED: December 18, 2025

BONA LAW PC

*/s/James F. Lerner*

JAMES F. LERNER

James F. Lerner
james.lerner@bonalawpc.com
16 Madison Square Park West
9th Floor
New York, NY 10010
Telephone: (212) 634-6861

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
331 2nd Avenue, Suite 420
Minneapolis, MN 55401
Telephone: (612) 968-7758

*Counsel for Plaintiff PharmacyChecker.com LLC*

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing is under 25 pages in accordance with Rule II.B of Your Honor's Individual Rules of Practice, and that the foregoing contains 5,901 words in accordance with Local Civil Rule 7.1(c). The undersigned relied on the word count of the word-processing program used to prepare this document.

By: s/ *James F. Lerner*

James F. Lerner
james.lerner@bonalawpc.com
16 Madison Square Park West
9th Floor
New York, NY 10010
Telephone: (212) 634-6861

CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, Plaintiff's Opposition to Defendant NABP's Motion to Exclude the Expert Testimony of Dr. Jonathan Hochman was filed electronically with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to all counsel of record in this matter.

By: s/ *James F. Lerner*

James F. Lerner
james.lerner@bonalawpc.com
16 Madison Square Park West
9th Floor
New York, NY 10010
Telephone: (212) 634-6861